1      UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - X

4  MIRIAM McKNIGHT,

5      Plaintiff                      Civil Action No.

6      -vs-                           11-Cv-6328

7  CITY OF ROCHESTER, et al,              Rochester, New York

8      Defendant

9  - - - - - - - - - - - - - - - - - - X

10

11              Transcript of trial proceedings

12          before the Honorable Marian W. Payson

13              United States Magistrate Judge

14              Friday, February 26, 2016

15

16

17  Appearances:

18      Robert Fussell, Esq., Attorney for plaintiff

19

20      John Campolieto, Esq., Attorney for City of Rochester

21

22

23

24  Proceedings recorded by mechanical stenography; transcript

25  produced by Computer Reporting Service

1    THE COURT:  Since the last time we were in Court

2  the Court has received various letters, correspondence

3  concerning a variety of matters which I will attempt to address

4  now.

5    First of all, there was an issue about assuring

6  that Mr. Campolieto had an opportunity to review the recording

7  from which the excerpt was played in Court of the encounter

8  between Ms. McKnight and the defendant officers, and Mr.

9  Campolieto, you have listened to that recording and you have

10  made a copy of whatever you wanted to make a copy of, correct?

11    MR. CAMPOLIETO:  I have.  I've made a copy of the

12  whole disk, yes.

13    THE COURT:  Mr. Fussell has asked me to place on

14  the record the race of the parties.  Mr. Campolieto has

15  objected to that on the grounds that it is not relevant.

16    I am not making any determination about whether it

17  is relevant.  I know it is something that -- the race issues

18  are addressed in Dr. Ewing's report.  So I will permit the

19  record to reflect that the plaintiff is African American.  The

20  two defendant officers their races were not -- they weren't

21  asked about their races.  They appeared to be Caucasian.

22    MR. CAMPOLIETO:  That's possible.  I don't know,

23  your Honor.

24    THE COURT:  That's all we'll say about that.  As I

25  said, I'm not making any finding with respect to whether that

1   is or is not relevant on the issues that the Court will

2   determine, but it is something that was evident to those of us

3   that were in Court that day - that the plaintiff was African

4   American and the defendants did not appear African American.

5            MR. CAMPOLIETO:  Your Honor, I think that was

6   really my point.  I didn't believe it to be relevant to the

7   causes of action and I thought it was evident already, but it

8   goes without saying, yes, she is African American.

9            THE COURT:  The Rochester Police Department code

10  of ethics that has been provided by an email from Mr.

11  Campolieto to Mr. Fussell and that appears to comport with the

12  exhibit that you have previously identified.

13           MR. FUSSELL:  It's identical.  Well, I think it

14  has a picture or something on it, but the language is

15  identical.

16           THE COURT: You're offering that?

17           MR. FUSSELL:  Yes.

18           THE COURT:  Do you know what exhibit that is?

19           MR. FUSSELL:  I think it's 23.  No, it's not 23.

20  It's 21.

21           THE COURT:  Any objection, Mr. Campolieto?

22           MR. CAMPOLIETO:  No, your Honor.  I just want to

23  point out that it is a preamble to a larger document of the

24  rules and regulations of the City of Rochester Police

25  Department and I believe that those are available online.

1           THE COURT:  We have a court reporter so you don't

2     have to bend down into the microphone.

3           MR. CAMPOLIETO:  Okay.  There are additional ethic

4     provisions in the rules and regulations and I do have that

5     document.  I can make it available to the Court.  I don't

6     know -- it's not going to be used in any questioning so I think

7     that, yes, the preamble to the code of ethics and the rules and

8     regulations that is the document.

9           THE COURT:  All right.  23 is received.  Thank

10    you.

11          With respect to Lieutenant Grande we had expected

12    that she was going to testify yesterday and her testimony was

13    scheduled for yesterday.

14          On Tuesday we -- my chambers received a

15    communication from Mr. Campolieto indicating that Lieutenant

16    Grande had departed this district and was out of town with

17    family members.

18          I inquired as to what she was doing, why she left,

19    et cetera.  Mr. Campolieto did not at that time have any more

20    specifics.  He advised the Court that he had expected to meet

21    with her on Monday to prepare for trial and she didn't show up.

22          I gather at that point, Mr. Campolieto, you began

23    to make inquiries; is that right, Mr. Campolieto and then

24    learned she was out of town?

25          MR. CAMPOLIETO:  That's correct.  I think I can

1      short circuit this argument.

2                      THE COURT:  Okay.  Go ahead.

3                      MR. CAMPOLIETO:  We don't believe that she is a

4      necessary witness.  So we will withdraw Lieutenant Grande from

5      our witness list.

6                      I think her deposition is going to be -- parts of

7      her deposition are going to be entered by Counsel for the

8      plaintiff.

9                      I would just like to say I do have an additional

10     argument to make in regards to the entrance of parts of her

11     testimony.  In regards to fairness and completeness of the

12     record I think that more than just snippets of her testimony

13     need to be entered.

14                     I believe that at least from the pages that are

15     selected by the plaintiff I think that the whole of it needs to

16     be entered into the record starting at a certain page until the

17     end of what Mr. Fussell is looking to enter into the record.

18                     THE COURT:  Okay.  So let me deal with these

19     issues one after the other.

20                     Lieutenant Grande as we discussed on the phone

21     when we had a conference call on Wednesday to address this --

22     Lieutenant Grande was the defendant's witness.  So Mr.

23     Campolieto is indicating that he is -- does not intend to

24     proceed with Lieutenant Grande's testimony.

25                     Mr. Fussell had previously offered - and the Court

 1   had admitted - certain portions of Lieutenant Grande's

 2   testimony. Those are already in evidence.

 3        Yesterday I received a letter indicating that you

 4   wish to offer some additional testimony -- portions of her

 5   testimony that begins on page 30 and ends on page 54, quite a

 6   number of portions from 30 to 37 and then a few portions up

 7   through 54.

 8        What I would like to do is - and what I will do -

 9   is direct Counsel to confer with respect to Mr. Campolieto's

10   concern that he would like to offer some additional testimony

11   to put this testimony in context.

12        There's no question in my mind that the testimony

13   that is offered needs to have the appropriate context for the

14   Court to consider it.

15        I don't -- do you have an objection to Mr.

16   Campolieto's request? Would you like to consider it further?

17        MR. FUSSELL: Well, I have no objection except he

18   hasn't yet set forth what additional pages he wants.

19        THE COURT: Well, we're talking about -- what are

20   you asking for?

21        MR. CAMPOLIETO: Your Honor, this letter came in

22   last night so I did review it and I reviewed -- I'm looking for

23   Mr. Fussell's letter.

24        THE COURT: I'll tell you what, I don't want to

25   hold things up so I am going to, Mr. Fussell, admit those

1    portions of Lieutenant Grande's testimony that you have

2    identified in your February 25th, 2016 letter subject to my

3    requirement that they be accompanied by whatever testimony is

4    needed to put them in their proper context.

5            Mr. Campolieto, you have shall by Monday - okay -

6    send me a letter --

7            MR. CAMPOLIETO:  Could I have until Tuesday?

8            THE COURT:  You can have until Tuesday.  Send me a

9    letter with a copy to Mr. Fussell telling me what portions you

10   think are necessary.

11           Again, I'm not interested in additional testimony

12   that goes to a different topic.  It really is testimony that

13   puts these lines in the proper context.

14           MR. CAMPOLIETO:  Yes.

15           THE COURT:  Mr. Fussell, then you can take a look

16   at Mr. Campolieto's proposal and I would take those additional

17   portions as offered by the defendant.  If there's a dispute

18   I'll take a look and give you my ruling.

19           MR. FUSSELL:  My only issue is that I'm leaving

20   the country on Thursday the third and I'll be gone until the

21   twenty-sixth.  So I ask -- Mr. Campolieto, I want to get this

22   resolved before I leave.  I don't foresee a problem with any of

23   this, but just because he said he wants until Tuesday and

24   that's fine, but I'll have to get back to him either Tuesday or

25   Wednesday because I'm going to be gone Thursday.

1        THE COURT:  Mr. Campolieto, if you can do it as

2  quickly as you can I think that would be helpful.

3        Okay?

4        MR. CAMPOLIETO:  Yes.  Your Honor, as you know I

5  will be out of town until Monday at midnight.  So Tuesday I

6  will have it -- my thoughts on the context testimony to you and

7  to Mr. Fussell and we can just wait and see what Mr. Fussell

8  says.  If that's a plan.

9        THE COURT:  Yes.  I know you had asked for

10  permission to put this testimony over to another day.  I didn't

11  know how that resolved in terms of if you are going out of

12  town.

13        You certainly can take the deposition.  You can

14  send an email.  You don't have to send a formal letter if you

15  want.  So any way that we can try and get it resolved as soon

16  as possible.

17        MR. FUSSELL:  I mean, I  would --

18        THE COURT:  That's fine.  We'll get it resolved

19  before you go on vacation.

20        MR. FUSSELL:  Okay.

21        THE COURT:  So you have -- who do you wish to call

22  first?

23        MR. FUSSELL:  I've referred to him as Mr.

24  Williams, but I recently realized that he's Dr. Williams.  So I

25  call Dr. James Williams.

1    Again, I wish my client were here and I know she

2 planned to be here.  She told me she would be here, but my

3 guess is the bus got mixed up or whatever.

4    THE COURT:  Well, when she gets here she's

5 certainly welcome to join us.

6    MR. FUSSELL:  Okay.

7    THE COURT:  Is Dr. Ewing in the courtroom?

8    MR. FUSSELL:  I told him to come at 11:00.  I'm

9 actually not going to be as long with Dr. Williams as I thought

10 I would be.  So we may be -- I don't know how long we're going

11 to be with him.

12                   JAMES WILLIAMS

13   called herein as a witness, being duly sworn, testified as

14                      follows:

15    MR. CAMPOLIETO:  Your Honor, before we get started

16 are the exhibits in your possession?

17    THE COURT:  I have exhibits, yes.

18    MR. CAMPOLIETO:  So if we're going to use exhibits

19 you would like us to use yours I assume?

20    THE COURT:  Okay.

21    MR. FUSSELL:  Before I begin I do want to ask, Mr.

22 Campolieto, did you make a copy of the thirty-three minute

23 tape?

24    MR. CAMPOLIETO:  Yes.  I told the Court I did.

25    MR. FUSSELL:  Will you give me a copy?

1    MR. CAMPOLIETO:  Of my copy?

2    MR. FUSSELL:  Yes.  Because I don't have a copy of

3  the thirty-three minute tape.  We only did the first -- up

4  through line 40 of Exhibit 2.  So --

5    MR. CAMPOLIETO:  I can't make a copy without

6  effort from employees at the City of Rochester.

7    MR. FUSSELL:  Well, I understand that.  I'm not

8  asking you to --

9    THE COURT:  Let's keep going.  We're going to go

10  with the testimony and it seems that your request to have Mr.

11  Campolieto make a copy of that which he made a copy of just

12  comes a little too late.

13    If you want to come make a copy of the microchip

14  the way Mr. Campolieto did you're certainly --

15    MR. FUSSELL:  But I do think I asked him to get it

16  to me initially or quite a while ago in one of these letters.

17  So I think I made it already.  So I think I'm just repeating

18  what I already asked for.

19    THE COURT:  Let's get going with the testimony for

20  Dr. Williams.

21                    JAMES WILLIAMS

22    called herein as a witness, being duly sworn, testified as

23                      follows:

24    COURTROOM DEPUTY:  Would you state your name for

25  the record please?

1          THE WITNESS:  James Aaron Williams.

2     DIRECT-EXAMINATION BY MR. FUSSELL:

3          Q.  Dr. Williams, what's your date of birth?

4          A.  August 9th, 1935.

5          Q.  What is your post high school education?

6          A.  I attended Western Illinois State University and

7     received a doctorate degree at Pacific Western University in

8     Los Angeles, California.  It has recently -- well, not

9     recently, but the school has been changed.  The name is now

10    California Miramar University.

11         Q.  What is your current occupation?

12         A.  I currently am a professor at Rowan University where I

13    teach in the Law and Justice Department and I serve as a police

14    consultant.

15         Q.  Is there any name of your police consultant

16    organization?

17         A.  Yes, sir.  It's Williams & Associates and it consists

18    of retired state policemen and retired county prosecutors,

19    investigators.

20         Q.  Do you work for both plaintiffs and defendants?

21         A.  Yes, sir, I do.

22         Q.  You may have already said this, you are a professor?

23    You said that.

24         A.  Yes.  An adjunct professor for twenty years.

25         Q.  Where do you teach?

1  A.  Rowan University, Glassboro, New Jersey.

2  Q.  What do you teach?

3  A.  Criminal Justice studies in the Law and Justice

4  Department.

5  Q.  I show you Exhibit 25 which is not stapled, there's a

6  number of pages, and ask you if you know what Exhibit 25 is?

7  A.  It's a supplemental report that I submitted with my

8  expert report relative to Federal Rules of Civil Procedure,

9  Rule 702 in specifics.

10  MR. FUSSELL:  I ask that Exhibit 25 be admitted in

11  evidence.

12  MR. CAMPOLIETO:  Your Honor, I would object.

13  Again, I think some Courts do it differently, but it's my

14  practice that expert reports are not admitted in evidence.

15  THE COURT:  This is really a list of cases I

16  believe.  I'm not sure what it is.

17  Why don't you ask him what it is.  It doesn't

18  appear to be a report in this case.

19  BY MR. FUSSELL:

20  Q.  What is this, Dr. Williams?  What does it show?  What's

21  it a list of?

22  A.  Pursuant to the Federal Rules of Civil Procedure it's a

23  listing of the cases that I have worked on in the last four

24  years and I have listed any case that is relevant to this type

25  of case.  So it's simply a listing of cases for Counsel's

1    review.

2       Q.  Are they -- does it show cases you testified in?

3       A.  Testified in and deposed.

4       Q.  Does it indicate by each case whether -- strike that.

5          I see the word trial right here on about the fourth

6    line, what does that mean trial in parenthesis?

7       A.  Yes, sir.  Where trial is indicated it means that case

8    went to trial and I testified at trial.  Where I have listed

9    settled it means the case went to trial and it was settled

10   without my testimony.  Where I listed others it's clearly

11   indicated.

12             THE COURT:  Mr. Campolieto, do you persist in your

13   objection?

14             MR. CAMPOLIETO:  I do.  I would object to

15   relevancy, your Honor.

16             THE COURT:  Overruled.  Exhibit 25 is received.

17   BY MR. FUSSELL:

18      Q.  Have you ever testified for the prosecution?

19      A.  Yes, sir.

20      Q.  Approximately how many times have you testified for the

21   prosecution?

22      A.  My testimony for prosecution and the plaintiff is

23   approximately seventy percent for the plaintiff and thirty

24   percent for the prosecution.

25      Q.  Okay.  Had you -- before you were Williams & Associates

1  as a police officer did you testify for the prosecution?

2  A.  Yes, sir.

3  Q.  Do you know how many times approximately?

4  A.  Including as a state policeman and as a federal law

5  enforcement officer about three hundred.

6  Q.  Okay.  As noted in Exhibit 5 you've testified in civil

7  cases?

8  A.  Yes, sir.

9  Q.  Approximately how many times have you testified in

10  civil cases?

11  A.  Offhand I'm remembering civil cases one hundred and

12  eighty-seven.

13  Q.  Of those one hundred and eighty-seven were some of

14  those for the plaintiff and some for the defendant?

15  A.  Yes, sir.

16  Q.  Approximately what percentage were for the plaintiff

17  and what percent for the defendant?

18  A.  Seventy percent plaintiff and thirty prosecution.

19  Q.  Well, if it was civil it would have been defendant.

20  A.  Defendant, I'm sorry.  It's been too many years as a

21  law enforcement officer.

22  Q.  Can you list courses you taught at Rowan University?

23  A.  Yes, sir.  At Rowan I taught criminal investigations.

24  There's a number of criminal investigations cases that I

25  taught, Law and Justice, just any criminal justice case that

1    you can imagine I taught in the last twenty years.

2        Q.  Would it refresh your recollection if I tell you that

3    you told me you taught the following courses, Police in

4    America; Minorities, Crime and Criminal Justice; American

5    Corrections; Law Enforcement; Survey of Criminal Justice and

6    Criminal Justice and Social Conflict?

7        A.  Those are some of the courses that I teach.

8        Q.  Are you a member of any bar associations?

9        A.  I'm an associate member of the American Bar Association

10   and I serve on the criminal justice section committee.

11       Q.  You do that now?

12       A.  Yes, sir.

13       Q.  How long have you been an associate member of the

14   American Bar Association?

15       A.  At least six years.

16       Q.  Have you consulted on police matters for the American

17   Bar Association?

18       A.  Yes, sir.

19       Q.  What have you done?

20       A.  I've consulted on police training, federal, state and

21   local.

22       Q.  Okay.  Have you met any national court certifications?

23       A.  I've been certified under the Daubert challenges in

24   several states.

25            THE COURT:  Did you say Daubert challenges?

1           THE WITNESS:  Daubert challenges.

2    BY MR. FUSSELL:

3       Q.  Are you a member of any police related training

4    programs?

5       A.  Several.

6       Q.  Name one or two.

7       A.  The American Association of Trainers.

8       Q.  Would it refresh your recollection if you told me you

9    were a member of the American College of Forensic Examiners?

10      A.  I am a member of the American College of Forensic

11   Examiners and I serve as a fellow.  I teach studies relative to

12   expert witnesses and testimony as a fellow.

13      Q.  Okay.  Do you teach any yearly certification training

14   through them or through anyone?

15      A.  I do through the American -- through that facility,

16   yes.

17      Q.  Are you a member of the Board of American College of

18   Forensic Examiners?

19      A.  Yes, sir.

20      Q.  Do you play any role or have you played any role in

21   that organization?

22      A.  As a member of that board I assist in the setting up of

23   various syllabuses that we use during our presentations

24   annually.

25           MR. CAMPOLIETO:  Your Honor, I didn't hear Dr.

1    Williams' answer.

2              THE COURT:  Can you read back the answer.

3    (Record read.)

4    BY MR. FUSSELL:

5       Q.  Have you been a member and/or participated in

6    administrative and training programs of any police or security

7    societies?

8       A.  Yes, sir.

9       Q.  Okay.  What organizations for example have you done so?

10      A.  As a state policeman in New Jersey I served as a deputy

11   director at the regional police academy and we facilitated

12   services for all of the police departments in Southern New

13   Jersey.

14           As a federal agent I was a chief of international

15   training where we trained police officers worldwide at the

16   behest of the State Department of the United States.

17      Q.  Have you ever worked as a state police officer?

18      A.  Yes, sir.

19      Q.  Where, in what capacity?

20      A.  In New Jersey as a highway patrolman and then later in

21   Burlington Township Police Department as a detective, sergeant,

22   lieutenant, captain and Chief of Police.

23      Q.  Did you ever work for any Department of Motor Vehicles?

24      A.  Yes.  I served as a state highway patrolman.  At the

25   time state police were state highway patrolman.

1    Q.  You said you were a Chief of Police.  What municipality

2    were you Chief of Police in?

3    A.  Beverly City, New Jersey.

4    Q.  Have you ever taught at any police academies?

5    A.  Yes, sir.  Throughout the United States and in major

6    foreign countries.

7    Q.  Did you teach at the Burlington County Regional Police

8    Academy?

9    A.  Yes, sir.  As stated I was the deputy director there.

10   Q.  Did you teach police operations there?

11   A.  My main course of teaching was police operations, self

12   defense and firearms training.

13   Q.  I believe you touched on this, did you ever perform

14   any -- did you ever develop curricula for police training?

15   A.  Yes, sir.  When I was a police officer and at the

16   Burlington County Police Academy I was selected to assist New

17   Jersey Police Training Commission in formulating the syllabus

18   to train police officers to become instructor police officers.

19   Q.  Other than teaching at Rowan University did you do any

20   work at the Richard Stockton College in Galloway, New Jersey?

21   A.  Yes, sir.  I was selected to go there and initiate and

22   develop and train a certified Police Department which I did and

23   served as the initial director of public safety.

24   Q.  Were you ever the department commander of any police

25   department?

1    A.  I was the commander of the Burlington County Sheriff's

2  Department with the duties to initiate and develop a criminal

3  investigations unit.

4    Q.  Have you ever worked for the federal government?

5    A.  Yes, sir.  I retired from the federal government as a

6  deputy assistant special agent in charge and chief of organized

7  crime task forces worldwide.

8    Q.  Did you work for the Drug Enforcement Administration?

9    A.  Yes, sir.

10   Q.  Did you just answer that question?

11   A.  Yes, sir, I did.

12   Q.  Okay.  Did you say you were assigned to the organized

13  crimes task force?

14   A.  Yes, sir.

15   Q.  How long did you work for that agency?

16   A.  The DEA?

17   Q.  Yes.

18   A.  Twenty years.

19   Q.  Okay.  What was the position you held just before you

20  retired if you haven't already testified to this?

21   A.  I was deputy associate special agent in charge and

22  chief of organized crimes task forces worldwide.

23   Q.  Did you ever handle any diplomatic assignments?

24   A.  I was a country adversary for the Caribbean on behalf

25  of the State Department and the Drug Enforcement

1    Administration.

2        Q.  As part of your work for the federal government did you

3    perform work in any other continents other than North America?

4        A.  I have worked every continent in the world.

5        Q.  For how many years did you work for the federal

6    government did you teach law enforcement courses?

7        A.  Seven years.

8        Q.  Did you ever work for the Central Intelligence Agency?

9        A.  Yes, sir.

10       Q.  What did you do for them if you can testify to it?

11       A.  I'm thinking.  I worked for the Central Intelligence

12   Agency.

13       Q.  Okay.  Let me ask, did you work out of their offices in

14   Langley, Virginia?  If you don't want to answer these just say

15   so.

16       A.  It was a liaison assignment from the DEA to the Central

17   Intelligence Agency.  My offices were at Langley, Virginia.

18       Q.  Did I on behalf of the plaintiff - here she is - retain

19   you to review the events involving the Rochester police

20   department and Officer Vasile and Sergeant Nicholls to provide

21   your professional opinion of their treatment of the plaintiff

22   in this case?

23       A.  Yes, sir.

24       Q.  Did I provide you with documentation to review?

25       A.  Yes, sir.

1    Q.  Do you know as you sit here what documentation I gave

2    you?  If not I can ask you to review a list I have here.

3    A.  I can refer to my report.  There's a listing of all the

4    documents that were submitted to me initially for review.

5    Initially there were thirteen --

6              THE COURT:  I'm sorry.  The record should make

7    clear that Dr. Williams is looking -- you're looking at a

8    report dated July 13th, 2015?

9              THE WITNESS:  Yes, your Honor.

10             THE COURT: You're looking at page 5?

11             THE WITNESS:  I'm looking at page 5 which lists

12   specifically thirteen relative documents.  They included

13   depositions of police officers and other related information.

14   BY MR. FUSSELL:

15   Q.  Why don't you list them for the record because it's not

16   going into the record unless you say what it was you reviewed.

17   A.  It was a deposition of police officer Gregory Vasile,

18   deposition of Sergeant Michael Nicholls, deposition of

19   Lieutenant Laura Grande, deposition of Ms. Miriam McKnight and

20   the plaintiff's motion for summary judgment, plaintiff's demand

21   for discovery and inspection.

22        Number seven was a Subject Resistance Report signed by

23   Sergeant Nicholls and Lieutenant Grande and I specifically

24   added the date on there when it was signed.

25        Number eight was --

1    Q.  When was it signed?

2    A.  7/3/2010.

3    Q.  Go ahead.

4    A.  Defendant's amended answer, photograph copies of an arm

5    injury of an African American female.  Plaintiff's response to

6    City's interrogatories.

7            THE COURT:  I'm sorry.  Plaintiff's response to

8    City's interrogatory number ten.

9            THE WITNESS:  Number ten.  Thank you, your Honor.

10           Transcript of recording dated 7/3/2010, media

11   statement of City of Rochester Police Chief James Sheppard

12   relative to inappropriate police actions involving deliberate

13   police officer violations of municipal and state motor vehicle

14   codes.

15           MR. CAMPOLIETO:  I'm going to object to that

16   categorization of that article, your Honor.  That's not the

17   title of the article.

18           THE COURT:  Okay.  Objection is overruled.  Go

19   ahead.

20   BY MR. FUSSELL:

21   Q.  You may continue.

22   A.  Yes, sir.  In reference to what I just gave you I

23   didn't specifically say it was a title.  I said it was in

24   reference to.

25   Q.  Okay.

1    A.  Number 13 was a statement of City -- number 13, police

2   department General Order 401.

3    Q.  Did you also review documents I sent you by letter

4   dated January 13th, 2016?

5    A.  Yes, sir.  I had an opportunity to review additional

6   information relative to this report subsequent to what I had

7   initially received and subsequent to what I had based the

8   initial report upon.

9    Q.  Did I send you certain exhibits marked at this trial -

10  several pages from Exhibit 6, Exhibits 8A, 8B, 9, 10, 11, 12,

11  13, 14, 16 and 17?

12   A.  I had an opportunity to review all of those documents

13  after the report had been written.

14   Q.  Okay.  This was after the original trial that took

15  place in mid -- early or mid January of this year?

16   A.  Yes, sir.

17   Q.  Did you obtain the transcripts of the trial that had

18  taken place in early January?

19   A.  I received copies of the transcript, yes.

20   Q.  Of the testimony of the witnesses who had testified on

21  January 11th, 12th and 13th?

22   A.  Yes, sir.

23   Q.  Based on this documentation and your experience as

24  testified to already have you made opinions based upon a

25  reasonable degree of professional certainty as to the treatment

 1   of the plaintiff by one or more of the individuals, Vasile and

 2   Nicholls?

 3      A.  Yes, sir, by the three individuals.  The officer, the

 4   sergeant and the lieutenant.

 5               MR. CAMPOLIETO:  Your Honor, I'm going to object

 6   to --

 7               THE COURT:  Hold on.  We haven't got any further

 8   other than what is his professional opinion.

 9               MR. CAMPOLIETO:  I'm not objecting to a question.

10   I'm objecting to any further testimony from Dr. Williams.

11               He's obviously reviewed additional documents, made

12   opinions on those documents and at this point the city has no

13   information in regards to what he reviewed, what his opinions

14   are on those additional documents, how it --

15               THE COURT:  I agree that he should not be

16   permitted to offer an opinion based on additional documents

17   that the city has not been made aware of that opinion.  I don't

18   know if that's an opinion that is different than the opinion

19   set forth in the prior report, but I would agree that the city

20   has not been notified of any supplemental opinion.  So --

21               MR. FUSSELL:  He has not done any other reports.

22               THE COURT:  Well, he cannot offer a supplemental

23   opinion in my view that is different from his prior opinion

24   based on additional information.

25               MR. FUSSELL:  Well, I guess -- can we cross that

1   path if we come to it as we go along?

2           THE COURT:  Yes.

3   BY MR. FUSSELL:

4     Q.  I'm going to show you Exhibit 12.

5           MR. FUSSELL:  I guess I should get the Court's

6   copy.

7           THE COURT:  Well, you can go ahead and use that.

8   It's probably going to get cumbersome to keep coming up here

9   and getting mine.

10  BY MR. FUSSELL:

11    Q.  I'm showing you what's been marked as Exhibit 12 which

12  is in evidence and was originally supplied to you, was it not?

13    A.  Yes.

14    Q.  That's -- I ask you to look at just the first page of

15  that document.  Does it show on that document the names of any

16  of the individuals and the addresses of individuals who

17  reported the incident that's -- was the stabbing incident that

18  led to what this lawsuit is all about?

19    A.  It indicates the names of the people and the addresses

20  in which reported siting this incident.

21    Q.  What's the first name of the first caller?

22    A.  The first name is Olivia Poles.

23    Q.  Does it have her address?

24    A.  Yes, it does.  232 Pierpont Street.

25    Q.  Who was the second one if you can see?

1    A.  The reporting second one is actually a police officer

2  because --

3    Q.  Go down to find out -- I think --

4    A.  The next one was Amanda Hackman.

5    Q.  Look a little higher.

6    A.  There is -- I question the name.  It says --

7    Q.  Could it say Sassfras residence?

8    A.  It has Sassfras residence and I was referring to it as

9  Sassfras Reed on my report, but on this report Sassfras'

10  residence.

11    Q.  What's the residence of the Sassfras'?

12    A.  249 Pierpont Street.

13    Q.  Is that their residence or is that the location that

14  they say the event occurred at?

15          MR. CAMPOLIETO:  Your Honor, I'm going to object

16  to this line of questioning.  I don't think Mr. Williams -- Dr.

17  Williams is able to interpret this document.  He is certainly

18  not trained in the City of Rochester's Emergency Communication

19  Department work product and this is outside of the scope of his

20  expertise, your Honor.

21          MR. FUSSELL:  I'll withdraw it.  I'll withdraw

22  that question.

23          THE COURT:  All right.

24  BY MR. FUSSELL:

25    Q.  In your opinion what should Officer Vasile and/or

1  Nicholls have done upon reading that information or - strike

2  that - obtaining that information on their computer?

3           MR. CAMPOLIETO:  Objection, your Honor.  I don't

4  think that there's testimony or any type of evidence to show

5  that Officer Vasile or any other defendant in this action

6  received this or when they received it or how they acted after.

7  I think it's outside the scope of the evidence.

8           MR. FUSSELL:  No.  I'm sorry.

9           THE COURT:  Try not to do that.  You did that last

10  time.

11           My recollection, Mr. Campolieto, is that you may

12  well be correct, but I've got probably hundreds of pages of

13  testimony here.  So I'm going to permit the question and the

14  examination, but I'm cognizant of the question as to whether

15  the record reveals that either officer saw this information on

16  their computer screen.

17           Go ahead.

18           MR. CAMPOLIETO:  If I could -- I'm sorry, your

19  Honor.  If I could just add -- I understand that and I accept

20  that.  What I wanted to direct the Court in when we review this

21  case afterwards I do know -- recall Officer Vasile testified

22  that -- and Nicholls testified that they were receiving this

23  information by radio and certain portions of it by computer at

24  certain different times.

25           THE COURT:  Go ahead.

BY MR. FUSSELL:

Q.  So let's --

A.  I may have misunderstood.  I thought the question was what should the officers have done on receipt of this information.

Q.  That's correct.  On their computers.

A.  That's what I thought you said.

Q.  Yes.  That's the question.

A.  It's universal in police departments across this country and in major foreign countries that once an officer receives information via his radio or his laptop - which we have now - that they act immediately on the information that was received.

Q.  Okay.

A.  It is a ministerial duty that they do it.  There's no room for discretion.  This is what the officers are required to do.

Q.  What are they required to do with the fact that they have -- with regard to the names and addresses of the individuals that come up on that card?  I use the word card -- on their computer screen.

A.  The officers are to act immediately upon receipt of information relative to an address more importantly than the name because quite frequently and more often than not people who report instances of this nature to the dispatcher's office

1   at the police department do not want to use their real name for

2   obvious reasons.

3        The officers are to respond immediately to the address

4   that they're given to check if there are any victims or if

5   there is any ongoing criminal activity.

6   Q.   Are they required to talk to these individuals that

7   called as potential witnesses?

8              MR. CAMPOLIETO:  Objection.  Leading question,

9   your Honor.

10             THE COURT:  Sustained.

11  BY MR. FUSSELL:

12  Q.   What if anything are they required to do with respect

13  to the individuals that -- whose names come up on the card as

14  people who have called 911?

15             MR. CAMPOLIETO:  Objection.  Leading question,

16  your Honor.

17             THE COURT:  Overruled.

18             THE WITNESS:  Officers are required to seek out

19  individuals who have given information or who are willing to

20  give information and to separate those people from the

21  multitude of people that may have gathered there in order to be

22  more comfortable in talking to the officers outside the view

23  and the hearing of their friends, people that they know.

24  BY MR. FUSSELL:

25  Q.   I show you Exhibit 21 and ask you if you know what that

1   is?

2       A.   All police departments across this country and in major

3   foreign countries are required to set up a code of ethics and

4   rules and regulations and they are duty bound to abide by them.

5       Q.   Is that the code of ethics from the Rochester police

6   department?

7       A.   What I'm holding is a Rochester police department code

8   of ethics rules and regulations.

9               MR. FUSSELL:  I offer Exhibit 21 in evidence.

10              THE COURT:  It's already been admitted.

11              MR. FUSSELL:  Okay.

12  BY MR. FUSSELL:

13      Q.   In your opinion did either Officer Vasile or Officer

14  Nicholls -- let's stick to Vasile right now, violate any of the

15  terms in that code of ethics that you're looking at now?

16      A.   Yes, sir.

17      Q.   Which terms did Officer Vasile violate and why do you

18  take that opinion?

19      A.   If I may refer to paragraph three on the Rochester

20  police department code of ethics rules and regulations where

21  the officer swears that he will never act officiously.

22      Q.   What does that mean?

23      A.   Meaning, he will never use his position as a law

24  enforcement officer to foster his own feelings.  He will not

25  permit personal feelings, prejudices or animosity to influence

1    his decisions.

2       Q.   Okay.   Why in your opinion did Officer Vasile violate

3    one or more of those provisions that you just testified to?

4       A.   In my review of the documents submitted Officer Vasile

5    at one point explained or stated to the plaintiff that he did

6    not care what she thought or understood and he went on further

7    to say that, "I've had enough of this shit and you're going to

8    be arrested."  That's totally outside the perimeter of what

9    police officers are taught to do and how to handle people that

10   they are dealing with as a matter of public service.

11            MR. CAMPOLIETO:  Objection, your Honor.  I don't

12   believe Mr. -- Dr. Williams is able to answer -- or state that

13   as a factual statement for Officer Vasile.  He does not know

14   what Officer Vasile was taught.

15            THE COURT:  The question is based on the

16   information that Dr. Williams had - which he has communicated

17   what information he had.

18            He has indicated that based upon his understanding

19   that Vasile said what he just recounted that that is a

20   violation of paragraph 3 of the code of ethics Plaintiff's 21.

21            MR. CAMPOLIETO:  It was the further testimony that

22   I was objecting to where he said, "All police officers are

23   taught."  Again, he just doesn't have that information

24   regarding Officer Vasile.

25            THE COURT:  Well, you can cross-examine him as to

1    that.

2    BY MR. FUSSELL:

3        Q.  Are there any other clauses in that paragraph that in

4    your opinion Officer Vasile violated?

5        A.  That he would never employ unnecessary force or

6    violence.

7        Q.  Okay.  What did Officer Vasile do in your opinion that

8    violated that clause that you just read?

9        A.  As the plaintiff was going away from Officer Vasile to

10   enter her residence according to Officer Vasile's testimony and

11   his words that are in parenthesis he ran up the person's stairs

12   on the front porch, physically grabbed the person by the arm

13   and twisted the arm to keep her from going inside her own home

14   which he had originally requested that she do.

15            MR. CAMPOLIETO:  Objection, your Honor.  There's

16   no testimony or evidence that states that Mr. -- that Officer

17   Vasile twisted an arm.  It's not in the record.

18            THE COURT:  Overruled.

19   BY MR. FUSSELL:

20       Q.  How did that violate the clause that you just referred

21   to?

22       A.  Police officers are trained that they may use force --

23   enough force to offset that amount being used against them.

24            At this point in time the plaintiff was not using any

25   force towards the officer.  The plaintiff was walking away from

1    the officer to go into her house.

2         So in this instance there was no need for the officer

3    to use any physical force.

4    Q.  What about the fact that Vasile used a straight arm

5    bar, what's your opinion of that with respect to the use of

6    force?

7    A.  In reviewing what the officer stated he used the

8    straight arm bar in order to control the activities of the

9    plaintiff by forcing her against the side of the building in

10   which she was trying to enter.  The straight arm bar is a term

11   that is used by this officer.

12   Q.  But what I'm asking is did that violate the ethics

13   phrase that you read with respect to use of unnecessary force?

14   A.  In my opinion it does based on what I stated before.

15   Q.  The same reasons you gave for the grabbing the arm?

16   A.  Yes, sir.

17   Q.  In your opinion did Sergeant Nicholls violate any terms

18   of the Rochester police department code of ethics?

19   A.  In my opinion based on my expertise as a law

20   enforcement officer all the activities in which Officer Vasile

21   was involved in also involved the sergeant as a supervisor on

22   the job.  It's his duty to control the activities of all of his

23   officers as well as himself.

24   Q.  What about with respect to --

25                MR. CAMPOLIETO:  Objection, your Honor, to the

1  answer.  It's outside the scope of Mr. Williams' knowledge.

2  He's importing knowledge as to what Sergeant Nicholls --

3            THE COURT:  His testimony is that Sergeant

4  Nicholls is responsible as Vasile's supervisor for what Vasile

5  did as I understand it.  That may be a completely different

6  standard than a standard under 1983, but I will permit the

7  testimony with respect to his opinion.

8  BY MR. FUSSELL:

9    Q.  With respect to Sergeant Nicholls applying pepper spray

10  to the plaintiff did that in any way violate the code of ethics

11  in your opinion?

12    A.  In my opinion it was blatant and unprovoked.  From what

13  I observed and read and understand is that the sergeant

14  observed one of his officers in physical contact or as he

15  indicated a struggle with the plaintiff.  He went to the

16  officer's side leaving a mortally wounded person laying in the

17  street to go to the steps where the officer and the plaintiff

18  were and without any provocation sprayed pepper spray into her

19  face.

20    Q.  Why in your opinion did he -- was it -- is it your

21  opinion that that applying of pepper spray was unnecessary?

22    A.  In my opinion it was totally unnecessary.

23    Q.  Have you given all the reasons why you feel it's

24  unnecessary?

25    A.  Yes, sir.  When I explained that that police officer

1    is --

2              THE COURT:  If the answer is yes --

3              THE WITNESS:  Yes, the answer is yes.

4              THE COURT:  Thank you.

5    BY MR. FUSSELL:

6       Q.  Is it your opinion that Officer Vasile could have on

7    his own controlled --

8              MR. CAMPOLIETO:  Objection, your Honor.  Leading

9    question.

10             MR. FUSSELL:  Strike that.

11   BY MR. FUSSELL:

12      Q.  In your opinion assuming the plaintiff needed to be

13   controlled on that assumption - which I don't stand by that,

14   but for the purposes of this question --

15             THE COURT:  Just frame the question without your

16   other comments.

17   BY MR. FUSSELL:

18      Q.  Was Officer Vasile competent or should he have been

19   competent to be able to physically handle the plaintiff without

20   the assistance of another officer?

21             MR. CAMPOLIETO:  Objection, your Honor.  That's a

22   leading and compound question.

23             THE COURT:  Assuming that the plaintiff needed to

24   be controlled do you have an opinion as to how Officer Nicholls

25   should have done that?

1            THE WITNESS:  Yes, your Honor, I do.

2            THE COURT:  Or was it Officer Vasile?  Were you

3   asking with respect to Vasile or Nicholls?

4            MR. FUSSELL:  Yes, you've got my question.

5            THE COURT:  But is the question about Nicholls or

6   Vasile?

7            MR. FUSSELL:  I was asking about Vasile.  The

8   point being -- if you want me to add I will.

9            THE COURT:  No.  I don't want you to add.  I just

10  wanted to know who we were talking about.

11           Assuming the plaintiff needed to be controlled do

12  you have an opinion as to how Officer Vasile should have

13  handled that?

14           MR. FUSSELL:  I think the question should be could

15  have handled it more than should have handled it.

16           THE COURT:  Okay.

17           THE WITNESS:  I'm a bit thrown, your Honor,

18  because assume is not a word that I use in Court.

19           Officers are trained to handle people who are

20  resisting them physically.  In this instance Officer Vasile is

21  a trained, in shape police officer attempting to physically

22  handle a much out of shape, heavy female.  Officers are trained

23  to do this in specific procedures and he could have handled her

24  without the assistance of the sergeant.

25  BY MR. FUSSELL:

1     Q.   What is Mace?

2     A.   Mace is a chemical spray that is used to incapacitate

3  people when they are resisting arrest by police officers.

4     Q.   What is pepper spray?

5     A.   Pepper spray is used basically for the same purposes,

6  however, they are different in content.

7     Q.   Okay.  Is it common -- are those words used

8  interchangeably at times among people in the police world?

9          MR. CAMPOLIETO:  Objection.  I mean, he can answer

10  for himself.

11          THE COURT:  Overruled.  You may answer if you

12  know.

13          THE WITNESS:  The police officers that I have

14  trained here in the State of New York when I was an instructor

15  at John Jay College --

16  BY MR. FUSSELL:

17     Q.   In New York City?

18     A.   In New York City that terminology was and remains in

19  use.

20          As a matter of fact, Mace is a product name of pepper

21  spray in some instances.  The difference is that Mace is an

22  inherit -- irritant.  It irritates the eyes and so forth while

23  pepper spray is inflammatory which immediately inflames the

24  eyes and causes them to close uncontrollably and of the two the

25  more dangerous we found in police research is pepper spray.

1      Q.  Why is that?

2      A.  Because it's immediate and the person --

3           MR. CAMPOLIETO:  I'm going to object to Dr.

4  Williams' testimony.  This is outside the scope of his report.

5           MR. FUSSELL:  The reason I'm bringing it up --

6           THE COURT:  Let me just take a look here.

7           I think the question was do officers use Mace and

8  pepper spray interchangeably.  That was the question.

9           MR. FUSSELL:  That was the initial question.

10          THE COURT:  And what is your followup question?

11          MR. FUSSELL:  I think he answered without my

12  question, but I was going to ask -- he did describe that they

13  are used -- can be used interchangeably and that Mace is

14  actually a name under which pepper spray is sold.

15          I was going to ask him - and I think he started to

16  say this - which is the more dangerous substance to be used and

17  I think that's what he was answering.

18          May I add one thing?

19          THE COURT:  Yes.

20          MR. FUSSELL:  He used the word Mace in his report.

21  He didn't use the word pepper spray.  That's why I wanted to

22  get into the fact that he used the word Mace in his report not

23  pepper spray.

24          A great deal was made on direct in this case about

25  the fact that it was Mace and pepper spray.  I think Sergeant

1    McPhearson talked about it and I think at least one of the

2    other two defendants talked about the difference between Mace

3    and pepper spray.

4              THE COURT:  I'm going to sustain the objection

5    with respect to your desire to ask Dr. Williams to offer an

6    opinion as to the relative dangerous properties of both agents

7    in relation to one another and I sustained it as being outside

8    the scope of the opinion that is reflected in the July 2015

9    report.

10   BY MR. FUSSELL:

11     Q.  Is it standard in the profession for officers to

12   receive training with respect to nonverbal communications they

13   make with members of the public?

14     A.  Yes, there is standard training in this state and

15   states throughout the United States that officers receive

16   training as to how to use verbal and nonverbal force or

17   initiatives.

18     Q.  Okay.  With -- what training do they receive with

19   respect to nonverbal communications?

20     A.  At the police academies officers are trained to be able

21   to handle the activities, the wordings and so forth of people

22   who are hostile or just plain resisting them.  The use of

23   names, whether the person is a racist or the person understands

24   English or a small portion of English -- there are a number of

25   things that they're taught -- hands-on type training on how to

1  handle persons who are acting in the manners that I just

2  described.

3         MR. CAMPOLIETO:  Your Honor, I'm not objecting.

4  I'm looking for a clarification on Dr. Williams' testimony.

5  He's speaking generally I would imagine and not specific to the

6  Rochester police department.

7         THE COURT:  That is what his testimony was, yes.

8  He wasn't asked about the Rochester police department

9  specifically, but he did testify that all police officers are

10  trained in that manner.

11         Go ahead.

12  BY MR. FUSSELL:

13   Q.  You may have answered this, was it in your opinion

14  acceptable police behavior for Vasile to have told the

15  plaintiff he had enough of this shit?

16   A.  Nowhere in the police training manuals and police

17  academies throughout the United States and foreign countries is

18  this language acceptable.

19   Q.  Why not?

20   A.  Because police trainers have a specific responsibility

21  to train officers how not to initiate physical contact and the

22  use of force.  By using profanity and directing profanity and

23  other forms of harsh words towards the person you're talking to

24  puts the officer in the position where he is initiating contact

25  between the two and police officers throughout the world are

1    trained not to do that.

2         Q.  Assuming there was some conflict between the plaintiff

3    and Vasile and/or Nicholls what -- were there other options for

4    them to use in dealing with the plaintiff other than the force

5    that we've talked about here today already?

6         A.  Again, Counselor, assume is not a word that I use.

7    There was conflict between the plaintiff and the officer and at

8    that point in time from what I observed on the papers that I

9    reviewed there was no need for physical activity initiated by

10   the police officer.

11        Q.  What could have the officers done other than be engaged

12   in physical --

13        A.  The officers could have and should have used the

14   training principles that they had received in the police

15   academy to talk a person down regardless of how belligerent

16   that person may have been.  Officers receive hands-on training

17   of how to talk people down.

18        Q.  Was that done in this case?

19        A.  No, sir.

20        Q.  Again, you may have touched on this already was the

21   fact that the plaintiff was a female approximately five foot,

22   three inches tall and weighing over two hundred pounds -- was

23   that a factor in whether or not they could have taken control

24   of her without use of physical force, the type of physical

25   force they used?

1    A.  I indicated before that the plaintiff was a female and

2    that the plaintiff was not a particular in shape female, her

3    physical prowess at the time in no way compared with the police

4    officer's and he should have been able to contact her -- I mean

5    to control her.

6        Q.  Does that mean Officer Vasile, is that who you're

7    speaking of now?

8        A.  Yes, sir.

9        Q.  Based on your training how long after pepper spray is

10   applied are the subject's eyes closed?

11              MR. CAMPOLIETO:  Again, I'm going to object, your

12   Honor.  This is outside the scope of Dr. Williams' testimony.

13              THE COURT:  Mr. Fussell, do you have any response

14   to the objection that this is outside the scope of the

15   opinions?

16              MR. FUSSELL:  It's not in his report.  I can't

17   dispute the fact.

18              THE COURT:  Objection sustained.

19   BY MR. FUSSELL:

20       Q.  Showing you Exhibit 14 and ask you if I provided that

21   to you initially when you first --

22       A.  Yes, sir, you did.

23       Q.  What is -- what do you call that document?  What is the

24   title for that document as you would see it?

25       A.  It's a narrative of the responding officer.

1    Q.  Is it entitled subject resistance somewhere along the

2  side I think?

3    A.  On these types of reports there are a number of

4  checkmarks to be checked off and the officers, in fact, do

5  this.

6        One of the checked off items was verbal resistance.

7    Q.  Let me --

8            THE COURT:  I think the question is across the

9  side of the report is the title Subject Resistance Report?

10           THE WITNESS:  Yes.

11  BY MR. FUSSELL:

12   Q.  Now, are reports like Subject Resistance Report

13  required to be filed by police officers?

14   A.  Yes, they are required to be filed.  There is a format

15  for these reports which most departments follow.  It's not

16  followed on Rochester's simply because it's in a different

17  location.

18   Q.  But it is required?

19   A.  It is required.

20   Q.  By the state?

21   A.  Yes, sir.

22           MR. CAMPOLIETO:  Objection, your Honor.  This is

23  without foundation.  There's no --

24           THE COURT:  You can cross-examine him on that.

25  BY MR. FUSSELL:

 1     Q.   Does it note -- at the top of the page does it note a

 2   date?

 3     A.   Yes, sir.

 4     Q.   What's the date?

 5     A.   The date is 7/03/10.

 6     Q.   Okay.   Does it show on the bottom the typed name of one

 7   of the defendants?

 8     A.   Yes, sir.

 9     Q.   Who is that?

10     A.   Primary officer.

11     Q.   What's the name?

12     A.   Vasile.

13     Q.   On the third page at the bottom does it also show the

14   name of an officer, a typed name?

15     A.   M. Nicholls - and I believe that's the sergeant - is

16   the typed name on there as the assisting officer.

17     Q.   On the second page is there a signature?

18     A.   Yes, sir.   There's a signature of the reviewing

19   supervisor Lieutenant Grande.

20     Q.   What's the date of that?

21     A.   7/21/2010.

22     Q.   Is it standard for a supervisor to sign a Subject

23   Resistance Report eighteen days after the incident took place?

24     A.   No, sir, it is not standard.

25     Q.   What is the standard?

1      A.   The standard in receiving reports is the supervisor

2   mandates that the reports are received at the close of business

3   or the next day when that responding officer has finished

4   writing up what he observed at the scene.   That report then

5   goes in for investigation by investigative officers who are

6   trained to continue that investigation.

7              MR. CAMPOLIETO:   I'm going to object to the

8   answer, your Honor.   I don't know what department or what rule

9   book he's referring to.   He has reviewed the City of

10  Rochester's use of force General Order, but he is stating a

11  policy which is not the policy of the City of Rochester and I

12  don't know what policy he's stating, but he had the policy for

13  subject to resistance report.

14             THE COURT:   I think he's -- the question was

15  whether it was standard and customary for a supervising officer

16  to review a report about three weeks or whatever the time

17  difference was between this report and Lieutenant Grande's

18  report and he said it was not standard.

19             You're certainly free to cross-examine him on the

20  basis of that belief.

21             MR. CAMPOLIETO:   But then he -- Dr. Williams then

22  went on to talk about an additional layer of review of reports

23  and I'm objecting to that because I don't know what policy he's

24  referring to.

25             THE COURT:   Okay.

1          MR. CAMPOLIETO:  Again, it wasn't responsive to

2  the question.

3          THE COURT:  I'll strike it as nonresponsive.

4          You had asked him about Lieutenant Grande's

5  report.

6          MR. FUSSELL:  Right.  Maybe I'll rephrase the

7  question so he can answer it.

8  BY MR. FUSSELL:

9    Q.  In your experience in this state and other states and

10  even internationally -- well, strike that.

11          THE COURT:  Let me just say there have been a

12  number of answers in which Dr. Williams talked about foreign

13  countries and my view is what happens in foreign countries I

14  don't find to be relevant to this.  So let's not include that

15  in your question.

16          MR. FUSSELL:  I understand.  I blurted it out.

17  BY MR. FUSSELL:

18    Q.  In your experience in New York State and other states

19  in the United States what is the policy in standard policies in

20  police departments with respect to when the supervising officer

21  is to sign documents such as the Subject Resistance Report --

22  documents that are required to be prepared by law?

23    A.  This report is usually signed at the close of business

24  or the next day by the supervisor reviewing this particular

25  first responder's report.

1    I indicated -- if I can clarify, your Honor, relative

2  to foreign training the training that I personally was involved

3  in and others like me in other countries is based upon the

4  exact training that police officers give in this State of New

5  York, New Jersey, Pennsylvania, Delaware.  So it is the same

6  training.

7    If I've thrown you off --

8  Q.  No.  That's fine.

9  A.  The next day is when they should have turned this in.

10  Q.  Okay.  Do you know of any experience where it has been

11  signed as long as a week after the event?

12  A.  In my experience -- my empirical experience there have

13  been times when reports have been signed off -- of this nature

14  in advance of the one day that I just stated.

15    MR. CAMPOLIETO:  Your Honor, I just want to

16  clarify.  There are two signatures on this document.  One is

17  the officer who signed it the night of the event and then the

18  additional signature is the supervisor's signature on July 21st

19  which is after the event.

20    I think that that's what -- when we're talking

21  about one signature I guess we need to clarify whose signature

22  we're talking about.

23    MR. FUSSELL:  Right.  I'm glad you asked that,

24  yes.  We're talking about Laura Grande's signature on the

25  twenty-first.

1    In fact, Vasile didn't sign it.  Nicholls didn't

2    sign it.  Those were just typed.  The only signature -- well, I

3    guess there is one other person who signed it also.

4    THE COURT:  Dr. Williams, the answer that you gave

5    you were referring to a signature of the supervising officer

6    reviewing the report; is that correct?

7    THE WITNESS:  Yes, your Honor.

8    THE COURT:  Thank you.

9    THE WITNESS:  There are two typed names at the

10    bottom of the report.  One is the primary officer, Officer

11    Vasile.  The other on the second page is a typed name of the

12    assisting officer, M. Nicholls.  Neither of those reports are

13    signed.  There is a signed report dated 7/21/10 which is some

14    three weeks later by Lieutenant Grande.

15    BY MR. FUSSELL:

16    Q.  Are there any reasons why supervising officers sign

17    such documents more than -- beyond the next day after the

18    event?

19    A.  The original report of the first responders are the

20    officers who are first on the scene is taking -- is taken just

21    as they witness what went on at the scene or their personal

22    observations.  For the report to be signed this far away from

23    the original dates would question any police administrative

24    officials reasoning.

25    The reasoning that supervisors or police administrators

1   look at something of this late date would be to make sure that

2   the final supervisor did not do anything to influence the

3   report of the first responders.

4      Q.  What do you mean by that?

5      A.  Supervisors are hired by police departments and other

6   agencies to supervise.  They want to make sure that the reports

7   that they get are factual, that they contain factual

8   information as to what they saw.  In some instances supervisors

9   will ask a police officer to review a part of his report.

10      They're not --

11      Q.  Why -- I'm sorry.  I interrupted you.

12      A.  They're not telling the police officer how to write the

13   report.  They're just asking him to review a certain section of

14   that report for a change if he feels it's necessary.

15      Q.  To comply with the law?

16      A.  To comply with the law or to comply with the rules and

17   regulations of that department.

18      Q.  But you don't know of course why Lieutenant Grande

19   signed this the twenty-first when the event took place on the

20   third or fourth?

21      A.  Well, I do know, but I don't know.

22          MR. CAMPOLIETO:  I'm going to object, your Honor.

23          THE COURT:  Sustained.

24          MR. FUSSELL:  I'll withdraw.

25   BY MR. FUSSELL:

1      Q.  Did you arrive at a concluding opinion in your January

2    2015 --

3                   THE COURT:  July.

4    BY MR. FUSSELL:

5      Q.  I'm sorry.  July.

6      A.  Yes, sir, I did.

7      Q.  What was your opinion?

8      A.  If I may refer to my report?

9      Q.  It's fine with me.  That's up to the Judge.

10                  THE COURT:  Can you give your concluding opinion

11   without looking at your report or do you need your report to

12   refresh your recollection?

13                  THE WITNESS:  I prefer the report.  I would prefer

14   the report, but I can give it without referring to the report.

15   BY MR. FUSSELL:

16     Q.  What she asked is, do you want to take a minute to

17   refresh your recollection and then orally give your answer?

18     A.  I would like a moment if that's permissible.

19                  THE COURT:  Yes.  You may have a moment.

20                  THE WITNESS:  I'm prepared to answer the question,

21   yes, sir.

22   BY MR. FUSSELL:

23     Q.  I believe I asked did you arrive at a concluding

24   opinion in that report?

25     A.  Yes, sir, I did.

1    Q.  What is your concluding opinion?

2    A.  In my opinion based upon all the aforementioned

3    documents and so forth it is my opinion that the police

4    department acted outside the policies and procedures that are

5    accepted in police department standard operation of procedures.

6    That there was no need for the use of force which in my opinion

7    was excessive.

8              MR. CAMPOLIETO:  Objection, your Honor.  The

9    expert is an stating opinion as to the ultimate issue.

10   BY MR. FUSSELL:

11   Q.  Well --

12   A.  My opinion was that there was --

13             THE COURT:  That's overruled.  You may go ahead.

14             THE WITNESS:  I'm sorry, your Honor.

15             THE COURT:  Go ahead.

16             THE WITNESS:  In my final opinion what I said

17   without referring to the actual document is that there was no

18   need for the amount of excessive force that was used on the

19   plaintiff in this particular incident.

20   BY MR. FUSSELL:

21   Q.  Was it your concluding opinion with respect to the

22   degree of intentionality or negligence or -- with respect to

23   the behavior of the defendants of one or both of them?

24             MR. CAMPOLIETO:  Your Honor, I'm going to object

25   on multiple grounds.  First, Mr. -- the question is a leading

1    question.  It's a compound question.

2              Dr. Williams is not able as an expert to testify

3    as to the intention or thought process of whoever he's speaking

4    about in terms of the defendants in terms of intentionality or

5    what they were thinking.

6              THE COURT:  I'd be inclined to agree with Mr.

7    Campolieto.  It strikes me that that's not a proper basis for

8    his opinion.

9              MR. FUSSELL:  Well, I'll just add my opinion for

10   the record.  I believe he can make a decision based on what he

11   saw here as to whether the behavior -- the violations of the

12   code of ethics or the use of force continuum was, in fact,

13   intentional and done with intentional -- with deliberate

14   indifference to the code and/or the use of force continuum

15   based on his extremely extensive experience with police

16   officers and all his different positions and knowing what was

17   done.  I think he can come up with a conclusion as to the

18   degree of intent to put it that way of what was motivating

19   these officers.

20             THE COURT:  To the extent that you're asking him

21   to offer an opinion as to whether the officers acted

22   negligently with deliberate indifference or intentionally I'm

23   going to sustain that objection.  You're welcome to try and

24   rephrase the question so that it doesn't implicate those legal

25   terms of art if you wish.

1          THE WITNESS:  I can answer?

2          THE COURT:  No.  The objection has been sustained.

3   BY MR. FUSSELL:

4     Q.  I'll ask again what was your final conclusion, Mr.

5   Williams, with respect to this case?

6          You said you had a concluding opinion?

7     A.  Yes, sir.

8     Q.  What is it?

9     A.  That opinion is based upon all of the information that

10  I reviewed with a degree of professional certainty.  The

11  sergeant and the officers both acted intentionally in their

12  efforts to control the plaintiff in this instance.

13         Their efforts were excessive and unnecessary to the

14  extent that the sergeant walked up to the plaintiff and without

15  any provocation sprayed pepper spray into her face which is a

16  violation and that's what -- that's what my opinion was all

17  about and then walked away after they had her in control,

18  handcuffed and put into a police car with no ventilation - I

19  believe that's in the report - and left her there for a period

20  of time which after the use of pepper spray was excessive.

21    Q.  What about Vasile's behavior?

22         MR. CAMPOLIETO:  Your Honor, I just move to strike

23  the provision -- the section of that answer where he did talk

24  about the intentionality and the legal term intentionality and

25  additionally in regards to his - I'm sorry - I shouldn't say

1   his, Dr. Williams, I move to strike the section regarding

2   intentionality, your Honor.

3                    THE COURT:  Is that an element of the section of

4   1983 events?

5                    MR. CAMPOLIETO:  No.

6                    THE COURT:  All right.  I'm going to overrule that

7   objection with respect to the answer given by Dr. Williams.

8                    I'm not accepting Dr. Williams' opinion as the

9   equivalent of an opinion with respect to the legal element of

10  these events.

11                   I accept it with respect to whether his

12  description of the conduct as intentional rather than mistaken

13  or unintended in that sense of the term.

14  BY MR. FUSSELL:

15     Q.  Now, with respect to -- I think you just testified with

16  respect to Nicholls.  With respect to Vasile's behavior what

17  was your concluding opinion?

18     A.  That the physical actions were totally without merit.

19     Q.  And with respect to the intentional aspect of it?

20     A.  By his own statements him running up the stairs to

21  apprehend this woman as she was going away from him - I'm not a

22  psychiatrist or a psychologist - the mere fact of his actions

23  to me as a police officer and as an expert in this field have

24  determined that he intentionally meant to grab this woman.

25                   Just as when the sergeant ran to the steps and without

1   using any other trained initiatives immediately sprayed pepper

2   spray into the woman's face to me as a police officer would

3   mean that he intentionally meant to do this.

4       Q.  What in your opinion were Sergeant Nicholls' duties

5   with respect to staging the ambulance when the sergeant was

6   speaking or trying to speak to the victim?

7       A.  Staging is a term that may be used by police

8   departments in this area.  It's not a term that I taught here

9   when I was here in New York to police officers at the police

10  academy.

11      Staging an ambulance away from a crime scene with the

12  emergency medical technicians available to treat a person who

13  is injured - in this instance fatally injured - is totally

14  without merit and is not taught to police departments in any

15  state that I've been in.

16          MR. CAMPOLIETO:  Your Honor, I'm going to object

17  to this answer.  First of all, it's not relevant to whether the

18  Rochester police department stages ambulances to make sure that

19  emergency responders are not going into an active crime scene

20  or in danger -- whether they do that or not that's not really

21  relevant and I believe that's outside the scope of Dr.

22  Williams' expertise.

23          THE COURT:  I agree.  It's outside the scope.

24          MR. FUSSELL:  I think his expertise -- I think --

25          THE COURT:  Well, the objection is sustained.

1    It's outside the scope of his expertise.

2    BY MR. FUSSELL:

3        Q.  In your opinion should Sergeant Nicholls -- what should

4    Sergeant Nicholls have done when he was attending the stabbing

5    victim and Sergeant Nicholls noticed that Vasile was struggling

6    with the plaintiff?

7        A.  The responsibility in my opinion of the officer who is

8    attending a victim who has been stabbed and in danger of losing

9    their life is they should not have left that victim because the

10   other officer has been trained and is capable of handling a

11   female who is overweight and out of shape.

12             MR. FUSSELL:  I have no further questions at this

13   time.

14             THE COURT:  All right.  It's a little after 11:00.

15   Why don't we take a fifteen minute break.

16   (Recess taken.)

17             MR. CAMPOLIETO:  Your Honor, since the additional

18   expert Dr. Ewing is not really relative to this testimony I

19   would ask that he wait outside the courtroom while this

20   cross-examination is concluded.

21             THE COURT:  Are you Dr. Ewing?

22             DR. EWING:  Yes, your Honor.

23             THE COURT:  Would you mind waiting outside?

24             DR. EWING:  Not at all.

25             THE COURT:  Thank you very much.

1    MR. CAMPOLIETO:  May I start, your Honor?

2    THE COURT:  Yes.

3  CROSS-EXAMINATION BY MR. CAMPOLIETO:

4    Q.  My name is John Campolieto.  I'm an attorney for the

5  City of Rochester and City of Rochester police department so

6  I'm going to be asking you questions about your testimony this

7  morning recently?

8    A.  Yes, sir.

9    Q.  Dr. Williams, I wanted to ask you you had stated that

10  you were the teacher of several criminal justice classes at

11  Rowan College?

12    A.  Yes, sir.

13    Q.  I'm interested in a couple of classes that you

14  mentioned and are stated in your CV and expert report.

15  Particularly, Dr. Williams, I'm interested in the class I

16  believe it was called minorities, is that the name of the

17  class?

18    A.  Yes, sir, minorities.

19    Q.  I think it's just called minorities in this expert

20  report.

21    A.  It's actually Minorities and the Criminal Justice

22  System.

23    Q.  That's the actual title, Minorities in the Criminal

24  Justice System?

25    A.  Minorities and the Criminal Justice System.

1    Q.  What is that class about?

2    A.  The differences in some instances wherein minorities

3    and people with different ethnic cultures are treated within

4    the criminal justice system.

5    Q.  Additionally, you had another class entitled crime in

6    society?

7    A.  Yes.

8    Q.  What is the name or the actual title of that class?

9    A.  I believe that would indicate the types of crimes that

10   are within our society today and how those crimes affect the

11   people in the United States.

12   Q.  Okay.  When you say people, any specific people?

13   A.  Citizens.

14   Q.  Just citizens.  Dr. Williams, I'd like you to take a

15   look at Plaintiff's Exhibit 14.  I think you have it in front

16   of you.

17   A.  Yes, I do.

18   Q.  Okay.  Now, you had stated that in your opinion and

19   through your knowledge you believe that this document should

20   have been signed by Lieutenant Grande the night of the

21   incident?

22   A.  The night of the incident close of business day is the

23   term that's used.

24        When the responding officer -- the first responder goes

25   upon a scene he indicates all that he observes and that's to be

1   turned in the close of business or the next day when the police

2   officer comes on duty.

3       Q.  And that's your opinion or is this a procedure of the

4   Rochester police department?

5       A.  It's not an opinion.  It's a procedure that is done

6   nationwide.

7       Q.  And it's done in the City of Rochester?

8       A.  Yes.

9       Q.  Do you have reason to believe that the person -- the

10  first responder in this case did not turn that document in the

11  night of the incident July 3rd, 2010?

12      A.  It was not signed by that person.

13      Q.  Do you believe that these documents need to be signed?

14      A.  Yes, sir.

15      Q.  Where -- what is the requirement that these documents

16  need to be signed?

17      A.  At the bottom of the document it has a position for the

18  responding officer or the first officer to sign and it has a

19  second line for the assisting officer to sign.  In this case

20  Officer Vasile would have been the primary officer and Sergeant

21  Nicholls would have been the assisting officer.

22      Q.  I'm going to ask you to show me where the signature

23  line is for the first responding signature.

24              MR. FUSSELL:  May I see what we're talking about?

25              THE COURT:  Yes.  Come on up here.

1             THE WITNESS:  At the bottom of the page on this

2  report it has clearly typed out assisting officer.

3  BY MR. CAMPOLIETO:

4    Q.  Does it say signature?

5    A.  There's no word that says signature.

6    Q.  Is the officer's name on there?

7    A.  The officer's name is on there, yes.

8    Q.  Is this document dated when it was filled out?

9    A.  The document is dated 7/3/10.

10    Q.  Does that comply with what you're talking about in

11  terms of being filled out by the close of business?

12    A.  Yes, sir.

13    Q.  Dr. Williams, you had talked about the actions of

14  Sergeant Nicholls when he arrived at the scene and you had

15  mentioned that you felt that it was inappropriate for him to

16  leave a mortally wounded person in the yard to attend to Ms.

17  McKnight and Officer Vasile struggling on the porch; is that

18  right?

19    A.  Yes, sir.

20    Q.  Do you have knowledge that officer -- that Sergeant

21  Nicholls left somebody who was mortally wounded --

22          THE COURT:  Mr. Campolieto, step back.

23          MR. CAMPOLIETO:  Thank you, your Honor.

24  BY MR. CAMPOLIETO:

25    Q.  Did you have knowledge that Sergeant Nicholls left an

1    individual who was mortally wounded to fend for himself?

2    A.  Yes, I do.

3    Q.  What -- how --

4    A.  I'm sorry.

5    Q.  What knowledge do you have?

6    A.  From the documents that were submitted it indicates and

7    from the deposition of Sergeant Nicholls that when he observed

8    his officer struggling with the plaintiff he left his position

9    which was in attendance of a person who's lying on the street -

10   not in some yard, but lying on the street after having been

11   stabbed.

12   Q.  Do you believe that he left that person alone or do you

13   believe he had any role further to do with that victim?

14   A.  There were only two police officers there, therefore,

15   when he left the person laying stabbed he left the person

16   alone.

17   Q.  Did you review the trial testimony of Sergeant

18   Nicholls?

19   A.  Yes.  I had an opportunity to review it after the

20   report was written.

21           MR. FUSSELL:  Objection, your Honor.  He didn't

22   let me get into this on direct now he's getting into on

23   cross -- issues that I was not allowed to get into on direct.

24           MR. CAMPOLIETO:  Your Honor, I'm not getting into

25   an issue.  What he's talking about is Sergeant Nicholls leaving

1    an individual in the street and if he has knowledge that he

2    left them alone I'd like to explore what that knowledge is.

3              THE COURT:  Okay.  Why don't you ask him that.

4    BY MR. CAMPOLIETO:

5      Q.  Where do you get the knowledge that you believe that

6    Sergeant Nicholls was the only person at the scene?

7      A.  As previously stated there were only two officers

8    there, Nicholls and Vasile.  When Nicholls left the person

9    laying on the street and joined Vasile at the yard of the

10   plaintiff he, in fact, left the person alone.

11     Q.  So you believe there were only two officers at the

12   scene, Officer Vasile and Sergeant Nicholls, when the struggle

13   ensued?

14     A.  They were the first officers that arrived.

15     Q.  Were there any other officers?

16     A.  I don't know.

17     Q.  I'm going to show you exhibit -- Defendant's -- you've

18   seen this exhibit before?  This is --

19              THE COURT:  What are you showing him?

20              MR. CAMPOLIETO:  Defendant's 403 and Plaintiff's

21   12.

22              MR. CAMPOLIETO:  You can hold on to it.  Do you

23   have a copy of it up there?

24              THE WITNESS:  This is 12.  I have a copy of 14.

25   BY MR. CAMPOLIETO:

1    Q.  You had looked at this document before in talking about

2  whether the plaintiff had called 911; is that right?

3    A.  Yes, sir.

4    Q.  Do you see any police officers on here that you can

5  identify if you can?

6    A.  The names of the police officers are on there.  Gregory

7  Vasile, I recognize that name, yes.

8    Q.  Do you recognize any other officers on here?

9    A.  Not as police officers, no.

10    Q.  Do you recognize a James Lorres and Dominick Borrelli

11  and Aaron Eyrich in any of the reports that you read?

12    A.  Yes.  On this report there's a James Lorres.

13    Q.  Do you recognize them as police officers?

14    A.  No, I don't.

15    Q.  I'm going to show you if you look at line -- on the

16  second page if you look at 23:17 there's a text line.

17    A.  You have to point it out to me, Counselor.  I don't see

18  it.

19          MR. CAMPOLIETO:  If I can just approach, your

20  Honor?

21          THE COURT:  Yes.  Where are you showing him?

22          MR. CAMPOLIETO:  It's right under the second hole

23  punch.  It says, "23:17 supp text ambulance fire clear at the

24  scene."

25          MR. FUSSELL:  Could I see that too?  I don't know

1    what you're --

2                    MR. CAMPOLIETO:  Right here.

3    BY MR. CAMPOLIETO:

4      Q.  Do you see that, Dr. Williams?

5      A.  I do now, sir.  Yes, sir.

6      Q.  Do you know what that line indicates?

7      A.  It says, "Ambulance clear into scene."

8      Q.  What does that mean to you?

9      A.  It means that the ambulance is at the scene.

10     Q.  Does "into scene mean," anything to you?

11     A.  It means that the ambulance was at the scene.

12     Q.  What about ambulance personnel?

13     A.  If the ambulance was there personnel was there because

14   they're in charge of the ambulance.

15     Q.  Okay.  Do you see any indication of Sergeant Nicholls'

16   prior to the ambulance being onto the scene?

17     A.  I'm searching this page that you gave me and I don't

18   see Nicholls.

19     Q.  Okay.  If you look down to two minutes after 23:17 when

20   the ambulance is cleared into the scene -- if you look at 23:19

21   do you see Sergeant Nicholls' name?

22     A.  I do see Sergeant Michael Nicholls' name, yes.

23     Q.  Is that after the ambulance was there?

24     A.  According to the numerical order here it should be,

25   yes.

1    Q.  Thank you.  I want you to look at your report, Dr.

2    Williams.  Do you have that there?

3    A.  Yes, sir, I do.

4    Q.  I want to go to page 4.

5    A.  Yes, sir.

6    Q.  If you could go down to the paragraph that starts, "In

7    developing opinions in this case incident."

8    A.  Yes, sir.

9    Q.  Then the next sentence says, "The materials reviewed

10   were those typically relied upon."

11        The next sentence -- could you read that sentence out

12   loud please?  It starts with "after an audit."

13   A.  Let me --

14   Q.  I'll show it to you, sir.  "After an audit" --

15   A.  Okay.  "After an audit of the materials submitted to my

16   office by Counsel I developed a set of material facts and

17   analyzed those facts against standard and accepted professional

18   police policies, procedures and training."

19   Q.  You can stop there.  My question for you, sir, is, the

20   part of the sentence that says, "I developed a set of material

21   facts," what does that mean?

22   A.  That means I reviewed the reports and developed what in

23   my opinion were facts of the matter, such as statements of the

24   deposed persons and police reports that were submitted.

25   Q.  So in your opinion you took out certain facts and --

1    A.  I didn't take anything out, sir.  I just reviewed the

2  whole report.

3    Q.  Did you use all the facts or did you use certain facts?

4    A.  I used what was submitted to me.

5    Q.  Okay.  When you first answered the question you said in

6  your opinion you took out relevant facts.  So what I'm asking

7  you is, did you look at all of the facts or did you choose

8  certain facts?

9    A.  I looked at the reports.  I considered the report of

10  the police department as a factual report.

11    Q.  So everything in the report?

12    A.  Yes.

13    Q.  So all the facts in the documents you reviewed you

14  used?

15    A.  I may not have used everything in the document.

16    Q.  So there may have been certain facts that you didn't

17  use in your analysis?

18    A.  Anything relating to police policies, practices and

19  procedures, yes, sir.

20    Q.  What does that mean?

21    A.  It means relating to police policies, practices and

22  procedures.

23    Q.  Meaning you took only facts that related to police

24  policies, practices and procedures?

25    A.  Yes, and that included the whole report.

1    Q.  The whole report?

2    A.  Yes, sir.

3    Q.  I just want to be clear, all of the facts in the

4    report?

5    A.  I reviewed the report whether or not they were factual

6    or not is up to the Court not me.

7         A police report is taken as being given as a fact by

8    the police officers.  That's why it's so important that the

9    reports are signed off when they are supposed to be received by

10   supervising officers.

11   Q.  Dr. Williams, I understand that you think the whole

12   report is a fact.  What I'm asking you is that if you looked at

13   a report did you use all of the facts in your analysis?

14   A.  I used a report.  Whether it was all factual or not is

15   for the Court to decide.

16   Q.  Okay.  Now, your conclusion if I can just sum it up is

17   that you do believe that Officer Vasile and Officer -- Sergeant

18   Nicholls were improper?

19   A.  Yes, sir.

20   Q.  From what I understand you believe that from the very

21   start everything that they did with Ms. McKnight was wrong?

22             MR. FUSSELL:  Object to the term wrong.

23             THE COURT:  Overruled.  You may answer.

24             THE WITNESS:  No, I do not believe everything they

25   did with the plaintiff was wrong.

BY MR. CAMPOLIETO:

Q. Okay. Well, why don't you start and tell us what they may have done that was right?

A. Not much.

Q. You believe that there was something that was right. What was it?

A. They separated her from the crowd and identified her as a person who actually called in the 911 message.

Q. They did do that?

A. Yes. They established that it was her even though another name had been used.

Q. When do you think that they did that?

A. I don't know.

Q. Was it -- are you sure that it was Officer Vasile and Sergeant Nicholls that did that?

A. They were the only two officers there at the time.

Q. When do you think that they determined that she was -- or when do you think it was determined that she was the caller to 911?

A. I don't know.

Q. Why do you attribute it to Officer Vasile and Nicholls?

A. They were the only two officers there.

Q. Where do you get the information that Officer Vasile and Nicholls were the only two officers there?

A. From the report that says that Officer Vasile was the

1    initial responder and the sergeant joined him later.

2        Q.  I understand that Officer Vasile was one of the first

3    officers there, but where do you get the information that there

4    were no other officers there?

5        A.  I don't have information that there were no other

6    officers there.  Sergeant Nicholls was there.  He's another

7    officer.

8        Q.  Any other officers?

9        A.  There were officers that joined later on that responded

10   as officers normally do in these situations.

11       Q.  What I'm trying to figure out is why you believe that

12   when Sergeant Nicholls and Officer Vasile were there together

13   there were no other police officers there?  Where do you get

14   that information?

15       A.  I don't have that information.  I have information

16   based on the depositions of the sergeant and officer that they

17   were the initial officers there and they were the officers that

18   conducted the investigation of the event.

19       Q.  What event?

20       A.  The event in which a person was reported having been

21   stabbed and laying on the ground in front of a residence.

22       Q.  Okay.  And you think that was Officer Vasile and

23   Nicholls' event that they were reporting or investigating?

24       A.  The event was what the officers investigated.

25       Q.  That's why they were called there is what you're

1  saying?

2      A.  That's why they were given information via the

3  transcription from the dispatcher's office that went to their

4  computers and caused them to respond to that area.

5      Q.  So your report -- your expert report is based on your

6  assumption or your belief that Officer Vasile and Officer

7  Nicholls were the first officers there and the only officers

8  there when they arrived?

9              MR. FUSSELL:  Objection.

10             THE COURT:  Overruled.

11             THE WITNESS:  They were the first officers there.

12  BY MR. CAMPOLIETO:

13     Q.  So your report is based on that assumption?

14     A.  Yes.

15     Q.  Would it surprise you to know that during the officers

16  testimony there were many officers there prior to Officer

17  Nicholls?

18     A.  I beg your pardon?  I didn't understand.

19     Q.  Would it surprise you or would it change your expert

20  opinion to know that Officer Vasile actually wasn't the first

21  officer there?

22             THE COURT:  What is your question?  Would it

23  surprise you or would it change anything?

24  BY MR. CAMPOLIETO:

25     Q.  Would it change anything in your report if you found

1  out there were additional officers there prior to Officer

2  Nicholls and Officer Vasile?

3     A.  No, it would not.

4          MR. FUSSELL:  I do want to object.  That's not

5  what the testimony showed on direct.

6          THE COURT:  He's testified that he understood from

7  the information given to him that they were the first two

8  officers to arrive.  It's a fair question to ask if he learned

9  otherwise would that affect his opinion.

10          Did you get an answer to that?

11          MR. CAMPOLIETO:  I think he said no.

12          THE WITNESS:  I did say no.

13          THE COURT:  Thank you.

14  BY MR. CAMPOLIETO:

15     Q.  Would it affect your opinion regarding whether

16  officer - I'm sorry, I keep saying officer - Sergeant Nicholls

17  would have been able to take time to go attend to Officer

18  Vasile and the plaintiff struggling on the porch?

19     A.  If you're asking would he take the time to --

20     Q.  No.  What I'm asking you is if you found out there were

21  other officers at the scene would that change your opinion

22  whether it was proper for Sergeant Nicholls to attend to the

23  struggle that you viewed on the porch between his officer,

24  Officer Vasile, and the plaintiff?

25          MR. FUSSELL:  We'll object.

1          THE COURT:  Overruled.

2          THE WITNESS:  In this instance it would appear

3  that you're dealing in a hypothetical in which I don't -- if

4  the sergeant was there and he left and there were other

5  officers on the scene it would then be the responsibility of

6  the sergeant to assign someone to take over the welfare of that

7  person and to continue whatever emergency assistance they were

8  giving.  That would have been the sergeant's responsibility.

9          In my reports and in my information that I

10  received I did not see that.

11  BY MR. CAMPOLIETO:

12    Q.  Do you believe that Sergeant Nicholls was giving

13  emergency care to the person on the ground?

14    A.  I believe that the sergeant was responsible for giving

15  emergency care to the person on the ground.

16    Q.  Himself -- he was responsible for giving emergency care

17  himself?

18    A.  He's a sergeant on the scene he's responsible for

19  everything that goes on on at the scene.

20    Q.  Medical care?

21    A.  If he was there or any officer was there they're

22  trained to give emergency medical treatment to the person at

23  the scene i.e. stop the bleeding and so forth.

24    Q.  How do you know that?

25    A.  Because I've done it for years.

1    Q.  What other emergency care are police personnel trained

2    to give?

3    A.  Artificial respiration, they now have machines to do

4    that.  In the dinosaur days in which I grew up we did it

5    mouth-to-mouth.

6    Q.  And you believe that all officers are trained in these

7    techniques to give medical care?

8    A.  No, I don't believe that.  I know that.

9    Q.  You know that?

10   A.  Yes, sir.

11   Q.  All police officers are trained to give medical care?

12   A.  All police officers are trained in certain aspects of

13   emergency medical treatment.

14   Q.  Are they all EMTs?

15   A.  No, they're not EMTs.

16   Q.  If there were EMTs, ambulance personnel, as that report

17   indicates there before Officer Vasile or Sergeant Nicholls and

18   additional police officers for which there has been testimony

19   that they were there before Sergeant Nicholls would it still be

20   your opinion that it was improper for Sergeant Nicholls to

21   attend to Officer Vasile on the porch with Ms. McKnight?

22   A.  If as I stated before there were other officers there

23   and the sergeant indicated that at least one officer was to

24   remain with the victim it would have been appropriate for him

25   to assist another officer.

1    Q.  Okay.  When he left the victim and went to attend to

2    the conflict on the porch - Officer Vasile trying to arrest Ms.

3    McKnight - what was it that you believed that Officer Vasile --

4    that Sergeant Nicholls did wrong?

5    A.  As a supervisor it was totally wrong for him to

6    immediately walk up to where the two individuals were and

7    without provocation spray the person in the face with pepper

8    spray.

9    Q.  Now, how do you know he walked?

10    A.  Well, he could have run.  He got there.  That's all I

11    know.

12    Q.  What do you mean by without provocation?  What do you

13    mean by that?

14    A.  She wasn't struggling with him and she was not out of

15    control of his fellow officer.

16    Q.  Did you read the deposition of Sergeant Nicholls?

17    A.  Yes.

18    Q.  Okay.  It's still your opinion that he wasn't

19    struggling with the plaintiff?

20    A.  He was struggling, but it was a police initiated

21    struggle with the plaintiff.

22    Q.  So the first part was that he was -- without

23    provocation Officer Nicholls pepper sprayed and you also

24    mentioned another officer and he was viewing the other officer,

25    Officer Vasile?

1    A.  Yes, sir.

2    Q.  And you believe he had the victim -- the plaintiff

3  under control?  Is that what you had said?

4    A.  I said he was capable of having her under control.

5    Q.  Did he have her under control?

6    A.  I don't know.

7    Q.  Okay.  Did you read the deposition of Officer Vasile?

8    A.  Yes, sir.

9    Q.  Did you get anything out of that in terms of a

10  knowledge of whether he had Ms. McKnight under control when

11  Sergeant Nicholls arrived?

12    A.  He was struggling with her.  He had her in an arm bar

13  lock against the side of a door on her house.

14    Q.  That's correct.  But he didn't have her under control?

15    A.  I don't know whether he considered her under control or

16  not.

17    Q.  Did you read the deposition?

18    A.  Yes, sir.

19    Q.  What did -- what was his statement in terms of

20  whether --

21    A.  That he put her in an arm lock and used the side of the

22  door to enforce the arm lock in order to get her under control.

23    Q.  Did you read anything about him losing grip on her

24  hands and her grabbing the doorway?

25    A.  Yes, sir.

1    Q.  Okay.  Now, another part of your testimony was that you

2  believed he should have had her under control because he was a

3  police officer?

4    A.  A trained police officer.

5    Q.  Do officers ever lose control - not by any fault of

6  their own, but by accident or something -- in this instance

7  Officer Vasile said he slipped on her arm and lost his grip?

8    A.  He indicated that he slipped on her arm and lost his

9  grip.  He indicated that she was greasy.

10    Q.  Did you believe that -- is that somehow the fault of

11  Officer Vasile?

12    A.  If he was attempting to control her and he didn't

13  control her that was his fault, yes.

14    Q.  Is that something -- is that violating the law because

15  he lost control?

16              MR. FUSSELL:  Objection.

17              THE COURT:  Sustained.

18              MR. CAMPOLIETO:  Just give me one second.  I have

19  to find something.  I still need another minute.  I need to

20  find a specific wording.

21  BY MR. CAMPOLIETO:

22    Q.  If you could take a look at Exhibit 21 that's been

23  provided by plaintiff's attorney.  You indicated that you

24  believe that was the code of ethics for the City of Rochester

25  police department?

1    A.  Based on the fact that it is a paper containing

2   Rochester police department code of ethics rules and

3   regulations, yes, sir.

4    Q.  What's the purpose of that document if you know?

5    A.  This is standard in which police officers are sworn to

6   in performance of their duties.

7    Q.  You believe that the City of Rochester police

8   department are sworn to that document?

9    A.  Yes, sir.

10   Q.  What's your knowledge of that?

11   A.  Police officers --

12   Q.  I'm asking only, Dr. Williams, for the City of

13  Rochester Police Department.

14   A.  As an instructor at John Jay College when I taught

15  criminal investigations here in New York police officers were

16  obligated, mandated to stand before an authority, raise their

17  right hand and swear that they would follow these instructions.

18   Q.  Those specific instructions?

19   A.  There may be a word different, but this is what the

20  City of Rochester has for their code of conduct.

21   Q.  That's not a code of conduct.  That's a code of ethics.

22   A.  Code of ethics, I stand corrected.

23   Q.  Is a code of conduct and code of ethics the same thing?

24   A.  They're intertwined -- if your code is defined by your

25  ethical conduct they're sometimes intertwined.

1      Q.  Do you have specific knowledge of the City of Rochester

2  code of ethics or code of conduct or is the only document you

3  reviewed --

4      A.  The document that I reviewed and that I went by is the

5  document that you handed to me.

6      Q.  I handed it to you as an exhibit?

7      A.  Yes.

8      Q.  What was the first thing you mentioned in your

9  testimony that officer -- that you believe Officer Vasile

10 violated in that code of ethics?

11     A.  That he wouldn't involve his personal feelings.

12     Q.  I don't think that that -- I don't think that you

13 mentioned that.

14     A.  Officiously.

15     Q.  Officiously?

16     A.  In other words, he wouldn't use his position as a

17 police officer for anything other than enforcing the law and

18 protecting the citizens.

19     Q.  And you believe that he used his position as a police

20 officer to do something different on July 3rd, 2010?

21     A.  I'm using his conduct, his words, expressions and

22 profanity that he used.

23     Q.  But my question -- if you would answer my question, do

24 you believe he used his position as a City of Rochester police

25 officer to do something other than to enforce the laws as he

1  believed it to be?

2     A.  Yes, sir.

3     Q.  And what do you believe that purpose was?

4     A.  The purpose in using his position as a police officer

5  was the way in which he conducted himself.

6     Q.  That wasn't the question, sir.  The question was, do

7  you believe he used his position as a police officer to do

8  something other than to enforce the law as he believed it and

9  you said, "Yes," and what I'm asking you is what do you believe

10  he was trying to do?

11     Q.  He was trying to teach this belligerent female that he

12  was a policeman and he did not care - which were his words -

13  what she thought.  "I don't care," were his exact words.

14     Q.  You believe he was trying to teach her that he was a

15  policeman?

16     A.  He was trying to show her not teach her.  She knew he

17  was a policeman.

18     Q.  If she knew he was a policeman why would he have to

19  show her?

20     A.  He would have to show her that he was in charge and he

21  didn't care about what she was saying to him.

22     Q.  And you believe --

23     A.  Those are his words not mine.

24     Q.  You believe he didn't care as to what her belief was as

25  to -- what do you think he didn't care about?

1    A.  He didn't care about anything that she had to offer.

2    Q.  Where do you get that information?

3    A.  From the reports.

4    Q.  Somewhere in the reports it states that he didn't care

5    about anything that she said?

6    A.  Yes, sir.  She indicated that he shouldn't put the tape

7    where he was putting it because the kids were running through

8    her yard and they would be tearing it down and that her house

9    was not the scene of the crime and the officer replied to that,

10   "I don't care," and then the other profanities were after that.

11   Q.  I'm going to ask you to read from Plaintiff's Exhibit

12   2.  I have it here and there's a copy here.

13        We'll go down to the line that says, "Miriam:  This is

14   not a crime scene."  Start there.

15             MR. CAMPOLIETO:  Just for the record --

16             MR. FUSSELL:  Wait a second so that I can get

17   there.

18             MR. CAMPOLIETO:  I'm not going to ask a question,

19   Bob.

20             MR. FUSSELL:  I got it now.  I'm sorry.

21             MR. CAMPOLIETO:  For the record I will state that

22   this is the plaintiff's own translation of what she believes

23   she recorded the night of July 3rd, 2010.

24   BY MR. CAMPOLIETO:

25   Q.  So start at, "Miriam:  This is not a crime scene," and

1    read to, "Miriam:  Well, this is not going to stay here all

2    night."

3        A.  I'm looking at -- oh, "Miriam:  This is not a crime

4    scene."  Then the police officer replies, "There's a victim

5    over there."

6            Then Miriam says, "It didn't happen here.  It happened

7    over there."

8            "The officer:  I don't care."

9            "Miriam:  Well, this is is not going to stay here all

10   night."

11       Q.  That's good.  You can stop there.  So that's the

12   section of the transcript of what the conversation said of why

13   you believe that the officer didn't care about what Miriam had

14   to say?

15       A.  Because that's what he said.

16       Q.  What was he talking about when he said, "I don't care?"

17   He wasn't talking about everything -- everything that Miriam

18   ever said in the history of the world, right, he was talking

19   about a specific thing?

20       A.  We'll go back to what you asked me to read and I'll do

21   that again.

22       Q.  You don't have to read it again.  You can tell me what

23   they're talking about.

24       A.  He's saying this is a crime scene.  She says this is

25   not a crime scene.

1    Q.  Okay.  Let me stop you there.  Why would Officer Vasile

2    care about what she thinks is a crime scene?  Why would he care

3    about that?

4         Why would he care what Miriam McKnight thinks is a

5    crime scene at this particular time?

6    A.  He has information that she called this particular

7    incident in.  They had --

8    Q.  How do you know that?

9              THE COURT:  Let him finish.

10             THE WITNESS:  They had identified the crime scene

11   as being some place other than where her house was.  So she

12   didn't believe that this area on her lawn was a crime scene and

13   the officer indicated I don't care.

14   BY MR. CAMPOLIETO:

15   Q.  I'm going to show you what's been marked as Defendant's

16   415.

17             MR. CAMPOLIETO:  Your Honor, I believe this has

18   been entered into the record.

19             THE COURT:  I think so.

20             MR. CAMPOLIETO:  I mean, it had to have been.

21             THE COURT:  Go ahead.

22   BY MR. CAMPOLIETO:

23   Q.  Dr. Williams, if you could just take a look at this

24   document.

25             THE COURT:  Yes.  It's in evidence, 415.

BY MR. CAMPOLIETO:

Q.  Now, Dr. Williams, you see the circle drawn there?

A.  Yes, sir.  I see several circles.

Q.  You're right.  You see the big blue circle?

A.  Yes, sir.

Q.  I don't believe I'm misstating anything contrary to what was put into evidence, but Javian Jones, the plaintiff's son, and Officer Vasile and Sergeant Nicholls testified that I believe that's where the victim was, would you -- looking at that area when an officer who arrives on the scene who has no knowledge of anything except that there are crowds -- angry and noisy crowds, a victim there and a victim further down the road and reports of gunfire, would you argue that those three houses would generally be the area which would be considered the crime scene when you immediately come upon the address?

A.  If this was the scene that I approached, no.  These circles mean nothing to me.  I don't see any evidence that this is a crime scene other than these circles.

Q.  I guess maybe you're missing my question.  The point of my question was, if you were an officer and you went to the scene and there's a victim within that circle and there's crowds of people everywhere and you can see that - I'll point it out to you - this being the location of where apparently there was a party what would be your initial observation of this area and where the crime scene would be when you initially

1  came upon it with a victim in that circle?

2      A.  If it were in this circle in front of this house then

3  that would be a crime scene.

4      Q.  What would be the crime scene?

5      A.  The circle that someone has drawn here in front of the

6  house.

7      Q.  Just that circle?

8      A.  I'm going by your explanation of what it is not mine.

9  You asked me what does this circle mean to me.  This circle

10 doesn't mean anything to me.

11     Q.  I understand.  I'm using that as a marker.  What I'm

12 saying is if you come upon a scene with a huge crowd, the party

13 reportedly happening at that location - house 234 - people all

14 around and the victim in that circle where -- what would be

15 your initial observation of this -- your initial crime scene

16 idea?

17     A.  If the victim was within this circle that would be the

18 crime scene.

19     Q.  So just the circle?

20     A.  No.  No.  The crime scene extends out from --

21     Q.  So that's what I'm asking.  Initially when you first

22 get there, you see a victim in that circle, where would be the

23 crime scene in your mind?

24     A.  The crime scene would be where the victim is laying and

25 then an appropriate police investigation would have the police

1  officers going --

2  Q.  I'm going to stop you.

3  A.  You asked me --

4  Q.  No.  No.  I'm going to stop you because you're not

5  answering my question.

6  My question was when you first get there, there's no

7  investigation, you're driving up there and you see the victim

8  in that circle, what would be your idea of a crime scene?

9  A.  Well, you're simplifying it now.

10 Q.  I am.

11 A.  When you're first driving up there and you see a victim

12 that's your crime scene.

13 Q.  Okay.  Then would you extend it?

14 A.  As I said and started to explain, yes, it would be

15 extended outward - which was not done here, but the appropriate

16 police method would be to extend it outward in a triangular

17 form.

18 Q.  Explain to us why in triangular form?

19 A.  Because you want to take into consideration everything

20 that could be used as evidence leading up to that crime scene.

21 Q.  Why not a square?

22 A.  You could make a square.  You could make a circle, but

23 police officers are trained to triangularize.

24 Q.  So that -- triangularize doesn't necessarily mean a

25 triangle.  You're saying cornered off is what you're saying?

1    A.   If I were the crime scene the police officers would

2   come in and look at me and they would go triangular off going

3   that way.

4    Q.   Going towards where the people were coming from, right?

5    A.   Yes.

6    Q.   So let's look at Exhibit 415 again.  Let's say the

7   officer -- I'm going to use a hypothetical.  Let's say the

8   officer on the scene who was putting up crime scene tape saw

9   people coming out of the party from right here at this fence

10   where -- would that be part of the crime scene?

11    A.   You say they saw people coming out from where the party

12   was?

13    Q.   Yes.  Let's say that was the egress and entrance to the

14   party, would that be part of the crime scene?

15    A.   Yes, sir.

16    Q.   That's right here?

17    A.   I'll agree with wherever you point.

18    Q.   So the area right next to the plaintiff's porch you're

19   considering part of the crime scene if he had knowledge that

20   this is where people were coming in and going out?

21    A.   A lot of ifs in there, but if he knew that's where

22   people were coming out of that would be part of the crime

23   scene.

24    Q.   Okay.  Great.  Thank you.  Now, I want to get back to

25   the code of ethics.  You mentioned that you believed Officer

1   Vasile -- in your opinion Officer Vasile was using his position

2   as a police officer to do something other than enforce the law,

3   right?

4       A.  I don't believe he was doing it other than to enforce

5   the law.  In my opinion based upon what was given to me the

6   plaintiff was not doing what the police officer wanted her to

7   do when he wanted her to do it and he was simply showing her

8   I'm the boss here and I don't care what you have to say or do.

9       Q.  Could it be possible that he was just trying to put up

10  the crime scene tape which was the scene of a double stabbing?

11  Could that be the purpose of why he didn't really care where

12  she thought the crime scene was?

13      A.  In my opinion that's what he was doing.

14      Q.  And you believe that that is something other than what

15  he should have been doing?

16      A.  No, I do not believe that.

17      Q.  Okay.  Now, you also mentioned that he used profanity?

18      A.  Yes, sir, I did.

19      Q.  You believe that was in violation of the code of

20  ethics?

21      A.  It's not my belief.  It is.

22      Q.  Is that against the law?

23      A.  It's against police policies and procedures.

24      Q.  So it's against the City of Rochester's internal police

25  procedures?

1    A.  Yes, sir.

2    Q.  But is it a cause of action in this lawsuit?

3              MR. FUSSELL:  Objection.

4              THE WITNESS:  I don't know.  That calls --

5              THE COURT:  That objection is sustained.

6    BY MR. CAMPOLIETO:

7    Q.  Was there ever an occasion where you swore during your,

8    you know, employment as a police officer or in law enforcement?

9    A.  I sworn in as a law enforcement officer when I

10   graduated from the state police academy and I was sworn as a

11   law enforcement officer --

12   Q.  No.  I guess --

13   A.  -- in every police department.

14             THE COURT:  I think the question is did you ever

15   use profanity?

16             THE WITNESS:  Did I use profanity?

17   BY MR. CAMPOLIETO:

18   Q.  Did you ever happen to use a profane word during your

19   employment as a police officer?

20   A.  No.  I don't use profanity period.

21   Q.  Good for you, sir.  That's admirable.

22             THE COURT:  Mr. Campolieto, you should have seen

23   that answer coming.

24             MR. CAMPOLIETO:  And I did.

25   BY MR. CAMPOLIETO:

1    Q.  Now, Dr. Williams, we had talked about Officer Vasile's

2  contact with the plaintiff and how you believe it was wrong.

3      Now, I want to go and talk about Sergeant Nicholls.

4  You've read the reports, correct, the SRRs which are exhibit --

5  I'll take this if you don't mind.

6    A.  Yes, sir.

7    Q.  Exhibit 406 -- Defendant's Exhibit 406 and you believe

8  that officer -- Sergeant Nicholls' conduct with the plaintiff

9  was inappropriate; is that correct?

10    A.  Yes, sir.

11    Q.  I'm going to have you take a look at the SRR and can

12  you tell me here today what was inappropriate about Sergeant

13  Nicholls' interaction with the plaintiff?

14    A.  What you have handed me is a report relative to the

15  actions of Officer Vasile when he was struggling with the

16  plaintiff.  He described his grip on her - that she was greasy

17  and he couldn't get a good grip on her.  I don't see anything

18  about that.

19    Q.  No.  This is is Sergeant Nicholls' SRR.  It's the third

20  page of Exhibit 403.  This is -- look at the bottom if you

21  could, sir.

22    A.  I see nothing in the narrative that relates to Sergeant

23  Nicholls.  All I see is what relates to Vasile.  Sergeant

24  Nicholls is listed as the assisting officer which means he was

25  assisting whatever was going on at the scene.

1    Q.  Do you have knowledge of what Sergeant Nicholls did?

2    A.  Yes, sir.

3    Q.  I think it's detailed in the second half of this

4    paragraph -- this narrative which was written by Sergeant

5    Nicholls.  That's Sergeant Nicholls' report.

6    A.  Okay.  He administered one -- A one second blast of

7    capsicum to plaintiff's face.

8    Q.  That's right.  That's his report.

9    A.  He's not -- I don't see a signature on it there.  I

10   don't know if he typed that report or not.  It wasn't signed by

11   him.

12   Q.  Well, it is Sergeant Nicholls' report.  He testified to

13   that.

14   A.  If you say so, yes, sir.

15   Q.  Did you look at this report and not -- during your

16   review of this case when you were doing your report did you not

17   believe that this was Sergeant Nicholls' report?

18   A.  I believe it was a report -- a police report and that's

19   all I'm concerned with.

20   Q.  You didn't believe that this was Sergeant Nicholls'

21   report?

22   A.  I don't know whose report it was.  It wasn't signed by

23   him.

24   Q.  Is it required to be signed?

25   A.  It's required to be signed.  Sergeant Nicholls is a

1    supervisor.  He was to sign off on the report written by his

2    subordinate officer.  Sergeant Nicholls would then turn it into

3    his supervisor which was Lieutenant Grande.

4        Q.  And how do you -- have you reviewed the general record

5    regarding City of Rochester Subject Resistance Reports?

6        A.  I did briefly review it, yes.

7        Q.  Do you know what General Order number that is?

8        A.  No.

9        Q.  Where did you obtain that document?

10       A.  I obtained it from research that I do on all police

11   departments prior to taking on a case for any attorney.

12       Q.  Why did you not indicate it in your expert report that

13   you --

14       A.  It's not necessary.

15       Q.  You're making an opinion on -- you're stating a fact as

16   to how City of Rochester Subject Resistance Reports are

17   supposed to be signed, when they're supposed to be signed and

18   who's supposed to sign them and you're claiming you reviewed

19   that General Order, how is that not relevant?

20       A.  It's based on my empirical knowledge of how police

21   reports are supposed to be signed.  This was not done.

22       Q.  But I'm not talking about police reports.  I'm talking

23   about a specific document, the Rochester Police Department

24   Subject Resistance Report, document 1377.

25       A.  And as you stated it is a police report.

1    Q.  It's a Rochester Police Department Subject Resistance

2  Report?

3    A.  Subject Resistance Report is what it is and it's

4  universal throughout the United States.

5    Q.  Is that just an assertion, sir, or is there some

6  document which says that this is a universal report?

7    A.  There's no document that says this is a universal

8  report.

9    Q.  How can you say that then?

10    A.  Based upon my experience in all the police departments

11  that I've worked with in the United States and all the police

12  academies that I taught in this is a report that is used.  It's

13  worded different and as I got into earlier it's not in the same

14  format.

15    Q.  I'm not going to continue with this, but I guess I

16  don't understand how you can make an assertion that this is a

17  universal report and yet you're saying they're all different

18  and they're all subject to different guidelines and

19  terminology?

20    A.  It is universal -- in the police establishments, the

21  police academies, the police departments in which I have been

22  involved in it's universal.

23    Q.  Now, you reviewed a General Order of the Rochester

24  Police Department regarding Subject Resistance Reports I just

25  want to make sure we have that correct?

1    A.  Yes.  That's the report that you have.

2    Q.  No.  We talked about the General Order, sir.

3    A.  Yes, sir.

4    Q.  General Order for Subject Resistance Reports, did you

5 review that document?

6    A.  I don't recollect.

7    Q.  But you just testified -- you just stated thirty

8 seconds ago that you did review it.

9    A.  You're asking about a different document, Counselor.

10    Q.  That's right.

11    A.  I only can answer to the documents that I reviewed and

12 I did briefly review all of those documents that were submitted

13 to me.

14    Q.  Only the documents that were submitted to you?

15    A.  I couldn't review anything that wasn't submitted.

16    Q.  Okay.  Then listen to my question.  There is a document

17 called General Order 335.  It deals specifically with Subject

18 Resistance Reports --

19    A.  Yes, sir.

20    Q.  -- and how they are filed and signed, did you review

21 that document?

22    A.  To my recollection I believe I did briefly.

23    Q.  Okay.  Why is it not listed in your report?

24    A.  That document was reviewed by me as a matter of how

25 Williams & Associates does things.

1    When we get the request from an attorney we look up the

2    police department -- a number of things on the police

3    department and we attempt to read the entire standard

4    operational procedures manual of that police department.  We

5    don't read every word and we don't remember every sentence

6    that's in there, but we do -- and that's where I got it.  I

7    would not necessarily have got it from the retaining attorney.

8    Q.  Then my question is, why is it not listed on your

9    expert report as something you reviewed in preparation of doing

10   an expert report?

11   A.  Because it would not have been something that I

12   received from the retaining attorney and he would have no idea

13   that I had done any background check on that police department.

14   Q.  You've stated that you testified at over five hundred

15   trials during your --

16   A.  No.  I did not say five hundred.  I said as a police

17   officer and federal agent I testified in three hundred trials

18   and in civil court I testified in -- I didn't testify.  I've

19   been involved in one hundred eighty-seven.

20   Q.  That's quite a lot of trials.  During that time you've

21   seen -- you've been an expert witness in other trials; is that

22   correct?

23   A.  Yes, sir.

24   Q.  You didn't think it would be important to talk about

25   what you reviewed in preparation of your report?

1    A.  There is a document that was brought up indicating the

2    cases in which I have either testified in at trial, been

3    deposed in or the case was settled or the case was ongoing and

4    it's stipulated on that form.

5    Q.  If I told you that General Order 335 tells how a

6    document is supposed to be submitted for further review beyond

7    the immediate supervisor would you have knowledge of that

8    document -- of that General Order?

9    A.  No.

10   Q.  Okay.  So the General Order that you have here -- this

11   is exhibit --

12   A.  I do have it here, Defendant's Exhibit 406.

13   Q.  Are you aware that this goes for further review within

14   the Rochester Police Department?

15   A.  All the way to the Chief's office, yes.

16   Q.  How are you aware of that?

17   A.  My own experience working with police departments

18   across the country.

19   Q.  Now, you had difficulty understanding why Lieutenant

20   Grande signed this document on July 21st; is that correct?

21   A.  Yes, sir.

22   Q.  Again, I couldn't understand why you thought that that

23   was a problem.  Can you explain now why it is a problem?

24   A.  It's a problem because it's about three weeks in

25   signing that document that -- what should have been signed

1   immediately within the next day to make sure that the facts

2   were as they were and the facts had not been altered by any

3   thoughts of any other law enforcement officer.

4       Q.  How would Lieutenant Grande know what the facts were

5   regarding this officer's Subject Resistance Report?

6       A.  Part of a supervisor's responsibility in particular

7   Lieutenant Grande would be to re-interview officers to make

8   sure that what they had written down was true.

9       Q.  Do you think that she -- is there reason for you to

10  believe that she didn't do that?

11      A.  There's a strong reason for me to believe that she did

12  do that.

13      Q.  Do you believe that this document, the Subject

14  Resistance Report, was not completed on July 3rd, 2010 or

15  immediately thereafter?

16      A.  It was completed, yes.

17      Q.  You believe that Lieutenant Grande is required to sign

18  this document immediately thereafter?

19      A.  You're using terms that I did not use.  My statement is

20  that a lieutenant is to sign the document once it's -- once she

21  receives it and it should have been signed by the police

22  officer and the assisting officer or the sergeant within the

23  next day.

24      Q.  That's where I guess the issue is.  Do you have reason

25  to believe that the officer and the assisting officer didn't

1    sign it within a day?

2        A.  I don't see their signatures on there.

3        Q.  You see their name typed, correct?

4        A.  Their typed written name.

5        Q.  With their badge number?

6        A.  Yes, sir.

7        Q.  And you believe that doesn't qualify as a signature?

8                MR. FUSSELL:  Objection.

9                THE COURT:  Overruled.

10               MR. FUSSELL:  A signature is a signature.  Typed

11   is typed.

12               THE COURT:  Overruled.

13   BY MR. CAMPOLIETO:

14       Q.  Do you believe that that's not their signature or

15   identifying mark on their report?

16       A.  It's their identifier, but it's not a signature.  It's

17   their identifier.

18               THE COURT:  Dr. Williams has testified that a

19   signature was required and there is no signature here.  So

20   let's move on.

21               MR. CAMPOLIETO:  Yes.  I'll leave it alone.

22   BY MR. CAMPOLIETO:

23       Q.  Now, I want to return to the actions of Sergeant

24   Nicholls when he encountered the plaintiff and Officer Vasile.

25   This is indicated -- again, we were looking at Defendant's 406

1  and Plaintiff's 14 Subject Resistance Report with Sergeant

2  Nicholls' name at the bottom; is that correct?

3     A.  Yes, sir.

4     Q.  Did you review that document?

5     A.  Yes, I did.

6     Q.  Looking at that document and based upon your review

7  again what were the actions that are detailed in that report

8  that you believe were inappropriate by Sergeant Nicholls?

9     A.  All the actions involving the use of force were

10  inappropriate by Sergeant Nicholls and his subordinate.

11     Q.  Let's go through them one by one.

12     A.  Okay.

13     Q.  What was the first action by Sergeant Nicholls if you

14  can tell from this report?

15     A.  You want me to read it, is that what you want?

16     Q.  From your knowledge making your expert report and

17  making a statement --

18     A.  It indicates, "I observed officer on the porch

19  attempting to take the plaintiff into custody."

20     Q.  Okay.

21     A.  She was attempting to escape his grasp and go back

22  inside of her house.

23     Q.  Do you have a problem with those statements?

24     A.  No, sir.

25     Q.  You can continue.

1    A.  "As I approached the plaintiff she had her left arm

2  hood" -- I guess he means hooked -- "hood around the entry door

3  frame."

4    Q.  So taking those two statements that subject was

5  attempting escape his grasp and go back inside the house, "As I

6  approached S she had her left arm hood hooked around the entry

7  door frame."

8         So apparently she was trying -- do you know what she

9  was trying to do at that time based on those sentences?

10   A.  Only by what the sergeant says.  She was attempting to

11  go in her house.

12   Q.  Is that something that an officer would want -- or a

13  sergeant coming onto a scene seeing his officer struggling

14  would want the subject to do is to get back into a house that

15  he wasn't aware of?

16   A.  He saw her trying to get back into her house and an

17  officer was trying to prevent that.  That's what he said he

18  saw.

19   Q.  He said he saw his officer trying to arrest her?

20   A.  Trying to arrest her, yes.

21   Q.  Would an officer want a subject to get into a house and

22  evade the escape of his officer?

23   A.  If she's attempting to escape him by going into a house

24  that's part of the attempt escape if that's, in fact, what was

25  happening.

1    Q.   So if Sergeant Nicholls saw the subject who we know is

2    the plaintiff --

3    A.   Yes, sir.

4    Q.   -- trying to evade arrest from his officer and get back

5    into a house that's not something that he would want to occur,

6    right?

7    A.   Yes, sir.

8    Q.   Why?

9    A.   Because she would be evading arrest.  She would be

10   getting away from the officer who was trying to arrest her.

11   Q.   Would there be any danger to a subject who the sergeant

12   doesn't know anything about going into a house that he doesn't

13   know anything about?

14   A.   Only the danger that he doesn't know anything about

15   what's in the house.

16   Q.   What could be some of the dangers?  In your experience

17   as a police officer what could be some of the dangers?

18   A.   There could be anything -- any danger.  There could be

19   children inside the house that are going to come to the defense

20   of their mother.  There could be a husband in the house who is

21   concerned with what's happening to his wife.  It could be any

22   number of things.

23   Q.   Those are things that the officers don't want to

24   encounter -- those would be volatile issues to encounter?

25   A.   What I look at as an expert is what is in front of me.

1  The officer simply didn't want to her escape the grasp of his

2  subordinate officer.

3      Q.  For various unknown reasons that could be dangerous to

4  the officer?

5      A.  As you say for unknown reasons.

6      Q.  Now, I'm going to show you Exhibit 2.  I apologize.  My

7  eyesight has been going for the past couple months, but if you

8  could look at -- we talked about -- what I'm referring to is

9  the previous items that the expert read -- that Dr. Williams

10 read into the record.

11         Now, if you go three sentences down --

12             MR. FUSSELL:  Are you talking about Exhibit 2?

13             THE COURT:  Exhibit 2.

14             MR. CAMPOLIETO:  Right below where Dr. Williams

15 testified before.

16 BY MR. CAMPOLIETO:

17     Q.  Now, Dr. Williams, if you could look two sentences down

18 from where it says, "It's not going to stay here all night."

19 Can you read the statement and who made the statement?

20     A.  Yes, sir.  "Miriam:  Well, this is not going to

21 stay" --

22     Q.  The one below that, sir.  There's two Miriams in a row.

23     A.  You want me to read where the police officer responds?

24 "Police officer:  Turn around and put your hands behind your

25 back.  I've had enough of this shit."

1    Q.   Yes.   That's what he said.   Now, I'm going to read to

2    you -- below that there's a line that says, "Miriam," and then

3    it says, "Get him."

4         Do you see that?

5    A.   As I read down the report, "Miriam:  I don't live here.

6    What are you doing to me?"  "Miriam:  Hey, get him."

7         "Police officer:  Put your hand behind your back."

8         "Javian:  Mama" --

9    Q.   You can stop there.   Now we don't know what that meant

10   and it may have meant something different to Miriam, but if

11   you're an arresting officer and you have a door to a house

12   that's open - which there's been testimony that it was - and

13   you have a woman you were trying to arrest and she is moving

14   toward that door and she says, "Get him" - which the recording

15   says she did - is that something that would concern you as an

16   officer?

17   A.   Yes, it would concern me.

18   Q.   What could it mean?

19        I mean, we understand that it could mean go get your

20   father, it could mean go get your son, but if you're an officer

21   and you're trying to arrest somebody and you hear, "Get him,"

22   as she's moving towards the house what would go through your

23   mind?

24   A.   In most instances as a police officer -- you said --

25   Q.   I'm just saying in most instances.  I'm just saying

1    what would go through your head if you heard that?

2        A.  In my experience a woman could be calling to get her

3    spouse.

4        Q.  Obviously that probably -- it would be at the house she

5    was running into?

6        A.  Yes, sir.

7        Q.  Now, is that a concern for a police officer?  Now,

8    regardless of what he's trying to arrest her for or whether

9    he's arrested her, but he's trying to arrest her is that a

10   concern when someone says that, "Get him," when you're trying

11   to arrest somebody?

12       A.  When she indicates, "Get him," my concern is that she's

13   probably referencing her husband or spouse or kid or anybody to

14   observe what's going on between her and the officer.  That's my

15   concern.

16       Q.  So that's what you would think and that's what an

17   average police officer would think?

18       A.  Yes, sir.

19       Q.  So if she's saying, "Get him," meaning get somebody

20   else when that person comes that would mean there were two

21   people?  You would be dealing with the person you're trying to

22   arrest and a spouse who you would think would come?

23       A.  Yes, sir.

24       Q.  That would be a more dangerous situation than just the

25   single person; is that right?

1    A.  I don't necessarily believe it would be a more

2  dangerous situation.

3    Q.  Could be?

4    A.  Could be.

5    Q.  Now, regardless again of what you're trying to arrest

6  somebody for when you're trying to arrest them and you realize

7  there's an open door, somebody says get him, there could be

8  somebody else coming as a police officer wouldn't it be

9  important or necessary to effectuate that arrest and get the

10  person away from the scene as quick as possible?

11    A.  Always, yes, sir.

12    Q.  Okay.  Now, I'm going to get back to Sergeant Nicholls.

13  Sergeant Nicholls you had indicated that -- we had talked about

14  this and it appeared she was trying to get in the house, right?

15    A.  Yes, sir.

16    Q.  Can we go further into what his -- the document with

17  his name on the bottom says?

18    A.  Okay.

19    Q.  So if we stopped at the door frame it says, "Her left

20  arm was hooked around the door frame"?

21    A.  "I advised her to put her hands behind her back."

22    Q.  Now I'm going to stop you there.  So Sergeant

23  Nicholls -- he saw when he was near the stabbing victim -- his

24  report states that he saw Vasile attempting to take S into

25  custody, right?

1    A.   Yes, sir.

2    Q.   So that means that he knew that -- just from this

3  report he knew that she was being arrested by Vasile?

4    A.   Yes, sir.

5    Q.   So then he says it again, right, in his report he

6  states that he advised her to put her hands behind her back?

7    A.   Yes.  Not again.  He said --

8    Q.   He said that for the first time there?

9    A.   Yes.

10   Q.   Does that mean he's trying to arrest her to you?

11   A.   Yes.

12   Q.   He's letting it be known to her that she needs to put

13  her hands behind her back?

14   A.   Yes, sir.

15   Q.   What does the next sentence say?

16   A.   "The plaintiff did not comply."

17   Q.   Okay.  Now, there's two parts to officer -- or Sergeant

18  Nicholls' behavior and actions after this.  He tried to grab

19  her arm is what he says and he slipped because of grease?

20   A.   Yes.

21   Q.   Then it says he attempted to regain his grip; is that

22  right?

23   A.   No.  It says, "I attempted to place her left hand

24  behind her back, but her arm had some type of cream or grease

25  on it that caused me to lose control of her arm."

1    Q.  Now, do you have a problem of with those actions of

2    Sergeant Nicholls?

3    A.  I have no problems with those actions although they

4    were totally unnecessary as I stated before.

5    Q.  Why is that, sir?

6    A.  Because he had no reason to believe that she was any

7    danger to him and she was according to the standards of police

8    policies and procedures he was using force on her which was not

9    required.

10        Police officers are trained to use that amount of force

11   that is necessary to offset the amount of force being used

12   against him.  That's it.  Plain and simple.

13   Q.  But what we just read was he was trying to put her

14   hands behind her back?

15   A.  Yes.

16   Q.  And place her under arrest?

17   A.  Yes.

18   Q.  What was improper about the amount of force used at

19   that time?

20   A.  It was initiated by the police.

21   Q.  So you don't believe that Officer Vasile -- or Sergeant

22   Nicholls should have arrested -- should have attempted to put

23   Ms. McKnight into custody?

24   A.  For one --

25   Q.  I think we already determined that he observed her

1  resisting arrest?

2     A.  He observed her in the struggle with another officer,

3  yes.

4     Q.  Would you consider what he observed -- what he wrote

5  was he observing Ms. McKnight resisting arrest?

6     A.  Yes.

7     Q.  You don't believe that he should have tried to put Ms.

8  McKnight into custody after he observed her resisting arrest?

9     A.  If he observed someone resisting arrest the police

10  officer - whether it's a sergeant or any officer - is duty

11  bound to assist that officer if necessary.

12     Q.  So let's move on then.  He says he attempted to regain

13  his grip, but wasn't able to do so because the grease was on

14  his hands?

15     A.  The grease was on her arms not his.

16     Q.  Then he said, "S continued to actively pull away from

17  to Vasile.  So I administered a one second burst of capsicum to

18  S's face."

19     A.  Yes, sir.

20     Q.  Do you have a problem with that action?

21     A.  Absolutely.

22     Q.  Why?

23     A.  There was nothing to necessitate spraying a chemical

24  into the face of an individual when you have two well trained

25  and disciplined officers there to handle the actions of a five

foot three or four woman who was totally out of shape and
unable to respond to their physical actions.

Q.  Well, she may have been -- you claim she was out of
shape.  I don't think we know that.  She was a large woman; is
that correct?

A.  Yes.

Q.  Were these officers -- did they weigh as much as her,
do you know?

A.  They did not weigh as much as her, no.

Q.  Okay.  So whether they're in shape or she's not in
shape, and we don't know -- shape is very subjective, in shape
is subjective.

A.  Shape is definitely subjective in this instance because
the officers are physically fit and trained to handle
persons --

Q.  How do you know police are physically fit?

A.  In my research of the Rochester Police Department
they're one of the best physically trained police departments
in this area.

Q.  That's good, but how do we know that every single
officer including these two are physically fit or were
physically fit at the time?  I mean, how do we know that?

A.  They're police officers and they're observed by their
supervisors and so forth on a regular basis and the police
officers are required to maintain physical fitness.

1    Q.  Does that always happen in your experience?

2    A.  No, it does not.

3    Q.  Okay.  So when the pepper spray was deployed you had

4    two officers who couldn't control a suspect that they were

5    trying to arrest, is that what the reports indicate?

6    A.  Yes.

7    Q.  And she was moving towards a door -- an open door at a

8    house?

9    A.  Yes.

10   Q.  Do the reports indicate that?

11   A.  That she was moving towards -- she was attempting to

12   get into her house is what the reports indicate.

13   Q.  The exhibit -- Plaintiff's Exhibit 2 states that as she

14   was moving toward the door at some point she said, "Get him"?

15   A.  Yes.

16   Q.  We also established that Sergeant Nicholls was duty

17   bound to make an arrest and to put this person into custody if

18   he thought she was resisting arrest?

19   A.  Yes, sir.

20   Q.  Which his report indicates that he thought she was

21   resisting?

22   A.  Yes, sir.

23   Q.  So when we get to the deployment of pepper spray in

24   this situation with the assumptions that I just built into the

25   question why would it be inappropriate for Sergeant Nicholls to

1 deploy pepper spray?

2         MR. FUSSELL:  Asked and answered.  Objection.

3         THE COURT:  Overruled.  You may answer.

4         THE WITNESS:  For the sake of repeating myself

5 there were two trained police officers.

6 BY MR. CAMPOLIETO:

7   Q.  That's not the answer to my question.  You have two

8 officers who did not have control of a larger woman.  The

9 officer that pepper sprayed Ms. McKnight believed she was

10 resisting arrest, he could not control her and with all the

11 other assumptions -- with those assumptions why was it

12 inappropriate for Sergeant Nicholls to deploy pepper spray?

13         MR. FUSSELL:  Objection.

14         THE COURT:  Overruled.

15         THE WITNESS:  In my opinion?

16 BY MR. CAMPOLIETO:

17   Q.  Yes, sir.

18   A.  In my opinion it was not appropriate - excuse me -

19 because there were other trained things that the officers could

20 have used not including the use of pepper spray.

21   Q.  Okay.  You're right.  I'm not going to argue with you.

22 I'm going to show you --

23         THE COURT:  We can strike that.  You don't need to

24 respond to his answers.

25 BY MR. CAMPOLIETO:

1    Q.  I'm going to have you look at Defendant's 417.  Have

2  you seen this document before?

3    A.  Yes.

4    Q.  You have?

5    A.  Yes, sir.

6    Q.  Did you list this on your information that you reviewed

7  to make your opinion?

8    A.  No, I did not.

9    Q.  Okay.  Regardless, if you could look at that document

10  and can you tell us what level of force on this document which

11  we know has been testified to - this is the City of Rochester's

12  Police Department's use of force matrix level two -- I'm sorry.

13       If you could tell us what level the use of pepper spray

14  which is also referred to as OC Aerosol and you'll see -- can

15  you tell us what level of force that would be listed under?

16    A.  According to the Rochester Police Department use of

17  force matrix which is taken from the continuum of force matrix

18  that is used nationally.

19    Q.  That's right.  You're exactly right.

20            THE COURT:  Again, If you can refrain affirming or

21  disavowing his statements.

22            MR. CAMPOLIETO:  I'm sorry.

23            THE WITNESS:  Level two would indicate the use of

24  OC Aerosol.

25  BY MR. CAMPOLIETO:

1    Q.  Now, the first thing under level two what does it say?

2    A.  "Persuasive compliance" -- maybe person.

3    Q.  Can you tell us in your opinion what those mean?

4    A.  No.

5    Q.  You don't know what they mean?

6    A.  No.

7    Q.  Well, that's not -- let's -- underneath OC Aerosol do

8    you see the other --

9    A.  Yes.

10   Q.  -- use of force techniques in level two?

11   A.  Yes.

12   Q.  What are some of those?

13   A.  Pressure points, displacement, jugular notch, clavicle

14   notch, imprint, hypoglossal pain compliance.

15   Q.  Can I just stop you so we can go over the pressure

16   points?  What does pressure points mean to you?

17   A.  Officers are trained to apply pressure to certain

18   vulnerable points of the body.

19        If I can better explain it there are points behind the

20   ear that induce extreme pain.  There are points underneath the

21   armpits that conduce pain.  There's points on the wrist and the

22   positioning in which you can hold a wrist which would demand

23   compliance because of pain and these are pressure points

24   throughout the whole body that the officers are trained to use.

25   Q.  So the pressure points requires grabbing, touching -- a

1  physical contact, you have to get near the person; is that

2  correct?

3      A.  Yes.

4      Q.  You use force strength to manipulate parts of the body

5  to cause extreme pain?

6      A.  Yes, sir.

7      Q.  What does that extreme pain result in?

8      A.  Compliance.

9      Q.  Are there -- when you manipulate the pressure points

10  like this is there a chance there could be injury?

11      A.  Absolutely.

12      Q.  Let's go further down then.  What are some of the other

13  things that are listed in the City of Rochester's use of force

14  matrix?

15      A.  Wrist locks and arm locks, that's in item two.

16      Q.  Pain compliance, mandibular angle, center ear, are

17  those pressure points?

18      A.  Yes.

19      Q.  Wrist locks and arm locks?

20      A.  Yes, as I explained them.

21      Q.  Now, wrist locks, arm locks with empty hands, was that

22  attempted prior to the pepper spray?

23      A.  The officer was attempting to grab her or control her

24  by moving her arms, so yes, sir.

25      Q.  And it didn't work according to the report?

1    A.  According to the officers it wasn't working.

2    Q.  What was the next one?

3    A.  That's it.

4    Q.  I'm sorry.  There's another wrist lock, arm locks?

5    A.  Empty hands.

6    Q.  We just talked about that, but there's another one

7    after that?

8            THE COURT:  After empty hands?  Not on my copy.

9            THE WITNESS:  There isn't on mine.

10            MR. CAMPOLIETO:   Okay.  I withdraw the question,

11    your Honor.  I was referring to an older version that wasn't

12    introduced into evidence and I apologize, but all the other

13    questions were based on this.

14            THE COURT:  Okay.

15    BY MR. CAMPOLIETO:

16    Q.  So looking at this use of force matrix there was an

17    attempt to use a technique that's listed on there as wrist

18    lock, arm lock empty hand; is that correct?

19    A.  Yes, sir.

20    Q.  And it apparently didn't work according to the report?

21    A.  According to what the officer said, yes.

22    Q.  So they went to -- Sergeant Nicholls went to the OC

23    Aerosol; is that correct?

24    A.  Yes, sir.

25    Q.  And you believe that he shouldn't have done that?

1    A.   There were other things available for him to do.

2    Q.   But it was his choice; is that correct?

3    A.   It was his choice, correct.  This use of force matrix

4  is the choice of the Rochester City police department.  It is

5  in no means in compliance with the International Associates of

6  Chiefs of Police continuum of force or what is taught as

7  continuum of force throughout the country.

8    Q.   We're not talking about that.  I thought before we

9  looked at this didn't you say this was based on --

10   A.   It's based on the continuum of force.

11   Q.   What's the difference?

12   A.   Briefly, level two on this report for the Rochester

13  Police Department is beyond what is recommended on the

14  continuum of force.

15   Q.   Is that --

16   A.   And nowhere does it --

17   Q.   That's the choice of --

18           MR. FUSSELL:  Let him answer the question.

19  Objection.

20           THE WITNESS:  In nowhere does it go into the

21  appropriate levels of force to be used in the continuum of

22  force because it totally omits attempting to talk a person down

23  in an aggressive situation.  It omits just trying to talk to

24  people which is usually what good police officers would do.

25  BY MR. CAMPOLIETO:

1    Q.  Sir, are you looking at the same document that I'm

2  looking at?

3    A.  Yes, I am.

4    Q.  Okay.  Level one, what are those --

5    A.  Level one, command presence, yes person, effective

6  communications, relative positioning, stances, compliant.

7    Q.  What does effective communication mean to you?

8    A.  Effective communication would be to talk so a person

9  understands what you're saying.

10    Q.  So what you're saying it's missing is right there

11  effective communication?

12    A.  That's missing, yes, in what the officers actually did.

13        The continuum of force has five particular instances in

14  which police officers are trained.  The first one -- the first

15  did --

16    Q.  I didn't ask that question.  What I want to ask, sir,

17  is, the report that you read, the Subject Resistance Report,

18  doesn't that indicate that Sergeant Nicholls attempted to have

19  her put her hands behind her back?

20    A.  He requested her or commanded her to put her hands

21  behind her back.

22    Q.  As she's struggling with his officer?

23    A.  Yes, sir.

24    Q.  Do you think that's something that he did wrong?

25    A.  What they had was the availability to talk this person

1  down.

2      Q.  You say they --

3      A.  Which they did not.  They, yes, the two officers.

4      Q.  Well, I'm talking about Sergeant Nicholls.

5      A.  Okay.

6      Q.  Did he have the ability to have time to communicate

7  with her and talk her down?

8      A.  Yes.

9      Q.  Okay.  Was she struggling with his officer?

10      A.  According to the officer's report, yes.

11      Q.  Was she trying to get into the house?

12      A.  Yes.

13      Q.  Did he observe her resisting arrest?

14      A.  The sergeant observed her resisting the arrest of a

15  subordinate officer.

16      Q.  His report indicates he attempted to talk to her to

17  have her put her hands behind her back.

18      A.  The report doesn't indicate that he attempted to talk

19  to her.  The report indicates that I ordered her to put her

20  hands behind her back.

21      Q.  So as you sit here today as an expert witness in police

22  policy you believe that he was duty bound to have a

23  conversation with her --

24      A.  Yes.

25      Q.  -- as he believed --

1    A.  Yes.

2    Q.  -- she was resisting arrest?

3    A.  Yes.

4    Q.  Struggling with an officer?

5    A.  Yes.

6    Q.  Near an open door?

7    A.  I'm Jim Williams.  I don't know about an open door.

8    Q.  Well, we did talk about she was attempting to get to an

9    open door?

10   A.  Yes.  She was attempting to get to an open door.

11   Q.  And you indicated that there are dangers associated

12   with a suspect who needs to be arrested going into an open door

13   of an unknown house and you believe that the officer was duty

14   bound to sit and talk to her?

15   A.  Yes.

16           MR. CAMPOLIETO:  I have no further questions, your

17   Honor.

18           THE COURT:  Mr. Fussell, do you have redirect?

19           MR. FUSSELL:  I may not.  Just a couple.

20   REDIRECT-EXAMINATION BY MR. FUSSELL:

21   Q.  Had Officer Vasile read the 911 communications on his

22   computer would he have known that the first call came from 232

23   Pierpont Street and that it had come from a female?

24   A.  Yes, sir.  That information was given to the police

25   dispatcher and it was put out over the air which all the police

1    officers received.

2                MR. FUSSELL:  I have no further questions.

3                THE COURT:  Thank you very much, Dr. Williams.

4    Have a safe trip back to New Jersey.

5                Counsel, how much time would you like for a lunch

6    break?  I think it would be a good time to take a break and

7    refortify ourselves.

8                MR. CAMPOLIETO:  I don't have much.  My cross on

9    Dr. Ewing -- I think an hour.

10               THE COURT:  We'll take an hour for lunch.  We'll

11   see you in an hour.

12   (Recess taken.)

13               THE COURT:  Mr. Fussell, are you ready to call the

14   next witness?

15               MR. FUSSELL:  Yes, your Honor.  I call Dr. Charles

16   Ewing.

17               THE COURT:  Dr. Ewing, please step forward here to

18   be sworn.

19                        CHARLES EWING, MD,

20      called herein as a witness, being duly sworn, testified as

21                            follows:

22               THE WITNESS:  My name is Charles Patrick Ewing.

23               THE COURT:  Good afternoon, Dr. Ewing.  Thank you

24   for your patience.

25               Go ahead, Mr. Fussell.

DIRECT-EXAMINATION BY MR. FUSSELL:

Q.  What's your date of birth, Dr. Ewing?

A.  8/2/49.

Q.  What is your occupation?

A.  I'm a forensic psychologist.  I'm an attorney and a SUNY distinguished service professor at the State University of New York, Buffalo.

Q.  How long have you had that position at the University of Buffalo Law School?

A.  I've been on the faculty at the law school since 1983. I was promoted to full professor in 1988 and I think in 2004 I was promoted to highest rank, distinguished professor.

Q.  What courses do you teach?

A.  I teach criminal law, evidence and sorts.

Q.  I'm showing you Plaintiff's Exhibit 24 and ask you if you can say what that is?

A.  This is my resume, my CV.

MR. FUSSELL:  Okay.  I ask that Exhibit 24 would go in evidence.

MR. CAMPOLIETO:  Again, your Honor, the city objects on relevancy.

THE COURT:  Okay.  That objection is overruled. I'll accept Plaintiff's Exhibit 24.

BY MR. FUSSELL:

Q.  Maybe I'll ask a couple of questions right from here.

1    Where did you get your law degree?

2      A.   Harvard Law School.

3      Q.   Did you get any honors?

4      A.   Graduated with honors, yes.

5      Q.   Are you a licensed psychologist in New York?

6      A.   Yes.  New York and Massachusetts.

7      Q.   When were you licensed in New York?

8      A.   1979.

9      Q.   There's no reason to go through the rest of it.  It's

10   there for the Court to reread.

11         I'm showing you Exhibit 26 which appears to be the

12   beginning of a letter from me to Mr. Campolieto, but that part

13   I'm not concerned with.  The list that's on Exhibit 26, can you

14   tell us what that is?

15     A.   These are the cases in which I've testified either at

16   trial or deposition in the last I believe five years.

17     Q.   Now, did you testify as an expert in any field?

18     A.   Forensic psychology.

19             MR. FUSSELL:  Okay.  I ask that Exhibit 26 be

20   placed in evidence.

21             THE COURT:  Okay.  Same objection?

22             MR. CAMPOLIETO:  Same objection, your Honor.

23             THE COURT:  Same ruling.  Exhibit 26 is received.

24   BY MR. FUSSELL:

25     Q.   Did I retain you to examine the plaintiff in this case,

1  Miriam McKnight, to determine whether and if so to what extent

2  she was psychologically injured by the actions taken against

3  her by employees of the City of Rochester on July 3rd and 4th,

4  2010 and subsequently?

5  A.  Yes.

6  Q.  Prior to your examination of Ms. McKnight did you

7  review documents that I supplied you relating to this lawsuit?

8  A.  I did.

9  Q.  What documents did I supply you?

10  A.  You gave me numerous records.  I'm going to have to

11  refer to my notes if that's --

12  Q.  I assume -- I'll ask the Court how she wants to handle

13  it.  You can either read off of his report to me or refresh his

14  recollection?

15  A.  I'm looking at my report to refresh my recollection.

16              THE COURT:  Is that dated July 24th, 2015?

17              THE WITNESS:  Yes.

18              THE COURT:  Any objection?

19              MR. CAMPOLIETO:  No.  Just -- he referred to

20  notes, does he have notes?

21              THE WITNESS:  This is what I meant.  I do have

22  notes, but this is what I meant.

23              MR. CAMPOLIETO:  You have notes there with you?

24              THE WITNESS:  Not in front of me, but I have

25  notes.

1    THE COURT:  Go ahead.  You may use that letter to

2  refresh your recollection.

3    THE WITNESS:  Okay.  I reviewed Ms. McKnight's

4  medical records from Unity Health System, Rochester Police

5  Department records relating to her arrest, her booking and

6  attention on July 3rd and 4th, 2010.  The defendant's responses

7  to plaintiff's demand for discovery inspection.  Plaintiff's

8  notice of motion for summary judgment and read a number of

9  depositions; Laura Grande, Michael Nicholls, Gregory Vasile,

10  Miriam McKnight.  I believe that's it.

11  BY MR. FUSSELL:

12    Q.  Did you at any time meet with Ms. McKnight?

13    A.  Yes, I did.  On July 13th, 2015.

14    Q.  How long did you meet with her?

15    A.  Three hours and forty-five minutes.

16    Q.  Based on your meeting with Ms. McKnight and the

17  documentation I supplied you did you make any factual

18  background findings with respect to Ms. McKnight?

19    A.  Well, I talked to her about her history, life history.

20  At that time she was thirty-eight years old.  She was an

21  African American woman who had worked in the past as a

22  Certified Nursing Assistant, but I believe when I saw her she

23  was working at Walmart.

24    She relaid that she had no previous psychological or

25  psychiatric history, but that she had been receiving some

treatment for the past couple of years with regard to alcohol

abuse.  The treatment was at Unity Health System.  We talked

about that and her history of having been a social drinker

until this incident occurred in 2010.

I believe we also discussed a previous DWI conviction

she had when she was nineteen years old.  I don't know if

that's what you mean by background information.

Q.  Yes.  I guess I'm asking for those sorts of things?

A.  Yes.

Q.  Did you find out whether she was married or not?

A.  I believe she was married, but separated from her

husband and she had three sons who I believe were teenagers.

Q.  Okay.  Well, your report would indicate, would it not?

A.  Yes.  Eighteen, nineteen and the youngest was eight.

Q.  At the time you met her?

A.  At the time -- last summer.

Q.  Okay.  Was the information that you just described and

what I gave you and your interview with her sufficient for you

to arrive at opinions you reached with respect to the effect of

her involvement with the individual defendants, Vasile,

Nicholls, as set forth in the report that's in front of you?

A.  Yes.

Q.  Is the report you prepared the product of reliable

principles and methods utilized by members of your profession

when making assessments such as those you made in response to

1    my requests regarding the plaintiff?

2        A.  Yes.

3        Q.  Did you apply those principles and methods reliably to

4    the facts of this case?

5        A.  I did.

6        Q.  Based upon your meeting with Ms. McKnight and the

7    documentation I supplied you did you make any findings with

8    respect to the events of 7/3/10 and 7/4/10 involving Ms.

9    McKnight and members of the Rochester Police Department?

10       A.  Yes.

11       Q.  What did you determine or what -- with respect to her

12   involvement with the police on July 3rd and 4th?

13       A.  Well, what I learned from the materials and from

14   interviewing Ms. McKnight is essentially that there was a crime

15   committed I believe next door to her and police were called.

16   She was one of the parties who called the police.  Police

17   officers responded.

18           She was on her porch on her own property and noticed

19   the police officer putting crime scene tape up on her porch and

20   she confronted him about that and he responded by being vulgar

21   and disrespectful to her in his language.

22           He handled her roughly and arrested her.  She was

23   sprayed in the face was oleoresin capsicum, pepper spray, and

24   she was then handcuffed, placed into a patrol car, driven to I

25   think it was the Hall of Justice and then kept overnight in a

solitary cell with no bedding until the morning when she was

given an appearance ticket and released.

Q.  Okay.

A.  She also mentioned that she is asthmatic and that when

she was forced into the police car she was having difficulty

breathing.  She had been sprayed.  She was temporarily blinded

and having difficulty breathing and she thought she was going

to die.

Q.  Did you make any findings with regard to what happened

to any -- strike that.

Were there any charges filed against her that you

discovered?

A.  I believe she was charged with obstructing governmental

administration and resisting arrest.

Q.  Do you know what the results of that charge were?

A.  She was granted an adjournment in contemplation of

dismissal on those charges.

Q.  Do you know why she accepted that ACD?

A.  Yes.  What she said to me was that she was -- well, two

things.  One, she was tired of going back to Court time and

time again and not getting anywhere, but also that she was

afraid that she wouldn't be believed that the police would be

believed and, you know, she didn't believe she was guilty.  Her

attorney suggested and she accepted the recommendation to take

the ACD.

1    Q.  After your examination of Ms. McKnight did you reach an

2    opinion of a reasonable degree of professional psychological

3    certainty that she suffered or suffers from any psychological

4    effects as a result of her treatment by the defendants in the

5    lawsuit?

6    A.  Yes, she does.

7    Q.  Just in general what are those effects?

8    A.  I would say diagnostically she suffers from reoccurring

9    episodes of major depression and she suffers from posttraumatic

10    stress disorder.

11    Q.  When you use the word major depression is there a

12    definition for that term that you rely upon?

13    A.  Yes.  It's a technical term that comes from this book

14    that we rely upon in my profession the Diagnostic and

15    Statistical Manual For Mental Disorders, Fifth Edition, known

16    as the DSM 5, spells out the diagnostic material for major

17    depression or major depressive disorder and posttraumatic

18    stress disorder.

19    Q.  You have the book in front of you?

20    A.  I do.

21    Q.  Can you read those definitions or are they too

22    extensive?

23    A.  No.  Essentially --

24    Q.  Essentially what is major depression either as defined

25    specifically in the DSM or as you understand it to be?

1    A.  Well, major depression is -- goes beyond ordinary

2  depression.

3    Q.  What is ordinary depression?

4    A.  Ordinary depression is basically persistent feelings of

5  sadness that are accompanied by other kinds of cognitive and

6  effective distortions that make people basically unhappy.

7  Major depressive disorder is much greater than that.  It's not

8  just being depressed.

9    Major depressive disorder includes being depressed -

10  that's one of the criteria to make that diagnosis, is a

11  subjective depressed mood most of the day for long periods of

12  time, but you need more than that.

13    You need to show that the individual has remarkably

14  diminished interest in activities that previously would have

15  brought joy or satisfaction.  Appetite loss is another

16  criteria, sleep problems, so-called vegetative problems, the

17  inability or lack of desire to eat, problems sleeping - either

18  falling asleep or staying asleep - loss of libido, sexual

19  interest, fatigue.

20    Sometimes psychomotor retardation or agitation where

21  either the person is not moving at their normal rate or they're

22  moving way beyond their normal rate.  They're either agitated

23  or retarded in their movement.

24    Feelings of worthlessness and loss of self esteem,

25  diminished ability to think and concentrate and in some cases

 1    reoccurring thoughts of death or suicide.

 2        Those are the major criteria that you see with people

 3    who have major depressive disorder.

 4        You don't have to have all of them, but you do have to

 5    have many of them and they have to occur for more than two

 6    weeks at a time to meet the diagnostic criteria.

 7    Q.  At this point without going into detail as to which of

 8    those she may have had did she suffer some or all of the types

 9    of conditions that you just described?

10    A.  Yes.  Nearly all of them.

11    Q.  Okay.  In your opinion when did she begin to suffer

12    depression?

13    A.  Almost immediately after she was arrested in July 2010.

14    Q.  What facts did you rely upon to conclude that she began

15    suffering from depression shortly after July 3rd, 2010?

16    A.  Well, primarily her own statement that prior to then

17    she had been functioning adequately and that when she -- after

18    she was arrested she was embarrassed, ashamed, felt like people

19    blamed her, that her -- she felt worthless.

20        I guess she said even her own mother said, "Well, if

21    they arrested you you must have done something wrong."

22        She felt like she wasn't believed and that caused her

23    to have a drop in herself esteem.  She began having trouble

24    sleeping almost immediately after this incident.  She began to

25    lose her appetite.  She completely lost her sex drive or

1  interest in sex.

2      She was feeling fatigued to the point where some days

3  she just didn't get out of bed or if she got of bed she

4  basically had to force herself out of bed.

5      The things she had previously been interested in -

6  socializing with friends, family members - she was no longer

7  interested in going out and doing things.

8      She had to work economically, but she didn't enjoy her

9  work any longer.

10      She had almost nightly dreams of her own death.

11      I think those are the main things that I gleamed from

12  my assessment of her.

13      Plus, she did -- I should add that she felt not only

14  depressed, but hopeless.  She said to me that, "I felt like my

15  life was ruined and I still do."

16   Q.  Did you talk to her about whether or not she

17  contemplated suicide?

18   A.  Yes.  She denied contemplating suicide.

19   Q.  Okay.  Did she indicate that she was going through the

20  motions in life rather than acting spontaneously?

21          MR. CAMPOLIETO:  Objection.  Leading, your Honor.

22          THE COURT:  Overruled.  You may answer.

23          THE WITNESS:  Yes.  What she said was there were

24  times when people would say, "What's wrong with you?" or

25  "What's going on with you?" because they realized that even

1    though she was there physically she wasn't there mentally.

2              I asked her how she explained that and she said,

3    "Well, I was just kind of going through the routines.  I

4    just -- that's all I could do -- couldn't really associate with

5    other people or pay attention to what they thought about or

6    cared about."

7    BY MR. FUSSELL:

8       Q.  Did she talk about tearfulness?

9       A.  Yes.  She was crying on a daily basis for weeks on end

10   and sometimes would get over it and then go back and cry again.

11      Q.  Did this depression continue after a short period after

12   July 4th?

13      A.  Yes, it continued right up until the time I saw her.

14   In July of 2015 she was still depressed.

15      Q.  Did she talk to you about her alcohol consumption and

16   her eating?

17      A.  Yes.  She -- as I said before, in taking her history

18   she was a social drinker, did not abuse alcohol on any regular

19   basis, but after the incident of July 2nd and 3rd, 2010 she

20   began to abuse alcohol almost daily.

21            In fact, she said it was her go to method of dealing

22   with her depression and anxiety.

23            She -- unfortunately it sounds to me like she was --

24   she became an alcoholic to put it in lay terms.  She was a

25   serious alcohol abuser and in the next year or two arrested at

1    least twice for driving while intoxicated.

2        Q.   Did she talk about being incarcerated as a result of

3    DWIs?

4        A.   Yes.  She was incarcerated for several months as a

5    result of being a repeat DWI offender.

6        Q.   Did she talk to you about what effect that

7    incarceration had on her drinking and driving habits?

8        A.   She stopped drinking and she stopped driving and she

9    told me she had no longer driven or consumed alcohol since

10   then.

11       Q.   Since her release from jail, is that --

12       A.   Yes.

13       Q.   Did she talk about the changes in social activities

14   such as going to concerts or parties or that sort of thing?

15       A.   Yes.  One of the symptoms of both posttraumatic stress

16   disorder and major depressive disorder is withdrawal,

17   alienation from other people and it's clear that's what

18   happened with her that she -- although she blamed herself.

19            She said that she feels like she alienated other

20   people, but whether she did it or not the bottom line was that

21   she stopped associating with friends.

22            She told me, "I no longer have friends.  I just have

23   family."  People either didn't want to be with her or she

24   didn't want to be with them, but in any event, she withdrew

25   from pretty much all of her social activities.

1    Q.  Did you come to the opinion as to whether there was any

2    relationship between the incidents she had that are the subject

3    of this lawsuit with the defendants and the symptoms that you

4    just described?

5    A.  I think they're the direct result of what happened to

6    her on July 3rd and July 4th, 2010.

7    Q.  Did she talk about the relationship she had with her

8    husband prior to and after July 3rd and 4th, 2010?

9    A.  Yes.  She was married to and living with her husband

10    and her sons prior to July 3rd and 4th.  Subsequently, after

11    the incident with the Rochester Police -- as I said, one of the

12    symptoms of depression is -- she suffered one of the most

13    pronounced symptoms which is she lost interest in interacting

14    and socializing with other people, but she also lost her

15    libido.  She had no interest in sex at all.  Her husband

16    subsequently involved himself in an extramarital affair and

17    they broke up.  She blamed herself.

18    She said she doesn't blame him.  Basically she said he

19    had to look elsewhere because she could not fulfill his sexual

20    needs and she was sad and depressed and unhappy about it and

21    didn't blame him, but blamed herself.

22    Q.  Did she indicate that he made efforts to keep this

23    marriage together?

24    A.  Yes.  She said he tried as hard as he could, but she

25    couldn't blame him because he's a man and he has sexual needs

1   and she couldn't fulfill his needs.

2      Q.  Did -- and again, in your opinion did the incident of

3   July 3rd and 4th that are the subject of this lawsuit and

4   thereafter with the criminal charges -- were they in your

5   opinion a cause or have any affect with respect to her

6   relationship with her husband?

7      A.  I think the causal chain was those incidents that --

8   those July 3rd and 4th incidents plus the following criminal

9   justice proceedings against her made her severely depressed and

10  as a result of that depression one of the symptoms that she

11  manifested was a loss of sexual desire and a loss of desire to

12  relate to other people and that's what led to the breakup of

13  her marriage.

14     Q.  Did she talk to you at all about her relationship with

15  her sons?

16     A.  Yes.

17     Q.  What did you conclude was the relationship with her

18  sons before the July 3rd, 4th incident and after the July 3rd

19  and 4th incident?

20     A.  Both before and after she appears to have a very

21  positive relationship with her sons, but since the July 3rd and

22  July 4th incident in 2010 she has become much more

23  overprotective of her sons.

24        She worries that something like this could happen to

25  them and she expresses it to them whether they want to hear it

1   or not.  She has informed them and continues to inform them --

2   or at least as of July 13th, 2015 she continued to tell them,

3   "Don't do anything that could get you into trouble with the

4   police.  Don't even do anything that could call you to the

5   attention of the police because something like this could

6   happen to you."

7       Q.  Did she indicate that her concern resulted from the

8   fact that she was the parent of black males?

9       A.  Yes.  She talked about her fear that just as the parent

10  of young black males this could happen, but how that has been

11  really hammered home to her because of what happened in July of

12  2010.

13      She talked about how this incident has just made her

14  much more acutely aware of other incidents that she learns

15  about in the media, television, radio, newspapers of African

16  Americans being abused or shot by the police.

17          MR. CAMPOLIETO:  Objection, your Honor.  Relevance

18  to this proceeding.

19          THE COURT:  Overruled.

20  BY MR. FUSSELL:

21      Q.  In your opinion did Ms. McKnight's relationship with

22  the police change after the July 2010 incidents?

23      A.  Yes.  Prior to that time as far as I can tell she

24  didn't concern herself much with the police, but since then

25  she's become obsessed with the idea that police could do this

1    to her again.

2         She told me that for some weeks after her arrest she

3    noticed a police car sometimes parked for hours at a time near

4    her home.

5         She said she avoids the police at all costs, doesn't go

6    near the police, and in fact, avoids going places where she

7    knows there are likely to be police officers.

8         Q.  Did she indicate that these police people being around

9    her house took place around July 3rd or 4th or at some other

10   time?

11              MR. CAMPOLIETO:  Objection.  Leading, your Honor.

12              THE COURT:  Sustained.

13   BY MR. FUSSELL:

14        Q.  Did she talk to you about the fact that she had filed a

15   Notice of Claim against the City of Rochester?

16        A.  Yes.

17        Q.  Did she indicate that the presence of the police around

18   her house was related in any way to the time the Notice of

19   Claim was filed?

20              MR. CAMPOLIETO:  Objection.  Leading, your Honor.

21              THE COURT:  Sustained as to leading.

22   BY MR. FUSSELL:

23        Q.  When did -- did she indicate to you - and I believe

24   it's in your report - when these -- when she became

25   concerned -- when she noticed the police hanging around her

1  house?

2    A.  When she notified the city that she was going to bring

3  a lawsuit against the police.

4    Q.  Did she indicate that this feeling with - and you may

5  have said this, that this -- her relationship with the

6  police -- her feelings about the police are ongoing?

7    A.  Yes.  At least as of July of last year when I saw her.

8    Q.  Okay.  When you saw her in July of last year what was

9  in your opinion her degree of depression?

10   A.  She remained depressed, but her depression was not

11 nearly as bad as it had been in previous years.  I think she's

12 made some progress in the area of depression, but she remained

13 depressed and she was still suffering periodic bouts of major

14 depressive episodes or disorder.

15   Q.  Were all those -- again, were all those a result of

16 this July 3rd and 4th incidents and the subsequent criminal

17 lawsuit against her?

18   A.  Yes.  I wasn't able to determine any other major

19 stressors in her life since then other than the incarceration,

20 but as I said, I think that was secondary to the whole

21 depression.  So it's kind of one chain.

22   Q.  What about -- I think you may have answered this, what

23 about her libido, did she talk about how it was as of July --

24   A.  Still no interest in sex, no interest in men, really no

25 interest in people or relating to people.

1     Q.  What about her concern or interest in alcohol, did she

2  describe that when you saw her?

3               MR. CAMPOLIETO:  Your Honor, I'm going to object.

4  I think we've already been over all of her symptoms with the

5  doctor.

6               I don't know if he's asking on the day he

7  visited -- or she visited the doctor, but we've already been

8  over the symptoms.  I think this is -- you know, they're

9  repeated questions.

10             THE COURT:  I think he's trying to distinguish

11  what she was like in July 2015 versus what she was reported

12  that she had experienced prior to the incidents.  So I'll allow

13  it.

14             THE WITNESS:  When I saw her in July she had not

15  touched alcohol in a long time, but what she said to me is that

16  it's very difficult not to and every day it's a struggle not to

17  drink because alcohol is -- well, she basically said it's her

18  go to relief for the depression and anxiety.

19             I would call it a form of self medication, but

20  whatever you call it she still struggles with every day I would

21  like to drink.  I would like to use alcohol, but I know I

22  can't.

23             She's still at risk let me put it that way.

24  BY MR. FUSSELL:

25     Q.  At risk for what?

1    A.   For resumption of alcohol abuse.

2    Q.   That's your opinion?

3    A.   Yes.

4    Q.   What about when you saw her in your opinion what were

5    her feelings with respect to her own self, self-worth let's

6    say?

7    A.   She still feels guilty about this, humiliated,

8    embarrassed and felt that to that date people still wondered

9    about her because people had seen her arrested, taken out in

10   handcuffs and she feels like somehow they believe this couldn't

11   have happened unless she did something criminal.

12   Q.   You mentioned posttraumatic stress syndrome earlier in

13   your testimony?

14   A.   Yes, sir.

15   Q.   What is it?

16   A.   Well again, that's a technical term that's used in the

17   DSM, but I think I can say generally that posttraumatic stress

18   disorder involves being subjected to or witnessing a situation

19   that is either life threatening or potentially life threatening

20   and thereafter being subjected to a variety of symptoms not all

21   of which are present in every case, but most of which are

22   present in this case and in other cases where you would make

23   that diagnosis.  For example, intrusive thoughts on a regular

24   basis.

25   Q.   What does intrusive thoughts mean?

1    A.  Out of nowhere comes a thought about what happened to

2   you about the traumatic event; bad dreams, nightmares, repeated

3   bad dreams and nightmares about the traumatic incident, efforts

4   to avoid stimuli that remind you of the incident.

5    Q.  For example, like what?

6    A.  Well, like staying away from the police in this case.

7   I mean, in other cases it could be anything -- anything that

8   would remind you of the trauma that you experienced that

9   triggered the posttraumatic stress.

10        Other factors are sort of for short in sense of the

11   value and length of your life, alienation from other people,

12   hypervigilance or sometimes bordering on paranoia.

13    Q.  With respect to Ms. McKnight did you see those

14   symptoms?

15    A.  I saw all of those symptoms, yes.

16    Q.  What are examples of hypervigilance?

17    A.  Well, she's constantly alert to whether police are

18   nearby or if they could be nearby.  She's constantly alert to

19   the concern that her son's could be victimized by the police.

20   If someone knocks on her door she jumps.  She assumes that it's

21   the police or it could be the police.

22        She tries to conform her behavior such that she would

23   give the police no excuse or reason to have anything to do with

24   her.  So that I think -- that's the hypervigilance aspect.

25    Q.  Did she indicate to you that she's -- anything in

1    particular reminds her of these events?

2       A.   Yes.  Any time she sees a police officer it reminds her

3    of the event.  Any time she reads or hears in the newspaper or

4    television accounts of a police assault and particularly police

5    assaults on African Americans.

6       Q.   Did she talk to you at all about the scars on her arm?

7       A.   Yes.

8       Q.   What did she say?

9       A.   They too are a reminder of what was done to her on that

10   occasion, July 3rd and 4th, 2010.

11      Q.   Did she talk to you about whether or not she was still

12   experiencing nightmares as of the day you saw her?

13      A.   Yes.  She was still having nightmares.  The nightmares

14   are nightmares in which she dies.

15      Q.   Okay.  Did you believe her when she made these

16   statements?

17      A.   Yes, I did.

18      Q.   Again, because I'm catching up did you believe that all

19   these things you testified -- since the last time I asked you

20   this question were they connected the nightmares,

21   hypervigilance everything else related to the July 3rd, 4th and

22   subsequent with the Rochester Police?

23      A.   Yes.  I think they're directly --

24               MR. CAMPOLIETO:  Your Honor, I'm going to object.

25   This is the third time this question has been asked.

1          MR. FUSSELL:  I asked it because -- I could have

2    waited until the end I guess and asked about all the things,

3    but I don't want to forget to connect what he just testified to

4    to the incident.  So I'm asking about the incidents that I've

5    asked about since the last time I asked that question as to

6    whether they're connected.  That's what I'm doing.

7          THE COURT:  Overruled.  You may answer.

8          THE WITNESS:  They're all connected and they all

9    seem to be a direct result of what happened to her on July 3rd

10   and 4th, 2010.

11   BY MR. FUSSELL:

12   Q.  Did she talk about any efforts with respect to dramatic

13   events in her life -- how she deals with drama?

14   A.  She leads a very sheltered life now.  She tries to

15   avoid any drama - and by that she means anything out of the

16   ordinary.  She has a routine.  She sticks to her routine.

17   She's afraid to go outside that routine for fear that something

18   like this will happen again.

19   Q.  Did she talk to you about her feelings of her -- her

20   feelings for the future?

21   A.  Yes.

22   Q.  And what they were and what they are now?

23   A.  Well, prior to this time she had very positive feelings

24   about her future, but since the events of 2010 she said she

25   feels like her life has been ruined, but toward the end of the

1   evaluation I did with her she acknowledged that she does still

2   have some hope that some day she'll get over this.

3      Q.  In your opinion does she require treatment for PTSD and

4   depression?

5      A.  Very much so, yes.

6      Q.  What kind of treatment does she need in your opinion?

7      A.  She needs intensive and extensive psychotherapy.  I

8   would say certainly individual psychotherapy and probably in

9   terms of relapse prevention with regard to alcohol.  She needs

10  probably some type of group psychotherapy or some involvement

11  in maybe a twelve step program in addition to some kind of

12  group therapy.

13      I think she also needs medication for the depression

14  and anxiety that she suffers and I encouraged her to consider

15  that.

16     Q.  Did you analyze whether or not she could actually

17  afford to get this kind of treatment?

18              MR. CAMPOLIETO:  Objection.  I believe this is

19  outside the scope of his expert testimony.

20              THE COURT:  Sustained as to the question and how

21  it's framed.

22  BY MR. FUSSELL:

23     Q.  Did she talk to you about financial or family burdens

24  that would have some affect on her ability to get the help that

25  you believe she needs?

1    A.  Yes.

2    Q.  What did she say?

3    A.  She can't afford to take the time or to pay the money

4    that would be necessary to get that kind of treatment.

5    Q.  Did she indicate that part of that reason was her

6    children?

7    A.  Yes.

8    Q.  What did she say about her children?

9    A.  Well, she feels like she has all that she can handle

10   with just getting her work done and taking care of her kids and

11   that's pretty much all consuming given her current mental

12   status.

13   Q.  Did she indicate that any of her children were in

14   college?

15   A.  I don't remember.  I think maybe the nineteen year old

16   was and one was about to go to college.  I can't --

17   Q.  Do you have your report?

18   A.  Yes.

19   Q.  Can I look at it?

20   A.  Yes.  I'm trying to testify without reference to it.

21         MR. FUSSELL:  Can I take a minute, your Honor?  I

22   don't see it right here, but I'm sure it's in here.

23         Never mind.  I don't see it.

24   BY MR. FUSSELL:

25   Q.  Do you recall -- see if this refreshes your

1   recollection because I remember her saying this, that her two

2   sons need money for college and she has a nine year old, do you

3   remember her saying that?

4          MR. CAMPOLIETO:  Objection, your Honor.  This was

5   already asked and the Doctor said he doesn't remember.

6          THE COURT:  Sustained.

7          MR. FUSSELL:  Well, I withdraw.  It wasn't in the

8   report.  I misunderstood my own notes.

9   BY MR. FUSSELL:

10    Q.  Did she give you an opinion of her own opinion of being

11   labeled as a person that needed psychiatric assistance?

12    A.  One of the reasons -- I asked her why she hadn't sought

13   treatment and she is a very bright person.  She has a lot of

14   insight into her problems and she understands what's going on

15   and I commented on that and I said, "Why haven't you sought

16   treatment?"

17       She said that, "I don't want to be labeled as crazy or

18   mentally ill."  She said, "If I," - meaning she - "were looking

19   at someone in this situation for self treatment" -- that she

20   would label that person as crazy or mentally ill and that it

21   was especially difficult for her to deal with that stigma

22   because she's always been the strong one in her family.

23       She's been the one that everybody else leaned on and

24   also as a result of what she's gone through she feels like she

25   has to always present a strong facade so that people won't take

1   advantage of her or harm her.

2       So I think that's the way she feels about herself and

3   that's interfering with her willingness to get help.  She

4   certainly needs it and I think she knows she needs it, but

5   she -- at least as of last July she'd been unwilling to get it

6   because of the stigma that she saw as attaching to it.

7       Q.  Are those feelings that you just expressed from her --

8   are they typical of people in her culture?

9       A.  I would say yes.  I've had a lot of experience dealing

10  with --

11          MR. CAMPOLIETO:  I'm going to object to the

12  question, your Honor.  This is outside the scope of this

13  report.

14          THE COURT:  Sustained.

15          THE WITNESS:  Actually, I did mention it in the

16  report for what it's worth.

17          MR. CAMPOLIETO:  Objection, your Honor.

18          THE COURT:  Sustained.  There was no question

19  pending.

20          THE WITNESS:  I'm sorry, your Honor.

21          MR. FUSSELL:  Okay.  Well, it is in his report,

22  your Honor.  This third to last paragraph on the last page it

23  does address this issue.

24          THE COURT:  All right.  I see a parenthetical in

25  there in the subject and I developed an opinion that I saw in

1   the letter which was the basis of the objection and the witness

2   volunteered something that was not in response to a question,

3   but it has been brought to my attention that my recollection of

4   the report was incorrect.  I will permit him to answer the

5   question, but let's try to confine your responses to questions

6   that are posed rather than offering information.

7             THE WITNESS:  I'm sorry, your Honor.

8             MR. FUSSELL:  Can I have the question read back?

9   I'm not sure how far back that is.

10            THE COURT:  Go ahead.  Just ask the question

11   again.

12            MR. FUSSELL:  I don't remember what it was.

13   BY MR. FUSSELL:

14   Q.  You did indicate in your report that the stigma

15   attached to mental illness and psychiatric and psychological

16   treatment parenthesis particular in a racial ethnic community

17   end parenthesis after what she went through with the police,

18   what did you mean by particularly in a racial slash ethnic

19   community with respect to her attitudes toward psychiatric

20   health treatment?

21   A.  My experience working with people of color - and I

22   spend much of my career working with people of color - in those

23   communities there's a great stigma that attaches to seeking

24   psychological or psychiatric treatment as much more so than in

25   other communities.

1  Q. If she did get the treatment you believe she should

2  obtain what in your opinion would be your prognosis with

3  respect to the psychological damage she now endures?

4  A. I think if she got the treatment she would feel

5  subjectively better particularly in terms of the depression. I

6  think in terms of posttraumatic stress disorder the prognosis

7  is much more guarded. I don't think she will ever completely

8  get over the symptoms of posttraumatic stress disorder that

9  have been endured from the events of July 3rd and 4th, 2010.

10  Q. What is your prognosis with respect to her relapse into

11  alcohol abuse?

12  A. I think she's at significant risk any day and I think

13  she understands that any day she could fall back into a pattern

14  of alcohol abuse. So I would say at risk at best.

15  Q. Okay. You may have already said this. I may be

16  repeating, but what treatment do you -- in your opinion should

17  she receive to deal with her potential relapsing into alcohol

18  abuse?

19  A. Some sort of group therapy, treatment for substance

20  abuse and involvement in some kind of twelve step program, AA

21  or something similar to that.

22  Q. Okay. My last question is, is all the problems that

23  she's dealt with that you've testified here today -- in your

24  opinion are they a result of the July 3rd, 4th, 2010

25  involvement with the City of Rochester Police?

1      A.  Directly.

2                  MR. CAMPOLIETO:  Objection, your Honor.  This has

3      already been asked.

4                  MR. FUSSELL:  I'm just clarifying for anything.

5                  MR. CAMPOLIETO:  It's been asked and it's been

6      answered.

7                  MR. FUSSELL:  I don't think it's been answered

8      with respect to the last two things that I asked.  So that's

9      why --

10                 THE COURT:  Okay.  There's not going to be any

11     prejudice about the fact that he's asked the question four

12     times at different stages.  If we had a jury here I think it

13     would be a greater concern.

14                 You may answer the question.

15                 THE WITNESS:  I would say directly or indirectly,

16     yes, they're all the result of what happened to her in July of

17     2010 at the hands of the police department.

18                 MR. FUSSELL:  I have no further questions at this

19     time.

20                 THE COURT:  Dr. Ewing, I wanted to ask you one

21     question.  You explained the meaning of the term major

22     depressive disorder, you indicated that your diagnosis was that

23     Ms. McKnight suffered from reoccurring major depression or

24     major depressive disorder?

25                 THE WITNESS:  Yes.

1    THE COURT:  I think I probably understand what

2    recurring means, but in the context of major depressive

3    disorder what does the term recurring mean?

4    THE WITNESS:  It's a qualifier to say that it

5    comes and goes.  As of last July it was still coming and going.

6    THE COURT:  Okay.  Can you offer an opinion as to

7    the frequency with which it comes and goes?

8    THE WITNESS:  I'd say fairly frequently.  I don't

9    know if I could be more specific than that, but she certainly

10   wasn't over it.

11   I do think it's fair to say, however, that between

12   2010 and 2015 when I saw her that the recurrences were becoming

13   further apart and less serious.

14   THE COURT:  Okay.  Do you have an opinion as to

15   how long the episodes last or lasted over that period of time

16   when they came?

17   THE WITNESS:  Well, by definition they need to be

18   two weeks.

19   THE COURT:  So at least two weeks?

20   THE WITNESS:  At least two weeks, yes.

21   THE COURT:  Do you know in Ms. McKnight's case

22   during the period of 2010 to 2015 how long those periods

23   lasted?

24   THE WITNESS:  I think anywhere from two weeks to

25   several months.

1          THE COURT:  Okay.  Were they -- did they last a

2     shorter duration in 2015 than they did in 2010?

3          THE WITNESS:  Yes.  I would say so.

4          THE COURT:  Thank you.  Mr. Campolieto.

5          MR. CAMPOLIETO:  Before I get started the Unity

6     Health records, are they in evidence?

7          THE COURT:  Yes, 6.

8          MR. CAMPOLIETO:  Your Honor, I have a package

9     which I assumed were in the plaintiff's Unity Health record

10    package, but they don't appear to be.  These are specific to

11    her alcohol and drug treatment.

12         THE COURT:  Okay.  Well, what is your -- I have a

13    notebook that has what was premarked as Plaintiff's Exhibit 6

14    that I believe has been admitted into evidence.

15         MR. CAMPOLIETO:  But these aren't the records that

16    I have.  What I have are dated 6/9/15 - which is the same date,

17    but they don't appear to be included in here.

18         MR. FUSSELL:  I assume they are.  I don't know why

19    they wouldn't be.

20         THE COURT:  Do you want to ask questions about

21    them?

22         MR. CAMPOLIETO:  Yes.  I'll start and I'll see.

23    CROSS-EXAMINATION BY MR. CAMPOLIETO:

24    Q.  Doctor, how are you?  My name is John Campolieto.  I'm

25    a municipal attorney for the City of Rochester and I'm going to

1    be asking you some questions regarding your report and your

2    testimony?

3        A.  Hi.  Nice to meet you.

4        Q.  Doctor, I want to start out with a basic question.  How

5    many times have you testified at a civil or criminal proceeding

6    as an expert witness?

7        A.  Over seven hundred.

8        Q.  Of those seven hundred times in a civil trial how many

9    times or what percentage of time did you represent the

10   plaintiff side or the defendant's side?

11       A.  I really don't have any idea.  I can't even tell you

12   how many were civil versus criminal.  Most of them are criminal

13   or quasi-criminal.

14           I can tell you that in most civil cases that I've been

15   involved in they haven't gone to trial.  They've settled.  So

16   it's a much smaller number of cases -- civil cases where I

17   testified.

18           Generally I'm just -- don't hold me to this, but I'm

19   generalizing from the cases that I've had that it's about 50/50

20   plaintiff's work, defendant's work, maybe a little bit more on

21   defendant's side.

22       Q.  Have you testified against the City of Rochester at any

23   time?

24       A.  I don't think so.

25       Q.  Are you engaged as an expert witness against the City

1  of Rochester in any cases?

2     A.  Yes.

3     Q.  What cases are they?

4     A.  I don't know if I can tell you the names, but there are

5  at least two other cases that I can think of that involve the

6  Rochester Police Department.

7     Q.  Have you met with attorneys in those cases?

8     A.  Yes.

9     Q.  Have you discussed the Rochester Police Department in

10 any way during those conversations?

11    A.  Yes.

12    Q.  Were those cases -- were you retained in those cases

13 prior to being retained in this case?

14    A.  I don't think so.  I think those were after, but I'm

15 not sure.  I honestly don't remember.  They're all around the

16 same time.

17    Q.  In your discussions during those cases with the

18 attorneys did you formulate any opinions or did you make any

19 observations about the Rochester Police Department or its

20 actions in your work in those other cases?

21             MR. FUSSELL:  Objection.

22             THE COURT:  Your question is just a broad one?

23             MR. CAMPOLIETO:  It's a broad one and I can be

24 more specific.  Did he formulate any opinions or -- not expert

25 opinions, just general opinions regarding the Rochester Police

1    Department in his work in those other cases?

2                THE COURT:  Opinions about anything in particular?

3    BY MR. CAMPOLIETO:

4       Q.  Opinions about the Rochester Police Department

5    procedures, actions, behavior, anything of that nature?

6       A.  No.  I don't have any opinions.  I mean, I've been told

7    by the people I examined the way they were treated by the

8    Rochester Police Department.

9       Q.  How were they treated?  What did they tell you?

10                MR. FUSSELL:  Objection.

11                THE COURT:  Sustained.

12   BY MR. CAMPOLIETO:

13      Q.  Did your work on the other cases that you have been

14   retained against in any way influence or have any bearing or

15   impact on your expert report that you made in this case?

16      A.  No.

17      Q.  Could you explain to the Court what your role was with

18   the plaintiff in this case, were you a practicing physician or

19   were you an expert?

20      A.  I was retained specifically to evaluate her and to

21   determine whether she had suffered any psychological injury as

22   a result of the events of July 3rd and 4th, 2010, and if so,

23   what those injuries were, and if so, how serious they were.

24      Q.  You were in no way a treating physician; is that

25   correct?

1    A. No. Right.

2    Q. Did the plaintiff -- was she offered an informed

3  consent form or any type of informed consent waiver from you?

4    A. Yes. Verbally.

5    Q. Verbally?

6    A. Yes.

7    Q. Is that a normal practice, a verbal form?

8    A. It is for me. I start out by explaining to everybody

9  that I see that they've been referred to me -- well, I

10  shouldn't say everybody. In cases where I'm working for

11  criminal prosecution I don't, but leaving those cases aside

12  every other case that I do the people have been referred to me

13  by an attorney or by a Court and I always start out by

14  saying -- making sure they understand why they're there to see

15  me and making sure that they understand that there's no

16  confidentiality if a report is requested or if I testify and

17  that I'm not their treating doctor and that I'm not there to

18  help them. I'm there strictly to do an assessment.

19      I also tell people that they're under no obligation to

20  cooperate with me, but if they do choose to cooperate with me I

21  request that they be truthful because I will be forming

22  opinions based in part on what they tell me.

23      If I reach an opinion based on what they tell me and

24  what they have told me turns out to be false then my opinion

25  will not only not be helpful, but it will probably be damaging.

1     Q.  Is that a concern for you that your patients -- strike

2   that.

3       Is that a concern for you that the people you are

4   acting as an expert witness for are truthful to you?

5     A.  Yes, of course.

6     Q.  Has it been an occurrence to you in the past during

7   your over seven hundred expert witness actions that people have

8   not been completely truthful or not been truthful?

9     A.  Sure.  It's happened to me, of course.

10     Q.  Now, in this case you stated to -- in response to Mr.

11   Fussell's questions what you used in terms of your review of

12   this case?

13     A.  Yes.

14     Q.  Obviously you interviewed Ms. McKnight?

15     A.  Correct.

16     Q.  Now, you indicated that you spent three and three

17   quarter hours with her?

18     A.  Yes.

19     Q.  Did you spend any other time with her or was it just

20   that one visit for --

21     A.  Just that one visit.

22     Q.  Now, is that -- in your experience is that a sufficient

23   amount of time to diagnose a person with the application you

24   mentioned severe depression?

25     A.  Yes.  I would say, however, it depends on the

1   situation.  I've seen people for an hour.  I've seen people for

2   ten hours.  One case I saw a criminal defendant for twenty-four

3   hours.

4   Q.  So the time varies --

5   A.  Yes.

6   Q.  -- in terms of what it takes to formulate that type of

7   diagnosis --

8   A.  Yes.

9   Q.  -- or opinion?

10   A.  Yes.

11   Q.  Now, we've talked about the fact that it is a concern

12   of yours that your clients or patients are telling the truth?

13   A.  It is always.

14   Q.  Is there a manner in which you determine or formulate

15   an opinion if they are telling the truth?

16   A.  Yes.

17   Q.  What is that?

18   A.  Well, I look for several things.  I start from the

19   assumption that most of the people who are seeing me would have

20   something to gain -- what we call secondary gain.  They would

21   have some reason perhaps not to be truthful.

22   So I'm looking for any evidence that they're not

23   truthful.

24   The two major things that I look for are internal

25   consistency.  I know in Court you're not supposed to ask the

1  same questions again and again, but I do in my evaluations ask

2  the same questions again and again in different ways and I'm

3  looking for consistency in answers.  I'm also looking for

4  consistency among the answers that I'm getting to the various

5  questions.

6      The other thing I look for is consistency between what

7  the examinee tells me and what documents or other people tell

8  me.

9      Q.  In this case it appears that the background information

10  that you used was all related to the lawsuit of the police

11  incident as of July -- the police incident on July 3rd, 2010?

12      A.  Yes.  Other than the medical records.

13      Q.  Were there any other collateral source, documents that

14  you reviewed, things unrelated to the police incident; for

15  instance, school records, employment records, any type of other

16  law enforcement records that aren't related to this incident?

17      A.  I did not.  I think I gave a pretty exhaustive list in

18  my report of what I reviewed.

19      Q.  Now, besides documents were there any collateral

20  individuals or interviews that you used to help you formulate

21  an opinion or a diagnosis for Ms. McKnight and her condition?

22      A.  No.  The law enforcement officers were deposed and I

23  relied upon what they said in the depositions.

24      Q.  When I say collateral interviews or collateral

25  individuals I'm more referring to family, friends, coworkers?

1    A.  I see.

2    Q.  Was there anybody that you talked to?

3    A.  I did not.

4    Q.  Is that type of collateral documentation or collateral

5    individuals or interviews is that something that would be

6    useful in reviewing and diagnosing a mental condition such as

7    depression or PTSD?

8    A.  Yes.

9    Q.  It is?

10   A.  Yes.

11   Q.  And it was not used in this case?

12   A.  No.

13   Q.  Do you normally use that type of tool -- collateral

14   tool in diagnosing patients that you see with depression, major

15   depression or PTSD?

16   A.  Not so much with depression.  Sometimes with PTSD, but

17   it depends on the circumstances of the case.  If I feel the

18   need to get more information I would certainly get it.

19        I would certainly agree that the more information you

20   can get the better off you are, no question about that.  It's

21   just at some point I as a professional have be satisfied that I

22   have sufficient information and if I'm satisfied then I'm

23   satisfied.

24   Q.  Did you -- and I'm sure you have, can you tell us what

25   a test called MMPI-2 is?

1    A.  Yes.  It's called Minnesota Multiphasic Personality ii,

2  referring to the second revision.

3    Q.  That's pretty complicated.  Can you tell us what it

4  stands for?

5    A.  Yes.  It's five hundred sixty-seven true and false

6  questions that people answer and it is a test of personality

7  functioning and psychopathology.

8    Q.  Is that something that is utilized by mental health

9  professionals in diagnosing and treating depression related to

10  mental health illnesses?

11    A.  I'm not sure about depression specifically, but it's --

12  last I knew it was the most widely used psychological test in

13  the world.  I use it when necessary.

14    Q.  What does it show a mental health professional?

15    A.  The main thing that it shows is evidence of

16  psychopathology, you know, schizophrenia, mania, depression, or

17  antisocial things that sort of thing.

18    Q.  When you answered questions with Mr. Fussell you talked

19  about being concerned with what the client or patient is

20  telling you?

21    A.  Yes.

22    Q.  Whether it's true or not?

23    A.  Correct.

24    Q.  Because you depend a lot on what the patient is telling

25  you?

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Correct.

4    Q.   And what you reviewed in your interview with Ms.

5    McKnight during your treatment or your analysis of her what you

6    gained from your conversation with her was subjective

7    information; is that correct?

8    A.   Yes.

9    Q.   So it was all based on what she was telling you?

10   A.   Well, plus what's in the records and the other people

11   have testified to, yes.

12   Q.   Does the result of the MMPI-2 provide mental health

13   professionals with an objective basis to diagnose and treat

14   certain mental health conditions?

15   A.   Depends on what you mean by objective.  It's more

16   objective I would say than some narrative accounts because it

17   is a standardized test, but it's still subjective in the sense

18   that the individual is answering the questions himself or

19   herself.

20        There is -- there are some scales that are built in to

21   check the reliability.  In other words -- well, they do what I

22   do.  They ask the same questions different ways.  Are you

23   answering the same question the same way?

24        There are ways to judge whether or not somebody is

25   being truthful with regard to the test, but it's -- there's a

1   misconception I think that it's sort of a test of truthfulness.

2   It isn't, but it is a test of -- we can tell pretty well

3   whether somebody is being honest and open on the test itself.

4       Q.  So it does give mental health professionals an

5   indication -- some indication of truthfulness not necessarily

6   truthfulness for what their symptoms are, but truthfulness in

7   some degree or some respect?

8       A.  I guess I could say that although truthfulness may be

9   too strong a word.  I guess reliability.

10          In other words, can I rely upon this test result as --

11  the five hundred sixty-seven questions that the patient has

12  answered, but it doesn't generalize to their truthfulness.

13      Q.  For instance, if Ms. McKnight was suffering from

14  depression for a longer period of time it might give an

15  indication of that?

16      A.  No.  I don't think it would give an indication of the

17  duration, but it might give an indication of the severity.

18      Q.  I'm going to show you what has not been marked --

19          MR. CAMPOLIETO:  Would you mark this.

20  BY MR. CAMPOLIETO:

21      Q.  Dr. Ewing, do you have your expert report in front of

22  you?

23      A.  Yes.

24      Q.  You indicated in your expert report that she had --

25  strike that.

1          You had indicated in your expert report that Ms.

2    McKnight had not undergone any type of treatment for any mental

3    health disorder in the past before seeing you; is that correct?

4          A.   I said she has no prior history of psychological

5    psychiatric treatment, but has received treatment for alcohol

6    abuse at Unity Health Systems.

7          Q.   Okay.  Now, could you take a look at what's been marked

8    as Defendant Exhibit 418 and tell me if you recognize those

9    records?

10         A.   I think I've seen these.  I can't say for certain, but

11   these look like part of the records for Unity Health System

12   that I saw.

13         Q.   They deal specifically with alcohol abuse?

14         A.   Yes.

15              MR. CAMPOLIETO:  I'm not sure if those are in the

16   records that were submitted or not, your Honor.

17              THE COURT:  Well, we've been going at it about an

18   hour and a half.  Let's take a ten minute recess.  You can take

19   a look and see if they're in the records.

20   (Recess taken.)

21              THE COURT:  Did you have a chance to look at those

22   records?

23              MR. FUSSELL:  Yes.  For the record, they're not

24   part of Exhibit 6, but they are records that I did send to Dr.

25   Ewing and I remember them specifically.  I do not object to

1    them.  I did send them to Dr. Ewing they just weren't part of

2    Exhibit 6.

3                    THE COURT:  You're offering them?

4                    MR. CAMPOLIETO:  I am.  I have them as Defendant's

5    418.

6                    THE COURT:  418 is received.

7    BY MR. CAMPOLIETO:

8       Q.  Doctor, I'd like you to take a look at what's been

9    marked as Exhibit 418.

10      A.  Did you want me to read through it?

11      Q.  Just flip through it.

12      A.  Yes.  As I said before, I can't say precisely, but I do

13   recall reviewing her Unity Health System records.  So my best

14   recollection is I did review this record.

15      Q.  If you take a look at -- on my document it's page 8

16   circled?

17      A.  Yes.

18      Q.  Can you tell us what that is?

19      A.  It says alcohol use history grid.

20      Q.  Have you seen anything like this in your experience?

21      A.  No.  But I mean, I've seen notes taken to sort of

22   indicate people's history of substance abuse.  I haven't seen a

23   particular chart like this.

24      Q.  What does this chart show in your experience and

25   knowledge?

1    MR. FUSSELL:  Objection.  He just said he has no

2  knowledge of it.

3    THE COURT:  Do you have any knowledge?

4    THE WITNESS:  I don't have any knowledge of it.  I

5  mean, it looks to me like it's trying to categorize Ms.

6  McKnight's alcohol use over time.

7  BY MR. CAMPOLIETO:

8    Q.  Did you use this in your evaluation of Ms. McKnight?

9    A.  In that I read it, yes.

10   Q.  In your report you do indicate that Ms. McKnight had an

11  alcohol abuse problem prior to July 3rd, 2010; is that right?

12   A.  Yes.  She used alcohol prior to that time.

13   Q.  Does this grid bear that belief out?

14   A.  I honestly don't know because I don't know exactly what

15  they mean.  It looks like frequency use twice a week, once or

16  twice a year, once a month and then ages thirty to thirty-four

17  twice a month and then thirty-five to thirty-six sometimes

18  weekends, sometimes not, it seems consistent with what she told

19  me about being a social drinker.

20   Q.  Now, if you look at page 9?

21   A.  Yes.

22   Q.  What does that document indicate?

23   A.  Marijuana use.

24   Q.  Does it show a normal use of marijuana or does -- how

25  would you describe the marijuana use that's shown in this grid

1  here?

2    A.  I would say sporadic.  Ten times ever, fifteen to

3  thirty-four and then thirty-five to thirty-six four to five

4  times a year.

5    Q.  Sporadic?

6    A.  Yes.

7    Q.  Is that at a consistent level, it's sporadic throughout

8  her history?

9    A.  On this grid it seems to be -- I don't know if there's

10  something -- it starts at fifteen and goes to thirty-four and

11  then thirty-five, thirty-six -- I guess.

12    Q.  Okay.  Look at page 12.

13    A.  Okay.

14    Q.  If you look down at CD evaluations, you look at the

15  risk global suicide formulation and it has a sentence or two.

16  Could you read the sentences that follow risk global suicide

17  formulation?  You can read them out loud.

18    A.  Yes.

19    Q.  It starts out with, "Miriam" --

20    A.  Correct.  I read it.

21    Q.  Could you read them out loud?

22    A.  "Miriam is a low acute and low long term risk of

23  suicide due to elevation in mood altering chemicals, no prior

24  attempts of suicide and she denied any mental health needs."

25    Q.  What's the date of that report?

1    A.  It was printed on 6/9/2015, but I think it's somewhere

2    between April and July 2014.

3    Q.  Is this --

4    A.  I'm having a hard time locating the exact date.  I

5    guess it's May 1st, 2014.  That sounds right.

6              THE COURT:  Where do you see that?

7              THE WITNESS:  Right there.

8              THE COURT:  I see.  Okay.  Next to Boreman LNMSW

9    Christy.

10             THE WITNESS:  Yes.

11   BY MR. CAMPOLIETO:

12   Q.  Is that a statement that she made to her Dr. Boreman?

13   A.  Yes.  It appears to a licensed social worker.

14   Q.  Licensed social worker.  Is that statement at odds with

15   the statement she mentioned to you?

16   A.  I wouldn't say so.  I think she denies her needs for

17   mental health treatment because she doesn't want it.

18   Q.  Now, we were talking about a tool or a test, the MMPI

19   test?

20   A.  Yes.

21   Q.  And you mentioned you do use it?

22   A.  I do.

23   Q.  What do you yourself use it for?

24   A.  When I had doubts about the kind of pathology that I'm

25   seeing or when someone appears not to be presenting any

1    pathology, but claims to be presenting pathology.  It's a test.

2    It's like any other test.  I mean, it's used on an as needed

3    basis.  I don't give it to everybody that I see.

4        Q.  Now, you had mentioned in your report Ms. McKnight's

5    problems with her marriage --

6        A.  Yes.

7        Q.  -- after the incident of July 2010 with the Rochester

8    Police Department?

9        A.  Yes.

10       Q.  Were you aware of any past marriages with Ms. McKnight

11   when you interviewed her or after you interviewed her?

12       A.  There were marriages.  She was previously involved in

13   at least one relationship.  It was an abusive relationship.

14       Q.  When did that take place, do you know?

15       A.  Well, it was long before she became involved with her

16   husband.

17       Q.  You mentioned that it was abusive.  Were you aware that

18   that relationship resulted in an arrest of Ms. McKnight prior

19   to July 3rd, 2010?

20       A.  An arrest of Ms. McKnight?

21       Q.  Yes.

22       A.  I don't think I was aware of that.

23       Q.  Were you aware when you talked to Ms. McKnight that she

24   was arrested at least two possibly more times - this is

25   according to her testimony - prior to July 3rd, 2010?

1           MR. FUSSELL:  I'll object only because I was not

2     allowed to have any of my experts talk about anything as a

3     result of the beginning of this trial.  Now he's asking

4     questions about what came out about --

5           THE COURT:  You provided information that you

6     think is relevant to offer an opinion.  Mr. Campolieto is

7     allowed to test that opinion by essentially if you knew this,

8     if you knew this would that affect your opinion?

9           MR. FUSSELL:  Okay.

10          THE COURT:  I'll overrule the objection.  You may

11    answer.

12          THE WITNESS:  I don't recall.

13          Are you referring to juvenile issues?

14    BY MR. CAMPOLIETO:

15    Q.  That could be.  We established that there was a DWI and

16    a domestic arrest.  There's possibly more.  That was just a

17    question, did you know she had two or more arrests?

18    A.  I knew about the DWI at age nineteen and I knew there

19    was a juvenile record of some sort, but my understanding was

20    that it ended in PINS, Person in Need of Supervision.

21    Q.  My question was more related to the number of arrests.

22    A.  Okay.  I know she had two involvements with the law.

23    Q.  Were you aware of the domestic arrest?

24    A.  I don't -- not by that characterization, no.

25    Q.  Now, you had talked about Ms. McKnight being resistant

1    to treatment and to acknowledge a mental illness?

2       A.  Yes.

3       Q.  You also described in various words -- you've described

4    Ms. McKnight as insightful, bright?

5       A.  Yes.

6       Q.  I don't doubt any of those.  You also described her as

7    understanding the mental aspect of her -- the problems

8    associated with her mental health?

9       A.  Correct.

10      Q.  Would those indications of being bright, understanding,

11   being resistant to the term mental health and treatment of

12   mental health -- would those lead you to question veracity in

13   any way when a subject comes before you, somebody who does have

14   a stake in the outcome of your analysis and possibly use the

15   MMPI to test that?

16      A.  No.  Because what I found is that in this case and in a

17   lot of the other personal injury type cases I've done is that

18   rather than exaggerate or overestimate the psychopathology

19   people have a tendency to underestimate it.

20          That's what I saw with Ms. McKnight.  She seemed to

21   want to tell me -- want to tell me that she was doing better

22   than she was.

23          When I say she has insight it came about only through

24   long discussion with her about her symptoms and she

25   acknowledged somewhat begrudgingly, yes, she did have some of

1   these symptoms, and yes, she did realize she needed treatment,

2   but it's clear to me she didn't want treatment.

3       She didn't even want to -- initially she didn't even

4   want to with me acknowledge that there was a serious problem.

5       Q.  Now, on the other side looking at those

6   characterizations and the resistance to treatment is it

7   possible though maybe not in exaggerating her symptoms that Ms.

8   McKnight was maybe not talking about the span of how long these

9   mental conditions had lasted and possibly this had lasted

10  longer than 2010 and had stretches back further than that,

11  could it be an indication of that?

12      A.  I didn't see it that way.  I tried to be very careful.

13  Obviously what we're looking at here is was any psychopathology

14  that she manifests the result of what happened on July 3rd and

15  July 4th, 2010.

16      So I took it as my duty to be very precise and careful

17  in getting a history of what went on up to that point, at that

18  point and after that point and it didn't strike me from what

19  she said to me or what I read that she had mental health issues

20  prior to that date.

21      Q.  What does the term malingering measures mean to you?

22      A.  Malingering measures?

23      Q.  Yes.

24      A.  I assume you're talking about some kind of way of

25  quantifying malingering?

1      Q.   That's correct.

2      A.   That's what it means.

3      Q.   Did you use any malingering measures besides your own

4  personal observations of Ms. McKnight?

5      A.   No.   There really aren't in my estimation reliable

6  malingering measures.   There are certain kinds of questions

7  that can be asked that will lead you to information that will

8  allow you to make a clinical judgment about malingering, but

9  it's not the kind of thing where there's a thumbs up, thumbs

10  down objective test.

11     Q.   Is the recurrence of a singular nightmare -- which you

12  had testified that Ms. McKnight has, is that considered a

13  malingering measure?

14     A.   No.   To me it's a symptom of postraumatic stress

15  disorder.   It's very common.

16     Q.   Have you ever seen it referred to as -- a singular

17  dream being considered an indication that there may not be

18  quite the level of veracity in terms of symptoms that are being

19  stated?

20     A.   No, I haven't.

21     Q.   Okay.   Now, we talked about the more information you

22  get about a patient the better your analysis or diagnosis will

23  be?

24     A.   I agree.

25     Q.   In this case we know what you have looked at?

1    A.  Yes.

2    Q.  And that's what was given to you.  In a normal --

3  outside of the legal arena or your practice as an expert

4  witness when you're diagnosing somebody with depression do you

5  tend to talk to people related to that person or associated

6  with that person?

7    A.  You're saying outside of forensic evaluations?

8    Q.  Thank you for the clarification.  Let's take it both

9  ways, outside and also in forensic evaluations.

10    A.  Outside of forensic evaluations mental health

11  clinicians pretty much take what the patient says.  If somebody

12  comes in and says I'm depressed they don't say prove it.  They

13  say okay you're depressed.  Let's go from there.

14      In a forensic evaluation you can't just say okay you

15  said you're depressed so you're depressed.  That's why you have

16  to ask really detailed questions and you have to look at

17  whether or not the symptoms that are described to you by the

18  patient or evaluee are consistent with what we know about

19  depression.  A lot of people I see want to convince me that

20  they're depressed.

21      So they come in and say, "I'm just so depressed.  I

22  feel so depressed," you know, "I can't tell you I just feel

23  awful."  Well, what else do you feel?  Well, I just feel

24  depressed, but then when you get into the specifics of what

25  constitutes depression clinically they don't have it.

1     Those are the people I'm more concerned about.  Those

2  are the people I'm more likely to use a psychological test like

3  the MMPI.

4          THE COURT:  When you talk about a forensic

5  evaluation are you reserving that for an examination that you

6  do in criminal cases?

7          THE WITNESS:  No.  For any kind of legal

8  evaluation.

9          THE COURT:  So this would be a forensic

10  evaluation?

11          THE WITNESS:  Civil or criminal.  Where -- for

12  lack of a better way of putting it I have to start out from the

13  point of view that the evaluee has something to gain.

14          Insurance would be another one.  I sometimes do

15  insurance evaluations.  They're outside the legal system, but I

16  would consider those forensic too.

17  BY MR. CAMPOLIETO:

18  Q.  Now, in terms of your report on page 4 you -- and

19  again, your conclusion in this case was the depression began

20  and resulted from Ms. McKnight's arrest in this case?

21  A.  Yes.

22  Q.  Now, you were unaware of the domestic arrest pursuant

23  to your testimony?

24  A.  Yeah.  I was aware that there was some domestic

25  violence.  I wasn't aware that she was arrested specifically

1    for domestic violence.

2        Q.  Was that considered in your analysis in terms of when

3    you're determining when this started -- when this depression

4    started?

5        A.  Sure.

6        Q.  Now, this conclusion on page 4 of your report is

7    specifically related to posttraumatic stress disorder was the

8    term that was mentioned began and resulted does the abuse and

9    problems with alcohol -- is that also considered to have begun

10   on July 3rd, 2010?

11       A.  The abuse of alcohol?

12       Q.  The abuse and problems with alcohol?

13       A.  Yes.  I would say it's clear from the records and it's

14   clear from my direct testimony that Ms. McKnight used alcohol

15   socially prior to then, but never to the extent where she was

16   using it on a daily basis as a form of self-medication for

17   depression and anxiety.

18       Q.  Now, the records that you see in Exhibit 418, the Unity

19   Health --

20       A.  Yes, I have it.

21       Q.  Do they indicate anywhere in this document that she was

22   using alcohol on a daily basis?

23       A.  I have to go back through.

24       Q.  Well, look at page 8.  I think that's where it was.

25       A.  Yes.  This is before the incident.  This goes up

1    through age thirty-six.

2      Q.   That's right.

3      A.   So I guess -- well, I saw her in 2015.  So she would

4    have been about thirty-four.

5           THE COURT:  Your report says she was thirty-eight

6    when you saw her.

7           THE WITNESS:  Right.  So the last part of that

8    grid would be the years -- the pertinent years I guess.

9    BY MR. CAMPOLIETO:

10     Q.   Well, if you look at this report she states in this

11   report -- she states in this report if you look at the

12   narratives on page 7 that she had already been arrested for her

13   DWI -- her fourth DWI.  So her -- it appears she was not using

14   alcohol any longer when this report was made?

15     A.   I guess.

16          THE COURT:  You're talking about his report?

17          MR. CAMPOLIETO:  This Unity Health report which

18   predates his report -- Dr. Ewing's report.

19          THE WITNESS:  Yes.  This is from 2014.

20   BY MR. CAMPOLIETO:

21     Q.   So I guess my question is, is there any indication in

22   here that she was using alcohol on a daily basis that you saw?

23          MR. FUSSELL:  Objection.  I mean, it speaks for

24   itself.

25          THE COURT:  Overruled.

1          THE WITNESS:  My understanding from her is that

2     she -- after she was jailed she stopped using alcohol all

3     together.

4     BY MR. CAMPOLIETO:

5       Q.  That's correct.  That's what I believe, but this

6     document was also after she was jailed, but it doesn't indicate

7     daily alcohol use?

8       A.  It doesn't indicate daily alcohol, yes.  I'm trying to

9     figure out -- I don't know if I have the date when she was

10    jailed wrong, but you're right.  There's no mention of daily

11    alcohol use on this record.

12      Q.  Also if you could look at the back, page 18 there's a

13    CD discharge summary and then there's some sentences and lines?

14      A.  It looks like what they had written was deleted or

15    crossed out.

16      Q.  Do you know why that would be crossed out?

17      A.  Based on my experience with records is that if you put

18    something in a record and it's an error you can cross it out,

19    but usually there would be some kind of signature or at least

20    electronic signature.  I guess you can say maybe there is here.

21    So my best guess is that this was an error.

22      Q.  If you had the perfect conditions in your meeting with

23    Ms. McKnight would you have liked to have spoken with people

24    related to her in her life dating back for years in order to

25    get a fuller picture of her health?

1    A.  Well, to do a perfect evaluation if there is such a

2    thing as I said on direct the more information you have the

3    better.  In my practice and in our field we do what we think is

4    necessary to make an opinion to a reasonable degree of

5    professional certainty and no more.  I'd be the first to

6    acknowledge that more information is better.

7    Q.  If you had the resources would you use the MMPI in all

8    of your cases?

9    A.  No.  The MMPI is a test that's meant to be used where

10   it's clinically indicated.  You go to see a physician and say I

11   have a cough, the physician doesn't say you need an MRI or

12   probably doesn't even say you need a test x-ray.  If it's

13   indicated they'll use it.  That's how I feel about the test.

14        The MMPI is not a resource question.  It's very easy to

15   administer.  I don't have to do anything.  I just have to give

16   it to the individual have them sit down and answer five hundred

17   sixty-seven questions.  So that's not a resource question.

18        It is a resource question as to how far you're going to

19   go if you're going to talk to every single person or even

20   anyone beyond what you feel is necessary to render an opinion

21   to a reasonable degree of medical certainty.

22        I know some colleagues who do because frankly it's a

23   good way to make money.  I charge a lot of money for my time

24   and if I wanted to I could fill it again and again, but I don't

25   do that.  I do what's necessary.

1    Q.  Have you ever seen an MMPI administered by a

2    plaintiff's attorney in order to -- strike that.

3        Have you ever seen an MMPI administered by plaintiff's

4    expert?

5    A.  Sure.  I've done it myself.

6    Q.  What did the results show you on that occasion?

7                MR. FUSSELL:  Objection.

8                THE COURT:  You want to know the MMPI that he did

9    on himself?

10               THE WITNESS:  No.  I did it myself.

11               THE COURT:  I'm going to sustain the objection.

12               MR. CAMPOLIETO:  Just give me one second.

13   BY MR. CAMPOLIETO:

14   Q.  Dr. Ewing, did -- during your discussions did Ms.

15   McKnight speak to you as to if these issues that you

16   diagnosed -- mental health issues that you have diagnosed with

17   her have caused her any financial harm?

18   A.  I don't think we discussed that.  I think she talked

19   about financial concerns and especially as part of her

20   rationale for not getting treatment, but I don't recall her

21   saying specifically that it's caused her financial grieving.

22               MR. CAMPOLIETO:  Thank you very much.  I

23   appreciate it.

24               THE COURT:  Let me ask you, Mr. Campolieto, on

25   page 8 of this document 418 there are some handwritten

1  notations, are they yours?

2          MR. CAMPOLIETO:  I apologize.  Yes.  All the

3  handwritten notations were made by me.  It's the only copy I

4  had.

5          THE COURT:  That's fine.  I just wanted to make

6  sure.

7          MR. FUSSELL:  I think the page number circled at

8  the bottom were made by me.

9          MR. CAMPOLIETO:  That's correct.

10         THE COURT:  Mr. Fussell, do you have redirect?

11         MR. FUSSELL:  I don't know, your Honor.  May I

12  have just a minute to look through my notes?  I may not have

13  any.

14         THE COURT:  Sure.

15         MR. FUSSELL:  I have just a couple.

16         THE COURT:  Go ahead.

17  REDIRECT-EXAMINATION BY MR. FUSSELL:

18    Q.  Were you satisfied with the information you had before

19  you when you reached the conclusions that you testified to

20  today?

21    A.  Yes.

22    Q.  Do you feel it was necessary to do any of the

23  additional work or examinations or tests that Mr. Campolieto

24  brought out during cross-examination in order for you to do the

25  report that you prepared today to a reasonable degree of

1  psychological certainty?

2   A.  No.  I felt like the resources were there.  I could

3  have done whatever I wanted to do.  I did what was required.

4   Q.  Did you reach your opinions with a reasonable degree of

5  professional certainty?

6   A.  Yes.

7   Q.  Did you observe any evidence of the plaintiff

8  malingering and/or exaggerating her stress?

9   A.  No.  As I said, I felt like if anything she was trying

10  to play down her pathology and distress.

11        MR. FUSSELL:  I have no further questions.

12  RECROSS-EXAMINATION BY MR. CAMPOLIETO:

13   Q.  Doctor, you mentioned quite a number of symptoms during

14  your direct-examination?

15   A.  Yes.

16   Q.  Those symptoms such as loss of libido, such as outlook,

17  tiredness, things of that nature that you mentioned, are those

18  things that can be caused by something other than depression?

19        MR. FUSSELL:  Objection.

20        THE COURT:  Overruled.

21        THE WITNESS:  Could they be caused, yes.

22        MR. CAMPOLIETO:  That's all I have.  Thank you.

23  REDIRECT-EXAMINATION BY MR. FUSSELL:

24   Q.  In your opinion in this case were those issues that Mr.

25  Campolieto just asked you about caused by some other event or

 1    circumstance other than what you have testified to here today

 2    with respect to Ms. McKnight's engagement with the police in

 3    July of 2010?

 4       A.  No.

 5                THE COURT:  Thank you very much.  You're excused.

 6                Mr. Fussell, do you have any other witnesses you

 7    would like to call?

 8                MR. FUSSELL:  No, your Honor, I don't.

 9                THE COURT:  Does the plaintiff rest?

10                MR. FUSSELL:  I always hate to say yes, but --

11                THE COURT:  Now is the time.

12                MR. FUSSELL:  Well, other than I do have pages

13    from Lieutenant Grande's deposition that I'd like to have

14    copies marked.

15                THE COURT:  I would admit those pages.  The

16    question is just whether there is some additional deposition

17    testimony surrounding those excerpts that will have to come in.

18                MR. FUSSELL:  Other than that, no.  Then we can

19    talk to Mr. Campolieto, whatever you want to do.

20                THE COURT:  But the plaintiff rests subject to

21    receipt of those excerpts?

22                MR. FUSSELL:  Yes.

23                MR. CAMPOLIETO:  I know that you had mentioned

24    post trial briefs --

25                THE COURT:  Do the defendants rest?

1          MR. CAMPOLIETO:  Yes.

2          What I was -- my point is that in lieu of any

3     motions at this time we would -- you know, we would do the post

4     trial briefs.

5          THE COURT:  Okay.  Does anybody wish to make

6     closing statements or would you simply like to make your

7     arguments in post hearing submissions after you have an

8     opportunity to think more about it, put it together and make it

9     to me in that form?

10         MR. CAMPOLIETO:  Yes.  I think we both did this

11    over an extended period of time and I think we would like post

12    trial briefs instead of closing arguments.

13         MR. FUSSELL:  That's fine with me and I think the

14    Court indicated the Court would approve -- would welcome that.

15         THE COURT:  I certainly welcome that and I would

16    probably direct them in any event.

17         I was going to give you an opportunity to make

18    arguments although I think the post hearing submissions are

19    going to be more helpful than an argument now when you don't

20    have the actual testimony right at your fingertips the way you

21    will when you put together the post hearing submissions.

22         MR. FUSSELL:  I agree.

23         THE COURT:  That's fine.  So I'll give you dates

24    for post hearing submissions.

25         I did want to address the issue of -- the one

1    evidentiary issue that was in dispute and that is Mr. Fussell

2    had offered a letter that Councilman McFadden had written to

3    Judge Yacknin in connection with -- I think it was a criminal

4    proceeding against Ms. McKnight.

5              Mr. Fussell's contention was that that letter

6    should be admitted and accepted as non hearsay under Federal

7    Rule of Evidence 801(d)(ii) as a statement of a party opponent;

8    specifically, a statement of the city; that is, that Councilman

9    McFadden was either speaking in a representative capacity of

10   the city or he was authorized to make a statement on that

11   subject by the city or he was making a statement as an agent

12   within the scope of his relationship to the city.

13             The defendants have opposed the receipt of the

14   letter and argued that it is hearsay and that it is not a

15   statement -- should not be considered a statement by a party

16   opponent.

17             I will say there is not a lot of law out there

18   that I could find on this particular issue.

19             At first I questioned whether the letter could be

20   received as a statement against a party opponent when the City

21   of Rochester is no longer a party opponent, but I determined

22   that the answer to that is probably yes.  They were certainly a

23   party opponent for most of this proceeding.

24             I couldn't find any cases in which a Court said,

25   "Well, they were a party originally and not a party any more

1  and so, therefore, it doesn't come in on that basis."

2       Mr. Campolieto has not argued that and so that --

3  in my view that is the basis which I decline to admit it.

4       I have reviewed the Charter of the City of

5  Rochester which confirms I think that which we all assumed when

6  this issue was argued which is that the powers of the city

7  council are primarily legislative and that is set forth in the

8  City Charter.

9       I do note in Section 5-21(g) that, "The council

10 also has powers to investigate all departments, boards, bureaus

11 and officers and have access to all records and papers kept in

12 the custody of any department, board, bureau or other agency,

13 to compel the attendance of witnesses in the production of

14 books, papers or other evidence at any meeting of the council

15 or of any committee thereof and for that purpose to issue

16 subpoenas signed by the president of the council."

17      It appears to me based on review of the City

18 Charter that the city council's principal powers and

19 obligations are legislative although there is evidently some

20 additional power -- investigative power.

21      Mr. Fussell's letter relies on legislative power.

22 Council has the power to enact ordinances for the preservation

23 of order, peace and health for the safety and welfare of its

24 inhabitants.

25      I don't see any relationship -- any evident

1    relationship between that power and Mr. McFadden's letter.

2          Mr. McFadden's letter makes clear he is writing

3    the letter after having spoken with Ms. McKnight and having

4    reviewed her tape recordings.

5          The question is not whether Mr. McFadden believed

6    genuinely in the statements that he made in the letter.  The

7    question is whether that may be admitted as some kind of

8    admission against the city and I guess by extension of

9    defendants in this case.

10          I did some legal research on it to try and find

11    cases in which a statement had been offered by somebody acting

12    in a legislative capacity or city council member to see if

13    there were circumstances under which those statements were

14    admitted under the rules and I will say the overwhelming

15    majority of cases declined to admit under that analysis.

16          It's not a frivolous argument, but I think here

17    that the combination of the case law which weighs against it

18    and the absence of either testimony by Councilman McFadden or

19    an affidavit by Councilman McFadden explaining the

20    circumstances of the letter and demonstrating that the letter

21    somehow was -- should be considered a statement of the council

22    either in its legislative business or its investigative

23    business -- in the absence of an affidavit telling me more

24    about why that letter containing his statements should

25    essentially bind the city I'm going to decline to admit it.

1          I want to just make reference to some of the cases

2     that I found just for the completeness of the record.  LaFond

3     versus Stirs, 2004 West Law, 1946, 404 and that is the District

4     Court opinion.  It dealt with a city council member.

5          Plaintiff argues this testimony should not have

6     been excluded as hearsay because it qualifies as an admission

7     by a party of permanence.  His theory is that the city

8     councilman is an agent of the defendant city, and therefore,

9     any statement that he makes qualifies as an admission by a

10    party opponent under 801(d)(ii)(D).

11         The Court says it is unclear that he would qualify

12    as an agent under that rule.  Before a statement can be

13    received as an admission there must also be evidence of an

14    agency relationship.  In this context, general principles of

15    agency law applied at least one other Court in this circuit

16    that elected officials are not likely agents of the government.

17         Typically agents are selected or approved by the

18    principle the city council members are elected officials and

19    appointed only in the event that there is a vacancy.

20         The plaintiff has not shown any basis for finding

21    him an agent and that is a basis for concluding that

22    801(d)(ii)(D) does not apply.

23         The case to which that case was referring is

24    Jarman versus City of North Lake 950 F. Supp. 1375, Northern

25    District of Illinois, 1997.

1          I also found Buckheit verus Dennis, Northern

2    District of California, 2001 - I'm sorry - 2011 West Law 8354,

3    68.

4               MR. CAMPOLIETO:  What was that number, your Honor?

5               THE COURT:  8354, 68.

6          Plaintiff argues that Dobbie's statement to

7    plaintiff is admissible under 801(d)(2)(C) because Dobbie is a

8    member of the Atherton City Council, was either a person

9    authorized by a party, the Town of Atherton, to make a

10   statement concerning the subject or as an agent or

11   representative of the party, again, the Town of Atherton.  The

12   Court disagrees.

13          The plaintiff has made no foundation showing that

14   Dobbie was an agent of the town or authorized to speak on

15   behalf of the Town of Atherton regarding what Carlson said

16   after the conclusion of the town council meeting.

17          Then the last two cases Cook versus Mississippi

18   Department of Human Services, Fifth Circuit case, 2004, 108

19   federal appendix 852 that deals with 801(d)(2)(D) and the

20   context of a statement by a Senator -- declines to admit the

21   statement of a Senator on that basis.

22          Then finally Yoshina -- Bennett versus Yoshina, 98

23   F. Supp. 2d, 1134, District of Hawaii, 2000 similarly dealt

24   with a statement by a Senator.

25          So I think there are a number of obstacles in

1    summary to the admission of the letter.

2              One is that I don't know about the circumstances

3    of the the letter.  I don't know enough about the circumstances

4    of Councilman McFadden's work.  I don't know the circumstances

5    if any under which any of the councilmen are authorized to

6    speak individually on a matter, and if so, whether this would

7    be a matter within the scope of this authority.

8              I do recognize that he is the chair I think of a

9    committee.  Law enforcement would appear to be within the

10   purview of that committee, but I don't know anything more than

11   that.

12             So I appreciate the opportunity to learn a little

13   bit more about this Federal Rule of Evidence and its

14   application under these circumstances, but for the reasons I've

15   indicated I'm going to sustain the defendant's objection to the

16   offer of Councilman McFadden's letter.  So don't rely on that

17   in your post hearing submissions.

18             I think you know everything else that is in

19   evidence.  If you have any questions about that you can

20   certainly call the Court and we can clarify that for you.

21             How much time would you like for post hearing

22   submissions?

23             MR. FUSSELL:  Well, I'll need to get the

24   transcript and I'm going to be away until essentially the end

25   of March and I have lots of depositions scheduled for the month

1   of April in different cases.

2           MR. CAMPOLIETO:  Your Honor, would it be okay if

3   we talked about this - Mr. Fussell and I - when we talk about

4   the additional deposition transcript excerpts that I want

5   included with Grande and we can get you an answer on Tuesday?

6           THE COURT:  That's fine.  You can send me a letter

7   and make a proposal to me.  I'm unlikely to have any problems.

8   If you can agree on something that seems reasonable to you let

9   me know.  If not I'll put a schedule in place, but I won't make

10  you work on it while you're away.

11          Thank you.  I appreciate the opportunity to have

12  tried a case with all of you.

13          It's nice to meet you, Ms. McKnight, and I'll look

14  forward to the post hearing submissions.

15                    *              *              *

16

17

18

19

20

21

22

23

24

25

1        REPORTER CERTIFICATE

2

3   I, Danielle M. Shaheen, do hereby certify that I did report in

4   stenotype machine shorthand the proceedings held in the

5   above-entitled matter;

6   Further, that the foregoing transcript is a true and accurate

7   transcription of my said stenographic notes taken at the time

8   and place hereinbefore set forth.

9

10  Dated  March 10, 2016

11  At Rochester, New York

12

13

14                      S/ Danielle M. Shaheen

                    _____

15                      Danielle M. Shaheen

16

17

18

19

20

21

22

23

24

25

**A**

**AA (1)** 667:20
**Aaron (2)** 530:1 582:11
**abide (1)** 549:4
**ability (3)** 636:6 647:25 662:24
**able (9)** 545:17 550:12 554:19 558:20 561:4 571:2 590:17 626:13 656:18
**above-entitled (1)** 710:5
**absence (2)** 705:18,23
**Absolutely (2)** 626:21 632:11
**abuse (15)** 643:2 650:18,20 658:1 667:11,14,18,20 682:6,13 683:22 684:11 694:8,11,12
**abused (1)** 654:16
**abuser (1)** 650:25
**abusive (2)** 687:13,17
**academies (5)** 537:4 558:20 559:17 611:12,21
**academy (6)** 536:11 537:8,16 560:15 574:10 607:10
**accept (3)** 546:19 573:11 639:23
**acceptable (2)** 559:14,18
**accepted (5)** 570:5 584:17 645:18,24 703:6
**accepting (1)** 573:8
**access (1)** 704:11
**accident (1)** 595:6
**accompanied (2)** 526:3 647:5
**accounts (2)** 660:4 680:16
**accurate (1)** 710:6
**ACD (2)** 645:18,25
**acknowledge (3)** 689:1 690:4 697:6
**acknowledged (2)** 662:1 689:25
**act (3)** 547:12,22 549:21
**acted (4)** 546:6 570:4 571:21 572:11
**acting (4)** 559:1 649:20 675:4 705:11
**action (6)** 520:5 522:7 546:5 607:2 617:13 626:20
**actions (12)** 541:12 573:18,22 579:13 608:15 616:23 617:7,9 624:18 625:1,3 626:25 627:2 641:2 672:20 673:5 675:7
**active (1)** 574:19
**actively (1)** 626:16
**activities (7)** 552:8,20,22 558:21 647:14 651:13,25
**activity (2)** 548:5 560:9
**actual (4)** 570:17 576:23 577:8 702:20
**acute (1)** 685:22
**acutely (1)** 614:14
**add (6)** 546:19 555:8,9 557:18 571:9 649:13
**added (1)** 540:24
**addition (1)** 662:11
**additional (21)** 523:3 524:9 525:4,10,18 526:11,16 542:5 543:11,14,16,24 564:22 566:18 575:17 590:1 592:18 699:23 701:16 704:20 709:4
**additionally (2)** 572:25 577:5
**address (8)** 521:3 524:21 544:23 547:23 548:3 602:15 665:23 702:25
**addressed (1)** 521:18

**addresses (3)** 544:16,19 547:19
**adequately (1)** 648:17
**adjournment (1)** 645:16
**adjunct (1)** 530:24
**administer (1)** 697:15
**administered (4)** 609:6 626:17 698:1,3
**administration (3)** 538:8 539:1 645:14
**administrative (2)** 536:6 567:23
**administrators (1)** 567:25
**admirable (1)** 607:21
**admissible (1)** 707:7
**admission (5)** 705:8 706:6,9 706:13 708:1
**admit (6)** 525:25 701:15 704:3 705:15,25 707:20
**admitted (8)** 525:1 531:10,14 549:10 670:14 703:6 705:7 705:14
**advance (1)** 566:14
**advantage (1)** 665:1
**adversary (1)** 538:24
**advised (3)** 523:20 623:21 624:6
**Aerosol (4)** 630:14,24 631:7 633:23
**affair (1)** 652:16
**affect (6)** 577:10 590:9,15 653:5 662:24 688:8
**affidavit (2)** 705:19,23
**affirming (1)** 630:20
**afford (2)** 662:17 663:3
**aforementioned (1)** 570:2
**afraid (2)** 645:22 661:17
**African (8)** 521:19 522:3,4,8 541:5 642:21 654:15 660:5
**afternoon (1)** 638:23
**age (2)** 688:18 695:1
**agencies (1)** 568:6
**agency (7)** 538:15 539:8,12 539:17 704:12 706:14,15
**agent (10)** 536:14 538:6,21 613:17 703:11 706:8,12,21 707:10,14
**agents (3)** 558:6 706:16,17
**ages (1)** 684:16
**aggressive (1)** 634:23
**agitated (1)** 647:22
**agitation (1)** 647:20
**ago (2)** 529:16 612:8
**agree (9)** 543:15,19 571:6 574:23 605:17 678:19 691:24 702:22 709:8
**ahead (14)** 524:2 541:3,19 544:7 546:17,25 559:11 570:13,15 601:21 638:25 642:1 666:10 699:16
**air (1)** 637:25
**al (1)** 520:7
**alcohol (33)** 643:1 650:15,18 650:20,25 651:9 657:1,15 657:17,21 658:1 662:9 667:11,14,17 670:11 682:5 682:13 683:19 684:6,11,12 694:9,11,12,14,22 695:14 695:22 696:2,7,8,11
**alcoholic (1)** 650:24
**alert (2)** 659:17,18
**alienated (1)** 651:19
**alienation (2)** 651:17 659:11
**allow (2)** 657:12 691:8
**allowed (3)** 580:23 688:2,7
**altered (1)** 615:2

**altering (1)** 685:23
**Amanda (1)** 545:4
**ambulance (13)** 574:5,11 582:23 583:7,9,11,12,13,14 583:16,20,23 592:16
**ambulances (1)** 574:18
**amended (1)** 541:4
**America (2)** 534:4 539:3
**American (15)** 521:19 522:4 522:4,8 534:4,9,14,16 535:7,9,10,15,17 541:5 642:21
**Americans (2)** 654:16 660:5
**amount (6)** 551:23 570:18 625:10,11,18 675:23
**analysis (7)** 585:17 586:13 680:5 689:14 691:22 694:2 705:15
**analyze (1)** 662:16
**analyzed (1)** 584:17
**and/or (5)** 536:5 545:25 560:3 571:14 700:8
**Angeles (1)** 530:8
**angle (1)** 632:16
**angry (1)** 602:11
**animosity (1)** 549:25
**annually (1)** 535:24
**answer (37)** 536:1,2 538:10 539:14 541:4 550:12 553:1 554:2,3 556:9,11 564:8 565:7 567:4 569:17,20 572:1,23 573:7 574:17 586:23 590:10 597:23 607:23 612:11 629:3,7 634:18 649:22 661:7 666:4 668:14 679:6 688:11 697:16 703:22 709:5
**answered (9)** 557:11 559:13 585:5 629:2 656:22 668:6,7 679:18 681:12
**answering (4)** 557:17 604:5 680:18,23
**answers (4)** 565:12 629:24 677:3,4
**antisocial (1)** 679:17
**anxiety (4)** 650:22 657:18 662:14 694:17
**anybody (3)** 622:13 678:2 702:5
**apart (1)** 669:13
**apologize (3)** 620:6 633:12 699:2
**apparently (3)** 602:23 618:8 633:20
**appear (6)** 522:4 531:18 591:2 670:10,17 708:9
**appearance (1)** 645:2
**Appearances (1)** 520:17
**appeared (2)** 521:21 623:14
**appears (8)** 522:11 640:11 653:20 677:9 686:13,25 693:15 704:17
**appendix (1)** 707:19
**appetite (2)** 647:15 648:25
**application (2)** 675:23 708:14
**apply (3)** 631:17 644:3 706:22
**applying (3)** 553:9,21
**appointed (1)** 706:19
**appreciate (3)** 698:23 708:12 709:11
**apprehend (1)** 573:21
**approach (1)** 582:19
**approached (3)** 602:16 618:17 618:6

**appropriate (6)** 525:13 592:24 603:25 604:15 629:18 634:21
**approve (1)** 702:14
**approved (1)** 706:17
**approximately (6)** 532:20,23 533:3,9,16 560:21
**April (2)** 686:2 709:1
**area (9)** 574:8 589:4 601:12 602:10,14,25 605:18 627:19 656:12
**arena (1)** 692:3
**argue (2)** 602:13 629:21
**argued (3)** 703:14 704:2,6
**argues (2)** 706:5 707:6
**argument (4)** 524:1,10 702:19 705:16
**arguments (3)** 702:7,12,18
**arm (25)** 541:4 551:12,13,17 552:4,8,10,15 594:12,21,22 595:7,8 618:1,6 623:20 624:19,24,25 632:15,19,21 633:4,18 660:6
**armpits (1)** 631:21
**arms (2)** 626:15 632:24
**arrest (38)** 556:3 593:2 618:19,20 619:4,9,10 621:13,21 622:8,9,11,22 623:5,6,9 624:10 625:16 626:1,5,8,9 628:5,17,18 629:10 636:13,14 637:2 642:5 645:14 655:2 687:18 687:20 688:16,23 693:20 693:22
**arrested (14)** 550:8 622:9 624:3 625:22 637:12 644:22 648:13,18,21 650:25 658:9 687:24 693:25 695:12
**arresting (1)** 621:11
**arrests (2)** 688:17,21
**arrive (4)** 569:1,23 590:8 643:19
**arrived (4)** 579:14 581:14 589:8 594:11
**arrives (1)** 602:10
**art (1)** 571:25
**article (2)** 541:16,17
**Artificial (1)** 592:3
**ashamed (1)** 648:18
**aside (1)** 674:11
**asked (29)** 521:13,21 527:9 529:15,18 559:8 565:4 566:23 569:16,23 600:20 603:9 604:3 629:2 650:2 660:19,25 661:1,2,5,5 664:5,12 668:3,5,8,11 691:7 700:25
**asking (21)** 525:20 529:8 552:12 555:3,7 568:13 571:20 576:6 585:6 586:12 590:19,20 596:12 598:9 603:21 612:9 643:8 657:6 661:4 671:1 688:3
**asleep (2)** 647:18,18
**aspect (3)** 573:19 659:24 689:7
**aspects (1)** 592:12
**assault (1)** 660:4
**assaults (1)** 660:5
**assertion (2)** 611:5,16
**assessment (2)** 649:12 674:18
**assessments (1)** 643:25
**assign (1)** 591:6
**assigned (1)** 538:12
**assignment (1)** 539:16

**assignments (1)** 538:23
**assist (4)** 535:22 537:16 592:25 626:11
**assistance (4)** 554:20 555:24 591:7 664:11
**assistant (2)** 538:6 642:22
**assisting (9)** 563:16 567:12 578:19,21 579:2 608:24,25 615:22,25
**associate (4)** 534:9,13 538:21 650:4
**associated (3)** 637:11 689:8 692:5
**Associates (4)** 530:17 532:25 612:25 634:5
**associating (1)** 651:21
**Association (4)** 534:9,14,17 535:7
**associations (1)** 534:8
**assume (6)** 528:19 555:18 560:6 641:12 670:18 690:24
**assumed (2)** 670:9 704:5
**assumes (1)** 659:20
**assuming (4)** 554:12,23 555:11 560:2
**assumption (4)** 554:13 589:6 589:13 676:19
**assumptions (3)** 628:24 629:11,11
**assuring (1)** 521:5
**asthmatic (1)** 645:4
**Atherton (4)** 707:8,9,11,15
**attached (1)** 666:15
**attaches (1)** 666:23
**attaching (1)** 665:6
**attempt (4)** 521:3 613:3 618:24 633:17
**attempted (8)** 624:21,23 625:22 626:12 632:22 635:18 636:16,18
**attempting (13)** 555:21 595:12 617:19,21 618:5,10 618:23 623:24 628:11 632:23 634:22 637:8,10
**attempts (1)** 685:24
**attend (5)** 579:16 590:17,22 592:21 593:1
**attendance (2)** 580:9 704:13
**attended (1)** 530:6
**attending (2)** 575:4,8
**attention (4)** 642:6 650:5 654:5 666:3
**attitudes (1)** 666:19
**attorney (13)** 520:18,20 576:4 595:23 610:11 613:1 613:7,12 639:5 645:24 670:25 674:13 698:2
**attorneys (2)** 672:7,18
**attribute (1)** 587:21
**audit (3)** 584:12,14,15
**August (1)** 530:4
**authority (2)** 596:16 708:7
**authorized (4)** 703:10 707:9 707:14 708:5
**availability (1)** 653:5
**available (4)** 522:25 523:5 574:12 634:1
**average (1)** 622:17
**avoid (2)** 659:4 661:15
**avoids (2)** 655:5,6
**aware (12)** 543:17 614:13,16 618:15 654:14 687:10,17 687:22,23 688:23 693:24 693:25
**awful (1)** 692:23

**B**

**back (32)** 526:24 536:2 579:22 600:20 605:24 617:21 618:5,14,16 619:4 620:25 621:7 623:12,21 624:6,13,24 625:14 635:19 635:21 636:17,20 638:4 645:20 650:10 666:8,9 667:13 690:10 694:23 696:12,24
**background (4)** 613:13 642:18 643:7 677:9
**bad (3)** 656:11 659:2,3
**badge (1)** 616:5
**bar (8)** 534:8,9,14,17 552:5,8 552:10 594:12
**based (34)** 542:7,23,24 543:16,24 550:15,18 552:14,19 561:9 566:3 570:2 571:10,15 572:9 588:16 589:5,13 596:1 606:5 610:20 611:10 617:6 618:9 633:13 634:9,10 642:16 644:6 674:22,23 680:9 696:17 704:17
**basic (1)** 671:4
**basically (6)** 556:5 647:4,6 649:4 652:18 657:17
**basis (17)** 564:20 571:7 627:24 650:9,19 658:24 666:1 680:13 687:3 694:16 694:22 695:22 704:1,3 706:20,21 707:21
**bear (1)** 684:13
**bearing (1)** 673:14
**becoming (1)** 669:12
**bed (3)** 649:3,3,4
**bedding (1)** 645:1
**beg (1)** 589:18
**began (7)** 523:22 648:14,23 648:24 650:20 693:19 694:8
**beginning (2)** 640:12 688:3
**begins (1)** 525:5
**begrudgingly (1)** 689:25
**begun (1)** 694:9
**behalf (3)** 538:24 539:18 707:15
**behavior (8)** 559:14 570:23 571:11 572:21 573:16 624:18 659:22 673:5
**behest (1)** 536:16
**belief (5)** 564:20 589:6 598:24 606:21 684:13
**believe (91)** 522:6,25 524:3 524:14 531:16 537:13 550:12 563:15 569:23 571:10 572:19 574:21 576:16 577:9,19 578:9,13 580:12,13 581:5,11 586:17 586:20,24 587:5 588:11 591:12,14 592:6,8 594:2 595:10,24 596:7 597:9,19 597:24 598:3,7,9,14,22,24 600:13 601:12,17 602:6,9 606:4,14,16,19 608:2,7 609:17,18,20 612:22 615:10,11,13,17,25 616:7 616:14 617:8 623:1 625:6 625:21 626:7 633:25 636:22 637:13 640:16 642:10,22 643:5,11,12 644:15 645:13,23 655:23 658:10 660:15,18 662:18 662:25 667:1 670:14 696:5

**believed (11)** 593:3 595:2 598:1,8 605:25 629:9 636:25 645:22,23 648:22 705:5
**believes (1)** 599:22
**belligerent (2)** 560:15 598:11
**bend (1)** 523:2
**Bennett (1)** 707:22
**best (4)** 627:18 667:14 683:13 696:21
**better (8)** 631:19 667:5 678:20 689:21 691:22 693:12 697:3,6
**Beverly (1)** 553:7
**beyond (6)** 567:17 614:6 634:13 647:1,22 697:20
**big (1)** 602:4
**bind (1)** 705:25
**birth (2)** 530:3 639:2
**bit (3)** 555:17 671:20 708:13
**black (2)** 654:8,10
**blame (3)** 652:18,21,25
**blamed (4)** 648:19 651:18 652:17,21
**blast (1)** 609:6
**blatant (1)** 553:12
**bleeding (1)** 591:23
**blinded (1)** 645:6
**blue (1)** 602:4
**blurted (1)** 565:16
**board (3)** 535:17,22 704:12
**boards (1)** 704:10
**Bob (1)** 599:19
**body (3)** 631:18,24 632:4
**book (3)** 564:9 646:13,19
**booking (1)** 642:5
**books (1)** 704:14
**bordering (1)** 659:12
**Boreman (2)** 686:8,12
**Borrelli (1)** 582:10
**boss (1)** 606:8
**bottom (10)** 563:6,13 567:10 578:17 579:1 608:20 617:2 623:17 651:20 699:8
**bound (5)** 549:4 626:11 628:17 636:22 637:14
**bouts (1)** 656:13
**break (3)** 575:15 638:6,6
**breakup (1)** 653:12
**breathing (2)** 645:6,7
**briefly (4)** 610:6 612:12,22 634:12
**briefs (1)** 701:24 702:4,12
**bright (3)** 664:13 689:4,10
**bring (1)** 656:2
**bringing (1)** 557:5
**broad (2)** 672:22,23
**broke (1)** 621:17
**brought (4)** 614:1 647:15 666:3 699:24
**Buckheit (1)** 707:1
**Buffalo (2)** 639:7,9
**building (1)** 552:9
**built (2)** 628:24 680:20
**burdens (1)** 662:23
**bureau (1)** 704:12
**bureaus (1)** 704:10
**Burlington (4)** 536:21 537:7 537:16 538:1
**burst (1)** 626:17
**bus (1)** 528:3
**business (7)** 564:2 565:23 577:22 578:1 579:11 705:22,23

**C**

**California (3)** 530:8,10 707:2
**call (13)** 524:21 527:21,25 561:23 637:22 638:13,15 654:4 657:19,20 676:20 701:7 708:20
**called (16)** 528:13 529:22 548:7,14 576:16,19 582:2 587:8 588:25 601:6 612:17 638:20 644:15,16 678:25 679:1
**caller (2)** 544:21 587:18
**calling (1)** 622:2
**calls (1)** 607:4
**Campolieto (180)** 520:20 521:6,9,11,14,22 522:5,11 522:21,22 523:3,15,19,22 523:23,25 524:3,23 525:21 526:5,7,14,21 527:1,4 528:15,18,22,24 529:1,5,11 529:14 531:12 532:12,14 535:25 541:15 543:5,9 545:15 546:3,11,18 548:8 548:15 550:11,21 551:15 552:25 554:8,21 556:9 557:3 559:3 561:11 562:22 564:7,21 565:1 566:15 568:22 570:8,24 571:7 572:22 573:5 574:16 575:17 576:1,3,4 579:3,22 579:23,24 580:24 581:4,22 581:22,25 582:19,22 583:2 583:3 587:1 589:12,24 590:11,14 591:11 595:18 595:21 599:15,18,21,24 601:14,17,20,22 602:1 607:6,17,22,24,25 616:13 616:21,22 620:14,16 629:6 629:16,25 630:22,25 633:10,15 634:25 637:16 638:8 639:20 640:12,22 641:19,23 649:21 654:17 655:11,20 673:6 660:24 662:18 664:4 665:11,17 668:2,5 670:4,5,8,15,22,23 670:24 672:23 673:3,12 681:19,20 682:11 683:4,7 684:7 686:11 688:6,14 693:17 695:9,17,20 696:4 698:12,13,22,24 699:2,9,23 700:12,22,25 701:19,23 702:1,10 704:2 707:4 709:2
**Campolieto's (3)** 525:9,16 526:16
**capable (2)** 575:10 594:4
**capacity (3)** 536:19 703:9 705:12
**capsicum (3)** 609:7 626:17 644:23
**captain (1)** 536:22
**car (4)** 572:18 644:24 645:5 655:3
**card (3)** 547:20,20 548:13
**care (26)** 550:6 591:13,15,16 591:20 592:1,7,11 598:12 598:13,21,24,25 599:1,4,10 600:8,13,16 601:2,2,4,13 606:8,11 663:10
**cared (1)** 650:6
**career (1)** 666:22
**careful (2)** 690:12,16
**Caribbean (1)** 538:24
**Carlson (1)** 707:15
**case (46)** 531:18,24,25 532:4 532:7,9 533:25 539:22 546:21 557:24 560:18 572:5 578:10,19 584:7

**California (3)** 609:16 610:11 614:3,3 640:25 644:4 658:21,22 659:6 669:21 672:13 673:15,18 674:12 675:10 675:12 676:2 677:9 678:11 678:17 689:16 691:25 693:19,20 700:24 705:9,17 706:23,23 707:18 709:12
**cases (38)** 531:15,23,25 532:2 533:7,10,11,24 614:2 640:15 647:25 658:22 659:7 671:14,16,16,19 672:1,3,5,7,12,12,17,20 673:1,13 674:10,11 689:17 693:6 697:8 703:24 705:11 707:18
**catching (1)** 660:18
**categorization (1)** 541:16
**categorize (1)** 684:5
**Caucasian (1)** 521:21
**causal (1)** 653:7
**cause (3)** 607:2 632:5 653:5
**caused (8)** 589:4 624:25 648:22 698:17,21 700:18 700:21,25
**causes (2)** 522:7 556:24
**CD (2)** 685:14 696:13
**cell (1)** 625:1
**center (1)** 632:16
**Central (3)** 539:8,11,16
**certain (15)** 524:16 525:1 542:9 546:23,24 563:18 584:25 585:3,8,16 592:12 631:17 680:14 682:10 691:6
**certainly (13)** 527:13 528:5 529:14 545:17 564:19 662:8 665:4 669:9 678:18 678:19 702:15 703:22 708:20
**certainty (7)** 542:25 572:10 646:3 697:5,21 700:1,5
**CERTIFICATE (1)** 710:1
**certification (1)** 535:13
**certifications (1)** 534:22
**certified (3)** 534:23 537:22 642:22
**certify (1)** 710:3
**cetera (1)** 523:19
**chain (2)** 653:7 656:21
**chair (1)** 708:8
**challenges (3)** 534:23,25 535:1
**chambers (1)** 523:14
**chance (2)** 632:10 682:21
**change (6)** 568:14 589:19,23 589:25 590:21 654:22
**changed (1)** 530:9
**changes (1)** 651:13
**characterization (1)** 688:24
**characterizations (1)** 690:6
**charge (6)** 538:6,21 583:14 598:20 645:15 697:23
**charged (1)** 645:13
**charges (4)** 645:11,17 653:4
**Charles (3)** 638:15,19,22
**chart (2)** 683:23,24
**Charter (3)** 704:4,8,18
**check (3)** 548:4 613:13 680:21
**checked (2)** 562:4,6
**checkmarks (1)** 562:4
**chemical (2)** 556:2 626:23
**chemicals (1)** 685:2
**chief (7)** 536:14,22 537:1,2 538:6,22 541:11

**Chief's (1)** 614:15
**Chiefs (1)** 634:6
**children (4)** 619:19 663:6,8 663:13
**choice (4)** 634:2,3,4,17
**choose (2)** 585:7 674:20
**Christy (1)** 686:9
**circle (15)** 602:2,4,21 603:1,2 603:5,7,9,9,14,17,19,22 604:8,22
**circled (2)** 683:16 699:7
**circles (3)** 602:3,17,18
**circuit (3)** 524:1 706:15 707:18
**circumstance (1)** 701:1
**circumstances (7)** 678:17 705:13,20 708:2,3,4,14
**citizens (3)** 577:13,14 597:18
**city (57)** 520:7,20 522:24 529:6 537:3 541:11 542:1 543:12,17,19 545:18 556:17,18 564:9,11 576:5,5 578:7 595:24 596:7,12,20 597:1,24 606:24 610:5,16 630:11 632:13 634:4 639:20 641:3 655:15 656:2 667:25 670:25 671:22,25 703:8,10,11,12,20 704:4,6 704:8,17,18 705:8,12,25 706:4,7,8,18,24 707:8
**City's (2)** 541:6,8
**civil (14)** 520:5 531:8,22 534:6,10,15,19 613:18 671:5,8,12,14,16 619:13 claim (3) 627:3 655:15,19
**claiming (1)** 610:18
**claims (1)** 687:1
**clarification (2)** 559:4 692:8
**clarify (4)** 566:1,16,21 708:20
**clarifying (1)** 668:4
**class (5)** 576:15,17 577:1,5,8
**classes (2)** 576:10,13
**clause (2)** 551:8,20
**clauses (1)** 551:3
**clavicle (1)** 631:13
**clear (9)** 540:7 582:23 583:7 586:3 651:17 690:2 694:13 694:14 705:2
**cleared (1)** 583:20
**clearly (2)** 532:10 579:2
**client (2)** 528:1 679:19
**clients (1)** 676:12
**clinical (1)** 691:8
**clinically (2)** 692:25 697:10
**clinicians (1)** 692:11
**close (6)** 556:24 564:2 565:23 577:22 578:1 579:11
**closed (1)** 561:10
**closing (2)** 702:6,12
**code (26)** 522:9 523:7 549:3,5 549:7,15,20 550:20 552:18 553:10 571:12,14 595:24 596:2,20,21,21,22,23,23,24 597:2,2,10 605:25 606:19
**codes (1)** 541:14
**cognitive (1)** 647:5
**cognizant (1)** 546:14
**collateral (7)** 677:13,19,24,24 678:4,4,13
**colleagues (1)** 697:22
**college (10)** 535:9,10,17 537:20 556:15 576:11 596:14 663:14,16 664:2
**color (2)** 666:21,22
**combination (1)** 705:17
**come (17)** 528:8 529:13 544:1

547:20 548:13 571:17
578:25 602:15 603:12
605:2 619:19 622:22
637:23 652:1 692:21
701:17 704:1
**comes (9)** 529:12 578:2
622:20 646:13 659:1 669:5
669:7 689:13 692:11
**comfortable (1)** 548:22
**coming (10)** 544:8 605:4,9,11
605:20,22 607:23 618:13
623:8 669:5
**command (1)** 635:5
**commanded (1)** 635:20
**commander (2)** 537:24 538:1
**commented (1)** 664:15
**comments (1)** 554:16
**Commission (1)** 537:17
**committed (1)** 644:15
**committee (4)** 534:10 704:15
708:9,10
**common (2)** 556:7 691:15
**communicate (1)** 636:6
**communicated (1)** 550:16
**communication (5)** 523:15
545:18 635:7,8,11
**communications (4)** 558:12
558:19 635:6 637:21
**communities (2)** 666:23,25
**community (2)** 666:16,19
**compared (1)** 561:3
**compel (1)** 704:13
**competent (2)** 554:18,19
**completed (2)** 615:14,16
**completely (4)** 553:5 648:25
667:7 675:8
**completeness (2)** 524:11
706:2
**compliance (6)** 631:2,14,23
632:8,16 634:5
**compliant (1)** 635:6
**complicated (1)** 679:3
**comply (5)** 568:15,16,16
579:10 624:16
**comport (1)** 522:11
**compound (2)** 554:22 571:1
**computer (6)** 520:25 546:2,16
546:23 547:21 637:22
**computers (2)** 547:6 589:4
**concentrate (1)** 647:25
**concern (15)** 525:10 621:15
621:17 622:7,10,12,15
654:7,24 657:1 659:19
668:13 675:1,3 676:11
**concerned (6)** 609:19 619:21
640:13 655:25 679:19
693:1
**concerning (2)** 521:3 707:10
**concerns (1)** 698:19
**concerts (1)** 651:14
**conclude (2)** 648:14 653:17
**concluded (1)** 575:20
**concluding (8)** 569:1,10,23
570:1,21 572:6 573:17
706:21
**conclusion (6)** 571:17 572:4
586:16 693:19 694:6
707:16
**conclusions (1)** 699:19
**condition (2)** 677:21 678:6
**conditions (4)** 648:9 680:14
690:9 696:22
**conduce (1)** 631:21
**conduct (8)** 573:12 596:20,21
596:23,25 597:2,21 608:8
**conducted (2)** 588:18 598:5

**confer (1)** 525:9
**conference (1)** 524:21
**confidentiality (1)** 674:16
**confine (1)** 666:5
**confirms (1)** 704:5
**conflict (4)** 534:6 560:2,7
593:2
**conform (1)** 659:22
**confronted (1)** 644:20
**connect (1)** 661:3
**connected (3)** 660:20 661:6,8
**connection (1)** 703:3
**consent (2)** 674:3,3
**consider (5)** 525:14,16 626:4
662:14 693:16
**consideration (1)** 604:19
**considered (9)** 585:9 594:15
602:14 691:12,17 694:22,9
703:15 705:21
**considering (1)** 605:19
**consistency (4)** 676:25 677:3
677:4,6
**consistent (3)** 684:18 685:7
692:18
**consists (1)** 530:17
**constantly (2)** 659:17,18
**constitutes (1)** 692:25
**consultant (2)** 530:14,15
**consulted (2)** 534:16,20
**consumed (1)** 651:9
**consuming (1)** 663:11
**consumption (1)** 650:15
**contact (6)** 553:14 559:21,24
561:4 608:2 632:1
**contain (1)** 568:7
**containing (2)** 596:1 705:24
**contemplated (1)** 649:17
**contemplating (1)** 649:18
**contemplation (1)** 645:16
**content (1)** 556:6
**contention (1)** 703:5
**context (8)** 525:11,13 526:4
526:13 527:6 669:2 706:14
707:20
**continent (1)** 539:4
**continents (1)** 539:3
**continue (6)** 541:21 564:6
591:7 611:15 617:25
650:11
**continued (3)** 626:16 650:13
654:2
**continues (1)** 654:1
**continuum (9)** 571:12,14
630:17 634:6,7,10,14,21
635:13
**contrary (1)** 602:6
**control (24)** 552:8,22 560:23
561:5 572:12,17 593:15
594:3,4,5,10,14,15,22
595:2,5,12,13,15 624:25
628:4 629:8,10 632:23
**controlled (4)** 554:7,13,24
555:11
**conversation (3)** 600:12
636:23 680:6
**conversations (1)** 672:10
**conviction (1)** 643:5
**convince (1)** 692:19
**Cook (1)** 707:17
**cooperate (2)** 674:20,20
**copies (3)** 541:4 542:19
701:14
**copy (18)** 521:10,10,11 526:9
528:22,25 529:1,2,5,11,11
529:13 544:6 581:23,24
599:12 633:8 699:3

**cornered (1)** 604:25
**correct (31)** 521:10 523:25
546:12 547:6 567:6 594:14
608:4,9 611:25 613:22
614:20 616:3 617:2 627:5
632:2 633:18,23 634:2,3
673:25 675:15 679:23
680:2,3,7 682:3 685:20
689:9 691:1 696:5 699:9
**corrected (1)** 596:22
**Corrections (1)** 534:5
**correspondence (1)** 521:2
**costs (1)** 655:5
**cough (1)** 697:11
**council (11)** 704:7,9,14,16,22
705:12,21 706:4,18 707:8
707:16
**council's (1)** 704:18
**councilman (7)** 703:2,8
705:18,19 706:8 708:4,16
**councilmen (1)** 708:5
**Counsel (4)** 524:7 525:9
584:16 638:5
**Counsel's (1)** 531:25
**Counselor (3)** 560:6 582:17
612:9
**countries (7)** 537:6 547:10
549:3 559:17 565:13,13
566:3
**country (6)** 526:20 538:24
547:10 549:2 614:18 634:7
**county (4)** 530:18 537:7,16
538:1
**couple (6)** 576:13 620:7
637:19 639:25 643:1
699:15
**course (4)** 537:11 568:18
675:5,9
**courses (5)** 533:22 534:3,7
539:6 639:13
**court (224)** 520:1 521:1,1,2,7
521:13,24 522:1,3,9,16,18
522:21 523:1,1,5,9,20
524:2,18,25 525:14,19,24
526:8,15 527:1,9,18,21
528:4,7,17,20,24 529:9,19
531:15 532:12,16 534:22
534:25 536:2 540:6,10
541:7,18 543:7,15,22 544:2
544:7 545:23 546:9,20,25
548:10,17 549:10 550:15
550:25 551:18 553:3 554:2
554:4,15,23 555:2,5,9,16
555:18 556:11 557:6,10,19
558:4 559:7 561:13,18
562:8,24 564:14,25 565:3
565:11 567:4,8 568:23
569:3,10,19 570:13,15
571:6,20 572:2 573:3,6
574:23,25 575:14,21,23,25
576:2 578:25 579:22 581:1
581:19 582:21 586:6,15,23
589:10,22 590:6,13 591:1
595:17 601:9,19,21,25
607:5,14,22 613:18 616:9
616:12,18 620:13 629:3,14
629:23 630:20 633:8,14
637:18 638:3,10,13,17,23
639:22 640:10,21,23
641:12,16,18 642:1 645:20
649:22 654:19 655:12,21
657:10 661:7 662:20 664:6
665:14,18,24 666:10
668:10,20 669:1,6,14,19,21
670:1,4,7,12,20 672:22
673:2,11,17 674:13 676:25

682:17,21 683:3,6 684:3
686:6,8 688:5,10 693:4,9
695:5,16,25 698:8,11,24
699:5,10,14,16 700:20
701:5,9,11,15,20,25 702:5
702:14,14,15,23 703:24
706:4,11,15 707:5,12
708:20 709:6
**Court's (1)** 544:5
**courtroom (3)** 528:7 529:24
575:19
**Courts (1)** 531:13
**coworkers (1)** 677:25
**crazy (2)** 664:17,20
**cream (1)** 624:24
**crime (38)** 534:4 538:7
574:11,19 577:5 599:9,14
599:25 600:3,24,25 601:2,5
601:10,12 602:14,18,25
603:3,4,15,18,20,23,24
604:8,12,20 605:1,8,10,14
605:19,22 606:10,12
644:14,19
**crimes (4)** 647:10,16 648:2,6
**criminal (29)** 531:3 533:23,24
533:25 534:4,5,6,10 538:2
548:5 576:10,21,23,25
577:4 596:15 639:14 653:4
653:8 656:16 658:11 671:5
671:12,12 674:11 676:2
693:6,11 703:3
**criteria (4)** 647:10,16 648:2,6
**cross (4)** 543:25 580:23 638:8
696:18
**cross-examination (4)** 575:20
576:3 670:23 699:24
**cross-examine (3)** 550:25
562:24 564:19
**crossed (2)** 696:15,16
**crowd (2)** 587:7 603:12
**crowds (3)** 602:11,12,22
**cry (1)** 650:10
**crying (1)** 650:9
**culture (1)** 665:8
**cultures (1)** 577:3
**cumbersome (1)** 544:8
**current (2)** 530:11 663:11
**currently (1)** 530:12
**curricula (1)** 537:14
**custody (6)** 617:19 623:25
625:23 626:8 628:17
704:12
**customary (1)** 564:15
**CV (2)** 576:14 639:17

### D

**daily (8)** 650:9,20 694:16,22
695:22 696:7,8,10
**damage (1)** 667:3
**damaging (1)** 674:25
**danger (6)** 574:20 575:8
577:11,14,18 625:7
**dangerous (6)** 556:25 557:16
558:6 620:3 622:24 623:2
**dangers (3)** 619:16,17 637:11
**Danielle (3)** 710:3,14,15
**date (14)** 530:3 540:24 563:2
563:4,5,20 568:1 639:2
658:8 670:16 685:25 686:4
690:20 699:9
**dated (9)** 540:8 541:10 542:4
567:13 579:8,9 641:16
670:16 710:10
**dates (2)** 567:23 702:23
**dating (1)** 696:24
**Daubert (3)** 534:23,25 535:1

**day (20)** 522:3 527:10 564:3
565:24 566:9,14 567:17
577:22 578:1 615:1,23
616:1 647:11 657:6,16,20
660:12 662:2 667:12,13
**days (3)** 563:23 592:4 649:2
**DEA (2)** 538:16 539:16
**deal (5)** 524:18 557:24 664:21
667:17 682:13
**dealing (10)** 550:10 560:4
591:3 622:21 650:21 665:9
707:19
**deals (3)** 612:17 661:13
707:19
**dealt (3)** 667:23 706:4 707:23
**death (2)** 648:1 649:10
**decide (1)** 586:15
**decision (1)** 571:10
**decisions (1)** 550:1
**decline (2)** 704:3 705:25
**declined (1)** 705:15
**declines (1)** 707:20
**defendant (8)** 520:8 521:8
521:20 526:17 533:14,17
533:19,20 546:5 676:2
682:8 706:8
**defendant's (15)** 524:22
541:4 581:17,20 601:15
608:7 614:12 616:25 630:1
642:6 671:10,20,21 683:4
708:15
**defendants (12)** 522:4 530:20
558:2 563:7 570:23 571:4
643:20 646:4 652:3 701:25
703:13 705:9
**defense (2)** 537:12 619:19
**defined (2)** 596:24 646:24
**definitely (1)** 627:13
**definition (2)** 646:12 669:17
**definitions (1)** 646:21
**degree (13)** 530:7 542:25
570:22 571:18 572:10
640:1 646:2 656:9 681:7
697:4,21 699:25 700:4
**Delaware (1)** 566:5
**deleted (1)** 696:14
**deliberate (3)** 541:12 571:13
571:22
**demand (3)** 540:20 631:22
642:7
**demonstrating (1)** 705:20
**denied (2)** 649:18 685:24
**denies (1)** 686:16
**Dennis (1)** 707:1
**departed (1)** 523:16
**department (59)** 522:9,25
530:13 531:4 536:16,21,23
537:22,24,25 538:2,25
539:20 542:2 545:19 548:1
549:6,7,20 552:18 559:6,8
564:8 568:17 570:4,5
574:18 576:5 578:4 585:10
595:25 596:2,8,13 607:13
610:23 611:1,24 613:2,3,4
613:13 614:14 627:17
630:16 634:4,13 642:5
644:9 668:17 672:6,9,19
673:1,4,8 687:8 704:12
704:10
**Department's (1)** 630:12
**departments (14)** 536:12
547:9 549:2 562:15 565:20
568:5 574:8,14 610:11
611:10,21 614:17 627:18
704:10
**depend (1)** 679:24
**depends (3)** 675:25 678:17

680:15
deploy (2) 629:1,12
deployed (1) 628:3
deployment (1) 628:23
deposed (4) 532:3 584:24 614:3 677:22
deposition (15) 524:6,7 527:13 540:17,18,19 580:7 593:16 594:7,17 640:16 701:13,16 709:4
depositions (5) 540:13 588:16 642:9 677:23 708:25
depressed (17) 647:8,9,11 649:14 650:14 652:20 653:9 656:10,13 692:12,13 692:15,15,20,21,22,24
depression (39) 646:9,11,17 646:24 647:1,2,3,4 648:12 648:15 650:11,22 652:12 653:10 656:9,10,12,21 657:18 662:4,13 667:5 668:23 675:24 678:7,14,15 678:16 679:9,11,16 681:14 692:4,19,25 693:19 694:3 694:17 700:18
depressive (9) 646:17 647:7,9 648:3 651:16 656:14 668:22,24 669:2
deputy (5) 529:24 536:10 537:9 538:6,21
describe (3) 557:12 657:2 684:25
described (9) 559:2 608:16 643:17 648:9 652:4 689:3,3 689:6 692:17
description (1) 573:12
desire (4) 558:5 647:17 653:11,11
detail (1) 648:7
detailed (3) 609:3 617:7 692:16
detective (1) 536:21
determination (1) 521:16
determine (6) 522:2 641:1 644:11 656:18 673:21 676:14
determined (5) 573:24 587:17 587:18 625:25 703:21
determining (1) 694:3
develop (3) 537:14,22 538:22
developed (4) 584:16,20,22 665:25
developing (1) 584:7
diagnose (2) 675:23 680:13
diagnosed (2) 698:16,16
diagnosing (4) 678:6,14 679:9 692:4
diagnosis (6) 647:10 658:23 668:22 676:7 677:21 691:22
diagnostic (3) 646:14,16 648:6
diagnostically (1) 646:8
die (1) 693:2
dies (1) 660:14
difference (4) 556:21 558:2 564:17 634:11
differences (1) 577:2
different (20) 526:12 543:18 543:23 546:24 553:5 556:6 562:16 571:16 577:3 596:19 597:20 611:13,17 611:18 612:9 621:10 668:12 677:2 680:22 709:1
differently (1) 531:13
difficult (2) 657:16 664:21

difficulty (3) 614:19 645:5,7
diminished (2) 647:14,25
dinosaur (1) 592:4
diplomatic (1) 538:23
direct (11) 525:9 546:20 557:24 580:22,23 590:5 652:5 661:9 694:14 697:2 702:16
direct-examination (3) 530:2 639:1 700:14
directing (1) 559:22
directly (3) 660:23 668:1,15
director (3) 536:11 537:9,23
disagrees (1) 707:12
disavowing (1) 630:21
discharge (1) 696:13
disciplined (1) 626:25
discovered (1) 645:12
discovery (2) 540:21 642:7
discretion (1) 547:16
discussed (4) 524:20 643:5 672:9 698:18
discussion (1) 689:24
discussions (2) 672:17 698:14
disk (1) 521:12
dismissal (1) 645:17
disorder (18) 646:10,17,18 647:7,9 648:3 651:16,16 656:14 658:18 667:6,8 668:22,24 669:3 682:3 691:15 694:7
Disorders (1) 646:15
dispatcher (1) 637:25
dispatcher's (2) 547:25 589:3
displacement (1) 631:13
dispute (3) 526:17 561:17 703:1
disrespectful (1) 644:21
distinguish (1) 657:10
distinguished (2) 639:6,12
distortions (1) 647:6
distress (1) 700:10
district (7) 520:1,2 523:16 706:3,25 707:2,23
Dobbie (2) 707:7,14
Dobbie's (1) 707:6
doctor (8) 657:5,7 664:5 670:24 671:4 674:17 683:8 700:13
doctorate (1) 530:7
document (53) 522:23 523:5 523:8 544:15,15 545:17 561:23,24 566:16 570:17 577:19 578:10,17 579:8,9 582:1 585:15 596:4,8 597:2 597:4,5 601:24 610:9,23,24 611:6,7 612:5,9,16,21,24 614:1,6,8,20,25 615:13,18 615:20 617:4,6 623:16 630:2,9,10 635:1 683:15 684:22 694:21 696:6 698:25
documentation (6) 539:24 540:1 542:23 642:17 644:7 678:4
documents (25) 540:4,12 542:3,12 543:11,12,14,16 550:4 565:21,22 567:17 570:3 578:13,15 580:6 585:13 612:11,12,14 641:7 641:9 677:7,13,19
doing (11) 523:18 606:4,6,13 606:15 609:16 613:9 621:6 635:2,3
domestic (5) 688:16,23 693:22,24 694:1

Dominick (1) 582:10
door (19) 594:13,22 618:2,7 621:11,14 623:7,19,20 628:7,7,14 637:6,7,9,10,12 644:15 659:20
doorway (1) 594:24
double (1) 606:10
doubt (1) 689:6
doubts (1) 686:24
Dr (58) 521:18 527:24,25 528:7,9 529:20 530:3 531:20 535:25 540:7 543:10 545:16 550:12,16 557:3 558:5 559:4 561:12 564:21 565:12 567:4 571:2 573:1,7,8 574:21 575:18,21 575:22,24 576:9,15 577:14 579:13 583:4 584:1 586:11 596:12 601:23 602:2 608:1 616:18 620:9,14,17 638:3,9 638:15,17,23 639:2 668:20 681:21 682:24 683:1 686:12 695:18 698:14
drama (2) 661:13,15
dramatic (1) 661:12
drawn (2) 602:2 603:5
dream (1) 691:17
dreams (3) 649:10 659:2,3
drink (2) 657:17,21
drinking (2) 651:7,8
drive (1) 648:25
driven (2) 644:24 651:9
driving (5) 604:7,11 651:1,7 651:8
drop (1) 648:23
drug (3) 538:8,25 670:11
DSM (3) 646:16,25 658:17
due (1) 685:23
duly (3) 528:13 529:22 638:20
duration (2) 670:2 681:17
duties (3) 538:2 574:4 596:6
duty (9) 547:15 549:4 552:22 578:2 626:10 628:16 636:22 637:13 690:16
DWI (6) 643:5 651:5 688:15 688:18 695:13,13
DWIs (1) 651:3

E
ear (2) 631:20 632:16
earlier (2) 611:13 658:12
early (3) 542:15,18
easy (1) 697:14
eat (1) 647:17
eating (1) 650:16
economically (1) 649:8
Edition (1) 646:15
education (1) 530:5
effect (2) 643:19 651:6
effective (5) 635:5,7,8,11 647:6
effects (2) 646:4,7
effectuate (1) 623:9
effort (1) 529:6
efforts (5) 572:12,13 652:22 659:3 661:12
egress (1) 605:13
eight (2) 540:25 643:14
eighteen (2) 563:23 643:14
eighty-seven (3) 533:12,13 613:19
either (16) 526:24 546:15 549:13 614:2 640:15

641:13 646:24 647:17,21 647:22 651:23 658:19 703:9 705:18,22 707:8
elected (2) 706:16,18
electronic (1) 696:20
element (2) 573:3,9
elevation (1) 685:23
email (2) 522:10 527:14
embarrassed (2) 648:18 658:8
emergency (10) 545:18 574:12,19 591:7,13,15,16 591:22 592:1,13
empirical (2) 566:12 610:20
employ (1) 551:5
employees (2) 529:6 641:3
employment (3) 607:8,19 677:15
empty (4) 632:21 633:5,8,18
EMTs (2) 592:14,15,16
enact (1) 704:22
encounter (3) 521:7 619:24 619:24
encountered (1) 616:24
encouraged (1) 662:14
ended (1) 680:20
ends (1) 525:5
endured (1) 667:9
endures (1) 667:3
enforce (5) 594:22 597:25 598:8 606:2,4
enforcement (15) 533:5,21 534:5 538:8,25 539:6 549:24 552:20 607:8,9,11 615:3 677:16,22 708:9
enforcing (1) 597:17
engaged (2) 560:11 671:25
engagement (1) 701:2
English (2) 558:24,24
enjoy (1) 649:8
ensued (1) 581:13
enter (3) 524:17 551:10 552:10
entered (4) 524:7,13,16 601:18
entire (1) 613:3
entitled (2) 562:1 577:5
entrance (2) 524:10 605:13
entry (2) 618:2,6
episodes (3) 646:9 656:14 669:15
equivalent (1) 573:9
error (2) 696:18,21
escape (6) 617:21 618:5,22,23 618:24 620:1
especially (2) 664:21 698:19
Esq (2) 520:18,20
essentially (6) 644:14 646:23 646:24 688:7 705:25 708:24
established (3) 587:10 628:16 688:15
establishments (1) 611:20
esteem (2) 647:24 648:23
estimation (1) 691:5
et (2) 520:7 523:19
ethic (1) 523:3
ethical (1) 596:25
ethics (21) 522:10 523:7 549:3,5,8,15,20 550:20 552:12,18 553:10 571:12 595:24 596:2,21,22,23 597:2,10 605:25 606:20
ethnic (3) 577:3 666:16,18
evade (2) 618:22 619:4
evading (1) 619:9

evaluate (1) 673:20
evaluation (7) 662:1 684:8 692:14 693:5,8,10 697:1
evaluations (6) 677:1 685:14 692:7,9,10 693:15
evaluec (2) 692:18 693:13
event (17) 545:14 566:11,17 566:19 567:18 568:19 588:18,19,20,23,24 651:24 659:2 660:3 700:25 702:16 706:19
events (9) 539:19 573:4,10 644:8 660:1 661:13,24 667:9 673:22
everybody (4) 664:23 674:8 674:10 687:3
evidence (26) 525:2 531:11 531:14 544:12 546:4,7 549:9 551:16 601:25 602:7 602:17 604:20 633:12 639:14,19 640:20 670:6,14 676:22 679:15 700:7 703:7 704:14 706:13 708:13,19
evident (3) 522:2,7 704:25
evidentiary (1) 703:1
evidently (1) 704:19
Ewing (17) 528:7 575:18,21 575:22,24 638:9,16,17,19 638:22,23 639:2 668:20 681:21 682:25 683:1 698:14
Ewing's (2) 521:18 695:18
exact (3) 566:4 598:13 686:4
exactly (2) 630:19 684:14
exaggerate (1) 689:18
exaggerating (2) 690:7 700:8
examination (4) 546:14 641:6 646:1 693:5
examinations (1) 699:23
examine (1) 640:25
examined (1) 673:7
examinee (1) 677:7
Examiners (3) 535:9,11,18
example (3) 536:9 658:23 659:5
examples (1) 659:16
excerpt (1) 521:7
excerpts (3) 701:17,21 709:4
excessive (4) 570:7,18 572:13 572:20
excluded (1) 706:6
excuse (2) 629:18 659:23
excused (1) 701:5
exhaustive (1) 677:17
exhibit (45) 522:12,18 529:4 531:5,6,10 532:16 533:6 542:10 544:4,11 548:25 549:9 561:20 577:15 581:17,18 595:22 597:6 599:11 605:6 608:4,7,7,20 614:11,12 620:6,12,13 628:13,13 639:15,18,23 640:11,13,19,23 670:13 682:8,24 683:2,9 694:18
exhibits (5) 528:16,17,18 542:9,10
expected (2) 523:11,20
experience (18) 542:23 565:9 565:18 566:10,12,12 571:15 611:10 614:17 619:16 622:2 628:1 665:9 666:21 675:22 683:20,24 696:17
experienced (2) 657:12 659:8
experiencing (1) 660:12
expert (33) 531:8,14 535:12

570:9 571:2 573:23 575:18 576:14,19 589:5,19 610:12 613:9,10,21 617:16 619:25 620:9 636:21 640:17 662:19 671:6,25 672:24 673:15,19 675:4,7 681:21 681:24 682:1 692:3 698:4
**expertise (5)** 521:20 552:19 574:22,24 575:1
**experts (1)** 688:2
**explain (5)** 604:14,18 614:23 631:19 673:17
**explained (5)** 550:5 553:25 632:20 650:2 668:21
**explaining (2)** 674:8 705:19
**explanation (1)** 603:8
**explore (1)** 581:2
**expressed (1)** 665:7
**expresses (1)** 653:25
**expressions (1)** 597:21
**extend (2)** 604:13,16
**extended (2)** 604:15 702:11
**extends (1)** 603:20
**extension (1)** 570:8
**extensive (3)** 571:15 646:22 662:7
**extent (4)** 571:20 572:14 641:1 694:15
**extramarital (1)** 652:16
**extreme (3)** 631:20 632:5,7
**extremely (1)** 571:15
**eyes (3)** 556:22,24 561:10
**eyesight (1)** 620:7
**Eyrich (1)** 582:11

**F**

**F (2)** 706:24 707:23
**facade (1)** 664:25
**face (8)** 553:19 572:15 574:2 593:7 609:7 626:18,24 644:23
**facilitated (1)** 536:11
**facility (1)** 535:15
**fact (23)** 547:18 552:4 556:20 557:22,25 560:21 561:17 562:4 567:1 571:12 573:22 581:10 586:7,12 596:1 610:15 618:24 650:21 654:8 655:6,14 668:11 676:11
**factor (1)** 560:23
**factors (1)** 659:10
**facts (20)** 584:16,17,21,23,25 585:3,3,6,7,8,13,16,23 586:3,13 615:1,2,4 644:4 648:14
**factual (7)** 550:13 568:7,7 585:10 586:5,14 642:17
**faculty (1)** 639:10
**fair (2)** 590:8 669:11
**fairly (1)** 669:8
**fairness (1)** 524:11
**fall (1)** 667:13
**falling (1)** 647:18
**false (2)** 674:24 679:5
**family (6)** 523:17 649:6 651:23 662:23 664:22 677:25
**far (4)** 567:22 654:23 666:9 697:18
**fatally (1)** 574:13
**father (1)** 621:20
**fatigue (1)** 647:19
**fatigued (1)** 649:2
**fault (3)** 595:5,10,13
**fear (2)** 654:9 661:17

**February (2)** 520:14 526:2
**federal (13)** 531:8,22 533:4 534:20 536:14 538:4,5 539:2,5 613:17 703:6 707:19 708:13
**feel (10)** 553:23 667:4 678:17 692:22,22,23,23 697:13,20 699:22
**feeling (2)** 649:2 656:4
**feelings (11)** 549:24,25 597:11 647:4,24 656:6 658:5 661:19,20,23 665:7 666:24 665:2
**feels (8)** 568:14 651:19 658:7 665:10 665:21 663:9 664:24 665:2
**fellow (3)** 535:11,12 593:15
**felt (9)** 579:15 648:18,19,22 649:13,14 658:8 700:2,9
**female (8)** 541:5 555:22 560:21 561:1,2 575:11 598:11 637:23
**fence (1)** 605:9
**fend (1)** 580:1
**field (3)** 573:23 640:17 697:3
**fifteen (3)** 575:15 685:2,10
**Fifth (2)** 646:15 707:18
**figure (2)** 588:11 696:9
**filed (6)** 562:13,14 612:20 645:11 655:14,19
**fill (1)** 697:24
**filled (2)** 579:8,11
**final (3)** 568:2 570:16 572:4
**finally (1)** 707:22
**financial (4)** 662:23 698:17 698:19,21
**find (8)** 545:3 565:14 595:19 595:20 643:10 703:18,24 705:10
**finding (2)** 521:25 706:20
**findings (3)** 642:18 644:7 645:9
**fine (8)** 526:24 527:18 566:8 569:9 699:5 702:13,23 623:19,20
**fingertips (1)** 702:20
**finish (1)** 601:9
**finished (1)** 564:3
**fire (1)** 582:23
**firearms (1)** 537:12
**first (38)** 521:5 527:22 529:3 544:14,21,21,22 561:21 565:25 567:19,20 568:3 570:25 574:17 577:24 578:10,18,23 581:14 585:5 588:2 589:7,11,20 590:7 593:22 597:8 603:21 604:6 604:11 617:13 624:8 631:1 635:14,14 637:22 697:5 703:19
**fit (4)** 627:14,16,21,22
**fitness (1)** 627:25
**five (10)** 560:21 613:14,16 626:25 635:13 640:16 679:5 681:11 685:3 697:16
**flip (1)** 683:11
**follow (3)** 562:15 596:17 685:16
**followed (1)** 562:16
**following (2)** 534:3 653:8
**follows (3)** 528:14 529:23 638:21
**followup (1)** 557:10
**foot (2)** 560:21 627:1
**force (41)** 538:13 551:5,22,23 551:25 552:3,6,13 558:16 559:22 560:4,24,25 564:10

570:6,18 571:12,14 617:9 625:8,10,11,18 630:10,12 630:15,17,17 631:10 632:4 632:13 633:16 634:3,6,7,10 634:14,21,22 635:13 649:4
**forced (1)** 645:5
**forces (2)** 538:7,22
**forcing (1)** 552:9
**foregoing (1)** 710:6
**foreign (7)** 537:6 547:10 549:3 559:17 565:12,13 566:2
**forensic (12)** 535:9,10,18 639:5 640:18 692:7,9,10,14 693:4,9,16
**foresee (1)** 526:22
**forget (1)** 661:3
**form (8)** 604:17,18 614:4 657:19 674:3,7 694:16 702:9
**formal (1)** 527:14
**format (2)** 562:14 611:14
**forming (1)** 674:21
**forms (1)** 559:23
**formulate (5)** 672:18,24 676:6,14 677:20
**formulating (1)** 537:17
**formulation (2)** 685:15,17
**forth (10)** 525:18 543:19 556:22 558:21 570:3 591:23 627:24 643:21 704:7 710:8
**forty-five (1)** 642:15
**forward (2)** 638:17 709:14
**foster (1)** 549:24
**found (6)** 556:25 589:25 590:20 689:16 706:2 707:17
**foundation (2)** 562:23 707:13
**four (4)** 531:23 627:1 668:11 683:5
**fourth (3)** 532:5 568:20 695:13
**frame (5)** 554:15 618:3,7 623:19,20
**framed (1)** 662:21
**frankly (1)** 697:22
**free (1)** 564:19
**frequency (2)** 669:7 684:15
**frequently (2)** 547:24 669:8
**Friday (1)** 520:14
**friends (5)** 548:23 649:6 651:21,22 677:25
**frivolous (1)** 705:16
**front (10)** 551:12 577:15 588:21 603:2,5 619:25 641:24 643:21 646:19 681:21
**fulfill (2)** 652:19 653:1
**full (1)** 639:11
**fuller (1)** 696:25
**functioning (2)** 648:17 679:7
**further (19)** 525:16 543:7,10 550:6,21 575:12 580:13 602:12 614:6,13 623:16 632:12 637:16 638:2 668:18 669:13 690:10 700:11 710:6
**Fussell (167)** 520:18 521:13 522:11,13,17,19 524:17,25 525:17,25 526:9,15,19 527:7,7,17,20,23 528:6,8 528:21,25 529:2,7,15 530:2 531:10,19 532:17 535:2 536:4 540:14 541:20 543:21,5,10 545:21,24 546:8 547:1

548:11,24 549:9,11,12 551:2,19 553:8 554:5,10,11 554:17 555:4,7,14,25 556:16 557:5,9,11,20 558:10 559:12 561:13,16 561:19 562:11,25 565:6,8 565:16,17 566:23 567:15 568:24,25 569:4,15,22 570:10,20 571:9 572:3 573:14 574:24 575:2,22 578:24 580:21 582:25 586:22 589:9 590:4,25 595:16 599:16,20 607:3 616:8,10 620:12 629:2,13 634:18 637:18,19,20 638:2 638:13,15,25 639:1,18,24 640:19,24 642:11 650:7 654:20 655:13,22 657:24 661:1,11 662:22 663:21,24 664:7,9 665:21 666:8,12,13 668:4,7,18 670:18 672:21 673:10 679:18 682:23 684:1 688:1,9 695:23 698:7 699:7,10,11,15,17 700:11 700:19,23 701:6,8,10,12,18 701:22 702:13,22 703:1 708:23 709:3
**Fussell's (4)** 525:23 675:11 703:5 704:21
**future (2)** 661:20,24

**G**

**gain (3)** 676:20,20 693:13
**gained (1)** 680:6
**Galloway (1)** 537:20
**gather (1)** 523:22
**gathered (1)** 548:21
**general (15)** 542:2 564:10 610:4,7,19 611:23 612:2,4 612:17 614:5,8,10 646:7 672:25 706:14
**generalize (1)** 681:12
**generalizing (1)** 671:19
**generally (4)** 559:5 602:14 658:17 671:18
**genuinely (1)** 705:6
**getting (9)** 544:9 580:22,24 619:10 645:21 663:10 677:4 690:17 698:20
**give (5)** 526:18 528:25 548:20 566:4 569:10,14,17 591:22 592:2,7,11 595:18 659:23 664:10 681:4,16 681:17 687:3 697:15 698:12 702:17,23
**given (12)** 548:4,19 553:23 573:7 586:7 589:2 590:7 606:5 637:24 645:2 663:11 692:2
**giving (4)** 591:8,12,14,16
**glad (1)** 566:23
**Glassboro (1)** 531:1
**gleamed (1)** 649:11
**global (2)** 685:15,16
**go (53)** 524:2 527:19 529:9 537:21 541:3,18 544:1,7 545:3 546:17,25 552:1 553:17 559:11 570:13,15 584:4,6 590:17 599:13 600:20 601:21 605:2 608:17 611:21 618:5,11 620:11 621:19,20,22 622:1 623:16 631:15 632:12 634:20 638:25 639:19 640:9 642:1 650:10,21 655:5 657:18 661:17 663:16 666:10

692:13 694:23 697:10,19 699:16
**goes (11)** 522:8 526:12 564:5 577:24 591:19 614:13 647:1 669:5,7 685:10 694:25
**going (99)** 523:6,12 524:6,7 525:25 526:25 527:11 528:9,10,18 529:9,9,19 540:16 541:15 543:5 544:4 544:8 545:15 546:13 550:7 551:9,13 557:3,12,15 558:4 561:11 564:7 568:22 570:24 571:23 573:6,21 574:16,19 576:6 578:22 581:17 582:15 599:11,18 600:1,9 601:15 603:8 604:1 604:2,4 605:2,4,7,20 608:11,25 611:15 618:23 619:12,19 620:6,7,18,20 621:1 622:14 623:12,22 629:21,22 630:1 637:12 641:10 645:7,20 648:7 649:7,19,25 650:3 651:14 655:6 656:2 657:3 660:24 664:14 665:11 668:10 669:5 670:25 681:18 682:17 697:18,19 698:11 702:17,19 705:25 708:15 708:24
**good (8)** 600:11 607:21 608:17 627:20 634:24 638:6,23 697:23
**government (5)** 538:4,5 539:2 539:6 706:16
**governmental (1)** 645:13
**grab (3)** 573:24 624:18 632:23
**grabbed (1)** 551:12
**grabbing (3)** 552:15 594:24 631:25
**graduated (2)** 607:10 640:4
**Grande (18)** 523:11,16 524:4 524:20,22 540:19,23 563:19 567:14 568:18 577:20 610:3 614:20 615:4 615:7,17 642:9 709:5
**Grande's (7)** 524:24 525:1 526:1 564:17 565:4 566:24 701:13
**granted (1)** 645:16
**grasp (3)** 617:21 618:5 620:1
**grease (4)** 624:19,24 626:13 626:15
**greasy (2)** 595:9 608:16
**great (3)** 557:24 605:24 666:23
**greater (2)** 647:7 668:13
**Gregory (3)** 540:17 582:6 642:9
**grew (1)** 592:4
**grid (5)** 683:19 684:13,25 685:9 695:8
**grieving (1)** 698:21
**grip (7)** 594:23 595:7,9 608:16,17 624:21 626:13
**ground (3)** 588:21 591:13,15
**grounds (2)** 521:15 570:25
**group (3)** 662:10,12 667:19
**guarded (1)** 667:7
**guess (24)** 528:3 543:25 544:5 566:21 567:3 602:19 607:12 611:15 615:24 618:2 643:8 648:20 661:2 681:8,9 685:11 686:5 695:3 695:8,15,21 696:20,21

705:8
**guidelines (1)** 611:18
**guilty (2)** 645:23 658:7
**gunfire (1)** 602:13

**H**

**habits (1)** 651:7
**Hackman (1)** 545:4
**half (2)** 609:3 682:18
**Hall (1)** 644:25
**hammered (1)** 654:11
**hand (4)** 596:17 621:7 622:23 633:18
**handcuffed (2)** 572:18 644:24
**handcuffs (1)** 658:10
**handed (3)** 597:5,6 608:14
**handle (11)** 538:23 550:9 554:19 555:19,22 558:21 559:1 626:25 627:14 641:12 663:9
**handled (5)** 555:13,15,15,23 644:22
**handling (1)** 575:10
**hands (15)** 594:24 622:24 623:21 624:6,13 625:14 626:14 632:21 633:5,8 635:19,20 636:17,20 668:17
**hands-on (2)** 558:25 560:16
**handwritten (2)** 698:25 699:3
**hanging (1)** 655:25
**happen (7)** 600:6 607:18 628:1 653:24 654:6,10 661:18
**happened (11)** 600:6 645:9 651:18 652:5 654:11 658:11 659:1 661:9 668:16 675:9 690:14
**happening (3)** 603:13 618:25 619:21
**happens (1)** 565:13
**hard (2)** 652:24 686:4
**harm (2)** 665:1 698:17
**harsh (1)** 559:23
**Harvard (1)** 640:2
**hate (1)** 701:10
**Hawaii (1)** 707:23
**head (1)** 622:1
**health (27)** 642:4 643:2 666:20 670:6,9 679:8,10,14 680:12,14 681:4 682:3,6,11 683:13 685:24 686:17 689:8,11,12 690:19 692:10 694:19 695:17 696:25 698:16 704:23
**hear (3)** 535:25 621:21 653:25
**heard (1)** 622:1
**hearing (8)** 548:23 702:7,18 702:21,24 708:17,21 709:14
**hears (1)** 660:3
**hearsay (3)** 703:6,14 706:6
**heavy (1)** 555:22
**held (2)** 538:19 710:4
**help (4)** 662:24 665:3 674:18 677:20
**helpful (3)** 527:2 674:25 702:19
**hereinbefore (1)** 710:8
**Hey (1)** 621:6
**Hi (1)** 671:3
**high (1)** 530:5
**higher (1)** 545:5
**highest (1)** 639:12
**highway (3)** 536:20,24,25

**hired (1)** 568:5
**history (11)** 600:18 642:19,19 642:25 643:3 650:17 682:4 683:19,22 685:8 690:17
**hold (5)** 525:25 543:7 581:22 631:22 671:18
**holding (1)** 549:7
**hole (1)** 582:22
**home (3)** 551:13 654:11 655:4
**honest (1)** 681:3
**honestly (2)** 672:15 684:14
**Honor (73)** 521:23 522:5,22 525:21 527:4 528:15 531:12 532:15 535:25 540:9 541:9,16 543:5 545:15,20 546:3,19 548:9 548:16 550:11 551:15 552:25 554:8,21 555:1,17 559:3 561:12 562:22 564:8 566:1,15 567:7 568:22 570:8,14,24 572:22 573:2 574:16 575:17,22 576:1 579:23 580:21,24 582:20 601:17 633:11 637:17 638:15 639:20 640:22 649:21 654:17 655:11,20 657:3 660:24 663:21 664:4 665:12,17,20,22 666:7 668:2 670:8 682:16 699:11 701:8 707:4 709:2
**Honorable (1)** 520:12
**honors (2)** 640:3,4
**hood (3)** 618:2,2,6
**hooked (3)** 618:2,6 623:20
**hope (1)** 662:2
**hopeless (1)** 649:14
**hostile (1)** 558:22
**hour (5)** 638:9,10,11 676:1 682:18
**hours (5)** 642:15 655:3 675:17 676:2,3
**house (30)** 552:1 594:13 599:8 601:11 603:2,6,13 617:22 618:5,11,14,16,21 618:23 619:5,12,15,19,20 621:11,22 622:4 623:14 628:8,12 636:11 637:13 655:9,18 656:1
**houses (1)** 602:13
**huge (1)** 603:12
**Human (1)** 707:18
**humiliated (1)** 658:7
**hundred (14)** 533:5,11,13 560:22 613:14,16,17,19 671:7,8 675:7 679:5 681:11 697:16
**hundreds (1)** 546:12
**husband (8)** 619:20 622:13 643:12 652:8,9,15 653:6 687:16
**hypervigilance (4)** 659:12,16 659:24 660:21
**hypoglossal (1)** 631:14
**hypothetical (2)** 591:3 605:7

**I**

**i.e (1)** 591:23
**idea (5)** 603:16 604:8 613:12 654:25 671:11
**identical (2)** 522:13,15
**identified (4)** 522:12 526:2 587:7 601:10
**identifier (2)** 616:16,17
**identify (1)** 582:5
**identifying (1)** 616:15
**ifs (1)** 605:21

**ii (1)** 679:1
**ill (2)** 664:18,20
**Illinois (2)** 530:6 706:25
**illness (2)** 666:15 689:1
**illnesses (1)** 679:10
**imagine (2)** 534:1 559:5
**immediate (2)** 557:2 614:7
**immediately (12)** 547:12,22 548:3 556:23 574:1 593:6 602:15 615:1,15,18 648:13 648:24
**impact (1)** 673:15
**implicate (1)** 571:24
**important (3)** 586:8 613:24 623:9
**importantly (1)** 547:23
**importing (1)** 553:2
**imprint (1)** 631:14
**improper (3)** 586:18 592:20 625:18
**inability (1)** 647:17
**inappropriate (8)** 541:12 579:15 608:9,12 617:8,10 628:25 629:12
**incapacitate (1)** 556:2
**incarcerated (2)** 651:2,4
**incarceration (2)** 651:7 656:19
**inches (1)** 560:22
**incident (28)** 544:17,17,20 563:23 570:19 577:21,22 578:11 584:7 601:7 643:4 648:24 650:19 652:11 653:2,18,19,22 654:13 659:3,4 661:4 677:11,11,14 677:16 687:7 694:25
**incidents (8)** 652:2 653:7,8 654:14,22 656:16 657:12 661:4
**inclined (1)** 571:6
**include (1)** 565:14
**included (4)** 540:12 585:25 670:17 709:5
**includes (1)** 647:9
**including (3)** 533:4 627:21 629:20
**incorrect (1)** 666:4
**indicate (27)** 532:4 577:9 610:12 628:5,10,12 630:23 635:18 636:18 643:13 649:19 652:22 654:7 655:8 655:17,23 656:4 659:25 663:5,13 666:14 683:22 684:10,22 694:21 696:6,8
**indicated (23)** 532:7,11 550:18 553:15 561:1 566:1 592:23 595:8,9,23 599:6 601:13 616:25 623:13 637:11 668:22 675:16 681:24 682:1 697:10,13 702:14 708:15
**indicates (10)** 544:19 577:25 580:6 583:6 592:17 617:18 622:12 628:20 636:16,19 **indicating (4)** 523:15 524:23 525:3 614:1
**indication (9)** 583:15 681:5,5 681:15,16,17 690:11 691:17 695:21
**indications (1)** 689:10
**indifference (2)** 571:14,22
**indirectly (1)** 668:15
**individual (8)** 580:1 581:1 626:24 643:20 647:13 662:8 680:18 697:16
**individually (1)** 708:6

**individuals (12)** 543:1,3 544:16,16 547:20 548:6,13 548:19 593:6 677:20,25 678:5
**induce (1)** 631:20
**inflames (1)** 556:23
**inflammatory (1)** 556:23
**influence (3)** 549:25 568:2 673:14
**inform (1)** 654:1
**information (46)** 540:13 542:6 543:13,24 546:1,2,15 546:23 547:5,11,12,23 548:19,20 550:16,17,23 568:8 572:9 587:23 588:3,5 588:14,15,15 589:2 590:7 591:9 599:2 601:6 630:6 637:24 643:7,17 666:6 677:9 678:18,19,22 680:7 688:5 691:7,21 697:2,6 699:18
**informed (3)** 654:1 674:2,3
**inhabitants (1)** 704:24
**inherit (1)** 556:22
**initial (8)** 537:23 542:8 557:9 588:1,17 602:24 603:15,15
**initially (8)** 529:16 540:4,5 542:7 561:21 602:25 603:21 690:3
**initiate (3)** 537:21 538:2 559:21
**initiated (3)** 560:9 593:20 625:20
**initiating (1)** 559:24
**initiatives (2)** 558:17 574:1
**injured (3)** 574:13,13 641:2
**injuries (1)** 673:23
**injury (4)** 541:5 632:10 673:21 689:17
**inquired (1)** 523:18
**inquiries (1)** 523:23
**inside (4)** 551:13 617:22 618:5 619:19
**insight (2)** 664:14 689:23
**insightful (1)** 689:4
**inspection (2)** 540:21 642:7
**instance (9)** 552:2 555:20 572:12 574:13 591:2 595:6 627:13 677:15 681:13
**instances (7)** 547:25 556:21 568:8 577:2 621:24,25 635:13
**instructions (2)** 596:17,18
**instructor (3)** 537:18 556:14 596:14
**insurance (2)** 693:14,15
**Intelligence (3)** 539:8,11,17
**intend (1)** 524:23
**intensive (1)** 662:7
**intent (1)** 571:18
**intention (1)** 571:3
**intentional (4)** 571:13,13 573:12,19
**intentionality (5)** 570:22 571:4 572:24,24 573:2
**intentionally (4)** 571:22 572:11 573:24 574:3
**interacting (1)** 652:13
**interaction (1)** 608:13
**interchangeably (3)** 556:8 557:8,13
**interest (9)** 647:14,19 649:1 652:13,15 656:24,24,25 657:1
**interested (5)** 526:11 576:13 576:15 649:5,7

**interfering (1)** 665:3
**internal (2)** 606:24 676:24
**international (2)** 536:14 634:5
**internationally (1)** 565:10
**interpret (1)** 545:17
**interrogatories (1)** 541:6
**interrogatory (1)** 541:8
**interrupted (1)** 568:11
**intertwined (2)** 596:24,25
**interview (2)** 643:18 680:4
**interviewed (3)** 675:14 687:11,11
**interviewing (1)** 644:14
**interviews (3)** 677:20,24 678:5
**intoxicated (1)** 651:1
**introduced (1)** 633:12
**intrusive (2)** 658:23,25
**investigate (1)** 704:10
**investigated (1)** 588:24
**investigating (1)** 588:23
**investigation (5)** 564:5,6 588:18 603:25 604:7
**investigations (4)** 533:23,24 538:3 596:15
**investigative (3)** 564:5 704:20 705:22
**investigators (1)** 530:19
**involve (2)** 597:11 672:5
**involved (9)** 552:21,21 566:2 611:22 613:19 652:16 671:15 687:12,15
**involvement (5)** 643:20 644:12 662:10 667:20,25
**involvements (1)** 688:22
**involves (1)** 658:18
**involving (4)** 539:19 541:12 617:9 644:8
**irritant (1)** 556:22
**irritates (1)** 556:22
**issue (11)** 521:5 526:19 570:9 580:25 615:24 665:23 702:25 703:1,18 704:6,15
**issues (10)** 521:17 522:1 524:19 580:23 619:24 688:13 690:19 698:15,16 700:24
**item (1)** 632:15
**items (2)** 562:6 620:9

**J**

**jail (1)** 651:11
**jailed (3)** 696:2,6,10
**James (7)** 527:25 528:12 529:21 530:1 541:11 582:10,12
**January (5)** 542:4,15,18,21 569:1
**Jarman (1)** 706:24
**Javian (2)** 602:7 621:8
**Jay (2)** 556:15 596:14
**Jersey (9)** 531:1 536:10,13,20 537:3,17,20 566:5 638:4
**Jim (1)** 637:7
**job (1)** 552:22
**John (5)** 520:20 556:15 576:4 596:14 670:24
**join (1)** 528:5
**joined (3)** 581:9 588:1,9
**Jones (1)** 602:7
**joy (1)** 647:15
**judge (4)** 520:13 569:9 620:24 703:3
**judgment (3)** 540:20 642:8 691:8

**jugular (1)** 631:13
**July (60)** 540:8 558:8 566:18 569:3,5 578:11 597:20 599:23 614:20 615:14 641:3,16 642:6,13 644:12 648:13,15 650:12,14,19 652:6,6,8,10 653:3,8,18,18 653:21,22 654:2,11,22 655:9 656:7,8,16,23 657:11 657:14 660:10,21 664:9,10 665:5 667:9,24 668:16 669:5 673:22 677:11,11 684:11 686:2 687:7,19,25 690:14,15 694:10 701:3
**jumps (1)** 659:20
**jury (1)** 668:12
**justice (16)** 530:13 531:3,3 533:25,25 534:4,5,6,10 576:10,21,24,25 577:4 644:25 653:9
**juvenile (2)** 688:13,19

**K**

**keep (5)** 529:9 544:8 551:13 590:16 652:22
**kept (2)** 644:25 704:11
**kid (1)** 622:13
**kids (2)** 599:7 663:10
**kind (13)** 650:3 656:21 662:6 662:11,17 663:4 667:20 686:24 690:24 691:9 693:7 696:19 705:7
**kinds (2)** 647:5 691:6
**knew (9)** 598:16,18 605:21 624:2,3 679:12 688:7,8,18 688:18
**knocks (1)** 659:20
**know (98)** 521:17,22 522:18 523:6 527:4,9,11 528:1,10 531:6 533:3 540:1 543:18 546:21 548:23,25 550:13 555:10 556:12 564:8,12,23 566:10 568:18,21,21 581:16 582:25 583:6 587:13,20 589:15,20 591:24 592:8,9 593:9,11 594:6,15 596:4 601:8 607:4 607:8 609:10,22 610:7 615:4 618:8 619:1,12,13,14 621:9 627:4,8,11,16,20,22 630:11 631:5 637:7 643:6 645:15,18,23 657:6,8,21 669:9,21 670:18 672:4 676:25 679:16 684:14,14 685:9 687:14 688:17,22 691:25 692:18,22 696:9,16 697:22 698:8 699:11 701:23 702:3 708:2,3,4,10 708:18 709:9
**knowing (1)** 571:16
**knowledge (22)** 553:1,2 577:19 579:20,25 580:5 581:1,2,5 594:10 596:10 597:1 602:11 605:19 609:11 610:20 614:7 617:16 683:25 684:2,3,4
**known (3)** 624:12 637:22 646:15
**knows (2)** 655:7 665:4

**L**

**label (1)** 664:20
**labeled (2)** 664:11,17
**lack (2)** 647:17 693:12
**LaFond (1)** 706:2

**Lake (1)** 706:24
**Langley (2)** 539:14,17
**language (3)** 522:14 559:18 644:21
**laptop (1)** 547:11
**large (1)** 627:4
**larger (2)** 522:23 629:8
**lasted (4)** 569:15,23 690:9,9
**late (2)** 529:12 568:1
**Laura (3)** 540:19 566:24 642:9
**law (36)** 530:13 531:3 533:4 533:21,25 534:5 539:6 549:23 552:19 565:22 568:15,16 595:14 597:17 598:8 606:2,5,22 607:8,9 607:11 615:7 616:22 688:22 703:17 705:17 706:3,15 707:2 708:9
**lawn (1)** 601:12
**laws (1)** 597:25
**lawsuit (9)** 544:18 607:2 641:7 646:5 652:3 653:3 656:3,17 677:10
**lay (1)** 650:24
**layer (1)** 564:22
**laying (5)** 553:16 580:15 581:9 588:21 603:24
**lead (2)** 689:12 691:7
**leading (10)** 548:8,15 554:8 554:22 570:25 604:20 649:21 655:11,20,21
**leads (1)** 661:14
**leaned (1)** 664:23
**learn (1)** 708:12
**learned (3)** 523:24 590:8 644:13
**learns (1)** 654:14
**leave (3)** 526:22 579:16 616:21
**leaving (4)** 526:19 553:16 580:25 674:11
**led (2)** 544:18 653:12
**left (18)** 523:18 572:19 575:9 579:21,25 580:8,12,15,15 581:2,8,10 591:4 593:1 618:1,6 623:19 624:23 692:3 693:7,15 705:10
**legal (7)** 571:24 572:24 573:9 692:3 693:7,15 705:10
**legislative (5)** 704:7,19,21 705:12,22
**length (1)** 659:11
**let's (19)** 529:9,19 547:2 549:14 565:14 605:6,6,7,13 616:20 617:11 626:12 631:7 632:12 658:5 666:5 682:18 692:8,13
**letter (27)** 525:3,21,23 526:2 526:6,9 527:14 542:3 640:12 642:1 666:1 703:2,5 703:14,19 704:21 705:1,2,3 705:6,20,20,24 708:1,3,16 709:6
**letters (2)** 521:2 529:16
**letting (1)** 624:12
**level (12)** 630:10,12,13,15,23 631:1,10 634:12 635:4,5 685:7 691:18
**levels (1)** 634:21
**liaison (1)** 539:16
**libido (4)** 647:18 652:15 656:23 700:16
**licensed (4)** 640:5,7 686:13 686:14
**lieu (1)** 702:2

**lieutenant (25)** 523:11,15 524:4,20,22,24 525:1 526:1 536:22 540:19,23 543:4 563:19 564:17 565:4 567:14 568:18 577:20 610:3 614:19 615:4,7,17,20 701:13
**life (12)** 575:9 642:19 649:15 649:20 656:19 658:19,19 659:11 661:13,14,25 696:24
**liked (1)** 696:23
**line (11)** 529:4 532:6 545:16 578:19,23 582:15,16 583:6 599:13 621:2 651:20
**lines (2)** 526:13 696:13
**list (9)** 524:5 531:15,21 533:22 540:2,15 630:6 640:13 677:17
**listed (9)** 531:24 532:8,10 608:24 612:23 613:8 630:15 632:13 633:17
**listen (1)** 612:16
**listened (1)** 521:9
**listing (3)** 531:23,25 540:3
**lists (1)** 540:11
**little (5)** 529:12 545:5 575:14 671:20 708:12
**live (1)** 621:5
**living (1)** 652:9
**LNMSW (1)** 686:8
**local (1)** 534:21
**locating (1)** 686:4
**location (4)** 545:13 562:17 602:23 603:13
**lock (6)** 594:13,21,22 633:4 633:18,18
**locks (7)** 632:15,15,19,19,21 632:21 633:4
**long (16)** 528:9,10 534:13 535:18 561:9 566:11 639:8 642:14 647:11 657:15 669:15,22 685:22 687:15 689:24 690:8
**longer (8)** 649:6,9 651:9,22 681:14 690:10 695:14 703:21
**look (48)** 526:15,18 544:14 545:5 557:6 568:1 577:15 582:15,16 583:19,20 584:1 585:7 595:22 601:23 605:2 605:6 608:11,20 609:15 613:1 619:25 620:8,17 630:1 652:19 663:19 676:18,24 677:6 682:7,11 682:19,21 683:8,15 684:20 685:12,14,14 692:16 694:24 695:10,11 696:12 699:12 709:13
**looked (5)** 582:1 585:9 586:12 634:9 691:25
**looking (23)** 524:17 525:22 540:7,7,10,11 549:15 559:4 569:11 600:3 602:9 616:25 617:6 633:16 635:1,2 641:15 664:18 676:22 677:3,3 690:5,13
**looks (3)** 684:5,15 696:14
**Lorres (2)** 582:10,12
**Los (1)** 530:8
**lose (3)** 595:5 624:25 648:25
**losing (2)** 575:8 594:23
**loss (6)** 647:15,18,24 653:11 653:11 700:16
**lost (6)** 595:7,8,15 648:25 652:13,14

**lot (9)** 605:21 613:20 664:13 665:9 679:24 689:17 692:19 697:23 703:17
**lots (1)** 708:25
**loud (3)** 584:12 685:17,21
**low (2)** 685:22,22
**lunch (2)** 638:5,10
**lying (2)** 580:9,10

**M**

**M (5)** 563:15 567:12 710:3,14 710:15
**Mace (10)** 556:1,2,20,21 557:7,13,20,22,25 558:2
**machine (1)** 710:4
**machines (1)** 592:3
**Magistrate (1)** 520:13
**main (3)** 537:11 649:11 679:15
**maintain (1)** 627:25
**major (22)** 537:5 547:10 549:2 646:9,11,16,17,24 647:1,7,9 648:2,3 651:16 656:13,18 668:21,23,24 669:2 676:24 678:14
**majority (1)** 705:15
**making (9)** 521:16,25 610:15 617:16,17 643:25 674:14 674:15 703:11
**males (2)** 654:8,10
**malingering (8)** 690:21,22,25 691:3,6,8,13 700:8
**Mama (1)** 621:8
**man (1)** 652:25
**mandated (1)** 596:16
**mandates (1)** 564:2
**mandibular (1)** 632:16
**mania (1)** 679:16
**manifested (1)** 653:11
**manifests (1)** 690:14
**manipulate (2)** 632:4,9
**manner (2)** 559:10 676:14
**manners (1)** 559:1
**manual (2)** 613:4 646:15
**manuals (1)** 559:16
**March (2)** 708:25 710:10
**Marian (1)** 520:12
**marijuana (3)** 684:23,24,25
**mark (2)** 616:15 681:19
**marked (7)** 542:9 544:11 601:15 681:18 682:7 683:9 701:14
**marker (1)** 603:11
**marriage (3)** 652:23 653:13 687:5
**marriages (2)** 687:10,12
**married (3)** 643:10,11 652:9
**Massachusetts (1)** 640:6
**material (3)** 584:16,20 646:16
**materials (3)** 584:9,15 644:13
**matrix (6)** 630:12,17,17 632:14 633:16 634:3
**matter (7)** 550:10 556:20 584:23 612:24 708:6,7 710:5
**matters (2)** 521:3 534:16
**McFadden (5)** 703:2,9 705:5 705:18,19
**McFadden's (4)** 705:1,2 708:4,16
**McKNIGHT (48)** 520:4 521:8 540:19 579:17 586:21 592:21 593:3 594:10 601:4 625:23 626:5 626:8 629:9 641:1,6 642:10 642:12,16,18 644:6,9,14

**646:1 659:13 668:23 675:14 677:21 680:5 681:13 682:2 684:8,10 687:10,18,20,23 688:25 689:4,20 690:8 691:4,12 694:14 696:23 698:15 703:4 705:3 709:13
**McKnight's (7)** 642:3 654:21 662:1 684:6 687:4 693:20 701:2
**McPhearson (1)** 558:1
**MD (1)** 638:19
**mean (43)** 527:17 532:6 549:22 556:9 561:4,6 568:4 574:3 583:8,10 584:21 585:20 593:12,13 601:20 602:17 603:9,10 604:24 621:18,19,19,20 622:20 624:10 627:22 631:3,5,16 635:7 643:7 658:25 659:7 666:18 669:3 673:6 680:15 683:21 684:5,15 687:2 690:21 695:23
**meaning (5)** 549:23 585:23 622:19 664:18 668:21
**means (13)** 532:7,9 583:9,11 584:22 585:21 608:24 618:2 624:2 634:5 661:15 669:2 691:2
**meant (7)** 573:24 574:3 621:9 621:10 641:21,22 697:9
**measure (1)** 691:13
**measures (4)** 690:21,22 691:3 691:6
**mechanical (1)** 520:24
**media (2)** 541:10 654:15
**medical (9)** 574:12 591:20,22 592:7,11,13 642:4 677:12 697:21
**medication (2)** 657:19 662:13
**meet (6)** 523:20 642:12,14 648:6 671:3 709:13
**meeting (5)** 642:16 644:6 696:22 704:14 707:16
**member (12)** 534:8,9,13 535:3,9,10,17,22 536:5 705:12 706:4 707:8
**members (6)** 523:17 558:13 643:24 644:9 649:6 706:18
**men (1)** 656:24
**mental (22)** 646:15 663:11 666:15 678:6 679:8,10,14 680:12,14 681:4 682:2 685:24 686:17 689:1,7,8,11 689:12 690:9,19 692:10 698:16
**mentally (3)** 650:1 664:18,20
**mention (2)** 665:15 696:10
**mentioned (18)** 576:14 579:15 593:24 597:13 605:25 606:17 645:4 658:12 675:24 686:15,21 687:4,17 694:8 700:13,17 701:23
**mere (1)** 573:22
**merit (2)** 573:18 574:14
**message (1)** 587:8
**met (3)** 534:22 643:15 672:7
**method (2)** 646:10 650:21
**methods (2)** 643:24 644:3
**Michael (3)** 540:18 583:22 642:9
**microchip (1)** 529:13
**microphone (1)** 523:2
**mid (2)** 542:15,15
**midnight (1)** 527:5

**mind (6)** 525:12 575:23
603:23 608:5 621:23
663:23
**mine (4)** 544:9 598:23 603:8
633:9
**ministerial (1)** 547:15
**Minnesota (1)** 679:1
**minorities (8)** 534:4 576:16
576:18,19,21,23,25 577:2
**minute (8)** 528:22 529:3
569:16 575:15 595:19
663:21 682:18 699:12
**minutes (2)** 583:19 642:15
**Miramar (1)** 530:10
**Miriam (20)** 520:4 540:19
599:13,25 600:1,3,6,9,13
600:17 601:4 620:20 621:2
621:5,6,10 641:1 642:10
685:19,22
**Miriams (1)** 620:22
**misconception (1)** 681:1
**missing (3)** 602:19 635:10,12
**Mississippi (1)** 707:17
**misstating (1)** 602:6
**mistaken (1)** 573:12
**misunderstood (2)** 547:3
664:8
**mixed (1)** 529:1
**MMPI (9)** 686:18 689:15
693:3 697:7,9,14 698:1,3,8
**MMPI-2 (2)** 678:25 680:12
**moment (2)** 569:18,19
**Monday (3)** 523:21 526:5
527:5
**money (4)** 663:3 664:2 697:23
697:23
**month (3)** 684:16,17 708:25
**months (3)** 620:7 651:4
669:25
**mood (2)** 647:11 685:23
**morning (2)** 576:7 645:1
**mortally (4)** 553:16 579:16
579:21 580:1
**mother (2)** 619:20 648:20
**motion (2)** 540:20 642:8
**motions (2)** 649:20 702:3
**motivating (1)** 571:18
**motor (2)** 536:23 541:13
**mouth-to-mouth (1)** 592:5
**move (4)** 572:22 573:1 616:20
626:12
**movement (1)** 647:23
**moving (8)** 621:13,22 628:7
628:11,14 632:24 647:21
647:22
**MRI (1)** 697:11
**Multiphasic (1)** 679:1
**multiple (1)** 570:25
**multitude (1)** 548:21
**municipal (2)** 541:13 670:25
**municipality (1)** 537:1

**N**

**name (32)** 529:24 530:9,15
535:6 544:21,22 545:6
547:24 548:1 556:20
557:14 563:6,11,14,14,16
567:11 576:4,16 577:8
579:6,7 582:7 583:21,22
587:11 616:3,4 617:2
623:17 638:22 670:24
**names (8)** 544:15,19 547:19
548:13 558:23 567:9 582:6
672:4
**narrative (4)** 561:25 608:22
609:4 680:16

**narratives (1)** 695:12
**national (1)** 534:22
**nationally (1)** 630:18
**nationwide (1)** 578:6
**nature (4)** 547:25 566:13
673:5 700:17
**near (5)** 623:23 632:1 637:6
655:3,6
**nearby (2)** 659:18,18
**nearly (2)** 648:10 656:11
**necessarily (4)** 604:24 613:7
623:1 681:5
**necessary (13)** 524:4 526:10
568:14 610:14 623:9
625:11 626:11 663:4
679:13 697:4,20,25 699:22
**necessitate (1)** 626:23
**need (22)** 524:13 552:2 560:9
566:21 569:11 570:6,18
578:13,16 595:19,19
629:23 647:12,13 662:6
664:2 669:17 678:18
688:20 697:11,12 708:23
**needed (7)** 526:4 554:12,23
555:11 664:11 687:2 690:1
**needs (15)** 524:15 525:13
624:12 637:12 652:20,25
653:1 662:7,9,13,25 665:4
665:4 685:24 686:16
**negligence (1)** 602:20
**negligently (1)** 571:22
**Neither (1)** 567:12
**never (5)** 549:21,23 551:5
663:23 694:15
**New (23)** 520:2,7 531:1
536:10,12,20 537:3,16,20
556:14,17,18 565:18 566:4
566:5 574:9 596:15 638:4
639:7 640:5,6,7 710:11
**newspaper (1)** 660:3
**newspapers (1)** 654:15
**nice (2)** 671:3 709:13
**Nicholls (79)** 539:20 540:18
540:23 543:2 546:1,22
549:14 552:17 553:2,4,9
554:24 555:3,5 560:3
563:15 567:1,12 573:16
575:3,4,5 578:21 579:14,21
579:25 580:7,18,25 581:6,8
581:8,12 583:18 586:18
587:15,21,24 588:6,12
589:7,17 590:7,16,22
591:12 592:17,19,20 593:4
593:16,23 594:11 602:8
608:3,23,24 609:1,5,25
610:2 616:24 617:8,10,13
619:1 623:12,13,23 625:2
625:22 628:16,25 629:12
633:22 635:18 636:4 642:9
643:21
**Nicholls' (14)** 574:4 583:15
583:21,22 588:23 608:8,13
608:19 609:5,12,17,20
617:2 624:18
**night (9)** 525:22 566:17
577:20,22 578:11 599:23
600:2,10 620:18
**nightly (1)** 649:10
**nightmare (1)** 691:11
**nightmares (7)** 659:2,3
660:12,13,13,14,20
**nine (1)** 664:2
**nineteen (4)** 643:6,14 663:15
688:18
**noisy (1)** 602:12
**non (1)** 703:6

**nonresponsive (1)** 565:3
**nonverbal (3)** 558:12,16,19
**normal (5)** 647:21,22 674:7
684:24 692:2
**normally (2)** 588:10 678:13
**North (2)** 539:3 706:24
**Northern (2)** 706:24 707:1
**notations (2)** 699:1,3
**notch (2)** 631:13,14
**note (3)** 563:1,1 704:9
**notebook (1)** 670:13
**noted (1)** 533:6
**notes (10)** 641:11,20,20,22,23
641:25 664:8 683:21
699:12 710:7
**notice (3)** 642:8 655:15,18
**noticed (4)** 575:5 644:18
655:3,25
**notified (2)** 543:20 656:2
**number (25)** 524:6 531:6
533:24 540:22,25 541:8,9
542:1,1 558:24 562:3
565:12 610:7 613:2 616:5
619:22 642:8 671:16
688:21 699:7 700:13 707:4
707:25
**numerical (1)** 583:24
**numerous (1)** 641:10
**Nursing (1)** 642:22

**O**

**object (19)** 531:12 532:14
541:15 543:5 545:15 557:3
561:11 564:7 568:22
570:24 574:16 586:22
590:4,25 657:3 660:24
665:11 682:25 688:1
**objected (1)** 521:15
**objecting (5)** 543:9,10 550:22
559:3 564:23
**objection (54)** 522:21 525:15
525:17 532:13 541:18
546:3 548:8,15 550:11
551:15 552:25 554:8,21
556:9 558:4 561:14,18
562:22 570:8 571:23 572:2
573:7 574:25 580:21 589:9
595:16 607:3,5 616:8 629:2
629:13 634:19 639:22
640:21,22 641:18 649:21
654:17 655:11,20 662:18
664:4 665:17 666:1 668:2
672:21 673:10 684:1
680:10 695:23 698:7,11
700:19 708:15
**objective (4)** 680:13,15,16
691:10
**objects (1)** 639:21
**obligated (1)** 596:16
**obligation (1)** 674:19
**obligations (1)** 704:19
**observation (2)** 602:24
603:15
**observations (3)** 567:22
672:19 691:4
**observe (3)** 622:14 636:13
700:7
**observed (3)** 553:13,14
560:8 564:4 580:7 617:18
625:25 626:2,4,8,9 627:23
636:14
**observes (1)** 577:25
**observing (1)** 626:5
**obsessed (1)** 654:25
**obstacles (1)** 707:25
**obstructing (1)** 645:13

**obtain (3)** 542:17 610:9 667:2
**obtained (1)** 610:10
**obtaining (1)** 546:2
**obvious (1)** 548:2
**obviously (4)** 543:11 622:4
675:14 690:13
**OC (4)** 630:14,24 631:7
633:22
**occasion (3)** 607:7 660:10
698:6
**occupation (2)** 530:11 639:4
**occur (2)** 619:5 648:5
**occurred (2)** 545:14 643:4
**occurrence (1)** 675:6
**odds (1)** 686:14
**offender (1)** 651:5
**offer (11)** 525:4,10 543:16,22
549:9 558:5 571:21 599:1
669:6 688:6 708:16
**offered (5)** 524:25 525:13
526:17 674:2 703:2 705:11
**offering (3)** 522:16 666:6
683:3
**Offhand (1)** 533:11
**office (4)** 547:25 584:16 589:3
614:15
**officer (202)** 533:1,5,21
536:17 537:15 539:20
540:17 541:13 543:3 545:1
545:25 546:5,15,21 547:10
549:13,13,17,21,24 550:2,4
550:13,14,24 551:4,7,9,10
552:20 553:17,25 554:6,18
554:20,24 555:2,12,20,21
556:20 560:7 567:5,10,10
567:12 568:9,12 573:23
574:2 575:7,10 577:24
578:2,18,18,19,20,20,21
579:2,17,20 580:8 582:6,13
586:17,17 587:14,21,23,25
588:2,7,12,16,22 589:16,16
589:16,20,21 590:1,2,16,16
590:17,23,24 591:21
592:17,21,23,25 593:2,3,15
593:23,24,24,25 594:7
595:3,4,7,11 597:9,9,17,20
597:25 598:4,7 599:9 600:4
600:8,13 601:1,13 602:8,10
602:20 605:7,8,25 606:1,2
606:6 607:8,9,11,19 608:1
608:8,15,24 610:2 613:17
615:3,22,22,25 616:24
617:18 618:12,13,17,19,21
618:22 619:4,10,17 620:1,2
620:4,23,24 621:7,11,16,20
621:24 622:7,14,17 623:8
624:17 625:21 626:2,10,10
626:11 627:21 629:9
632:23 633:21 635:22
636:9,15 637:4,13,21
644:19 660:2
**officer's (6)** 553:16 561:4
579:6,7 615:5 636:10
**officers (112)** 521:8,20
536:15 537:18,18 540:13
547:4,16,22 548:3,18,22
550:9,22 551:22 552:23
553:14 555:19,22 556:3,13
557:7 558:11,15,20 559:9
559:21,25 560:11,13,16
562:4,13 564:5 566:4
567:16,20 571:16,19,21
572:11 574:9 580:14 581:7

581:11,14,15 582:4,6,8,9
582:13 586:8,10 587:16,22
587:24 588:3,4,6,8,9,10,13
588:17,17,24 589:7,7,11,15
589:16 590:1,8,21 591:5
592:6,11,12,18,22 595:5
596:5,11,15 604:1,23 605:1
615:7 619:23 625:10
626:25 627:7,14,23,25
628:4 629:5,8,19 631:17,24
633:1 634:24 635:12,14
636:3 638:1 644:17 655:7
677:22 704:11
**offices (2)** 539:13,17
**officials (3)** 567:24 706:16,18
**officiously (3)** 549:21 597:14
597:15
**offset (2)** 551:23 625:11
**oh (1)** 600:3
**okay (96)** 523:3 524:2,18
526:5 527:3,20 528:6,20
532:25 533:6 534:22
535:13 536:9 538:12,19
539:13 541:18,25 542:14
547:14 549:11 550:2 551:7
555:16 556:7 558:18 563:6
564:25 566:10 577:12,18
581:3 583:15,19 584:15
585:5 586:16 587:2 588:22
593:1,18 594:7 595:1 601:1
604:13 605:24 606:17
609:6 612:16,23 614:10
617:12,20 623:12,18
624:17 627:10 628:3
629:21 630:9 633:10,14
634:3 636:5,9 639:18,22
640:19,21 642:3 643:13,17
645:3 648:11 649:19 656:8
660:15 665:21 667:15,22
660:10 669:6,14 670:1,12
682:7 685:12,13 686:8
688:9,22 691:21 692:13,14
702:5 709:2
**old (4)** 642:20 643:6 663:15
664:2
**older (1)** 633:11
**oleoresin (1)** 644:23
**Olivia (1)** 544:22
**omits (2)** 634:22,23
**once (5)** 547:10 615:20,20
684:15,16
**ongoing (3)** 548:5 614:3
656:6
**online (1)** 522:25
**open (9)** 621:12 623:7 628:7
637:6,7,9,10,12 681:3
**operation (1)** 570:5
**operational (1)** 613:4
**operations (2)** 537:10,11
**opinion (107)** 539:21 543:8
543:16,17,18,20,23,23
545:25 549:13,18 550:2
551:4,7 552:5,14,17,19
553:7,11,12,20,21,22 554:6
554:12,24 555:12 558:6,8
559:13 569:1,7,10,24 570:17
570:2,3,6,9,12,16,21 571:8
571:9,21 572:6,9,16 573:8
573:9,17 574:4 575:3,7
577:18 578:3,5 584:23,25
585:6 589:20 590:9,15,21
592:20 593:18 606:1,5,13
610:15 629:15,18 630:7
631:3 646:2 648:11 652:1
653:2,5 654:21 656:9 658:2
658:4 662:3,6 664:10,10

**665:**25 667:2,16,24 669:6
669:14 674:23,24 676:9,15
677:21 688:6,7,8 697:4,20
700:24 706:4
**opinions (15)** 542:24 543:12
543:13 561:15 584:7
643:19 672:18,24,25,25
673:2,4,6 674:22 700:4
**opponent (6)** 703:7,16,20,21
703:23 706:10
**opportunity (8)** 521:6 542:5
542:12 580:19 702:8,17
708:12 709:11
**opposed (1)** 703:13
**options (1)** 560:3
**orally (1)** 569:17
**order (19)** 542:2 548:21
552:8 564:10 583:24
594:22 610:7,19 611:23
612:2,4,17 614:5,8,10
696:24 698:2 699:24
704:23
**ordered (1)** 636:19
**ordinances (1)** 704:22
**ordinary (4)** 647:1,3,4 661:16
**organization (2)** 530:16
535:21
**organizations (1)** 536:9
**organized (3)** 538:6,12,22
**original (3)** 542:14 567:19,23
**originally (3)** 544:12 551:14
703:25
**outcome (1)** 689:14
**outlook (1)** 700:16
**outside (23)** 545:19 546:7
548:22 550:8 553:1 557:4
558:7 561:12,14 570:4
574:21,23 575:1,19,23
661:17 662:19 665:12
692:3,7,9,10 693:15
**outward (2)** 604:15,16
**overestimate (1)** 689:18
**overnight (1)** 644:25
**overprotective (1)** 653:23
**overrule (2)** 573:6 688:10
**overruled (19)** 532:16 541:18
548:17 551:18 556:11
570:13 586:23 589:10
591:1 616:9,12 629:3,14
639:22 649:22 654:19
661:7 695:25 700:20
**overweight (1)** 575:11
**overwhelming (1)** 705:14

---

**P**

**Pacific (1)** 530:7
**package (2)** 670:8,10
**page (26)** 524:16 525:5,5
540:10,11 544:14 563:1,13
563:17 567:11 579:1
582:16 583:17 584:4
608:20 665:22 683:15
684:20 685:12 693:18
694:6,24 695:12 696:12
698:25 699:7
**pages (7)** 524:14 525:18
531:6 542:10 546:12
701:12,15
**pain (7)** 631:14,20,21,23
632:5,7,16
**paper (1)** 596:1
**papers (3)** 560:8 704:11,14
**paragraph (6)** 549:19 550:20
551:3 584:6 609:4 665:22
**paranoia (1)** 659:12
**pardon (1)** 589:18

**parent (2)** 654:8,9
**parenthesis (4)** 532:6 551:11
666:16,17
**parenthetical (1)** 665:24
**parked (1)** 655:3
**part (19)** 539:2 568:9 584:20
593:22 595:1 605:10,14,19
605:22 615:6 618:24
640:12 663:5 674:22
682:11,24 683:1 695:7
698:19
**participated (1)** 536:5
**particular (12)** 561:2 565:24
570:19 601:5,6 615:6
635:13 660:1 666:16 673:2
683:23 703:18
**particularly (4)** 576:15 660:4
666:18 667:5
**parties (3)** 521:14 644:16
651:14
**parts (4)** 524:6,10 624:17
632:4
**party (16)** 602:24 603:12
605:9,11,14 703:7,15,20,21
703:23,25,25 706:7,10
707:9,11
**path (1)** 544:1
**pathology (4)** 686:24 687:1,1
700:10
**patience (1)** 638:24
**patient (6)** 679:19,24 681:11
691:22 692:11,18
**patients (3)** 675:1 676:12
678:14
**Patrick (1)** 638:22
**patrol (1)** 644:24
**patrolman (3)** 536:20,24,25
**pattern (1)** 667:13
**pay (2)** 650:5 663:3
**Payson (1)** 520:12
**peace (1)** 704:23
**pending (1)** 665:19
**Pennsylvania (1)** 566:5
**people (62)** 544:19 547:24
548:14,20,21,23 550:9
555:19 556:3,8 558:21
560:17 577:3,11,12,12
602:22 603:13 605:4,9,11
605:20,22 622:21 634:24
647:6 648:2,18 649:24
650:5 651:17,20,23 652:14
653:12 655:8 656:25,25
658:8,9 659:11 664:25
665:8 666:21,22 673:7
674:12,19 675:3,7 676:1,1
676:19 677:7 679:6 680:10
689:19 692:5,19 693:1,2
696:23
**people's (1)** 683:22
**pepper (29)** 553:9,18,21
556:4,5,20,23,25 557:8,14
557:21,23,25 558:3 561:9
572:15,20 574:1 593:7,23
628:3,23 629:1,9,12,20
630:13 632:22 644:23
**percent (4)** 532:23,24 533:17
533:18
**percentage (2)** 533:16 671:9
**perfect (2)** 696:22 697:1
**perform (2)** 537:13 539:3
**performance (1)** 596:6
**perimeter (1)** 550:8
**period (7)** 572:19 607:20
650:11 669:15,22 681:14
702:11
**periodic (1)** 656:13

**periods (2)** 647:11 669:22
**permanence (1)** 706:7
**permissible (1)** 569:18
**permission (1)** 527:10
**permit (5)** 521:18 546:13
549:25 553:6 666:4
**permitted (1)** 543:16
**persist (1)** 532:12
**persistent (1)** 647:4
**person (48)** 551:12 553:16
557:2 558:23,23 559:23
560:15,16 567:3 574:12
578:9,12 579:16 580:9,12
580:15,15 581:6,8,10 587:8
588:20 591:7,13,15,22
593:7 622:20,21,25 623:10
628:17 631:2 632:1 634:22
635:5,8,25 647:21 664:11
664:13,20 675:23 688:20
692:5,6 697:19 707:8
**person's (1)** 551:11
**personal (5)** 549:25 567:21
597:11 689:17 691:4
**personality (2)** 679:1,6
**personally (1)** 566:2
**personnel (4)** 583:12,13
592:1,16
**persons (3)** 559:1 584:24
627:15
**Persuasive (1)** 631:2
**pertinent (1)** 695:8
**phone (1)** 524:20
**photograph (1)** 541:4
**phrase (1)** 552:13
**physical (12)** 552:3 553:14
559:21 560:9,12,24,24
561:3 573:18 627:2,25
632:1
**physically (10)** 551:12 554:19
555:20,21 627:14,16,18,21
627:22 650:1
**physician (4)** 673:18,24
697:10,11
**picture (2)** 522:14 696:25
**Pierpont (3)** 544:24 545:12
637:23
**PINS (1)** 688:20
**place (12)** 521:13 542:15,18
563:23 568:19 601:11
624:23 625:16 655:9
687:14 709:9 710:8
**placed (2)** 640:20 644:24
**places (1)** 655:6
**plain (2)** 558:22 625:12
**plaintiff (69)** 520:5,18 521:19
522:3 524:8,15 532:22,23
533:14,16,18 539:18,21
543:1 550:5 551:9,24,25
552:9 553:10,15,17 554:12
554:19,23 555:11 559:15
560:2,4,7,21 561:1,2
570:19 572:12,14 575:6
580:8 581:10 582:2 586:25
590:18,24 593:19,21 594:2
606:6 608:2,8,13,16 616:24
617:19 618:1 619:2 624:16
640:25 644:1 671:10
673:18 674:2 700:7 701:9
701:20 706:5,20 707:6,7,13
**plaintiff's (24)** 540:20,20
541:5,7 550:20 577:15
581:20 595:23 599:11,22
602:7 605:18 609:7 617:1
628:13 639:15,23 642:7,7
670:9,13 671:20 698:2,3
**plaintiffs (1)** 530:20

**plan (1)** 527:8
**planned (1)** 528:2
**play (2)** 535:20 700:10
**played (2)** 521:7 535:20
**please (3)** 529:25 584:12
638:17
**plus (3)** 649:13 653:8 680:10
**point (21)** 522:6,23 523:22
543:12 550:5 551:24 555:8
560:8 582:17 602:19,22
605:17 628:14 648:7 649:2
678:21 690:17,18,18
693:13 702:2
**points (11)** 631:13,16,16,18
631:19,20,21,23,25 632:9
632:17
**Poles (1)** 544:22
**police (235)** 522:9,24 530:13
530:15 533:1 534:3,16,20
535:3 536:6,11,12,15,17,21
536:22,25 537:1,2,4,7,10
537:11,14,15,16,17,18,18
537:22,24 539:19 540:13
540:17 541:11,12,13 542:1
545:1 547:9 548:1 549:2,5
549:7,20 550:9,22 551:22
552:18 553:25 555:21
556:3,8,13,25 558:20 559:6
559:8,9,14,16,16,20,25
560:10,14 561:3 562:13
565:20 566:4 567:23,25
568:5,9,12 570:3,5 571:15
572:18 573:23 574:2,7,9,9
574:14,18 576:5 578:1,4
580:14 582:4,6,9,13 584:18
584:24 585:10,18,21,23
586:7,8 588:13 592:1,11,12
592:18 593:20 595:3,4,25
596:2,5,7,11,13,15 597:17
597:19,24 598:4,7 600:4
603:25,25 604:16,23 605:1
606:2,6,23,24 607:8,10,13
607:19 609:18 610:10,20
610:22,23,25 611:1,10,11
611:20,21,21,24 613:2,2,4
613:13,16 614:14,17
615:21 619:17 620:23,24
621:7,24 622:7,17 623:8
625:7,10,20 626:9 627:16
627:17,18,23,24 629:5
630:12,16 634:4,6,13,24
635:14 636:21 637:24,25
642:4 644:9,12,15,16,16,19
645:5,22 652:11 654:4,5,16
654:22,24,25 655:3,5,6,7,8
655:17,25 656:3,6,6 659:6
655:19,21,23,23 660:2,4
660:4,22 666:17 667:25
668:17 672:6,9,19,25 673:4
673:8 677:10,11,14 687:17
701:2
**policeman (6)** 533:4 536:10
598:12,15,17,18
**policemen (1)** 530:18
**policies (8)** 565:19 570:4
584:18 585:18,21,24
606:23 625:8
**policy (7)** 564:11,11,12,12,23
565:19 636:22
**porch (10)** 551:12 579:17
590:18,23 592:21 593:2
605:18 617:18 644:18,19
**portion (1)** 558:24
**portions (8)** 525:1,4,6,6 526:1
526:9,17 546:23
**posed (1)** 666:6

**position (12)** 538:19 549:23
559:24 578:17 580:8
597:16,19,24 598:4,7 606:1
639:8
**positioning (2)** 631:22 635:6
**positions (1)** 571:16
**positive (2)** 633:21 661:23
**possession (1)** 528:16
**possible (5)** 521:22 527:16
606:9 623:10 690:7
**possibly (4)** 687:24 688:16
689:14 690:9
**post (11)** 530:5 701:24 702:3
702:7,11,18,21,24 708:17
708:21 709:14
**postraumatic (1)** 691:14
**posttraumatic (9)** 646:9,17
651:15 658:12,17 659:9
667:6,8 694:7
**potential (2)** 548:7 667:17
**potentially (1)** 658:19
**pounds (1)** 560:22
**power (5)** 704:20,20,21,22
705:1
**powers (3)** 704:6,10,18
**practice (4)** 531:14 674:7
692:3 697:3
**practices (3)** 585:18,21,24
**practicing (1)** 673:18
**preamble (2)** 522:23 523:7
**precise (1)** 690:16
**precisely (1)** 683:12
**predates (1)** 695:18
**prefer (2)** 569:13,13
**prejudice (1)** 668:11
**prejudices (1)** 549:25
**premarked (1)** 670:13
**preparation (2)** 613:9,25
**prepare (1)** 523:21
**prepared (4)** 565:22 569:20
643:23 699:25
**presence (2)** 635:5 655:17
**present (3)** 658:21,22 664:25
**presentations (1)** 535:23
**presenting (2)** 686:25 687:1
**preservation (1)** 704:22
**president (1)** 704:16
**pressure (8)** 631:13,15,16,17
631:23,25 632:9,17
**pretty (6)** 651:25 663:11
677:17 679:3 681:2 692:11
**prevent (1)** 618:17
**prevention (1)** 662:9
**previous (4)** 620:9 642:24
643:5 656:11
**previously (4)** 522:12 524:25
581:7 647:14 649:5 687:12
**primarily (2)** 641:6 704:7
**primary (3)** 563:10 567:10
578:20
**principal (1)** 704:18
**principle (1)** 706:18
**principles (4)** 560:14 643:24
644:3 706:14
**printed (1)** 686:1
**prior (23)** 543:19,23 583:16
589:16 590:1 610:11
632:22 641:6 648:16 652:8
652:10 654:23 657:12
661:23 672:13 682:4
684:11,12 685:23 687:18
687:25 690:20 694:15
**probably (1)** 544:8 546:12
622:4,13 662:8,10 669:1
674:25 697:12 702:16
703:22

**problem (9)** 526:22 614:23,23 614:24 617:23 625:1 626:20 684:11 690:4
**problems (11)** 625:3 647:16 647:16,17 664:14 667:22 687:5 689:7 694:9,12 709:7
**procedure (4)** 531:8,22 578:3 578:5
**procedures (12)** 555:23 570:4 570:5 584:18 585:19,22,24 606:23,25 613:4 625:8 673:5
**proceed (1)** 524:24
**proceeding (4)** 654:18 671:5 703:4,23
**proceedings (4)** 520:11,24 653:9 710:4
**process (1)** 571:3
**produced (1)** 520:25
**product (3)** 545:19 556:20 643:23
**production (1)** 704:13
**profane (1)** 607:18
**profanities (1)** 599:10
**profanity (7)** 559:22,22 597:22 606:17 607:15,16 607:20
**profession (3)** 558:11 643:24 646:14
**professional (10)** 539:21 542:25 543:8 572:10 584:17 646:2 678:21 679:14 697:5 700:5
**professionals (3)** 679:9 680:13 681:4
**professor (6)** 530:12,22,24 639:6,11,12
**prognosis (3)** 667:2,6,10
**program (2)** 662:11 667:20
**programs (2)** 535:4 536:6
**progress (1)** 656:12
**promoted (2)** 639:11,12
**pronounced (1)** 652:13
**proper (4)** 526:4,13 571:7 590:22
**properties (1)** 558:6
**property (1)** 644:18
**proposal (2)** 526:16 709:7
**prosecution (7)** 532:18,21,22 532:24 533:1,18 674:11
**prosecutors (1)** 530:18
**protecting (1)** 597:18
**prove (1)** 692:12
**provide (3)** 539:20,24 680:12
**provided (4)** 522:10 561:20 595:23 688:5
**provision (1)** 572:23
**provisions (2)** 523:4 550:3
**provocation (5)** 553:18 572:15 593:7,12,23
**prowess (1)** 561:3
**psychiatric (6)** 642:25 664:11 666:15,19,24 682:5
**psychiatrist (1)** 573:12
**psychological (11)** 642:24 646:2,3 666:15,24 667:3 673:21 679:12 682:4 693:2 700:1
**psychologically (1)** 641:2
**psychologist (3)** 573:22 639:5 640:5
**psychology (1)** 640:18
**psychomotor (1)** 647:20
**psychopathology (4)** 679:7 679:16 689:18 690:13
**psychotherapy (3)** 662:7,8,10

**PTSD (4)** 662:3 678:7,15,16
**public (3)** 537:23 550:10 558:13
**pull (1)** 626:16
**punch (1)** 582:23
**purpose (5)** 596:4 598:3,4 606:11 704:15
**purposes (2)** 554:14 556:5
**pursuant (2)** 531:22 693:22
**purview (1)** 708:10
**put (29)** 525:11 526:4 527:10 571:18 572:18 594:21 599:6 602:7 606:9 620:24 621:7 623:21 624:6,12 625:13,22 626:7 628:17 635:19,20 636:17,19 637:25 650:24 657:23 696:17 702:8,21 709:9
**puts (2)** 526:13 559:24
**putting (4)** 599:7 605:8 644:19 693:12

**Q**

**qualifier (1)** 669:4
**qualifies (2)** 706:6,9
**qualify (2)** 616:7 706:11
**quantifying (1)** 690:25
**quarter (1)** 675:17
**quasi-criminal (1)** 671:13
**question (84)** 525:12 538:10 543:9 545:6,22 546:13,14 547:3,8 548:8,15 550:15 554:9,14,15,22 555:4,5,14 557:7,8,9,10,12 562:8 564:14 565:2,7,15 567:23 569:20 570:25 571:1,1,24 584:19 585:5 589:22 590:8 597:23,23 598:6,6 599:18 602:19,20 604:5,6 607:14 612:16 613:8 628:25 629:7 633:10 634:18 635:16 660:20,25 661:5 662:20 665:12,18 666:2,5,8,10 667:22 668:11,14,21 671:4 672:22 678:20 680:23 688:17,21 689:12 695:21 697:14,17,18 701:16 705:5 705:7
**questioned (1)** 703:19
**questioning (2)** 523:6 545:16
**questions (26)** 575:12 576:6 633:13 637:16 638:12 639:25 657:9 666:5 668:18 670:20 671:1 675:11 677:1 677:2,5 679:6,18 680:18,22 681:11 688:4 691:6 692:16 697:17 700:11 708:19
**quick (1)** 623:10
**quickly (1)** 527:2
**quite (6)** 525:5 529:16 547:24 613:20 691:18 700:13

**R**

**race (2)** 521:14,17
**races (2)** 521:20,21
**racial (2)** 666:16,18
**racist (1)** 558:23
**radio (3)** 546:23 547:11 654:15
**raise (1)** 596:16
**ran (2)** 551:11 573:25
**rank (1)** 639:12
**rate (2)** 647:21,22
**rationale (1)** 698:20
**re-interview (1)** 615:7

**reach (3)** 646:1 674:23 700:4
**reached (2)** 643:19 699:19
**read (39)** 536:2,3 551:8 552:13 553:13 582:11 584:11 593:16 594:7,17,23 599:11 600:1,20,22 608:4 613:3,5 617:15 620:9,10,19 620:23 621:1,5 625:13 635:17 637:21 641:13 642:8 646:21 666:8 683:10 684:9 685:16,17,20,21 690:19
**reading (1)** 546:1
**reads (1)** 660:3
**ready (1)** 638:13
**real (1)** 548:1
**realize (2)** 623:6 690:1
**realized (2)** 527:24 649:25
**really (12)** 522:6 526:12 531:15 574:20 575:18 606:11 650:4 654:11 656:24 671:11 691:5 692:16
**reason (10)** 557:5 578:9 615:9 615:11,24 625:6 640:9 659:23 663:5 676:21
**reasonable (7)** 542:25 646:2 697:4,21 699:25 700:4 709:8
**reasoning (2)** 567:24,25
**reasons (8)** 548:2 552:15 553:23 567:16 620:3,5 664:12 708:14
**recall (5)** 546:21 663:25 683:13 688:12 698:20
**receipt (4)** 547:4,22 701:21 703:13
**receive (5)** 558:12,15,18 560:16 667:17
**received (22)** 521:2 523:9,14 525:3 530:7 532:16 542:7 542:19 546:6,6 547:13 560:14 564:2 586:9 591:10 613:12 638:1 640:23 682:5 683:6 703:20 706:13
**receives (2)** 547:11 615:21
**receiving (3)** 546:22 564:1 642:25
**recess (4)** 575:16 638:12 682:18,20
**recognize (6)** 582:7,8,10,13 682:8 708:8
**recollect (1)** 612:6
**recollection (14)** 534:2 535:8 546:11 569:12,17 612:22 641:14,15 642:2 664:1 666:3 683:14
**recommendation (1)** 645:24
**recommended (1)** 634:13
**record (25)** 521:14,19 524:12 524:16,17 529:25 536:3 540:6,15,16 546:15 551:17 571:10 599:15,21 601:18 610:4 620:10 670:9 682:23 683:14 688:19 696:11,18 706:2
**recorded (2)** 520:24 599:23
**recording (4)** 521:6,9 541:10 621:14
**recordings (1)** 705:4
**records (21)** 641:10 642:4,5 670:6,15 677:12,15,15,16 680:10 682:9,11,16,19,23 682:24 683:13 694:13,18 696:17 704:11
**recounted (1)** 550:19

**RECROSS-EXAMINATI...** 700:12
**recurrence (1)** 691:11
**recurrences (1)** 669:12
**recurring (2)** 669:2,3
**redirect (2)** 637:18 699:10
**REDIRECT-EXAMINAT...** 637:20 699:17 700:23
**Reed (1)** 545:9
**refer (4)** 540:3 549:19 569:8 641:11
**reference (4)** 541:22,24 663:20 706:1
**referencing (1)** 622:13
**referred (7)** 527:23 551:20 630:14 641:19 674:9,12 691:16
**referring (11)** 545:8 564:9,24 567:5 569:14 570:17 620:8 633:11 677:25 679:2 688:13 706:23
**reflect (1)** 521:19
**reflected (1)** 558:8
**refortify (1)** 638:7
**refrain (1)** 630:20
**refresh (7)** 534:2 535:8 569:12,17 641:13,15 642:2
**refreshes (1)** 663:25
**regain (2)** 624:21 626:12
**regard (5)** 547:19 643:1 645:9 662:9 680:25
**regarding (10)** 550:24 573:1 590:15 610:5 611:24 615:5 644:1 671:1 672:25 707:15
**regardless (4)** 560:15 622:8 623:5 630:9
**regards (4)** 524:10,11 543:13 572:25
**regional (2)** 536:11 537:7
**regular (3)** 627:24 650:18 658:23
**regulations (8)** 522:24 523:4 523:8 549:4,8,20 568:17 596:3
**relaid (1)** 642:24
**relapse (2)** 662:9 667:10
**relapsing (1)** 667:17
**relate (1)** 653:12
**related (12)** 535:3 540:13 585:23 655:18 660:21 677:10,16 679:9 688:21 694:9 694:7 696:24
**relates (2)** 608:22,23
**relating (5)** 585:18,21 641:7 642:5 656:25
**relation (1)** 558:7
**relationship (15)** 652:2,7 653:6,14,17,21 654:21 656:5 687:13,13,18 703:12 704:25 705:1 706:14
**relative (11)** 531:8 535:11 540:12 541:12 542:6 547:23 558:6 566:1 575:18 604:14 635:6
**release (1)** 651:11
**released (1)** 645:2
**Relevance (1)** 654:17
**relevancy (2)** 532:15 639:21
**relevant (11)** 521:15,17 522:1 522:6 531:24 565:14 574:17,21 585:6 610:19 688:6
**reliability (2)** 680:21 681:9
**reliable (2)** 643:23 691:5
**reliably (1)** 644:3
**relied (2)** 584:10 677:23

**relief (1)** 657:18
**relies (1)** 704:21
**rely (5)** 646:12,14 648:14 681:10 708:16
**remain (1)** 592:24
**remained (2)** 656:10,12
**remains (1)** 556:18
**remarkably (1)** 647:13
**remember (8)** 613:5 663:15 664:1,3,5 666:12 672:15 682:25
**remembering (1)** 533:11
**remind (2)** 659:4,8
**reminder (1)** 660:9
**reminds (2)** 660:1,2
**render (1)** 697:20
**reoccurring (3)** 646:8 648:1 668:23
**repeat (1)** 651:5
**repeated (2)** 657:9 659:2
**repeating (3)** 529:17 629:4 667:16
**rephrase (2)** 565:6 571:24
**replied (1)** 599:9
**replies (1)** 600:4
**report (157)** 521:18 531:7,8 531:18 540:3,8,22 542:6,8 542:13 543:19 545:9,9 547:25 557:4,20,22 558:9 561:16 562:9,9,12 563:23 564:4,13,16,17,18 565:5,21 565:23,25 567:6,10,13,19 567:22 568:3,9,13,14 569:8 569:11,11,13,14,14,24 572:19 576:14,20 579:2 580:20 582:12 584:1 585:2 585:9,10,11,25 586:1,4,5,7 586:12,13,14 587:25 589:5 589:5,13,25 592:16 608:14 609:5,8,10,12,15,16,17,18 609:18,21,22 610:1,12,24 610:25 611:2,3,6,8,12,17 612:1,23 613:9,16,20,25 615:5 615:14 616:15 617:1,7,14 617:16 621:5 623:24 624:3 624:5 628:20 632:25 633:20 634:12 635:17,17 636:10,16,18,19 641:13,15 643:13,21,23 655:24 663:17 664:8 665:13,16,21 666:4,14 671:1 673:15 674:16 677:18 681:21,24 682:1 684:10 685:25 687:4 693:18 694:6 695:5,10,11 695:11,14,16,17,18,18 699:25 710:3
**reported (4)** 544:17,20 588:20 657:11
**reportedly (1)** 603:13
**reporter (2)** 523:1 710:1
**reporting (3)** 520:25 545:1 588:23
**reports (31)** 531:14 543:21 562:3,12,15 564:1,2,22 566:13 567:12 568:6 582:11 584:22,24 585:9 586:9 591:9 599:3,4 602:13 608:4 610:5,16,21,22 611:24 612:4,18 628:5,10 628:12
**represent (1)** 671:9
**representative (2)** 703:9 707:11
**request (4)** 525:16 529:10 613:1 674:21
**requested (1)** 551:14 635:20

674:16
requests (1) 644:1
require (1) 662:3
required (18) 547:16,18
548:6,12,18 549:3 562:13
562:14,18,19 565:22
609:24,25 615:17 616:19
625:9 627:25 700:3
requirement (2) 526:3 578:15
requires (1) 631:25
reread (1) 640:10
research (4) 556:25 610:10
627:17 705:10
reserving (1) 693:5
residence (7) 545:7,8,10,11
545:13 551:10 588:21
resistance (21) 540:22 562:1
562:6,9,12 563:23 564:13
565:21 610:5,16,24 611:1,3
611:24 612:4,18 615:5,14
617:1 635:17 690:6
resistant (2) 685:25 689:11
resisting (14) 555:20 556:3
558:22 626:1,5,8,9 628:18
628:21 629:10 636:13,14
637:2 645:14
resolved (2) 526:22 527:11,15
527:18
resource (3) 697:14,17,18
resources (2) 697:7 700:2
respect (39) 521:25 523:11
525:9 548:12 552:5,13,24
553:7,9 555:3 558:5,12,19
565:20 570:21,22 572:5
573:7,9,11,15,16,16,19
574:5 642:18 643:19 644:8
644:11 653:5 658:5 659:13
661:12 666:19 667:3,10
668:8 681:7 701:2
respiration (1) 592:3
respond (4) 548:3 589:4
627:2 629:24
responded (3) 588:9 644:17
644:20
responder (3) 577:24 578:10
588:1
responder's (1) 565:25
responders (5) 567:19 568:3
574:19
responding (5) 562:15 564:3
577:24 578:18,23
responds (1) 620:23
response (6) 541:5,7 561:13
643:25 666:2 675:10
responses (2) 642:6 666:5
responsibility (5) 559:20
575:7 591:5,8 615:6
responsible (4) 553:4 591:14
591:16,18
responsive (1) 565:1
rest (3) 640:9 701:9,25
rests (1) 701:20
result (16) 632:7 646:4 651:2
651:5 652:5 653:10 656:15
661:9 664:24 667:24
668:16 673:22 680:12
681:10 688:3 690:14
resulted (4) 654:7 687:18
693:20 694:8
results (2) 645:15 698:6
resume (1) 639:17
resumption (1) 658:1
retain (2) 539:18 640:25
retained (4) 672:12,13 673:14
673:20
retaining (1) 613:7,12

retardation (1) 647:20
retarded (1) 647:20
retired (4) 530:18,18 538:5
538:20
return (1) 616:23
reveals (1) 546:15
review (33) 521:6 525:22
532:1 539:19,24 540:2,4
542:3,5,12 546:20 550:4
564:16,22 568:9,13 580:17
580:19 609:16 610:6 612:5
612:8,12,15,20 614:6,13
617:4,6 641:7 675:11
683:14 704:17
reviewed (28) 525:22 540:16
543:11,13 560:9 564:9
572:10 584:9,22 585:1,13
586:5 597:3,4 610:4,18
611:23 612:11,24 613:9,25
630:6 642:3 677:14,18
680:4 704:4 705:4
reviewing (6) 552:7 563:18
565:24 567:6 678:6 683:13
revision (1) 679:2
Richard (1) 537:20
right (48) 523:9,23 532:5
545:23 549:14 565:6
566:23 573:6 575:14
579:18 582:2,22 583:2
587:3,5 596:17 600:18
602:4 605:4,9,16,18 606:3
609:8 612:10 619:6 620:14
622:25 623:14,25 624:5,22
629:21 630:19,19 635:10
639:25 650:13 663:22
665:24 674:1 684:11 686:5
686:7 695:2,7 696:10
702:20
risk (7) 657:23,25 667:12,14
685:15,16,22
road (1) 602:12
Robert (1) 520:18
Rochester (57) 520:7,7,20
522:9,24 529:6 539:19
541:11 549:5,7,19 552:18
559:6,8 564:11 574:18
576:5,5 578:4,7 595:24
596:2,7,13,20 597:1,24
610:5,16,23 611:1,23
614:14 627:17 630:16
634:4,12 641:3 642:4 644:9
652:11 655:15 660:22
667:25 670:25 671:22
672:1,6,9,19,25 673:4,8
687:7 703:21 704:5 710:11
Rochester's (6) 545:18
562:16 564:10 606:24
630:11 632:13
role (4) 535:20,20 580:13
673:17
room (1) 547:16
roughly (1) 644:22
routine (4) 661:16,16,17
routines (1) 650:3
row (1) 620:22
Rowan (6) 530:12 531:1
533:22,23 537:19 576:11
ruined (2) 649:15 661:25
rule (5) 531:9 564:8 703:7
706:12 708:13
rules (11) 522:24 523:4,7
531:8,22 549:4,8,20 568:16
596:2 705:14
run (2) 526:18 640:23
run (1) 593:10
running (3) 573:20 599:7

622:5

**S**

S (3) 618:6 623:24 626:16
S's (1) 626:18
S/ (1) 710:14
sad (1) 652:20
sadness (1) 647:5
safe (1) 638:4
safety (2) 537:23 704:23
sake (1) 629:4
Sassfras (3) 545:7,8,9
Sassfras' (2) 545:9,11
satisfaction (1) 647:15
satisfied (4) 678:21,22,23
699:18
saw (29) 546:15 568:8 571:11
605:8,11 618:16,18,19
619:1 623:23,24 642:22
650:13 656:7,8 657:2,14
658:4 659:15 660:12 665:5
665:25 669:12 676:2
682:12 689:20 695:3,6,22
saying (19) 522:8 589:1
590:16 598:21 600:24
603:12 604:25,25 611:17
621:25,25 622:19 635:9,10
664:1,3 674:14 692:7
698:21
says (33) 527:8 545:6 579:5
582:23 583:7 584:9,20
587:25 599:13 600:6,24
611:6,7 618:10 620:18
621:2,3,14,15 622:10 623:7
623:17,19 624:5,19,21,23
626:12 683:19 692:11,12
695:5 706:11
scales (1) 680:20
scars (1) 660:6
scene (62) 564:4 567:20,21
574:11,19 577:25 579:14
581:6,12 582:24 583:7,9,10
583:11,16,20 590:21 591:5
591:18,19,23 599:9,14,25
600:4,24,25 601:2,5,10,12
602:10,15,16,18,21,25
603:3,4,12,15,18,20,23,24
604:8,19,23 605:1,8,8,10
605:14,19,23 606:10,10,12
608:25 618:13 623:10
644:19
schedule (1) 709:9
scheduled (2) 523:13 708:25
schizophrenia (1) 679:16
school (6) 530:5,9 639:9,10
640:2 677:15
scope (14) 545:19 546:7 553:1
557:4 558:8 561:12,14
574:21,23 575:1 662:19
665:12 703:12 708:7
screen (2) 546:16 547:21
searching (1) 583:17
second (14) 544:25 545:1
563:17 567:11 578:19
582:16,22 595:18 599:16
609:3,6 626:17 679:2
698:12
secondary (2) 656:20 676:20
seconds (1) 612:8
section (7) 534:10 568:13
572:23 573:1,3 600:12
704:9
security (1) 536:6
see (53) 527:7 532:5 544:25
561:24 578:24 582:4,17,25
583:4,15,18,21,22 591:10

602:2,3,4,17,22 603:22
604:7,11 608:17,22,23
609:9 616:2,3 621:4 630:14
631:8 638:11 648:2 659:13
663:22,23,25 665:24
670:22 674:9,14 678:1,14
682:19 686:6,8 687:3
690:12 692:19 694:18
697:10 704:25 705:12
seeing (4) 618:13 676:19
682:3 686:25
seek (1) 684:18
seeking (1) 666:23
seen (14) 581:18 607:22
613:21 630:2 658:9 676:1,1
682:10 683:20,21,22
691:16 698:1,3
sees (1) 660:2
selected (4) 524:15 537:16,21
706:17
self (5) 537:11 647:24 657:19
658:5 664:19
self-medication (1) 694:16
self-worth (1) 658:5
Senator (3) 707:20,21,24
send (8) 526:6,8 527:14,14
542:9 682:24 683:1 709:6
sense (3) 573:13 659:10
680:17
sent (1) 542:3
sentence (7) 584:9,11,11,20
613:5 624:15 685:15
sentences (6) 618:9 620:11,17
685:16 696:13
separate (1) 548:20
separated (2) 587:7 643:11
sergeant (93) 536:21 539:20
540:18,23 543:4 552:17,21
553:2,3,9,13 555:24 557:25
563:15 572:11,14 573:25
574:4,5 575:3,4,5 578:20
579:14,20,25 580:7,17,25
581:6,12 587:15 588:21,22
586:17 587:15 588:1,6,12
588:16 590:16,22 591:4,6
591:12,14,18 592:17,19,20
592:23 593:4,16 594:11
602:8 608:3,8,12,19,22,23
609:1,4,5,12,17,20,25
610:2 615:22 616:23 617:1
617:8,10,13 618:10,13
619:1,11 623:12,13,22
624:17 625:2,21 626:10
628:16,25 629:12 633:22
635:18 636:4,14
sergeant's (1) 591:8
serious (4) 650:25 669:13
673:23 690:4
serve (3) 530:13 534:10
535:11
served (3) 536:10,24 537:23
service (3) 520:25 550:10
639:6
services (2) 536:12 707:18
set (8) 525:18 543:19 549:3
584:16,20 643:21 704:7
710:8
setting (1) 535:22
settled (4) 532:9,9 614:3
671:15
seven (5) 539:7 540:22 671:7
671:8 675:7
seventy (2) 532:23 533:18
severe (1) 675:24
severely (1) 653:9
severity (1) 681:17

sex (4) 648:25 649:1 652:15
656:24
sexual (4) 647:18 652:19,25
653:11
Shaheen (3) 710:3,14,15
shape (11) 575:21,22 561:2
575:11 627:1,4,10,11,11,11
627:13
she'd (1) 665:5
she'll (1) 662:2
sheltered (1) 661:14
Sheppard (1) 541:11
Sheriff's (1) 538:1
shit (3) 550:7 559:15 620:25
short (3) 524:1 650:11 659:10
shorter (1) 670:2
shorthand (1) 710:4
shortly (1) 648:15
shot (1) 654:16
show (26) 523:21 531:5,20
532:2 544:4,15 546:4
548:25 563:6,13 578:22
581:17 582:15 584:14
598:16,19,20 601:15 620:6
629:22 647:13 679:14
681:18 683:24 684:24
698:6
showed (1) 590:5
showing (8) 544:11 561:20
581:19 582:21 606:7
639:15 640:11 707:13
shown (2) 684:25 706:20
shows (1) 679:15
side (10) 523:9 553:16 562:2
562:9 594:13,21 671:10,10
671:21 690:5
sign (12) 563:22 565:21 567:1
567:2,16 578:18,19 610:1
610:18 615:17,20 616:1
signature (23) 563:17,18
566:18,18,21,21,24 567:2,5
578:22,23 579:4,5 609:9
616:7,10,10,14,16,19,19
617:20,21
signatures (2) 566:16 616:2
signed (29) 540:22,24 541:1
563:23 566:11,13,17 567:3
567:13,13,22 568:19
577:20 578:12,13,16 586:9
609:10,22,24,25 610:17,17
610:21 612:20 614:20,25
615:21 704:16
significant (1) 667:12
signing (1) 614:25
similar (1) 667:21
similarly (1) 707:23
simple (1) 625:12
simplifying (1) 604:9
simply (5) 531:25 562:16
606:7 620:1 702:6
single (3) 622:25 627:20
697:19
singular (2) 691:11,16
sir (119) 530:17,21 532:7,19
535:19 536:8,18 537:5,9,15
537:21 538:5,9,11,14 539:9
539:23,25 541:22 542:5,16
542:22 543:3 549:16
552:16 553:25 560:19
561:8,22 562:21 563:3,8,18
563:24 569:6,21,25 572:7
576:8,12,18 578:14 579:12
579:19 582:3 583:5,5 584:3
584:5,8,14,19 585:1,19
586:2,19 592:10 594:1,8,18

594:25 596:3,9 598:2,6
599:6 602:3,5 605:15
606:18 607:1,21 608:6,10
608:21 609:2,14 611:5
612:2,3,19 613:23 614:21
616:6 617:3,24 619:3,7
620:20,22 622:6,18,23
623:11,15 624:1,4,14 625:5
626:19 628:19,22 629:17
630:5 632:6,24 633:19,24
635:1,16,23 637:24 658:14
**sit (4)** 540:1 636:21 637:14
697:16
**siting (1)** 544:20
**situation (7)** 622:24 623:2
628:24 634:23 658:18
664:19 676:1
**situations (1)** 588:10
**six (1)** 534:15
**sixty-seven (3)** 679:5 681:11
705:15
**slash (1)** 666:18
**sleep (1)** 647:16
**sleeping (2)** 647:17 648:24
**slipped (3)** 595:7,8 624:19
**small (1)** 558:24
**smaller (1)** 671:16
**snippets (1)** 524:12
**so-called (1)** 647:16
**social (8)** 534:6 643:3 650:18
651:13,25 684:19 686:13
686:14
**socializing (2)** 649:6 652:14
**socially (1)** 694:15
**societies (1)** 536:7
**society (2)** 577:6,10
**sold (1)** 557:14
**solitary (1)** 645:1
**somebody (13)** 579:21 621:21
622:11,19 623:6,7,8 680:24
681:3 689:13 692:4,11
705:11
**somewhat (1)** 689:25
**son (2)** 602:8 621:20
**son's (1)** 659:19
**sons (7)** 612:3 652:10
653:15,18,21,23 664:2
**soon (1)** 527:15
**sorry (18)** 533:20 540:6 541:7
546:8,18 568:11 569:5
570:14 572:25 580:4
590:16 599:20 630:12,22
633:4 665:20 666:7 707:2
**sort (7)** 651:14 659:10 667:19
679:17 681:1 683:21
688:19
**sorts (2)** 639:14 643:8
**sought (2)** 664:12,15
**sounds (2)** 650:23 686:5
**source (1)** 677:13
**Southern (1)** 536:12
**span (1)** 699:8
**speak (4)** 574:6 698:15
707:14 708:6
**speaking (5)** 559:5 561:7
571:3 574:6 703:9
**speaks (1)** 695:23
**special (2)** 538:6,21
**specific (12)** 555:23 559:5,20
577:12 595:20 596:18
597:1 600:19 610:23 669:9
670:10 672:24
**specifically (14)** 540:12,23
541:23 559:9 612:17
646:25 673:20 679:11
682:13,25 693:25 694:7

698:21 703:8
**specifics (3)** 523:20 531:9
692:24
**spells (1)** 646:16
**spend (2)** 666:22 675:19
**spent (1)** 675:16
**spoken (2)** 696:23 705:3
**spontaneously (1)** 649:20
**sporadic (3)** 685:2,5,7
**spouse (3)** 622:3,13,22
**spray (29)** 553:9,18,21 556:2
556:4,5,21,23,25 557:8,14
557:21,23,25 558:3 561:9
572:15,20 574:2 593:7,8
628:3,23 629:1,12,20
630:13 632:22 644:23
645:6
**sprayed (7)** 553:18 572:15
574:1 593:23 629:9 644:23
645:6
**spraying (1)** 626:23
**square (2)** 604:21,22
**SRR (2)** 608:11,19
**SRRs (1)** 608:4
**stabbed (4)** 575:8 580:11,15
588:21
**stabbing (4)** 544:17 575:4
606:10 623:23
**stages (2)** 574:18 668:12
**staging (3)** 574:5,7,11
**stairs (2)** 551:11 573:20
**stake (1)** 689:14
**stances (1)** 618:4
**stand (3)** 554:13 596:16,22
**standard (15)** 553:6,6 558:11
558:14 563:22,24,25 564:1
564:15,18 565:19 570:5
584:17 596:5 613:3
**standardized (1)** 680:17
**standards (1)** 625:7
**stands (1)** 679:4
**stapled (1)** 531:5
**start (11)** 576:1 586:21 587:2
599:14,25 670:22 671:4
674:8,13 676:18 693:12
**started (6)** 528:15 557:15
604:14 670:5 694:3,4
**starting (1)** 524:16
**starts (4)** 584:6,12 685:10,19
**state (24)** 529:24 530:6,18
533:4 534:20 536:10,16,17
536:24,25,25 538:25
541:13 550:12 556:14
558:14 562:20 565:9,18
566:4 574:15 599:21
607:10 639:6
**stated (16)** 537:9 550:5 552:7
552:14 566:14 576:9,14
577:18 581:7 592:22
610:25 612:7 613:14 625:4
675:10 691:19
**statement (28)** 541:11 542:1
550:13 594:19 615:19
617:17 620:19,19 648:16
686:12,14,15 703:7,8,10,11
703:15,15,20 705:11,21
706:9,12 707:6,10,20,21,24
**statements (10)** 573:20
584:23 617:23 618:4
630:21 660:16 702:6 705:6
705:13,24
**states (21)** 520:1,13 534:24
536:16 537:5 551:16
558:15,15 559:17 565:9,18
565:19 577:11 599:4 611:4
611:11 623:24 624:6
628:13 695:10,11

**stating (4)** 564:10,12 570:9
610:15
**Statistical (1)** 646:15
**status (1)** 663:12
**stay (4)** 600:1,9 620:18,21
**staying (2)** 647:18 659:6
**stenographic (1)** 710:7
**stenography (1)** 520:24
**stenotype (1)** 710:4
**step (4)** 579:22 638:17 662:11
667:20
**steps (2)** 553:17 573:25
**stick (1)** 549:14
**sticks (1)** 661:16
**stigma (4)** 664:21 665:6
666:14,23
**stimuli (1)** 659:4
**stipulated (1)** 614:4
**Stirs (1)** 706:3
**Stockton (1)** 537:20
**stop (9)** 584:19 591:23 600:11
601:1 604:2,4 621:9 623:22
631:15
**stopped (5)** 623:19 651:8,8,21
696:2
**straight (3)** 552:4,8,10
**street (8)** 544:24 545:12
553:17 580:9,10 581:1,9
637:23
**strength (1)** 632:4
**stress (11)** 646:10,18 651:15
658:12,17 659:9 667:6,8
691:14 694:7 700:8
**stressors (1)** 656:19
**stretches (1)** 690:10
**strictly (1)** 674:18
**strike (13)** 532:4 546:1
554:10 565:3,10 572:22
573:1 629:23 645:10 675:1
678:24 679:11 692:22
694:5 698:5 699:6,14
**strikes (1)** 571:7
**strong (4)** 615:11 664:22,25
681:9
**struggle (5)** 553:15 581:12
590:23 593:21 626:2
657:16
**struggles (1)** 657:20
**struggling (13)** 575:5 579:17
580:8 590:18 593:14,19,20
594:12 608:15 618:13
635:22 636:9 637:4
**studies (2)** 531:3 535:11
**subject (33)** 526:2 540:22
562:1,9,12 563:22 564:13
565:21 610:5,16,24 611:1,3
611:18,24 612:4,17 615:5
615:13 617:1 618:4,14,21
619:1,11 635:17 652:2
653:3 665:25 689:13
701:20 703:11 707:10
**subject's (1)** 561:10
**subjected (2)** 618:18,24
**subjective (6)** 627:11,12,13
647:11 680:6,17
**subjectively (1)** 667:5
**submissions (7)** 702:7,18,21
702:24 708:17,22 709:14
**submitted (3)** 531:7 540:4
550:4 580:6 584:15,24
585:4 612:12,14,15 614:6
682:16
**subordinate (4)** 610:2 617:10
620:2 636:15
**subpoenas (1)** 704:16
**subsequent (4)** 542:6,7
656:16 660:22

**subsequently (3)** 641:4
652:10,16
**substance (3)** 557:16 667:19
683:22
**suffer (2)** 648:8,11
**suffered (4)** 646:3 652:12
668:23 673:21
**suffering (3)** 648:15 656:13
681:13
**suffers (4)** 646:3,8,9 662:14
**sufficient (3)** 643:18 675:22
678:22
**suggested (1)** 645:24
**suicide (7)** 648:1 649:17,18
685:15,16,23,24
**sum (1)** 586:16
**summary (4)** 540:20 642:8
696:13 708:1
**summer (1)** 643:16
**SUNY (1)** 639:6
**supervise (1)** 568:6
**supervising (5)** 564:15
565:20 567:5,16 586:10
**Supervision (1)** 688:20
**supervisor (11)** 552:21 553:4
563:19,22 564:1 565:24
568:2 593:5 610:1,3 614:7
**supervisor's (2)** 566:18 615:6
**supervisors (4)** 567:25 568:5
568:8 627:24
**supp (3)** 582:23 706:24
707:23
**supplemental (3)** 531:7
543:20,22
**supplied (4)** 544:12 641:7
642:17 644:7
**supply (1)** 641:9
**supposed (5)** 586:9 610:17,17
610:18,21 614:6 676:25
**sure (21)** 531:16 568:1,6
574:18 587:14 611:25
615:1,8 663:22 666:9
672:15 674:14,15 675:9
678:24 679:11 682:15
694:5 698:5 699:6,14
**surprise (3)** 589:15,19,23
**surrounding (1)** 701:17
**Survey (1)** 534:5
**suspect (2)** 628:4 637:12
**sustain (4)** 558:4 571:23
698:11 708:15
**sustained (15)** 548:10 558:7
561:18 568:23 572:2
574:25 595:17 607:5
655:12,21 662:20 664:6
665:14,18 673:11
**swear (1)** 596:17
**swears (1)** 549:21
**swore (1)** 607:7
**sworn (8)** 528:13 529:22
596:5,8 607:9,10 638:18,20
**syllabus (1)** 537:17
**syllabuses (1)** 535:23
**symptom (1)** 691:14
**symptoms (19)** 651:15 652:3
652:12,13 653:10 657:4,8
658:20 659:14,15 667:8
681:6 689:24 690:1,7
691:18 692:17 700:13,16
**syndrome (1)** 658:12
**system (9)** 576:22,24,25
577:4 642:4 643:2 682:11
683:13 693:15
**Systems (1)** 682:6

―――――――――――
**T**
―――――――――――

**take (34)** 526:15,16,18 527:13
549:18 557:6 569:16
575:15 577:14 585:1
590:17,19 591:6 595:22
601:23 604:19 608:5,11
617:19 623:24 638:6,10
645:24 663:3,21 664:25
682:7,18,18 683:8,15
687:14 692:8,11
**taken (4)** 542:18 560:23
567:20 575:16 586:7
630:17 638:12 641:2 658:9
682:20 683:21 710:7
**takes (1)** 676:6
**talk (37)** 548:6 560:15,17
564:22 572:23 588:3
613:24 634:22,23 635:8,25
636:7,16,18 637:8,14
649:16 650:8,15 651:2,6,13
652:7 653:14 655:14
656:23 660:6,11 661:12,19
662:23 688:2 692:5 693:4
697:19 701:19 709:3
**talked (2)** 558:1,2 560:5
565:12 579:13 608:1 612:2
620:8 623:13 633:6 642:19
643:2 654:9,13 676:11
678:2 679:18 687:23
688:25 691:21 698:18
709:3
**talking (24)** 525:19 548:22
555:10 559:23 566:20,22
566:24 578:24 579:10
580:25 582:1 600:16,17,18
600:23 610:22,22 620:12
634:8 636:4 686:18 690:8
690:24 695:16
**tall (1)** 560:22
**tape (5)** 528:23 529:3 599:6
605:8 606:10 644:19 705:4
**task (3)** 538:7,13,22
**taught (15)** 533:22,23,25
534:1,3 537:4 550:9,14,23
558:25 574:8,14 596:14
611:12 634:6
**teach (14)** 530:13,25 531:2
534:7 535:11,13 537:7,10
539:6 598:11,14,16 639:13
639:14
**teacher (1)** 576:10
**teaching (2)** 537:11,19
**tearfulness (1)** 650:8
**tearing (1)** 599:8
**technical (2)** 646:13 658:16
**technicians (1)** 574:12
**technique (1)** 633:17
**techniques (2)** 592:7 631:10
**teenagers (1)** 643:12
**television (2)** 654:15 660:4
**tell (29)** 525:24 534:2 587:2
600:22 608:12 617:14
630:10,13,15 631:3 640:14
654:2,23 671:11,14 672:4
673:9 674:19 677:2 677:7
678:24 679:3 681:2 682:8
683:18 689:21,21 692:22
**telling (8)** 526:9 568:12
676:12,15 679:20,24 680:9
705:23
**tells (2)** 614:5 677:7
**temporarily (1)** 645:6
**ten (5)** 541:8,9 676:2 682:18
685:2
**tend (1)** 692:5
**tendency (1)** 689:19
**term (16)** 552:10 572:24

**terminology (2)** 556:18
611:19
**terms (20)** 527:11 549:15,17
552:17 571:4,4,25 579:11
594:9,19 615:19 650:24
662:9 667:5,6 675:11 676:6
691:18 693:18 694:2
**test (20)** 678:25 679:6,12
680:17,25 681:1,2,3,10
686:18,19 687:1,2 688:7
689:15 691:10 693:2 697:9
697:12,13
**testified (39)** 528:13 529:22
532:2,3,8,18,20 533:6,9
538:20 542:20,24 546:21
546:22 550:3 573:15 590:6
602:8 609:12 612:7 613:14
613:17,18 614:2 616:18
620:15 630:11 638:20
640:15 660:19 661:3
667:23 671:5,17,22 680:11
691:12 699:19 701:1
**testify (9)** 523:12 533:1
539:10 559:9 571:2 613:18
640:17 663:20 674:16
**testimony (53)** 523:12 524:11
524:12,24 525:2,4,5,10,11
525:12 526:1,3,11,12 527:6
527:10 529:10,19 532:10
532:22 535:12 542:20
543:10 546:4,13 550:21
551:10,16 553:3,7 557:4
559:4,7 561:12 575:18
576:6 580:17 589:16 590:5
592:18 595:1 597:9 621:12
658:13 662:19 671:2
687:25 693:23 694:14
701:17 702:20 705:18
706:5
**tests (1)** 699:23
**text (2)** 582:16,23
**Thank (17)** 523:9 541:9 554:4
590:13 605:24 638:3,23
670:4 692:8 698:22 700:22
701:5 709:11
**theory (1)** 706:7
**therapy (2)** 662:12 667:19
**thereof (1)** 704:15
**thing (11)** 557:18 596:23
597:8 600:19 631:1 651:14
677:6 679:15,17 691:9
697:2
**things (23)** 525:25 558:25
612:25 613:2 619:22,23
629:19 632:13 634:1 643:8
645:20 649:5,7,11 660:19
661:2 668:8 676:18,24
677:14 679:17 700:17,18
**think (114)** 522:5,13,19 523:6
523:23 524:6,12,15 526:10
527:2 529:15,17,17 531:13
545:3,16 546:4,7 555:14
557:7,11,15,17,25 558:1
562:2,8 564:14 566:20
571:17 573:15 574:24,24
576:19 577:15 586:11
587:12,17,18 588:22
590:11 597:12,12 598:25
601:19 607:14 609:3
613:24 615:9 622:16,17,22
625:25 627:4 635:24 638:6

**tool (3)** 678:13,14 686:18
**top (1)** 563:1
**topic (1)** 526:12
**totally (8)** 550:8 553:22
573:18 574:13 593:5 625:4
627:1 634:22
**touched (3)** 537:13 560:20
657:15
**touching (1)** 631:25
**town (9)** 523:16,24 527:5,12
707:9,11,14,15,16
**Township (1)** 536:21
**train (3)** 537:18,22 559:21
**trained (29)** 536:15 545:18
551:22 555:19,21,22
556:14 558:20 559:10
560:1 564:6 574:1 575:10
591:22 592:1,6,11,12 595:4
604:23 625:10 626:24
627:14,18 629:5,19 631:17
631:24 635:14
**trainers (2)** 535:7 559:20
**training (22)** 534:20 535:3,13
536:6,15 537:12,14,17
558:12,14,16,18,25 559:16
560:14,16 561:9 566:2,2,4
566:6 584:18
**transcript (8)** 520:11,24
541:10 542:19 600:12
708:24 709:4 710:6
**transcription (2)** 589:3 710:7
**transcripts (1)** 542:17
**translation (1)** 599:22
**trauma (1)** 659:8
**traumatic (2)** 659:2,3
**treat (2)** 574:12 680:13
**treated (3)** 577:3 673:7,9
**treating (3)** 673:24 674:17
679:9
**treatment (33)** 539:21 542:25
591:22 592:13 643:1,2
646:4 662:3,6,17 663:4
664:13,16,19 666:16,20,24
667:1,4,16,19 670:11 680:5
682:2,5,5 686:17 689:1,11
690:1,2,6 698:20
**trial (20)** 520:11 523:21 532:5
532:6,7,8,8,9 542:9,14,17
580:17 614:2 640:16 671:8
671:15 688:3 701:24 702:4
702:12
**trials (4)** 613:15,17,20,21
**triangle (1)** 604:25
**triangular (3)** 604:16,18
605:2
**triangularize (2)** 604:23,24
**tried (5)** 624:18 626:7 652:24
690:12 709:12
**tries (2)** 659:22 661:14
**triggered (1)** 659:9
**trip (1)** 638:4
**trouble (2)** 648:23 654:3
**true (4)** 615:8 679:5,22 710:6
**truth (2)** 671:6,12
**truthful (7)** 674:21 675:4,8,8
676:21,23 680:25
**truthfulness (6)** 681:1,5,6,6,8
681:12
**try (5)** 527:15 546:9 571:23
666:5 705:10
**trying (36)** 552:10 574:6
588:11 593:2 598:10,11,14
598:16 606:9 618:8,9,16,17
618:19,20 619:4 621:2
621:21 622:8,9,10,21 623:5
623:6,14 624:10 625:13

**Tuesday (7)** 523:14 526:7,8
526:23,24 527:5 709:5
**turn (3)** 578:10 610:2 620:24
**turned (2)** 566:9 578:1
**turns (1)** 674:24
**twelve (2)** 662:11 667:20
**twenty (3)** 530:24 534:1
538:18
**twenty-first (2)** 566:25
568:19
**twenty-four (1)** 676:2
**twenty-sixth (1)** 526:21
**twice (4)** 651:1 684:15,16,17
**twisted (2)** 551:13,17
**two (50)** 521:20 535:6 556:24
532:2 559:25 560:22
566:16 567:9 580:14 581:7
581:11 583:19 587:16,22
587:24 590:7 593:6 618:4
620:17,22 622:20 624:17
626:24 627:21 628:4 629:5
629:7 630:12,23 631:1,10
632:15 634:12 636:3
645:19 648:5 650:25 664:1
668:8 669:18,19,20,24
672:5 676:24 685:15
687:24 688:17,22 707:17
**type (13)** 531:24 546:4
558:25 560:24 624:24
662:10 674:3 676:6 677:15
678:4,13 682:2 689:17
**typed (12)** 563:6,14,16 567:3
567:9,11 579:2 609:10
616:3,4,10,11
**types (3)** 562:3 577:9 648:8
**typical (1)** 665:8
**typically (2)** 584:10 706:17

## U

**ultimate (1)** 570:9
**unable (1)** 627:2
**unaware (1)** 693:22
**unclear (1)** 706:11
**uncontrollably (1)** 556:24
**underestimate (1)** 689:19
**undergone (1)** 682:2
**underneath (2)** 631:7,20
**understand (17)** 529:7
546:19 553:5,13 565:16
586:11,20 588:2 589:18
603:11 611:16 614:22
621:19 646:25 669:1
674:14,15
**understanding (6)** 550:18
614:19 688:19 689:7,10
696:1
**understands (4)** 558:23 635:9
664:14 667:13
**understood (2)** 550:6 590:6
**unfortunately (1)** 650:23
**unhappy (2)** 647:6 652:20
**unintended (1)** 573:13
**unit (1)** 538:3
**United (10)** 520:1,13 536:16
537:5 558:15 559:17
565:19 577:11 611:4,11
**Unity (9)** 642:4 643:2 670:5,9
682:6,11 683:13 694:18
695:17
**universal (7)** 547:9 611:4,6,7
611:17,20,22
**University (9)** 530:6,7,10,12
531:1 533:22 537:19 639:6

**628:5 634:23 636:11
657:10 663:20 684:5 696:8
700:9
**Tuesday** (see above)
628:5 ...
**unknown (3)** 620:3,5 637:13
**unnecessary (7)** 551:5 552:13
553:21,22,24 572:13 625:4
**unprovoked (1)** 553:12
**unrelated (1)** 677:14
**unwilling (1)** 665:5
**use (72)** 528:18,19 535:23
544:7 547:20 548:1 549:23
551:22 552:3,5,13 555:18
556:19 557:7,21 558:16,22
559:22 560:4,6,24 564:10
570:6 571:12,14 572:20
585:3,3,17 586:13 597:16
605:7 607:15,16,18,20
615:19 617:9 625:10
629:20 630:12,13,16,23
631:10,24 632:4,13 633:16
633:17 634:3 642:1 646:11
657:21 678:13 679:13
683:19 684:6,8,15,23,24,25
686:21,23 689:14 691:3
693:2 696:7,11 697:7,13
**useful (1)** 678:6
**usually (3)** 565:23 634:24
696:19
**utilized (2)** 643:24 679:8

## V

**vacancy (1)** 706:19
**vacation (1)** 527:19
**value (1)** 659:11
**varies (1)** 676:4
**variety (2)** 521:3 658:20
**various (5)** 521:2 535:23
620:3 677:4 689:3
**Vasile (79)** 539:20 540:17
543:1 545:25 546:5,21
549:13,14,17 550:2,4,13,14
550:19,24 551:4,7,9,17
552:4,20 553:4 554:6,18
555:2,3,6,7 559:21,20 559:14
560:3 561:6 563:12 567:1
567:11 575:5 578:20
579:17 581:8,9,12 582:7
586:17 587:14,21,23,25
588:2,12,22 589:6,20 590:2
590:18,24 592:17,21 593:2
593:3,25 594:7 595:7,11
597:9 601:1 602:8 606:1,1
608:15,23 616:24 623:24
624:3 625:21 626:17
637:21 642:9 643:20
**Vasile's (5)** 551:10 553:4
572:21 573:16 608:1
**vegetative (1)** 647:16
**vehicle (1)** 541:13
**Vehicles (1)** 536:23
**ventilation (1)** 572:18
**veracity (2)** 689:12 691:18
**verbal (3)** 558:16 562:6 674:7
**Verbally (2)** 674:4,5
**version (1)** 633:11
**versus (6)** 657:11 671:12
706:3,24 707:17,22
**verus (1)** 707:1
**victim (21)** 574:6 575:5,8,9
580:13 592:24 593:1 594:2
600:4 602:9,12,12,21 603:1
603:14,17,22,24 604:7,11
623:23
**victimized (1)** 659:19
**victims (1)** 548:4
**view (5)** 542:3 548:22
565:13 693:13 704:3
**viewed (1)** 590:23

**639:8**

**viewing (1)** 593:24
**violate (7)** 549:14,17 550:2
551:20 552:12,17 553:10
**violated (3)** 551:4,8 597:10
**violating (1)** 595:14
**violation (3)** 550:20 572:16
606:19
**violations (2)** 541:13 571:11
**violence (3)** 551:6 693:25
694:1
**Virginia (2)** 539:14,17
**visit (2)** 675:20,21
**visited (2)** 657:7,7
**volatile (1)** 619:24
**volunteered (1)** 666:2
**vs- (1)** 520:6
**vulgar (1)** 644:20
**vulnerable (1)** 631:18

**W**

**W (1)** 520:12
**wait (5)** 527:17 575:19 599:16
**waited (1)** 661:2
**waiting (1)** 575:23
**waiver (1)** 674:3
**walk (1)** 593:6
**walked (3)** 572:14,17 593:19
**walking (1)** 551:25
**Walmart (1)** 642:23
**want (52)** 522:22 525:24
526:21 527:15 528:21
529:13 539:14 548:1 555:8
555:9 566:15 568:6 569:16
584:1,4 586:3 590:4 604:19
605:24 608:3 611:25
616:23 617:15,15 618:12
618:14,21 619:5,23 620:1
620:23 635:16 651:23,24
653:25 661:3 664:17
670:20 671:4 683:10
686:17 689:21,21 690:2,3,4
692:19 698:8 701:19
702:25 706:1 709:4
**wanted (11)** 521:10 546:20
551:10 557:21 576:9 606:6
606:7 668:20 697:24 699:5
700:3
**wants (3)** 525:18 526:23
641:12
**wasn't (20)** 559:8 565:1
589:20 593:14,18 598:6
600:17 609:10,22 612:15
618:15 626:13 633:1,11
648:22 650:1 656:18 664:7
669:10 693:25
**way (23)** 527:15 529:14
553:10 561:3 571:18 598:5
605:3 614:15 647:22
655:18 657:23 665:2
672:10 673:7,14,24 680:23
689:13 690:12,24 693:12
697:23 702:20
**ways (4)** 677:2 680:22,24
692:9
**we'll (7)** 521:24 527:18
590:25 599:13 600:20
638:10,10
**we're (10)** 525:19 528:10,18
529:9 566:20,22,24 578:24
634:8 690:13
**we've (5)** 560:5 657:4,7
676:11 682:17
**Wednesday (2)** 524:21
526:25
**week (2)** 566:11 684:15
**weekends (1)** 684:18

**weeks (10)** 564:16 567:14
614:24 648:6 650:9 655:2
669:18,19,20,24
**weigh (2)** 627:7,9
**weighing (1)** 560:22
**weighs (1)** 705:17
**welcome (4)** 528:5 571:23
702:14,15
**welfare (2)** 591:6 704:23
**went (14)** 532:8,9 550:6
553:15 564:22 567:21
589:3 593:1 597:4 602:20
633:22,22 666:17 690:17
**weren't (2)** 521:20 683:1
**West (2)** 706:3 707:2
**Western (3)** 520:2 530:6,7
**widely (1)** 679:12
**wife (1)** 619:21
**Williams (44)** 527:24,24,25
528:9,12 529:20,21 530:1,3
530:17 531:20 532:25
540:7 543:10 545:16,17
550:12,16 558:5 564:21
565:12 567:4 571:2 572:5
573:1,7 576:9,15 577:14
579:13 583:4 584:2 586:11
596:12 601:23 602:2 608:1
612:25 616:18 620:9,14,17
637:7 638:3
**Williams' (7)** 536:1 553:1
557:4 559:4 561:12 573:8
574:22
**willing (1)** 548:19
**willingness (1)** 665:3
**wish (5)** 525:4 527:21 528:1
571:25 702:5
**withdraw (6)** 524:4 545:21
545:21 568:24 633:10
664:7
**withdrawal (1)** 651:16
**withdrew (1)** 651:24
**witness (78)** 524:4,5,22
528:13 529:22 530:1 535:1
540:9,11 547:19 548:10
554:3 555:1,17 556:13
562:10 567:7,9,21 569:13
569:20 570:14,16 572:1
579:1 581:24 586:24
589:11 590:12 591:2
601:10 607:4,16 613:21
629:4,15 630:23 633:9
634:20 636:21 638:14,20
638:22 641:17,21,24 642:3
649:23 657:14 661:8
665:15,20 666:1,7 668:15
668:25 669:4,8,17,20,24
670:3 671:6,25 675:4,7
684:4 686:7,10 688:12
692:4 693:7,11 695:7,19
696:1 698:10 700:21
**witnesses (5)** 535:12 542:20
548:7 701:6 704:13
**witnessing (1)** 658:18
**woman (8)** 573:21,24 621:13
622:2 627:1,4 629:8 642:21
**woman's (1)** 574:2
**wondered (1)** 658:8
**word (13)** 532:5 547:20
555:18 557:20,21,22 560:6
579:5 596:19 607:18 613:5
646:11 681:9
**worded (1)** 611:13
**wording (1)** 595:20
**wordings (1)** 558:21
**words (11)** 551:11 556:7
559:23 597:16,21 598:12

598:13,23 680:21 681:10
689:3
**work (24)** 530:20 536:23
537:20 538:8,15 539:2,3,5
539:8,13 545:19 632:25
633:20 649:8,9 663:10
671:20,20 672:20 673:1,13
699:23 708:4 709:10
**worked (7)** 531:23 536:17
538:4 539:4,11 611:11
642:21
**worker (2)** 686:13,14
**working (6)** 614:17 633:1
642:23 666:21,22 674:10
**world (5)** 539:4 556:8 559:25
600:18 679:13
**worldwide (3)** 536:15 538:7
538:22
**worries (1)** 653:24
**worth (1)** 665:16
**worthless (1)** 648:19
**worthlessness (1)** 647:24
**wouldn't (6)** 597:11,16 623:8
645:22 670:19 686:16
**wounded (4)** 553:16 579:16
579:21 580:1
**wrist (7)** 631:21,22 632:15,19
632:21 633:4,17
**write (1)** 568:12
**writing (2)** 564:4 705:2
**written (8)** 542:13 580:20
609:4 610:1 615:8 616:4
696:14 703:2
**wrong (10)** 586:21,22,25
593:4,5 608:2 635:24
648:21 649:24 696:10
**wrote (1)** 626:4

**X**

**X (2)** 520:3,9
**x-ray (1)** 697:12

**Y**

**Yacknin (1)** 703:3
**yard (4)** 579:16 580:10 581:9
599:8
**Yeah (1)** 693:24
**year (8)** 542:15 650:25 656:7
656:8 663:15 664:2 684:16
685:4
**yearly (1)** 535:13
**years (17)** 530:24 531:24
533:20 534:1,15 538:18
539:5,7 591:25 640:16
642:20 643:1,6 656:11
695:8,8 696:24
**yesterday (3)** 523:12,13
525:3
**York (14)** 520:2,7 556:14,17
556:18 565:18 566:5 574:9
596:15 639:7 640:5,6,7
710:11
**Yoshina (2)** 707:22,22
**young (1)** 654:10
**youngest (1)** 643:14

**Z**

**0**

**1**

**10 (2)** 542:10 710:10
**108 (1)** 707:18
**11 (1)** 542:10
**11-Cv-6328 (1)** 520:6

**11:00 (2)** 528:8 575:14
**1134 (1)** 707:23
**11th (1)** 542:21
**12 (6)** 542:10 544:4,11 581:21
581:24 685:12
**12th (1)** 542:21
**13 (3)** 542:1,1,11
**1375 (1)** 706:24
**1377 (1)** 610:24
**13th (5)** 540:8 542:4,21
642:13 654:2
**14 (5)** 542:11 561:20 577:15
581:24 617:1
**16 (1)** 542:11
**17 (1)** 542:11
**18 (1)** 696:12
**1935 (1)** 530:4
**1946 (1)** 706:3
**1979 (1)** 640:8
**1983 (3)** 553:6 573:4 639:10
**1988 (1)** 639:11
**1997 (1)** 706:25
**1st (1)** 686:5

**2**

**2 (6)** 529:4 599:12 620:6,12
620:13 628:13
**2000 (1)** 707:23
**2001 (1)** 707:2
**2004 (3)** 639:11 706:3 707:18
**2010 (34)** 578:11 597:20
599:23 615:14 641:4 642:6
643:4 648:13,15 650:19
652:6,8 653:22 654:12,22
660:10 661:10,24 667:9,24
668:17 669:12,22 670:2
673:22 677:11 684:11
687:7,19,25 690:10,15
694:10 701:3
**2011 (1)** 707:2
**2014 (3)** 686:2,5 695:19
**2015 (12)** 540:8 558:8 569:2
641:16 642:13 650:14
654:2 657:11 669:12,22
670:2 695:3
**2016 (4)** 520:14 526:2 542:4
710:10
**21 (5)** 522:20 548:25 549:9
550:20 595:22
**21st (2)** 566:18 614:20
**23 (3)** 522:19,19 523:9
**23:17 (3)** 582:16,23 583:19
**23:19 (1)** 583:20
**232 (2)** 544:24 637:22
**234 (1)** 603:13
**24 (3)** 639:15,18,23
**249 (1)** 545:12
**24th (1)** 641:16
**25 (4)** 531:5,6,10 532:16
**25th (1)** 526:2
**26 (5)** 520:14 640:11,13,19,23
**2d (1)** 707:23
**2nd (1)** 650:19

**3**

**3 (1)** 550:20
**30 (2)** 525:5,6
**335 (2)** 612:17 614:5
**37 (1)** 525:6
**3rd (3)** 578:11 597:20
599:23 615:14 641:3 642:6
644:12 648:15 650:19
652:6,8,10 653:3,8,18,18
653:21 655:9 656:16
660:10,21 661:9 667:9,24

673:22 677:11 684:11
687:19,25 690:14 694:10

**4**

**4 (3)** 584:4 693:18 694:6
**40 (1)** 529:4
**401 (1)** 542:2
**403 (2)** 581:20 608:20
**404 (1)** 706:3
**406 (4)** 608:7,7 614:12 616:25
**415 (3)** 601:16,25 605:6
**417 (1)** 630:1
**418 (6)** 682:8 683:5,6,9
694:18 698:25
**4th (21)** 641:3 642:6 644:12
650:12 652:6,8,10 653:3,8
653:18,19,22 655:9 656:16
660:10,21 661:10 667:9,24
673:22 690:15

**5**

**5 (4)** 533:6 540:10,11 646:16
**5-21(g) (1)** 704:9
**50/50 (1)** 671:19
**54 (2)** 525:5,7

**6**

**6 (5)** 542:10 670:7,13 682:24
683:2
**6/9/15 (1)** 670:16
**6/9/2015 (1)** 686:1
**68 (2)** 707:3,5

**7**

**7 (1)** 695:12
**7/03/10 (1)** 563:5
**7/21/10 (1)** 567:13
**7/21/2010 (1)** 563:21
**7/3/10 (2)** 579:9 644:8
**7/3/2010 (2)** 541:2,10
**7/4/10 (1)** 644:8
**702 (1)** 531:9

**8**

**8 (3)** 683:15 694:24 698:25
**8/2/49 (1)** 639:3
**801(d)(2)(C) (1)** 707:7
**801(d)(2)(D) (1)** 707:19
**801(d)(ii) (1)** 703:7
**801(d)(ii)(B) (2)** 706:10,22
**8354 (2)** 707:2,5
**852 (1)** 707:19
**8A (1)** 542:10
**8B (1)** 542:10

**9**

**9 (2)** 542:10 684:20
**911 (5)** 548:14 582:2 587:8,19
637:21
**950 (1)** 706:24
**98 (1)** 707:22
**9th (1)** 530:4