UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

MIRIAM McKNIGHT,

                                    Plaintiff,

              v.

G. VASILE and M. NICHOLLS,

                                    Defendants.
———————————————————————

DECISION & ORDER

11-CV-6328P

## PRELIMINARY STATEMENT

                Plaintiff Miriam McKnight filed the pending lawsuit against the City of Rochester

and three of its police officers asserting constitutional and state law claims arising from her arrest

on July 3, 2010.  (Docket # 1).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the

disposition of this case by a United States magistrate judge.  (Docket # 11).

                Summary judgment was granted in favor of the City and defendant Laura Grande

dismissing the claims against them.  (Docket ## 56, 58).  Two of the state law claims against

defendants Gregory Vasile and Michael Nicholls – those for trespass and malicious prosecution

– were also dismissed before trial.  (Docket # 56).  As a result of those decisions, the claims

remaining for determination are claims against Vasile and Nicholls under 42 U.S.C. § 1983 for

excessive use of force, and claims under New York State law for false arrest, false imprisonment,

battery, and abuse of process.  (Docket ## 56; 76 at 5-7).  McKnight seeks both compensatory

and punitive damages.  (Docket ## 1, 56).

A bench trial was conducted before this Court on January 11-13 and February 26, 2016.[1]  (Docket ## 72-78, 80, 82).  McKnight testified on her own behalf and offered testimony from her son Javion Jones and two expert witnesses, James Williams, PhD, and Charles Ewing, PhD.  The defense called Officer Vasile, Sergeant Nicholls, and Sergeant Andrew McPherson as witnesses.  Both parties also introduced into evidence portions of deposition testimony from Lieutenant Laura Grande, who was a defendant in the action at the time of her testimony.  (Docket # 81).  Following trial, both parties submitted proposed findings of fact and conclusions of law.  (Docket ## 83-85).

Based upon the findings of fact set forth below, and for the reasons explained more fully herein, judgment is granted in favor of McKnight on her claims against Vasile for false arrest, false imprisonment, and battery.  Judgment is granted in favor of defendants on the remaining claims.


## FACTUAL BACKGROUND

### A.    McKnight's Call to 911

McKnight testified that she spent much of the afternoon of July 3, 2010, on the front porch of her home at 232 Pierpont Street.  (Tr. 38-39, 44-45).  She owned the house and was living there at the time with her husband, Kelly, and her sons, Malik, Javion and Naseem.  (Tr. 38-39).  From her porch, she observed and heard a party that was taking place in the backyard of her neighbor's house at 234 Pierpont Street, which was situated directly north of her house.  (Tr. 45).  According to McKnight, when she first became aware of the party at about 3:00 p.m., approximately 40 to 50 people were in attendance, and the party was noisy and involved

---

[1]  The transcripts of the trial proceedings shall be referred to herein as "Tr."  Trial exhibits introduced by McKnight shall be referred to as "P. Ex." and those introduced by defendants shall be referred to as "D. Ex."  (*See* Docket ## 76-78, 82).

music and a barbeque.  (Tr. 45, 171, 172).  She did not know any of the partygoers other than her

neighbor and did not attend the party.  (Tr. 172, 173).  McKnight recalled that the party began in

the afternoon and began to breakup about 10:00 or 11:00 p.m.  (Tr. 45, 172, 173).

Photographs and testimony establish that McKnight's front porch is on the

northwest corner of her house near the property line between 232 and 234.  (Tr. 53-57; P. Ex. 16;

D. Exs. 414, 415).  A fence runs along her property line between the two houses.  (Tr. 179;

D. Ex. 415).  It runs parallel to the northern facade of McKnight's house from a point several

feet east of the northwest corner of the house and into her backyard.  (D. Ex. 415).

At approximately 11:00 p.m., McKnight was on her porch and observed an

argument between two women in front of 234 Pierpont.  (Tr. 45-46, 175, 176, 209).  She testified

that a man emerged from the backyard of 234, walked along her fence line toward Pierpont

Street, and tried to escort one of the two women across Pierpont and to the north.  (Tr. 46, 175,

177).  The woman, who had had too much to drink, was screaming at him to take his hands off

her and to let her go.  (Tr. 46).  At that point, McKnight observed the other woman run up, and a

physical fight ensued between the two women in the middle of Pierpont Street in front of 236,

the second house to the north of McKnight's house.  (Tr. 47, 178-79, 209).  McKnight testified

that approximately ten people ran along her fence line to the area where the fight was occurring

in an apparent attempt to break it up.  (Tr. 47, 179).

At that point, according to McKnight, she told her sons to go inside the house, and

she herself went inside briefly.  (Tr. 59, 180).  When she reemerged on the porch, she saw the

two women fighting and heard someone say that someone had been stabbed.  (Tr. 180-81).

McKnight went back inside her house and called 911.  (Tr. 181).

Identifying herself as Olivia Coles, McKnight reported to the 911 operator that two females were fighting and that there was a possible stabbing. (Tr. 62-63; P. Ex. 12). She testified that she provided her middle name (Olivia), which she "go[es] by," and her maiden name (Coles) because she "wanted to report it, but not really be involved." (Tr. 40, 63, 183). Records reflect that her call was made at 11:14 p.m. and that her address was identified as 232 Pierpont Street. (Tr. 62; P. Ex. 12). Other calls about the incident were also received by 911 immediately after McKnight's call and identified 236 Pierpont Street and the area of Pierpont and Bryan Streets (across the street from 234 Pierpont Street) as the vicinity of the stabbing. (P. Ex. 12; Tr. 271, 419).

McKnight testified that she remained inside her house until the police arrived. (Tr. 63, 185). When the police arrived, she went back outside, but before she did, she retrieved her cellphone and turned on the voice recorder. (Tr. 64, 185).

**B.       The Arrival on Scene of Officer Vasile and Sergeant Nicholls**

Gregory Vasile, an officer with the Rochester Police Department ("RPD") since 2008, was dispatched to the area of Pierpont Street and Bryan Street at 11:15 p.m. on July 3, 2010. (Tr. 262, 270; P. Ex. 12). He testified that he was dispatched in response to a call reporting a stabbing. (Tr. 270). As he was driving to the area, he overheard more calls reporting fighting, noise, and chaos in the vicinity. (Tr. 274-75). Those dispatches reported that two shots had been overheard and that a victim was on the ground. (Tr. 274-75).

Vasile recalled that he was the first officer to arrive on scene at 234 Pierpont Street. (Tr. 272). He described the scene upon his arrival as "noisy" and "chaotic" and testified that he saw between fifteen to twenty people in the vicinity of two to three houses. (Tr. 270, 287). He observed a "crowd" on the stairs in front of 234 on either side of the sidewalk.

4

(Tr. 277-78; D. Ex. 415).  According to Vasile, that crowd was closer to 232 than it was to 236.  (Tr. 277-78).  Shortly after Vasile arrived, his supervisor Sergeant Michael Nicholls arrived on scene.  (Tr. 275-76, 403).

Sergeant Nicholls, who had been employed by RPD since 1995, also responded to the call about a possible stabbing.  (Tr. 398, 410).  Records demonstrate that at 11:19 p.m. he called out that he was responding.  (Tr. 412).  He testified that the dispatcher identified the address as 234 Pierpont Street.  (Tr. 412).  On his drive to 234, he learned through dispatches that other calls had reported that shots had been fired and that another victim had been located approximately one block from 234 Pierpont Street.  (Tr. 417-19).

When Nicholls arrived at the scene, one or two patrol cars were already there; he parked in front of 234.  (Tr. 416, 420).  He testified that the scene was chaotic and approximately fifteen to twenty people were spread out between the houses at 232 and 234.  (Tr. 419-21, 430).  He observed an apparent victim on the ground in the area near the steps above the sidewalk in front of 234.  (Tr. 417, 419, 421).  Nicholls approached the victim and attempted to speak to him, but the victim declined to respond to him.  (Tr. 422).  Nicholls described the scene as "volatile" and observed individuals yelling and screaming.  (Tr. 424).  At 11:22 p.m., Nicholls requested that more patrol cars be dispatched to the scene.  (Tr. 415; P. Ex. 12).

Nicholls testified that sometime between 11:19 and 11:22 p.m., he directed Officer Vasile to start securing the scene.  (Tr. 425).  As he explained, RPD General Order 401 provides that upon arrival at a crime scene, police officers should "provide aid and comfort to the victim(s), observe all conditions, events, and remarks and secure the scene to maintain and protect physical evidence, utilizing yellow crime scene tape, as applicable."  (Tr. 426-27; D. Ex.

410 at 2). Nicholls identified several purposes served by using crime scene tape to secure a scene:

> To protect evidence, to prevent any egress or exit from the scene.
> . . . [S]ometimes we'll have people inside of the scene. It generally
> calms things down and people start to understand that we're there
> and starting to take control of what's going on. The initial scene is
> set up to preserve the initial area where we believe that the
> stabbing may have occurred. We reassess that later to determine
> whether or not to expand it.

(Tr. 427). Nicholls explained that as a matter of practice crime scene tape is affixed to "one house at a minimum to either side of where we think the scene is." (Tr. 457). In response to Nicholls's direction, Vasile walked to his patrol car to retrieve his crime scene tape. (Tr. 280-81, 429). Nichols returned to the area where the victim was on the ground to question the individuals present about what had happened. (Tr. 429).

### C.   McKnight's Encounter with Officer Vasile

After McKnight had called 911 and returned to her porch, at some point she saw a victim with ambulance personnel near the individual. (Tr. 59, 64, 186). She testified that the victim was in the driveway between 234 and 236. (Tr. 59). She asked a man who was standing nearby, north of her porch close to 234, whether the victim was alive. (Tr. 64). The man responded affirmatively. (Tr. 65).

As McKnight was watching the scene, she noticed a group of teenagers come onto her yard in front of her house. (Tr. 65, 187-88). She testified that they were located near the southwest corner of her property near her driveway, which was on the south side of her property abutting the property at 230 Pierpont Street. (Tr. 65). McKnight called to them twice to tell them to get out of her yard. (Tr. 78, 188, 204). Because they did not respond, she got off her porch and walked toward them and told them again they had to leave her yard. (Tr. 78, 188,

6

204).  She testified that the group began to walk off, and she turned back toward her house.

(Tr. 188-89, 204-05).  At that point she noticed Officer Vasile for the first time.  (Tr. 65, 205).

According to McKnight, Vasile was standing on the ground at the north corner of the steps

leading to her front porch affixing yellow tape to her porch railing.  (Tr. 66, 79, 85, 90, 216;

P. Ex. 8A).  McKnight testified that he was tying the tape to the knob at the top of the first

spindle of the railing at the bottom of the stairs.  (Tr. 206, 245; P. Ex. 8A).

Vasile, who had retrieved the crime scene tape, was tying it to McKnight's porch

railing when he first encountered McKnight.  (Tr. 280-89).  He testified that because the crime

had occurred at 234 Pierpont Street and he had been trained to "start bigger and then close it in"

when securing a crime scene, he chose 232 as a starting point.  (Tr. 281).  Specifically, he stated:

> 232 [was] one house south of where it appeared that the crime
> occurred at 234 and that's the nearest place for me to logically
> attach the crime scene tape.

(Tr. 281).  Vasile had intended to run the tape west from McKnight's porch railing to a large tree

in the apron near the bottom of the stairs in front of 234 and then north to another spot likely "to

include 236."  (Tr. 283-84).  According to Vasile, the presence of a substantial number of people

in the vicinity created an urgent need to put up the crime scene tape.  (Tr. 293).  He explained

that the purpose of putting up tape was twofold:  to keep people out of the crime scene and to

assist technicians to locate evidence.  (Tr. 287-88).

McKnight testified that as she was walking toward her porch stairs, she said to

Officer Vasile, "Excuse me, Officer.  You cannot put that yellow tape in my yard."  (Tr. 66,

205).  She explained that she did not want the tape on her property because of its negative

connotations.  (Tr. 79).  He said, "Yes, I can," and she responded, "You can't," and told him that

"[t]his is not a crime scene" and "[t]he crime didn't happen here."  (Tr. 66, 207-08).  McKnight

testified that she pointed to the middle of the street where the victim was located and told Vasile that the crime had happened "over there." (Tr. 66, 208-09, 211). McKnight testified that she was walking up the south side of the stairs as she was speaking to the officer. (Tr. 87, 206-07, 216; P. Ex. 8A). Vasile responded that he could put up the tape. (Tr. 66). As McKnight approached or reached the top of the porch stairs, she replied, "It's not going to be here all night." (Tr. 66-67, 87-89, 208, 212, 216, 218; P. Ex. 8A). McKnight testified that she did not mean that she intended to remove it, but rather that the kids who were outside would likely tear it down. (Tr. 67, 88). According to McKnight, Vasile then came running up the stairs behind her, declared, "I'm tired of this shit," and ordered her to put her hands behind her back and grabbed her left arm. (Tr. 67, 89-90, 214, 218). McKnight testified that she never gestured to the tape, touched it, or tried to remove it. (Tr. 151, 217). Vasile acknowledged that the tape rips easily. (Tr. 362).

Vasile's testimony of the verbal exchange is similar to McKnight's in many material respects except concerning his stated conclusions as to her intent to rip down the tape. Vasile testified that as he was putting up the tape he noticed McKnight standing nearby. (Tr. 291). He heard her say to him that he could not put up the tape. (Tr. 295, 297-98). At the time, he was on the ground near the front bushes and porch railing and she was on the walkway near the porch stairs. (Tr. 294, 296, 300). Vasile replied, "[Y]es I can . . . it's a crime scene." (Tr. 295, 297-98). McKnight responded that it was not a crime scene and told him that the crime happened "over there," pointing in the direction of 234. (Tr. 299). Vasile stated that he said he did not care, to which she replied "something to the effect of 'This isn't going to stay up here all night.'" (Tr. 298-99). Vasile testified that when McKnight made that statement, she was "motioning toward [the tape], moving toward it." (Tr. 301). Vasile was asked what movement

8

McKnight made toward the tape, and he testified, "She was extending her arm in a reaching manner." (Tr. 301). Vasile admitted that she made no other movements toward the tape and did not rip it. (Tr. 302). He testified that he did not know if she touched it. (Tr. 302).

As McKnight walked up the stairs toward her front door, Vasile told her he had had enough of her "shit," to turn around and put her hands behind her back. (Tr. 302, 304). Vasile testified that he believed McKnight was going to rip down the tape and decided to arrest her for interfering with his performance of his official duties. (Tr. 302-03). According to Vasile, McKnight ignored his order to put her hands behind her back and interpreted her actions as an "attempt[] to flee inside of her house." (Tr. 305, 309). He grabbed her arm. (Tr. 312, 315).

Vasile testified that he believed that he had told her several times to go inside her house, although he acknowledged that he did not hear that on the cellphone recording of the encounter. (Tr. 299, 307). McKnight testified that no officer ever ordered her to go inside her house. (Tr. 80).

The recording of the encounter made from McKnight's cellphone captures the following exchange, which McKnight testified accurately recorded her statements to the teenagers and her verbal interaction with Vasile:[2]

| | |
|---|---|
| McKnight: | Y'all gonna have to get off my um yard. |
| McKnight: | Y'all gonna have to get out my yard. |
| McKnight: | Excuse me. |
| McKnight: | Y'all gonna have to get out my yard. |
| McKnight: | Ah, Officer, you cannot put that yellow tape in my yard. |
| Officer: | Ah, yeah I can. |
| McKnight: | Why? |
| Officer: | Because it's a crime scene, that's why. |
| McKnight: | This is not a crime scene. |
| Officer: | There's a victim over there. |
| McKnight: | It didn't happen here. It happen there. |

---

[2] McKnight testified that she recognized the voices in the recording as those individuals denoted. (Tr. 70, 74-77).

| | |
|---|---|
| Officer: | I don't care. |
| McKnight: | Well, this is not gonna stay here all night. |
| Officer: | Turn around and put your hands behind your back. I've had enough of this shit. |
| McKnight: | I don't, I live here.  What are you doing to me? |
| McKnight: | Ah, get him. |
| Officer: | Put your hands behind your back. |
| Javion: | Ma Ma. |
| McKnight: | Kelly.  Kelly.  Kelly.  Kelly.  Kelly. |

(Tr. 70; P. Ex. 1; *see also* P. Ex. 2).  The recording reveals that approximately thirteen seconds elapsed from McKnight's first statement to Vasile about the tape and his direction to her to put her hands behind her back.  (P. Ex. 1).  The recording also reveals that Vasile's direction to put her hands behind her back occurred instantaneously in response to McKnight's statement that the tape would not stay there all night.  (P. Ex. 1).  Another order to put her hands behind her back was issued four or five seconds after the first.  (P. Ex. 1).  It is not entirely clear which officer issued the verbal order, although the timing suggests that Vasile did.

McKnight testified that the recording refreshed her recollection that Vasile did not explicitly tell her she was under arrest, as she had testified at her deposition.  (Tr. 92, 152, 156-58, 219).  Vasile likewise testified that, contrary to his testimony on direct examination, the recording does not reflect that he told McKnight that she was under arrest.  (Tr. 358).  The recording also does not reflect that Vasile told McKnight, as he had testified during his deposition, that the tape would be removed after the investigation.  (Tr. 371).  He further testified that at the time of his deposition he did not know that he had stated he had had enough of "this shit."  (Tr. 377).

### D.   McKnight's Arrest

McKnight acknowledged that she understood that Vasile was attempting to arrest her.  (Tr. 221).  She testified that Vasile grabbed her left arm and tried to force her arms behind

her back; she attempted to turn left toward him to ask him why he was arresting her.  (Tr. 67, 92,

220, 246, 248).  McKnight tried to explain to him that she lived there.  (Tr. 91).  She

acknowledged that she attempted to get inside her front door rather than go with Vasile.

(Tr. 220-23).  McKnight saw her son Javion in the doorway and yelled, "Get him," referring to

her husband who was asleep inside the house, and then screamed for him by calling his name,

Kelly.  (Tr. 67, 73, 225; P. Exs. 1, 2).

McKnight testified that the more she turned toward Vasile, the more he turned

behind her.  (Tr. 222).  According to her, Vasile threw her against the front door and the front

facade of the house.  (Tr. 67, 68).  McKnight asked Vasile why he was hurting her, and he did

not respond.  (Tr. 67).  Another police officer appeared and sprayed her with pepper spray[3] in her

face.  (Tr. 68, 74, 93).  McKnight testified that the second officer did not give her any commands

or say anything to her before spraying her.  (Tr. 152-53, 226).  At that point, she testified, she

"just fell out . . . fell down."  (Tr. 68, 74, 95, 230).  She apparently dropped her cellphone on the

porch.  (Tr. 74, 228).  The officers handcuffed her, dragged her down the stairs and to Vasile's

patrol car, and "threw" her in the back seat.  (Tr. 68, 95, 227).  She testified that she did not

know how long she was in the car, although it felt like "forever."  (Tr. 96).

Vasile testified that McKnight ignored his commands to put her hands behind her

back and "began to move quickly up her stairs toward her porch . . . more specifically towards

the front door of her house."  (Tr. 309, 312).  He grabbed her right arm at the wrist area, but her

arm slipped out of his grasp.  (Tr. 312, 316).  According to Vasile, her arm felt as if it had some

"slippery" substance on it.[4]  (Tr. 316).  She was holding onto the inside of the doorway with her

---

[3]  The trial testimony established that pepper spray is the colloquial term for oleoresin capsicum ("OC")
spray.  (Tr. 482).  Those terms were used interchangeably by the witnesses, as they are in this opinion.

[4]  McKnight testified that she did not have any slippery cream on her arm.  (Tr. 152).

left arm.  (Tr. 316, 318).  Vasile attempted to employ a technique known as a "straight arm bar" to combat her resistance.  (Tr. 317, 321).  He explained the technique:

> I . . . take my right arm and grab the subject's right wrist and then take my left hand and roll it around the subject's left triceps for counterpressure to either bring [the] subject to the ground or up against something in order to be able to secure that arm and handcuff it.

(Tr. 317).  Vasile testified that his attempt was not successful because although he was able to grab her right arm, he was not able to grab her left arm because she had it hooked inside the doorway.  (Tr. 317, 321).  Vasile testified that he tried the technique a second time using the house as counterpressure, and his second attempt succeeded in permitting him to secure her right arm behind her back.[5]

        While Vasile was struggling with McKnight at the doorway, Sergeant Nicholls ascended the porch.  (Tr. 324).  Vasile testified that he did not hear Nicholls say anything. (Tr. 324).  At the time he noticed Nicholls, Vasile testified, "I had her right arm secured at that point, and had her against the house and was attempting to secure her left arm I guess, but never really got that far."  (Tr. 324).  Although he did not see Nicholls deploy his pepper spray, he recognized that pepper spray had been used because he could taste it.  (Tr. 326).  McKnight released the door, Nicholls took control of her left arm, and she was handcuffed.  (Tr. 321, 326). Vasile testified that he assumed that the pepper spray was the reason she released the door and allowed the handcuffing.  (Tr. 326).  According to Vasile, he did not take McKnight to the ground, and she did not fall on the ground.  (Tr. 322, 328-29).  He escorted her to the patrol car. (Tr. 326, 330).  Vasile testified that McKnight probably could not see her way to the car because

_____

        [5]  The cellphone recording reflects some sounds that McKnight recognized as the sounds of her doorbell, which she testified must have come from her body "being thrown up against the door."  (Tr. 94).  Based upon this Court's review of the recording, it appears that the doorbell ringing occurred approximately five seconds after McKnight screams for her husband and then again about thirty seconds later.  (P. Ex. 1).  A photograph of her front porch shows that the doorbell is located on the right frame of the doorway just to the right of the door handle. (P. Ex. 8A).

of the pepper spray.  (Tr. 330).  Vasile acknowledged that McKnight never struck him.
(Tr. 319).

Nicholls also testified regarding his involvement in McKnight's arrest.  He explained that after he observed Vasile go to the car to retrieve the crime scene tape, the next time he noticed Vasile was with McKnight on the porch at 232 Pierpont Street.  (Tr. 431).  From a distance of approximately twenty to thirty feet, he observed that Vasile was trying to take McKnight into custody.  (Tr. 431-32).  He described that Vasile was trying to put McKnight's hands behind her back, but she was pulling away from him and moving toward the house.  (Tr. 433-34).  He recalled that they were either on an upper step of the porch stairs or on the porch itself.  (Tr. 432-33).  Although he did not know why Vasile was trying to arrest McKnight, he recognized from the way Vasile was handling McKnight's arm that that was what Vasile was trying to do.  (Tr. 434-35).

Nicholls went to the porch to assist Vasile.  (Tr. 435).  When he got to the porch, he observed that McKnight had her left arm "hooked" to the south side of the door frame and was trying to pull herself away from Vasile and into the house.  (Tr. 436-38).  He recalled that the front door was open and that he did not see anyone else.  (Tr. 469).  Nicholls testified that he commanded McKnight to put her hands behind her back.  (Tr. 439, 441).  McKnight did not comply.  (Tr. 446).  Nicholls successfully unhooked her arm from the doorway, but lost control of her arm when she pulled it away and it slipped out of his grip due to the presence of some lotion or grease on her skin.  (Tr. 441-44).  McKnight then turned her body toward him, at which point Nicholls sprayed a burst of OC at McKnight.  (Tr. 444).  According to Nicholls, McKnight ceased resisting and became compliant; her face went down, Nicholls brought her left arm behind her back, and she was handcuffed.  (Tr. 450).  She never fell to the ground.  (Tr. 450-51).

Nicholls testified that the reason he used pepper spray was because their efforts to gain McKnight's compliance through verbal commands and joint manipulation had not succeeded. (Tr. 446). He was concerned about both the possibility of what she might do to him as she turned toward him, such as a punch, and the possibility of her retreat inside a house where weapons and other persons could be present. (Tr. 444-46, 449). For these safety reasons, Nicholls decided to use the pepper spray. (Tr. 445-46). Based upon his training and experience, Nicholls believed that use of pepper spray was an effective technique to induce compliance without risk of permanent injury. (Tr. 448).

Nicholls testified that he had no further interaction with McKnight. (Tr. 457). He also explained that because he had used force on McKnight, RPD policy required him to request that his supervisory lieutenant respond to the scene. (Tr. 453). At 11:24 p.m., he requested that Lieutenant Grande respond, which she did. (Tr. 452). Nicholls testified that he did not observe that McKnight had any injuries to her arm. (Tr. 475).

After listening to the cellphone recording, Nicholls acknowledged that he did not hear his voice on the recording. (Tr. 440, 465). He also acknowledged that he did not observe McKnight engage in any acts that constituted obstruction of governmental administration. (Tr. 467).

According to Vasile, McKnight was alone in his patrol car for about five minutes after he placed her there. (Tr. 341). At 11:48 p.m., Vasile called in that he had an individual in custody, referring to McKnight. (Tr. 343; P. Ex. 12). According to the job card, he departed 232 Pierpont Street at 11:53 p.m. and drove to the Public Safety Building, arriving there at 12:01 a.m. (Tr. 341, 344, 346). He testified that he drove with the air conditioning on. (Tr. 341). Vasile took McKnight to the eye wash station as soon as they arrived and then to booking. (Tr. 97, 100,

340-41).  Vasile testified that he did not observe that she was bleeding.  (Tr. 348).  He

acknowledged that the booking photographs show that her eyes are closed, likely as a result of

the pepper spray.  (Tr. 375-76; *see* P. Ex. 9).

       **E.**       **The Criminal Charges Against McKnight**

       Vasile signed two complaints "upon personal knowledge" on July 3, 2010,

charging McKnight with criminal misdemeanor offenses arising from his encounter with her that

night:  the first charging her with obstructing governmental administration in the second degree,

in violation of New York State Penal Law § 195.05; and, the second charging her with resisting

arrest, in violation of Penal Law § 205.30.  (Tr. 337-38; P. Ex. 10).  The complaint charging her

with obstructing governmental administration alleges that on or about July 3, 2010, at 11:15

p.m., at 232 Pierpont Street, McKnight:

> Interfere[d] with [Vasile] while [Vasile] was attempting to put up
> crime scene tape to secure a crime scene where a stabbing
> occurred.  Further, [McKnight] refused to go inside her house and
> remove herself from the crime scene.  [McKnight] was yelling at
> [Vasile] not to put crime scene tape up in her yard.  [McKnight's]
> actions prevented [Vasile] from securing a crime scene.

(P. Ex. 10).  The complaint charging her with resisting arrest alleges that at the same time and

place McKnight:

> Pull[ed] away from [Vasile] when [Vasile] attempted to take her
> into custody for an arrest.  Further, once [McKnight] pulled away
> from [Vasile] she did attempt to flee inside her house thus
> attempting to prevent [Vasile] from making an authorized arrest.

(P. Ex. 10).

       **F.**       **Vasile's Incident Report and Subject Resistance Report**

       Vasile prepared two reports that night relating to the incident.  (P. Exs. 13, 14;

Tr. 335, 361).  Both are RPD forms that he completed by hand.  (P. Exs. 13, 14; Tr. 335, 361).

The first, entitled Incident Report, indicates that McKnight was arrested and charged with the two misdemeanors noted above.  (P. Ex. 13; Tr. 335).  The report states that McKnight was 33 years old, 5'3" tall, and 220 pounds.  (P. Ex. 13; Tr. 335).  The handwritten narrative section of the report states:

> On [July 3, 2010, at 11:15 p.m.], I responded to 234 Pierpont for a stabbing. . . . While attempting to secure the crime scene and put crime scene tape up, [McKnight] approached me and yelled not to put crime scene tape up near her yard.  I told [McKnight] her yard is a crime scene and to please go inside her house.  [McKnight] refused.  I told her she was under arrest and I grabbed her right arm to handcuff her.  [McKnight] pulled away from me and attempted to go inside her house.  I kept [McKnight] out of her house by grabbing her arm, and was able to take her into custody.

(P. Ex. 13).  The form was signed by Vasile.  (P. Ex. 13).

Vasile was asked why he did not include in his incident report that McKnight attempted to rip down the crime scene tape.  (Tr. 333).  He responded:

> At the time of writing the report, as I said, I wasn't a hundred percent sure that Ms. McKnight was – got her hands on the crime scene tape.  I do recall her taunting me in an action that she was attempting to take down the tape and I didn't feel comfortable writing in a crime report that she was actively ripping crime scene tape.

(Tr. 333).

The second form that he completed, entitled Subject Resistance Report, relates to Vasile's use of "tactics" to address McKnight's conduct in resisting arrest.  (Tr. 315-16, 335; P. Ex. 14).  The form has checks in two preprinted boxes to reflect that McKnight resisted arrest through "[v]erbal [r]esistance (failing to adhere to verbal commands)" and through "[a]ctive [r]esistance (pulling away, striking or attempt assault)."  (P. Ex. 14; Tr. 318-19).  In the section assessing "tactic effectiveness," Vasile checked the box for "verbal" and indicated that it was "NE," meaning "not effective," and checked the box for "other: straight arm bar" and indicated

that it was "E," meaning "effective."  (P. Ex. 14; Tr. 318-19, 321).  The form also indicates that

the verbal tactic was attempted before the straight arm bar.  (P. Ex. 14; Tr. 318-19, 321).  The

narrative section of the report states:

> On [July 3, 2010, at 11:15 p.m.], I responded to 232 Pierpont
> St[reet] [f]or a stabbing.  [W]hen I arrived I began to secure the
> crime scene and put crime scene tape up.  While taping the scene
> off, [McKnight] approached me and told me not to put crime scene
> tape up in her yard.  I explained to her that her yard was part of a
> crime scene and that we would remove it after an investigation was
> complete.  [McKnight] yelled to take the tape down and attempted
> to rip it down.  I told [McKnight] she was under arrest and I
> grabbed her right arm to handcuff her.  [McKnight] slipped out of
> my grip and began to run towards her porch[.]  I chased her on foot
> onto her porch and told her to stop resisting and again that she was
> under arrest.  [McKnight] attempted to go inside her house.  I
> grabbed [McKnight's] right arm and performed a modified straight
> arm bar, using the side of her house as counter-pressure.  I was
> then able to handcuff [McKnight] without further incident, and
> placed [her] in the rear of my patrol vehicle.

(P. Ex. 14).  Among other information, the report has a check next to the box "sober" for

"condition of subject."  (P. Ex. 14).  The form also indicates that McKnight was transported to

the Public Safety Building for "eye wash" and then to booking.  (P. Ex. 14).  Vasile's name is

typed in the box next to "primary officer."  (P. Ex. 14).

Nicholls prepared a separate subject resistance report as an "assisting officer."

(P. Ex. 14).  His report lists three techniques he administered in the section for "tactic

effectiveness": first, "verbal," which he noted was "NE"; second, "other: pull from door frame,"

which he noted was "NE"; and, third, "OC," which he noted was "E1-15."  (P. Ex. 14).  The

narrative section of his report states in relevant part:

> While checking the status of one of the victims, I observed Ofc.
> Vasile on the porch of 232 Pierpont St. attempting to take
> [McKnight] into custody.  [McKnight] was attempting to escape
> his grasp and go back inside of her house.  As I approached
> [McKnight] she had her left arm hoo[ked] around the entry door

> frame.  I advised her to put her hands behind her back.
> [McKnight] did not comply.  I reached into the open door with my
> left arm and hooked my arm around [McKnight's] arm to release
> her grip.  I attempted to place her left hand behind her back but
> [McKnight's] arm had some type of cream/grease on it that caused
> me to lose control of her arm.  I attempted to regain my grip but
> was unable to do so because the cream/grease was on my hands.
> [McKnight] continued to actively pull away from Vasile so I
> administered a one second burst of capstun to [McKnight's] face.
> This was effective and Vasile was able to handcuff [McKnight].  I
> had no further contact with [McKnight].

(P. Ex. 14).

### G.    Javion Jones's Testimony about his Mother's Arrest

Javion Jones, McKnight's son, testified that he was thirteen years old on July 3,

2010, and lived with his mother, father, and older brother at 232 Pierpont Street in Rochester.

(Tr. 15, 17, 24).  At approximately 11:15 or 11:30 p.m. that night, he heard the sound of the

doorbell and the front door banging.  (Tr. 16).  He went to the front door and:

> saw [his] mother with her arm behind her back and . . . an officer
> behind her and [he] watched him push her into the door, and as he
> did that[,] he pushed her down and he had his knee on her back.
> . . . he was holding her down with his knee and her arm still behind
> her back.

(Tr. 16-17, 27).  Jones testified that he screamed and called for his brother Malik.  (Tr. 17).

According to Javion, Malik came to the door and asked the officer what he was

doing, but the officer did not respond.  (Tr. 20).  Javion also asked what the officers were doing,

and again they did not respond.  (Tr. 21).  Javion called, "Stop" and tried to open the door to go

outside and assist his mother.  (Tr. 21-22).  Javion testified that the officers slammed the door in

his face; he cried out to ask why they were pushing him.  (Tr. 21-22).  Javion testified that he

observed the officers "dragging [his mother] down the stairs."  (Tr. 23).  Javion was crying,

telling the officers that they could not take his mom, and asking them what they were doing.
(Tr. 23).  Javion testified that neither officer responded to him or his brother.  (Tr. 24).

On cross-examination, Javion testified that he saw was his mother being pepper sprayed.  (Tr. 27).  He elaborated:

> There was an officer here on the left of her and an officer in front of her, and then basically the officer in the front of her, he – sprayed her.

(Tr. 28).  According to Javion, at the time McKnight was sprayed, she was asking the officers what they were doing.  (Tr. 28).  As soon as she was sprayed, the officers put her arm behind her back, pushed her into the door and one officer brought her down with his "knee on her back pushing her down."  (Tr. 29).  Javion did not hear the officers say anything to McKnight.  (Tr. 30).

In response to the question whether he heard them tell her she was under arrest, Javion responded "When they were down by the . . . stairs, downstairs. . . . I think that he cursed at her actually."  (Tr. 30).  Javion testified that he was outside the house when that happened.  (Tr. 30).  He testified he heard an officer say, "I'm tired of this shit[,] [y]ou're under arrest" and that's when "they" came.  (Tr. 31).

### H.  McKnight's Injuries

#### 1.  McKnight's Testimony

McKnight testified that as soon as she was sprayed with the OC, she could not see, she had difficulty breathing, and she experienced burning and a suffocating sensation.  (Tr. 68, 96).  She believed she was going to die.  (Tr. 69).  According to McKnight, she had symptoms of asthma in 2010, although she was not formally diagnosed with the condition until the following year.  (Tr. 43, 128-29).

She also testified that her left forearm was lacerated in three places as a result of Vasile's treatment of her during the arrest. (Tr. 98). Although she testified that she did not know how she had been cut, she stated that she did not have cuts on her left arm before her arrest. (Tr. 231-32). The cuts were deep, McKnight testified, and were treated by a nurse at the jail. (Tr. 98, 234; P. Ex. 11). McKnight introduced photographs of lacerations on her arm, which she testified were taken on July 4, 2010. (Tr. 115; P. Ex. 7 at 2, 3, 5). The photographs depict two lacerations that appear raw and consistent with McKnight's description. (Tr. 115; P. Ex. 7 at 2, 3, 5). She identified three scars on her arm – one approximately two inches long and two about one inch long – as permanent scars from those injuries. (Tr. 98-100).

After going to the eye washing station and booking, McKnight was placed in a cell where she remained until her release at 10:00 a.m. the next morning. (Tr. 100, 101). She stated that she experienced continual burning and pain in her arms, face, eyes, throat, and back while in the cell, the intensity of which she characterized as a 10 out of 10. (Tr. 102, 112). She described her physical and emotional injuries:

> I was devastated. My emotional – I had just spent the night in jail in my opinion for no reason. My physical condition, my eyes were still burning. My arm was cut. I was sore all over. Everything was burning.

(Tr. 104). McKnight testified that the physical pain persisted for approximately one week, although it lessened in severity over the course of that period. (Tr. 112-13). The burning in her eyes was aggravated by showering, sweating, and crying. (Tr. 112, 113). Medical records dated September 1, 2010, refer to injuries to McKnight's left arm and indicate that they occurred two weeks earlier. (Tr. 127; P. Ex. 6 at 37). McKnight testified that the records are inaccurate and reflect a clerical error because she told the medical provider that the injuries had occurred two *months* earlier. (Tr. 128).

McKnight testified at length about the long-standing emotional injuries caused by her arrest and treatment by the officers on July 3, 2010.  (Tr. 131-43).  She explained that as a result, she became "afraid[,] . . . in pain[,] . . . embarrassed, hurt, scared, [and] depressed." (Tr. 131).  She developed a fear of police and became distrustful of others, resulting in social introversion.  (Tr. 132, 138, 141).  According to McKnight, those changes were marked differences from the positive self-esteem and confidence she exhibited before the incident. (Tr. 141).  As a result of her arrest and imprisonment, she became overprotective of her sons, had nightmares, and drank more.  (Tr. 135-36, 139-40).  In her estimation, her emotional injuries caused her to lose interest in her marriage, and it ultimately failed.  (Tr. 133-34).  She still has feelings of anger and fear.  (Tr. 140).

McKnight acknowledged that she had not sought or received mental health treatment for her emotional injuries.  (Tr. 143).  She stated that because she had two sons in college and had to work, she "just [had not] been able to" get treatment.  (Tr. 143).  At the time of the trial, McKnight was employed at Walmart; she had not been employed in July 2010. (Tr. 40, 237).

In her testimony, McKnight acknowledged that she had been convicted on four occasions for driving while intoxicated and had spent time in jail.  (Tr. 42-43, 166-68).  The first conviction occurred in 1996 when she was eighteen or nineteen; the other three occurred after the events giving rise to this lawsuit.  (Tr. 42-43, 162, 167, 241).  According to McKnight, before the July 2010 arrest, she had been jailed overnight on a complaint by her ex-husband, which did not result in any conviction.  (Tr. 166, 244).  Since her release from jail in March 2014 for the most recent DWI conviction, she has not consumed alcohol.  (Tr. 43).

2.      **Plaintiff's Expert's Testimony**

Charles Ewing, PhD, a forensic psychologist, testified concerning the emotional

injuries sustained by McKnight as a result of the July 3, 2010 incident.  Dr. Ewing has a

doctorate degree in psychology, a law degree, and holds the position of Distinguished Service

Professor at SUNY Buffalo Law School.  (Tr. 639-40; P. Ex. 24).  He affirmed that he had been

retained by McKnight:

> to examine [her] . . . to determine whether and[,] if so[,] to what
> extent she was psychologically injured by the actions taken against
> her by employees of the City of Rochester on July 3rd and 4th,
> 2010 and subsequently.

(Tr. 640-41).  To perform his evaluation, he met with McKnight on one occasion, July 13, 2015,

for three hours and forty-five minutes.  (Tr. 642).  He also reviewed RPD records relating to the

incident, McKnight's medical records, discovery responses and motions in this case, and

deposition testimony.  (Tr. 642).

Dr. Ewing opined that McKnight suffers from "reoccurring episodes of major

depression" and post-traumatic stress disorder ("PTSD") as a direct result of her treatment by

defendants Vasile and Nicholls and the criminal proceedings against her.  (Tr. 646, 652, 653).

Based upon his evaluation, he concluded that she suffered "nearly all" of the following

symptoms of major depression as a result of defendants' conduct:

> remarkably diminished interest in activities that previously would
> have brought joy or satisfaction[,] [a]ppetite loss . . . , sleep
> problems, . . . loss of libido, sexual interest, fatigue[,] [s]ometimes
> psychomotor retardation or agitation . . . [,] [f]eelings of
> worthlessness and loss of self-esteem, diminished ability to think
> and concentrate and in some cases reoccurring thoughts of death or
> suicide.

(Tr. 647-48).

22

With respect to the manifestations of depression in McKnight's life after her July 2010 arrest, Dr. Ewing testified that McKnight experienced feelings of embarrassment, shame, worthlessness, and diminished self-esteem.  (Tr. 648).  She developed difficulty sleeping almost immediately, experienced nightmares, began to lose her appetite, lost interest in sex, lost interest in socializing with friends and family, developed excessive worry over her sons and fear of the police, experienced fatigue, was prone to crying bouts, and generally felt hopeless.  (Tr. 648-54). According to Ewing, McKnight denied contemplating suicide.  (Tr. 649).  She resorted to daily alcohol use to address depression and anxiety, which developed into alcoholism.  (Tr. 650).  By the time she met with Ewing in 2015, she had ceased using alcohol, but acknowledged that sobriety was a daily struggle.  (Tr. 657).  She became so fearful of the police, Ewing testified, that she avoided going to places where police were likely to be present.  (Tr. 654-55).

According to Ewing, McKnight continued to experience depression at the time of their meeting in July 2015.  (Tr. 650).  He characterized her depression as "not nearly as bad as it had been in previous years," but explained that she remained depressed and still suffered "periodic bouts of major depressive episodes or disorder."  (Tr. 656).  Ewing testified that the reoccurrences were "becoming further apart and less serious."  (Tr. 669).

As to his diagnosis of PTSD, Dr. Ewing explained:

> [PTSD] involves being subjected to or witnessing a situation that is either life threatening or potentially life threatening and thereafter being subjected to a variety of [specific] symptoms.

(Tr. 658).  PTSD symptoms that Ewing indicated McKnight suffered included "intrusive thoughts on a regular basis," nightmares, "efforts to avoid stimuli that remind [her] of the incident," social alienation, and hypervigilance "sometimes bordering on paranoia." (Tr. 658-59).

With respect to the manifestations of PTSD, Ewing testified that McKnight is "constantly alert" to the concern that police may show up or that her sons may be victimized by the police. (Tr. 659). He explained that she has altered the way in which she lives and now leads a "very sheltered" life so as to avoid "anything out of the ordinary." (Tr. 661). Ewing characterized her emotional PTSD symptoms as follows:

> She sticks to her routine. She's afraid to go outside that routine for fear that something like this will happen again. . . . [P]rior to this time she had very positive feelings about her future, but since the events of 2010 she said she feels like her life has been ruined, but toward the end of the evaluation I did with her she acknowledged that she does still have some hope that some day she'll get over this.

(Tr. 661-62).

> Dr. Ewing further opined:
>
> [McKnight] needs intensive and extensive psychotherapy. I would say certainly individual psychotherapy and probably in terms of relapse prevention with regard to alcohol. . . . I think she also needs medication for the depression and anxiety that she suffers and I encouraged her to consider that.

(Tr. 662). McKnight told him that she could not afford "to take the time or to pay the money" necessary for treatment. (Tr. 663). According to Ewing, with treatment, McKnight likely "would feel subjectively better particularly in terms of the depression," but likely would never completely "get over" the symptoms of PTSD. (Tr. 667). Ewing believes that McKnight is currently at risk for relapse into alcohol abuse. (Tr. 667).

On cross-examination, Ewing acknowledged that he was aware at the time of his evaluation that before her arrest in July 2010, McKnight had been involved in an abusive relationship, had been arrested for DWI at nineteen and had a juvenile record of some sort, and had an alcohol abuse problem, although not "to the extent where she was using it on a daily basis

as a form of self-medication for depression and anxiety." (Tr. 684, 687, 688, 694). When

questioned about the possibility that McKnight may have exaggerated her psychological injuries,

Ewing replied:

> [W]hat I found is that in this case . . . [,] rather than exaggerate or
> overestimate the psychopathology[,] people have a tendency to
> underestimate it. That's what I saw with Ms. McKnight. She
> seemed to want to tell me – want to tell me that she was doing
> better than she was.

(Tr. 689). He testified that he saw no evidence that she was "malingering and/or exaggerating

her stress." (Tr. 700).

**I.       The Dismissal of the Criminal Charges**

McKnight appeared in court on July 6, 2010, and three or four times thereafter on

the criminal charges. (Tr. 104-05). The prosecution was adjourned in contemplation of

dismissal. (Tr. 110). The charges were dismissed approximately six months later. (Tr. 111).

**J.       Testimony Concerning Use of Force Techniques**

**1.       Defendants' Witness Andrew McPherson**

Andrew McPherson, a Sergeant employed by RPD in its training department,

testified about RPD training and policies concerning "tactics and techniques" used by officers to

address individuals who are resisting. (Tr. 477, 478). He testified that all police recruits are

trained in the "use of force continuum" to assist them in "using reasonable and appropriate force

based on the resistance that they are faced with." (Tr. 485). Specifically, he explained that the

use of force continuum or matrix:

> [is] a systemic tool that's given to officers. It's a systemic
> approach to the escalation and deescalation of force. It's a training
> tool to assist members in using reasonable and appropriate force
> based on the resistance that they are faced with.

> It's four levels.  Level [O]ne being a compliant individual all the
> way up to level four.  Level [F]our would be the use or threatened
> use of deadly physical force.  It gives officers – members an
> understanding of the levels of resistance in each level they may be
> encountering and it gives them some reasonable options to be able
> to control a subject that's displaying that level of resistance.

(Tr. 485-86).  McPherson identified a one-page chart entitled "PSTF [Public Safety Training

Facility] Use of Force Matrix" as a summary of the use of force continuum training that is taught

in RPD training classes.  (Tr. 485, 503; D. Ex. 417).  RPD recruits are also trained specifically on

the use and operation of OC spray.  (Tr. 503-05).

Level One on the use of force continuum, McPherson explained, "is used every

day by police officers – just their command presence . . . and when they're talking to people."

(Tr. 486).  Level One techniques include "effective communication," "relative positioning,"

"stances," and "compliant handcuffing."  (D. Ex. 417).  Level Two techniques are those

available to address individuals who are not compliant and may be attempting to negotiate with

an officer, such as to avoid being taken into custody, or those who are not compliant but "not

actively trying to fight with [an officer]."  (Tr. 487-88).  Techniques appropriate for Level Two

situations include separation techniques (*e.g.* "blanket," "escort"), "O.C. Aerosol," "pressure

points," "pain compliance," and "wristlocks/armlocks."  (D. Ex. 417).

McPherson testified that an officer's decision as to which technique to employ

should be "based on their training and their experience and the totality of all of the circumstances

that are occurring."  (Tr. 490).  The totality of the circumstances include factors such as the

subject's physical characteristics (age, gender, size, skill level), proximity to a weapon, an

officer's "special knowledge" of the subject, an officer's injury or exhaustion, ground fighting,

number of participants, risk of imminent danger, and the relative severity of the crime for which

the subject is being arrested.  (Tr. 491-92, 512-13).

26

With respect to the characteristics of OC or pepper spray, McPherson testified:

> Oleoresin capsicum is basically a food product.  It's a mixture –
> [o]leoresin is a mixture of different plants, oils.  Capsicum is a
> variety of red hot peppers primarily cayenne pepper mixed with the
> fleshy pods of the plant . . . . OC is an inflammatory.  It doesn't
> vaporize. . . . So when it's sprayed into someone's face it has some
> different effects.  Generally, it gets people's eyes to close –
> involuntary closing of the eyes.  It will burn – burn exposed skin.
> Because it's an aerosol[,] if somebody inhales it, it may cause a
> cough reflex.

(Tr. 484).  He further testified that a "straight arm bar" is a joint manipulation technique

consistent with a Level Two "wristlocks/armlocks" technique.  (Tr. 510; *see* D. Ex. 417).

## 2.   **Plaintiff's Witness James Williams**

James Williams, PhD, testified that he is an adjunct professor at Rowan

University, where he teaches criminal justice studies in the Law and Justice Department, and a

consultant on police practices through his firm Williams & Associates.  (Tr. 530).  He has

performed consulting work with the American Bar Association on federal, state and local police

training matters.  (Tr. 534).  Dr. Williams is also a fellow with the Board of American College of

Forensic Examiners.  (Tr. 535).  Among other positions, he has worked as a New Jersey State

Police Officer, the Chief of Police for the Township of Burlington, New Jersey, and as Deputy

Associate Special Agent in Charge and Chief of the Organized Crime Task Force for the Drug

Enforcement Administration.  (Tr. 536, 538).  He has taught in police academies throughout the

country.  (Tr. 537).  According to Williams, he was retained by McKnight to opine on the

treatment she received from Vasile and Nicholls on July 3, 2010.  (Tr. 539, 542-43).

Dr. Williams opined that Vasile should not have used any physical force against

McKnight when he initially ran up the porch stairs, grabbed her, and attempted to keep her from

entering her home:

> At this point in time[,] [McKnight] was not using any force
> towards the officer.  [McKnight] was walking away from the
> officer to go into her house.  So in this instance there was no need
> for the officer to use any physical force.

(Tr. 551-52).  He further opined that Nicholls's deployment of pepper spray was "totally

unnecessary."  (Tr. 553).  As he explained:

> There was nothing to necessitate spraying a chemical into the face
> of an individual when you have two well trained and disciplined
> officers there to handle the actions of a five foot three or four
> woman who was totally out of shape and unable to respond to their
> physical actions.

(Tr. 626-27).  As an initial matter, Vasile should have attempted to "talk [McKnight] down" if

she was engaged in a verbal conflict with him.  (Tr. 560).  Williams testified that Nicholls also

should have tried to communicate with McKnight and talk her down as she was struggling with

Vasile before resorting to force.  (Tr. 636-37).

On cross-examination, Dr. Williams acknowledged that McKnight struggled with

Vasile, but noted that "it was a police initiated struggle."  (Tr. 593).  He opined that if Vasile lost

control of McKnight's arm, even if her arm had been greasy, that would have been Vasile's

"fault" because he was responsible for having her under control.  (Tr. 595).  Williams agreed that

if Vasile knew that the area adjacent to McKnight's porch was "where people were coming out

of[,] that would be part of the crime scene."  (Tr. 605).  He also acknowledged the general risks

to officer safety that may be presented by a suspect's flight inside a house in order to evade

arrest, as well as the safety concerns raised in this case by McKnight's statement, "Get him."

(Tr. 619-23).  In Williams's opinion, Nicholls was obligated "to make an arrest and to put

[McKnight] into custody if he thought she was resisting arrest."  (Tr. 628).

**DISCUSSION**

A.   **False Arrest and False Imprisonment**

"Under New York state law, to prevail on a claim of false arrest [or false imprisonment], a plaintiff must show that (1) the defendant intended to confine [her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 454 (S.D.N.Y. 2012) (internal quotations omitted) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)).  Under New York law, "[b]ecause a cause of action for false arrest is essentially the same tort as false imprisonment," the claims may be analyzed as one cause of action.  *See Mitchell v. Home*, 377 F. Supp. 2d 361, 376 (S.D.N.Y. 2005); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 252 (E.D.N.Y. 2000) ("[u]nder New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements").

1.   **Probable Cause**

With respect to the first three elements, McKnight has satisfied her burden of demonstrating that she was intentionally detained by Vasile and Nicholls without her consent. The critical question is whether the confinement was otherwise privileged by the existence of probable cause.  Generally, a warrantless arrest is presumed to be unlawful, and the burden rests with the arresting officer to prove a legal justification.  *Decker v. Campus*, 981 F. Supp. 851, 857 (S.D.N.Y. 1997).  Of course, the existence of probable cause to arrest "is a complete defense to an action for false arrest."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

"Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has

been committed by the person to be arrested." *Curley v. Village of Suffern*, 268 F.3d 65, 69-70

(2d Cir. 2001) (internal quotation omitted); *Williams v. City of New York*, 2007 WL 2214390, *6

(S.D.N.Y. 2007) ("[p]robable cause is defined as such facts and circumstances as would lead a

reasonable prudent person in like circumstances to believe plaintiff guilty") (internal quotation

omitted).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the arrest." *Zellner v. Summerlin*, 494

F.3d 344, 369 (2d Cir. 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *Williams*

*v. City of Mount Vernon*, 428 F. Supp. 2d 146, 154 (S.D.N.Y. 2006) ("a probable cause

determination must be made by examining what the officer knew at the time of the arrest and

whether the officer was reasonable in relying on that knowledge") (internal quotations omitted).

### a.      Obstruction of Governmental Administration

Defendants maintain that they had sufficient probable cause to arrest McKnight

for obstructing governmental administration.  (Docket # 85 at 9-10).  Section 195.05 of the New

York Penal Law provides, in relevant part:

> A person is guilty of obstructing governmental administration
> when [she] intentionally obstructs, impairs or perverts the
> administration of law or other governmental function, or prevents
> or attempts to prevent a public servant from performing an official
> function, by means of intimidation, physical force or interference,
> or by means of an independently unlawful act.

N.Y. Penal Law § 195.05; *see Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) ("[t]he elements

of obstructing governmental administration therefore include: (1) prevention or attempt to

prevent (2) a public servant from performing (3) an official function (4) by means of

intimidation, force or interference").  New York law makes clear that "the official function being

performed must be one that was 'authorized by law.'" *Lennon v. Miller*, 666 F.3d at 424

(quoting *In re Verna C.*, 143 A.D.2d 94 (2d Dep't 1988)).

New York courts have repeatedly held that the word "physical" in the statute modifies the words "force" *and* "interference."  *See Dowling v. City of New York*, 2013 WL 5502867, *5 (E.D.N.Y. 2013) (internal citations omitted); *see Rasin v. City of New York*, 2016 WL 2596038, *5 (E.D.N.Y. 2016) ("[i]n addition to intent and actual or attempted obstruction or impairment of a government function, a violation of the statute requires physical interference"); *Trapp-Miley v. City of New York*, 2012 WL 1068102, *6 (E.D.N.Y.) ("recent caselaw makes clear that some physical aspect to the interference – albeit not necessarily physical *force* – must be present to constitute a violation of section 195.05"), *report and recommendation adopted as modified*, 2012 WL 1068084 (E.D.N.Y. 2012).  In other words, to constitute obstruction under the statute, the interference must contain a physical component; "verbal interference" alone is insufficient.  *In re Davan L.*, 91 N.Y.2d 88, 91 (1997); *see Hilderbrandt v. City of New York*, 2014 WL 4536736, *4 (E.D.N.Y. 2014) ("words alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing governmental administration as a matter of law") (internal citations omitted); *Dowling v. City of New York*, 2013 WL 5502867 at *4 ("[f]ailing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration"); *Richardson v. N.Y.C. Health & Hosps. Corp.*, 2009 WL 804096, *9 (S.D.N.Y. 2009).

"The physicality requirement need not be met by physical *force*, but must be in part, at least, physical in nature."  *Rasin v. City of New York*, 2016 WL 2596038 at *5 (internal quotations omitted).  Circumstances involving a verbal communication that has "an interfering effect combined with unwarranted physical intrusion into an area of police activity" may amount to physical interference within the meaning of the statute.  *Hilderbrandt v. City of New York*, 2014 WL 4536736 at *5.  Accordingly, "[i]nterrelated conduct – actions coupled with words or

conduct causing some 'physical reaction and dispersal' – is actionable." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 265 (E.D.N.Y. 2014).

As an initial matter, the record plainly establishes that Vasile was engaged in authorized official duties when he encountered McKnight. The evidence demonstrates that Vasile had responded to a chaotic scene involving a stabbing and potential shooting and was attempting to secure the crime scene area with crime tape in accordance with his supervisor's directions and RPD policy. Nicholls identified several legitimate purposes for using crime scene tape to secure a crime scene, including calming a chaotic scene. Further, Vasile reasonably explained his decision regarding the area to be cordoned off, including why he decided to attach the crime scene tape to McKnight's porch railing. Under these circumstances, I easily find that Vasile was engaged in authorized conduct at the time of his confrontation with McKnight. *See Gollop v. Torres*, 2016 WL 4004644, *3 (S.D. Fla. 2016) ("[t]he facts indicate that the [o]fficers were responding to a report of a home invasion and were responsible for directing pedestrians and traffic away from an area of criminal activity[;] [t]hus, the record clearly shows that the [o]fficers were acting pursuant to the performance of their duties and within the scope of their authority"); *Helms v. Armsey*, 2000 WL 277901, *2 (Ohio Ct. App. 2000) (plaintiff engaged in obstruction of official business where he distracted deputy from "keeping a potential crime scene free from external contaminants" by repeatedly trying to enter area of crime scene); *People v. Cruz*, 41 Misc. 3d 1222(A) (N.Y. Crim. Ct. 2013) (defendant's actions constituted interference with and disruption of an official function where he physically disrupted officer from "investigating and securing a crime scene").

The record does not demonstrate, and defendants do not argue, that McKnight's conduct constituted *intimidation* or *physical force* within the meaning of Section 195.05. As

reported by Vasile in his incident report, McKnight was considerably shorter and heavier and about ten years older than he.  (P. Ex. 13).  Indeed, photographs of her suggest that she was considerably overweight.  (P. Exs. 7, 9).  Moreover, his report reveals that Vasile was aware that McKnight lived at 232 Pierpont Street; thus, her presence there was not likely surprising.  Although Vasile testified that McKnight was "yelling" (P. Exs. 10, 13), he acknowledged that the scene remained "chaotic" at the time of their interaction.  Indeed, the cellphone recording reflects that although McKnight spoke somewhat loudly and assertively, the volume of her speech was not overbearing or overwhelming considering the level of background noise.  Nor, in my estimation, was the tone of her words aggressive or intimidating.  In fact, Vasile did not testify that he was subjectively intimidated by McKnight.

I reach a similar conclusion with respect to the issue of physical force.  Nothing in the record suggests that McKnight used any physical force to prevent Vasile from securing the crime scene.  She did not physically touch or attempt to touch Vasile in order to prevent him from affixing the tape.  She did not try to cross the crime scene tape.  Nor did she rip the tape, remove it, or even touch it.  Although Vasile testified that he was not certain whether she actually touched the tape, nothing in the record suggests that she did, and I credit her unequivocal testimony that she did not.

The central question is whether McKnight's statements to Vasile, coupled with her physical actions, considered together provided Vasile with adequate probable cause to believe that McKnight was attempting to interfere with his ability to secure the crime scene.  *See Hilderbrandt*, 2014 WL 4536736 at *4 ("[t]he physical requirement need not be satisfied by the use of physical force, but can be met instead by the physical encroachment on police officers' work or by the performance of threatening and distracting movements near officers"); *Breitkopf*

33

*v. Gentile*, 41 F. Supp. 3d at 266 ("[i]nterrelated conduct – actions coupled with words or conduct causing some physical reaction and dispersal – is actionable") (quotations omitted). Considering the totality of the circumstances, and for the reasons discussed below, I conclude that they did not. *Williams v. City of Mount Vernon*, 428 F. Supp. 2d at 154 ("[t]he existence of probable cause is objective . . . and determined by the totality of the circumstances").

Vasile's account of his seconds-long pre-arrest interaction with McKnight has varied in several material respects from the time he first reported it through the time of trial. Most striking is the apparent variance in Vasile's descriptions of the core factual underpinnings of the obstruction of governmental administration charge against McKnight. Vasile's trial testimony was clear that the charge was based upon his conclusion that McKnight was "attempting to take [the crime scene tape] down." (Tr. 303). His criminal complaint, however, does not mention that McKnight attempted to remove the tape. Rather, it cites as the basis for the charge (1) McKnight's "refus[al] to go inside her house and remove herself from the crime scene" and (2) her "yelling at [Vasile] not to put crime scene tape up in her yard." (P. Ex. 10). Vasile's incident report, which he also prepared and signed that night, contained essentially the same factual recitation as did his complaint.[6]

Significantly, the cellphone recording contains no requests or orders by Vasile to McKnight to go inside her house. Indeed, Vasile himself acknowledged that the recording did not capture any such statement by him. (Tr. 299, 307). Any notion that Vasile made such a direction and that it was simply not picked up by the recording is belied by the recording itself. As noted above, the entire pre-arrest interaction between Vasile and McKnight lasted only about

---

[6] These narrative accounts vary from the report contained in Vasile's subject resistance report, which he also prepared the same evening. (P. Ex. 14). In that report, Vasile did not mention that he ordered McKnight into her residence; rather, he reported that he informed her that the tape would be removed after the investigation, but that she nevertheless attempted to "rip it down." (*Id.*). The cellphone recording introduced at trial did not reflect that he told McKnight that the tape would be removed. (Tr. 371).

thirteen seconds, during which there was continuous, sometimes overlapping, dialogue between Vasile and McKnight.  The captured verbal exchange begins with McKnight's statement to Vasile that he could not put the tape in her yard.  Vasile did not testify that he directed her to go inside her house before she spoke to him about the tape, and no reason was offered or suggested as to why he would have done so.

Similarly, in his written reports and direct testimony concerning the incident, Vasile indicated that he explicitly informed McKnight that she was under arrest, although the audio recording belies these assertions.  After reviewing the recording, Vasile conceded that he had not heard himself inform McKnight that she was under arrest.  (Tr. 358).

In sum, I find that Vasile's varying accounts of the strikingly brief events that led to McKnight's arrest detract from the credibility of his trial testimony that he arrested McKnight because he believed that she was attempting to remove the tape.[7]  Even assuming, however, that Vasile subjectively held the belief that McKnight intended to remove the tape from her porch, I conclude that such belief would not have been objectively reasonable.  *See Zellner*, 494 F.3d at 369 ("[a]n arresting officer's state of mind (*except for the facts that he knows*) is irrelevant to the existence of probable cause").

The testimony and cellphone recording clearly demonstrate that McKnight initiated a verbal exchange with Vasile in which she expressed her objection to his placement of crime scene tape on her property.  Specifically, she first told him that he could not put tape on

---

[7]  Vasile's subjective reason for making the arrest need not necessarily correspond to the "criminal offense as to which the known facts provide probable cause."  *Zellner v. Summerlin*, 494 F.3d at 369 (internal quotation omitted).  Rather, "an arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime."  *Id.* (citing *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("a plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of the arrest")).  In this case, as discussed below, I do not find that probable cause existed to arrest McKnight for *any* crime.  Vasile's subjective beliefs are addressed herein as they are relevant to credibility determinations.

her property.  When he responded that he could, she asked why.  He replied without elaboration, "Because it's a crime scene, that's why."  McKnight then tried to explain that her property was not the scene of the crime, and Vasile responded, "I don't care."  At that point, McKnight stated, "Well this is not gonna stay here all night," prompting Vasile to order her to put her hands behind her back.

Under New York law, verbal communications are generally insufficient to establish probable cause for obstruction of governmental administration.  *See In re Davan L.*, 91 N.Y.2d at 91; *Hilderbrandt*, 2014 WL 4536736 at *4 ("words alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing governmental administration as a matter of law").  The insufficiency of verbal interference to give rise to probable cause to arrest for obstruction of governmental administration is particularly apparent where, as here, the individual has not become aggressive or disorderly.  *See Dowling*, 2013 WL 5502867 at *6 (key questions of fact include whether plaintiff "remained calm or became disorderly enough to interfere with police action").  The record likewise establishes that McKnight did not stop and confront Vasile on the ground where he was standing; rather, she continued to walk toward and up the porch stairs to the front door of her house and, if Vasile is credited, extended her arm in the direction of the tape.[8]

Although Vasile testified that he found McKnight's statements "odd" because no citizen had ever before argued with him about the placement of crime scene tape, the fact that it had not happened in his relatively brief tenure as an officer does not refute the many plausible reasons why an individual might object to the placement of crime scene tape on their property, including the implication that their home was associated with criminal activity of some sort.

---

[8]  McKnight denies that she gestured toward the tape, but admits the she pointed toward the neighboring property.

Further, the recording shows that McKnight was attempting to explain to Vasile that she believed that the crime had occurred at the neighboring property, which she identified by pointing with her finger.  Whether this gesture was the same arm extension that Vasile interpreted to be an attempt to remove the tape is unclear.  In any event, even assuming McKnight extended her arm toward the tape as she was telling Vasile that the tape would not remain in place all night, it is logical that her gesture toward the tape was meant to emphasize that she was talking about the tape; in fact, her statement was, "*This* is not gonna stay here all night."  On this record, I find that McKnight's verbal expressions, coupled with the gesture that Vasile described he saw, were simply insufficient to "cross[ ] the line between verbally expressing frustration with [Vasile's] approach to the situation and objectively manifesting that frustration" through physical conduct that would give rise to probable cause for her arrest.  *Richardson v. N.Y.C. Health & Hosps. Corp.*, 2009 WL 804096 at *9 (finding probable cause where plaintiff's verbal expressions, coupled with her physical conduct of entering into officer's police vehicle, were sufficient to give rise to probable cause).

Moreover, the remarkably short duration of Vasile's pre-arrest interaction with McKnight, and his almost instantaneous order to put her hands behind her back after she stated that the tape will not be there all night, undercuts defendants' suggestion that McKnight was actually interfering with Vasile's ability to secure the crime scene.  *See Rasin*, 2016 WL 2596038 at *7 ("the sheer brevity of the incident leaves doubt as to whether plaintiff can truly be said to have been interfering").  The entire encounter leading up to Vasile's order was over in approximately thirteen seconds.  During those thirteen seconds, Vasile never issued McKnight any orders that she failed to obey or warned her that her behavior could result in arrest.  Further, although the audio recording demonstrates that McKnight spoke in a somewhat loud voice, the

recording reveals that the scene was loud; McKnight did not become verbally aggressive or use abusive language, unlike Vasile who used profanity when he told her to put her hands behind her back.  Considering the totality of the circumstances, I find that a reasonable officer in Vasile's position would not have found probable cause to believe that McKnight was interfering or attempting to interfere with Vasile's duties.  *See Bryant v. Serebrenik*, 2016 WL 6426372, *2, 4 (E.D.N.Y. 2016) (probable cause undercut by short duration between officer's order to back up and arrest of minors); *Rasin*, 2016 WL 2596038 at *7 (finding of probable cause undercut by lack of warnings, brevity of any alleged interference, and lack of any evidence that plaintiff disobeyed any orders); *Hilderbrandt*, 2014 WL 4536736 at *6 (plaintiff's version of events revealed no conduct that constituted physical interference; "the mere presence and posture of plaintiff – particularly given the assumed facts that plaintiff remained calm and compliant throughout the encounter – would not lead a reasonable officers to believe that plaintiff was physically interfering with their investigation").

Indeed, the absence of any orders or warnings – much less repeated ones – and the notable brevity of the pre-arrest interaction distinguish this case from others in which minimal physical interference has been found sufficient to establish probable cause for obstruction.[9]  *See, e.g.*, *Bruno v. City of Schenectady*, 2016 WL 1057041, *12 (N.D.N.Y. 2016) (finding probable cause due to "[p]laintiff's repeated and deliberate disregard of [officer's] order to stay behind the police tape, which was exacerbated by her disruptive harangue"); *Petway v. City of New York*, 2014 WL 839931, *6 (E.D.N.Y. 2014) (finding probable cause where plaintiff disobeyed

---

[9]  I also find unpersuasive those cases that conclude that "merely approaching the police, or speaking during the course of a police action, or disregarding police instructions, will support a conviction for [obstructing governmental administration]."  *See Cancel v. Kelly*, 2016 WL 590230, *4 (S.D.N.Y.) (quoting *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 403 (E.D.N.Y. 2011)), *reconsidered in part*, 2016 WL 1559166 (S.D.N.Y. 2016).  Rather, the *Rasmussen* dicta is inconsistent with the statute's "require[ment] [of] *physical* interference with police action to support an [arrest for obstruction of governmental administration]."  *See Hilderbrandt*, 2014 WL 4536736 at *6 (distinguishing *Rasmussen* and cases relying upon its dicta).

multiple orders to back away from officers conducting an arrest); *Mitchell v. City of Albany*, 2010 WL 1235389, *4 (N.D.N.Y. 2010) (officer had probable cause to believe that plaintiff intended to obstruct police investigation where plaintiff, who was visibly upset and had raised her voice, walked toward police vehicle in which her daughter was being held after she was repeatedly told that her daughter would not be released).

### b.      Resisting Arrest

Defendants also maintain that they had sufficient probable cause to arrest McKnight for resisting arrest.  (Docket # 85 at 9-10).  Section 205.30 of the New York Penal Law provides that "[a] person is guilty of resisting arrest when [s]he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of [her]self or another person."  N.Y. Penal Law § 205.30.  Thus, the statute explicitly requires that an officer be "effecting an authorized arrest"; an unauthorized arrest will bar a charge of resisting arrest.  *People v. Jensen*, 86 N.Y.2d 248, 253 (1995) ("[a] key element of resisting arrest is the existence of an authorized arrest, including a finding that the arrest was premised on probable cause"); *see Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003) ("[t]here are thus at least two essential elements of a charge for resisting arrest under New York law: (1) the person charged must have intentionally attempted to prevent the arrest of [her]self or someone else, and (2) the arrest [s]he attempted to prevent must itself have been supported by a warrant or by probable cause").

This Court's determination that Vasile lacked probable cause to arrest McKnight for obstruction of governmental administration compels the determination that defendants likewise lacked probable cause to arrest McKnight for resisting arrest.  *See Curry v. City of Syracuse*, 316 F.3d at 336 (second element of resisting arrest requires the arresting officer to

have cause to arrest individual for some independent crime at the time individual resists);
*Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 290 (S.D.N.Y. 2001) ("because the officer
had no probable cause to arrest plaintiff, he likewise lacked probable cause for the charge of
resisting arrest").

2. **Qualified Immunity**[10]

Defendants maintain that even if probable cause was lacking, they are
nevertheless entitled to judgment because a reasonable police officer in their shoes *could* have
reasonably believed that probable cause existed.  (Docket # 85 at 14-15).  In other words,
defendants maintain that even in the absence of probable cause, they are entitled to judgment in
their favor on the false arrest and imprisonment claims because "officers of reasonable
competence could disagree on the legality of [the] arrest."  (*Id.*).  I disagree.

"Arguable probable cause exists when a 'reasonable police officer in the same
circumstances and possessing the same knowledge as the officer in question *could* have
reasonably believed that probable cause existed in the light of well established law.'"  *Cerrone v.
Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir.
1997)).  Thus, "[a]lthough the tests for probable cause and arguable probable cause are . . . not
congruent, . . . the concept of probable cause is the same in both inquiries."  *Zellner*, 494 F.3d at
369 (internal citation omitted).  Accordingly, "[a]rguable probable cause must not be
misunderstood to mean 'almost probable cause.'"  *Id.* (quoting *Jenkins v. City of New York*, 478
F.3d at 87).  The relevant inquiry is "whether it was objectively reasonable for the officer to
conclude that probable cause existed"; "[i]f officers of reasonable competence would have to

---

[10]   Although qualified immunity generally protects officials from liability under federal causes of action, "a
similar doctrine exists under New York common-law."  *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir. 2007).
Thus, if defendants are entitled to qualified immunity under federal law, they are also entitled to qualified immunity
on a state law cause of action for false arrest.  *Id.*; *see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) ("New York
law, however, does grant government officials qualified immunity on state-law claims except where the officials'
actions are undertaken in bad faith or without a reasonable basis").

agree that the information possessed by the officer at the time of the arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.* (quoting *Jenkins*, 478 F.3d at 87) (emphasis omitted).

a.     <u>Vasile</u>

As discussed at length above, the law is well-established that obstruction of governmental administration requires some degree of physical intrusion or action.  In this case, Vasile arrested McKnight after a thirteen-second verbal interaction during which McKnight was walking to the front door of her house.  At most, McKnight extended her arm toward the crime scene tape.  Prior to the arrest, Vasile did not warn or order McKnight either to stay away from or to go inside her house, nor did he direct her away from the crime scene tape that he was affixing to her front porch railing.  I do not find that reasonable officers could disagree that, without more, McKnight's extension of her arm – in the midst of a conversation about the location of a crime and the boundaries of a crime scene – is insufficient to satisfy the physical component required under New York law.  Under such circumstances, "officers of reasonable competence would have to agree that the information possessed by [Vasile] at the time of the arrest did not add up to probable cause," and he is therefore not entitled to qualified immunity. *Id.*; *see also Bryant v. Serebrenik*, 2016 WL 6426372 at *5 (same factors that undercut probable cause preclude court from determining issue of qualified immunity as a matter of law); *Rasin*, 2016 WL 2596038 at *8 (same).  Because Vasile did not have arguable probable cause to arrest McKnight for obstructing governmental administration, he likewise did not have arguable probable cause to arrest McKnight for resisting arrest.  *See Curry*, 316 F.3d at 337.

In reaching these conclusions, the Court is cognizant that Vasile was responding to a volatile, noisy and chaotic scene of a serious incident involving potentially life-threatening

injuries.  While Vasile's interest in defusing that volatility and securing the scene was appropriate, his actions toward the civilians at the scene – be they suspects, witnesses or bystanders – were still required to be bounded by the law and the Constitution.  The Fourth Amendment is not so elastic as to permit officers to arrest an individual without probable cause no matter how expedient or helpful that may be to their legitimate interests in securing a scene or investigating a serious crime.

    **b.**  <u>Nicholls</u>

    The record demonstrates that Nicholls was not involved in and did not witness the initial confrontation between McKnight and Vasile.  Rather, Nicholls credibly testified that after observing Vasile approach his vehicle to obtain the crime scene tape, he did not observe Vasile again until he noticed him struggling with McKnight.  From Nicholls's vantage point, he concluded that Vasile was attempting to arrest McKnight and that she was pulling away and trying to enter her house.  According to Nicholls, he did not know why Vasile was attempting to arrest McKnight, but he approached them to assist in the arrest.

    "[A] police officer is entitled to qualified immunity if it was objectively reasonable for him to believe that his actions did not violate plaintiff's clearly established rights."  *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 577 (S.D.N.Y. 2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).  Accordingly, "while an arrest may be found unconstitutional if probable cause was in fact lacking . . . , an officer who participates in the arrest is nonetheless immune from suit in his or her individual capacity under the doctrine of qualified immunity if it was objectively reasonable for him to rely on a fellow officer's report indicating the existence of probable cause."  *Id.* (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568-69 (1971) and *Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir.

2000)); *see Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists") (quotations omitted); *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2010) ("[w]hen one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine probable cause exists").

"In other words, when an assisting officer arrives late to the scene and has no personal knowledge of the arresting officer's basis for the arrest, liability does not turn on whether the arrest was actually based on probable cause." *Fernandes v. Montgomery County*, 2012 WL 1664086, *3 (D. Md. 2012) (citing *Carter v. Jess*, 179 F. Supp. 2d 534, 544 (D. Md. 2001) (assisting officer is not required to "make an independent assessment of probable cause before assisting other officers with [a] potentially dangerous arrest that is already underway")). Immunizing officers arriving to assist with an in-progress arrest, where it is later determined that probable cause was lacking, balances the competing interests involved.  The officer who initiated the arrest will face potential liability for any faulty probable cause determination, and the assisting officer will not be discouraged from lending assistance during volatile arrests that are already underway.  *See Golphin v. City of New York*, 2011 WL 4375679, *3 (S.D.N.Y. 2011) ("[i]f an officer . . . could be held liable for trusting the word of his superiors, then officers would be discouraged from relying on each other during investigations, which would degrade the efficiency of law enforcement"); *Jackson v. City of Hyattsville*, 2012 WL 933207, *4 (D. Md. 2012) ("[i]t would be impractical . . . to establish a *Miranda*-like requirement on [requesting

officers], obligating them, regardless of injury or the presence of danger, to recite a statement of probable cause before back-up officers . . . would be permitted to make an arrest"); *Carter v. Jess*, 179 F. Supp. 2d at 544 (finding no requirement that responding officer make an independent assessment of probable cause "before assisting other officers with what appears to be a difficult or potentially dangerous arrest that is already underway[;] . . . such a requirement could yield perilous results for officers whose colleagues are deterred from assisting them").

   In other words, qualified immunity as to Nicholls turns on whether his actions under the circumstances "were reasonable – not whether the actions of [Vasile] were reasonable or even whether probable cause was properly established." *Golphin v. City of New York*, 2011 WL 4375679 at \*3; *see Jackson v. City of Hyattsville*, 2012 WL 933207 at \*4 ("[i]n determining the lawfulness of a warrantless arrest to an assisting officer, the inquiry turns not on events that occurred before the officer's arrival of which the officer was unaware, but on whether the officer's decision to assist in the arrest was objectively reasonable in light of the circumstances . . . known to the assisting officer at the time of the arrest and existing law") (internal quotations omitted). Based upon his credible testimony, I find that Nicholls acted reasonably in coming to Vasile's aid when he observed that Vasile was struggling to arrest McKnight. According to Nicholls, he first observed McKnight's interaction with Vasile when Vasile was struggling with her arms in an effort to take her into custody. When Nicolls arrived on the porch, he saw that McKnight's arm was hooked in the doorway and he believed that she was attempting to pull herself into the house and elude arrest. Nicholls explained that her retreat into a residence where weapons or other persons could have been located presented a potential danger to the officers' safety.

Nothing in the record suggests that Nicholls knew or should have known that Vasile's decision to arrest McKnight was not based upon probable cause. Nicholls was not required to second-guess Vasile's decision to arrest her, nor was he required to establish probable cause independently before rendering assistance. Under these circumstances, Nicholls is entitled to qualified immunity for false arrest and false imprisonment. *See Duran v. Sirgedas*, 240 F. App'x 104, 116 (7th Cir. 2007) (officer who was not present at the scene when initial dispute began but arrived in response to a call for back-up support was entitled to qualified immunity for false arrest; "a reasonable officer witnessing the scene and seeing other officers move to arrest [plaintiff] could believe that those officers were acting on probable cause, and assist in effectuating that arrest"); *Askins v. City of New York*, 2012 WL 12884363, *6 (S.D.N.Y. 2012) (responding officer entitled to qualified immunity for false arrest; "even assuming that [responding officer] lacked probable cause to arrest plaintiff, because [requesting officer] could not impart it to him, [responding officer] nevertheless reasonably relied on the appearance of probable cause that [requesting officer's] statements created"), *aff'd in part, vacated in part on other grounds*, 727 F.3d 248 (2d Cir. 2013); *Phelps v. City of New York*, 2006 WL 1749528, *3 (S.D.N.Y. 2006) (responding officer entitled to summary judgment for false arrest claims; "police officers called upon to aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly"); *Fernandes v. Montgomery County*, 2012 WL 1664086 at *3 (qualified immunity protects responding officer, who "rendered immediate assistance to subdue a resisting individual[;] [u]nder these facts, a reasonable officer would have believed that [defendant's] actions were lawful and necessary"); *Hogue v. City of Fort Wayne*, 599 F. Supp. 2d 1009, 1032 (N.D. Ind. 2009) (responding officer was entitled to qualified immunity where there was no evidence that he "knew or should have known" that there was no

probable cause to arrest plaintiff; "a late-arriving officer may assist in an arrest already in progress when there is no basis for questioning the legality of the arrest") (internal quotations omitted); *Adeszko v. Degnan*, 2006 WL 3469541, *7 (N.D. Ill. 2006) ("[defendant], insofar as she was assisting a colleague in an arrest that was already underway, is similarly protected from liability because she could have reasonably relied upon her colleague[']s actions as a basis for probable cause"); *Carter*, 179 F. Supp. 2d at 544-45 (qualified immunity protects officer whose "attention was elsewhere when [p]laintiff was first placed under arrest by [other officers]," and when his attention returned to plaintiff, saw plaintiff struggling with officers as they attempted to take him to the ground).

**B.      Section 1983 Claim for Excessive Force**

**1.      Overview**

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct (1) was "committed by a person acting under color of state law" and (2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Section 1983 creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Here, no genuine dispute exists that Vasile and Nicholls were acting under color of state law. Rather, the central inquiry is whether their actions violated McKnight's constitutional rights.

Claims arising from the use of force during an arrest are judged by the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determination of whether the amount of force used to seize someone was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests as stake." *Id.* at 396
(internal quotations omitted).

Courts have long recognized that a police officer's right to make an arrest or
investigatory stop "necessarily carries with it the right to use some degree of physical coercion or
threat thereof to effect it." *Id.* at 396.  "Because [t]he test of reasonableness under the Fourth
Amendment is not capable of precise definition or mechanical application, . . . its proper
application requires careful attention to the facts and circumstances of each particular case,
including the severity of the crime at issue, whether the suspect poses an immediate threat to the
safety of the officers or others, and whether he is actively resisting arrest or attempting to evade
arrest by flight." *Id.* (internal citation and quotations omitted).  A police officer's application of
force is excessive if it is objectively unreasonable "in light of the facts and circumstances
confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.* at
397.

Evaluation of the use of force "must be judged from the perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.  At
the same time, "[u]nder the law, police are not permitted to use any degree of force in all
instances – in some circumstances, no use of force is reasonable because none is required."
*Weather v. City of Mount Vernon*, 2011 WL 1046165, *9 (S.D.N.Y. 2011), *aff'd*, 474 F. App'x
821 (2d Cir. 2012).  Accordingly, the actions of the officers must be assessed in the context of
the circumstances confronting the officer, and a defendant may be liable if "the force used
exceeded the force needed for the factual circumstances."  *Graham v. City of New York*, 928
F. Supp. 2d 610, 618 (E.D.N.Y. 2013).  Where an arrestee is resisting arrest, the force used by
the officer "must be reasonably related to the nature of the resistance and the force used,

threatened, or reasonably perceived to be threatened against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Liability may attach where the circumstances of the encounter suggest that the officer "gratuitously inflict[s] pain in a manner that [is] not a reasonable response to the circumstances." *Phelan v. Sullivan*, 541 F. App'x 21, 25 (2d Cir. 2013) (alterations in original) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 124 (2d Cir. 2004)); *Lemmo v. McKoy*, 2011 WL 843974, *6 (E.D.N.Y. 2011) ("although the *Graham* test does not consider the subjective intent of the officer(s) per se, . . . intentional, gratuitous uses of force that are not required to subdue an individual likely fail the *Graham* objective unreasonableness test").

## 2.    Use of Force by Vasile

As an initial matter, McKnight maintains that defendants were not reasonable in using any force against her because her arrest was unlawful. (Docket # 83 at 62-63). Alternatively, even if the arrest was lawful, McKnight contends that the force used by Vasile and Nicholls was unreasonable under the Fourth Amendment. With respect to Vasile, McKnight contends that he had reasonable alternatives to force. (*Id.*). With respect to Nicholls, McKnight maintains he should have investigated further or issued a verbal order before resorting to the use of pepper spray. (*Id.*).

Contrary to McKnight's argument, the Second Circuit has made clear that even if an arrest is unlawful, "there is no *per se* rule that any force employed for that arrest is also unlawful." *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 384-85 (D. Conn. 2009) (citing *Jones v. Parmley*, 465 F.3d at 62). Rather, "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Jones v. Parmley*, 465 F.3d at 62;

*see Mesa v. City of New York*, 2013 WL 31002, *21 (S.D.N.Y. 2013) ("the mere fact that the officers may not have had probable cause for [plaintiff's] arrest and detention does not necessitate a ruling for [p]laintiff on the excessive force claim").

The reason for this rule seems obvious. Arrest decisions are often made in split seconds on the basis of fluid, fast evolving circumstances, many of which involve potentially dangerous situations. Often the probable cause determinations underlying those arrests are correct; sometimes they are adjudged to be incorrect. A rule that automatically imposes liability on any officer who uses force to effect an arrest later determined to be unsupported by probable cause might well discourage an officer from using that force reasonable and necessary to effect an arrest that he or she believes in good faith to be lawful. In some cases, a decision to avoid force where force would otherwise be reasonable and necessary would threaten the safety of the arresting officer, as well as the public at large.

Turning first to Vasile, McKnight argues that it was unreasonable for him to use *any* force against her. (Docket # 83 at 38-39 at ¶ 6, 62-63). According to Dr. Williams, McKnight's expert, Vasile had a range of alternatives to arrest available to him that he could have employed to diffuse the situation and avoid a physical confrontation with McKnight. These alternatives included permitting McKnight to go inside her home or issuing an appearance ticket instead of arresting her. (*Id.*).

Vasile's response to his encounter with McKnight included the use of profanity and an abrupt determination to arrest her for interfering with his efforts to secure the crime scene. However, as the authority cited above makes clear, Vasile's precipitous decision to arrest McKnight without probable cause does not render his use of force necessarily excessive as a

matter of law.  Rather, the question is whether, once Vasile decided to arrest McKnight,[11] the

force he used to effectuate her arrest was excessive under the circumstances.  I find that it was

not.

   The record demonstrates that Vasile ordered McKnight to turn around and place

her hands behind her back.  McKnight concedes that she understood Vasile's direction to mean

that she was under arrest; in fact, she testified at her deposition that she thought that Vasile had

explicitly told her she was under arrest.  The record demonstrates that instead of complying with

the order, McKnight first attempted to turn and face the officer to try to talk him out of the arrest

by explaining that she lived there and that the crime had not occurred on her property.  When

that failed, McKnight, as she herself admits, sought to get away from Vasile and retreat inside

her house.  I find that she struggled with him and used her left arm to try to pull herself inside the

house.  Vasile was unable to maintain control of her right arm to handcuff her.  As these actions

were unfolding, McKnight was screaming for her husband and at one point yelled, "Get him."

Vasile attempted a "straight arm bar" technique to combat her resistance, failing in his first

attempt and succeeding in his second.

   At some point during the struggle, Nicholls intervened.  His attempts to unhook

McKnight's arm from the doorway and bring it behind her back were unsuccessful.  Like Vasile,

he was unable to control McKnight's arm because she pulled it away and it slipped from his

grasp.  When McKnight began to turn her body toward Nicholls – an act which he thought could

jeopardize his safety – he sprayed one burst of OC at her face.  The cellphone recording and the

testimony strongly suggest that Vasile's straight arm bar succeeded at almost the same time as,

---

[11]   New York Criminal Procedure Law affords officers the discretion to issue a desk appearance ticket ("DAT") instead of effecting a warrantless arrest for certain offenses.  *See* N.Y. Crim. Proc. Law § 150.20(1). However, "New York state law does not create a protected right in the issuance of a [DAT]; its issuance is purely discretionary." *Bryant v. City of New York*, 2003 WL 22861926, *9 (S.D.N.Y. 2003) (collecting cases), *aff'd*, 404 F.3d 128, 138 (2d Cir. 2005) ("New York's discretionary scheme with respect to the issuance of appearance tickets is well within the range of flexibility allowed to the states with respect to their postarrest procedures").

and perhaps as a result of, Nicholls's burst of pepper spray.  The recording reveals that McKnight was twice ordered to put her arms behind her back before the officers succeeded in handcuffing her.

Considering the totality of the circumstances, I find that Vasile's use of a "straight arm bar" technique to attempt to gain control of McKnight was not unreasonable.  Although obstructing governmental administration and resisting arrest – Class A misdemeanors punishable by terms of imprisonment of not more than one year – are generally not serious crimes, *Marlin v. City of New York*, 2016 WL 4939371, *13 (S.D.N.Y. 2016) ("the crimes with which [p]laintiff was charged – Resisting Arrest and Obstructing Governmental Administration – are undoubtedly minor"), *see also* N.Y. Penal Law §§ 70.15(1), 195.05, 205.30, in this case McKnight was not only actively resisting being taken into custody, but was attempting to retreat into her house where other individuals were evidently present and being summoned by McKnight.

Although Dr. Williams opines that Vasile should not have used any degree of force against McKnight, his opinion conflicts with the law of this Circuit, which makes clear that "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force."  *Sullivan v. Gagnier*, 225 F.3d at 165-66; *Sulkowska v. City of New York*, 129 F. Supp. 2d at 290 ("[a]lthough he effected an unlawful arrest, [the officer's] actions in restraining plaintiff, placing her in handcuffs, and then placing her in the police vehicle . . . were not, as a matter of procedure, unreasonable under the circumstances"); *see also Zellner*, 494 F.3d at 366 (denying motion for new trial to plaintiff who had argued that "jury should have been instructed that if it found in his favor on the false arrest claim, it must also find in his favor on the excessive-force-during-arrest claim, because if the arrest was unlawful no force whatever could be justified"; law does not compel finding of

51

excessive force where arrest is determined to be unlawful); *Rucks v. City of New York*, 96

F. Supp. 3d 138, 146, 152-53 (S.D.N.Y. 2015) (granting plaintiff's motion for judgment as a

matter of law on assault and battery claim where jury determined that the arrest was unlawful but

the force used was not excessive; under New York law, "where an arrest is unlawful and without

consent, the use of force in an arrest *must* give rise to a claim for assault and battery" but not

necessarily a claim for excessive force).  In light of McKnight's refusal to comply with Vasile's

orders to put her hands behind her back, her physical resistance to the officers' efforts to

handcuff her, her attempt to get inside her house, and her calls to others inside the house, I find

that Vasile's conduct in grabbing her arm and his eventual use of the straight arm bar were

reasonable and did not amount to excessive force.  *See Bozung v. Rawson*, 439 F. App'x 513,

520-21 (6th Cir. 2011) (officer's use of straight arm bar technique was not excessive where

plaintiff failed to comply with instructions to place his hands behind his back); *Gino v. Bender*,

2011 WL 1792643, *3 (E.D. Mich. 2011) (officer's use of straight arm bar technique was not

excessive where plaintiff failed to comply with repeated orders to get on the ground, pulled her

arm away, and took a combative posture toward officer); *Cardinal v. Allain*, 2007 WL 3256447,

*4 (M.D. La. 2007) (use of straight arm bar take down not excessive where plaintiff "jerked

away" from officer's attempts to handcuff him).

### 3.     Nicholls's Use of Pepper Spray

I turn now to the question of the reasonableness of Nicholls's use of OC spray

under the circumstances.  As an initial matter, I reject Dr. Williams's opinion insofar as it may be

interpreted to conclude that Nicholls's decision to render assistance to Vasile itself amounted to

excessive force.  (Tr. 575).  On cross-examination, Williams conceded that under the

circumstances, Nicholls was "duty bound to assist" Vasile once he observed McKnight resisting

arrest.  (Tr. 626, 628).  Whether or not he was "duty bound," his decision to intervene was hardly unreasonable.

Assuming that Nicholls was legally entitled to use some degree of force against McKnight, I must determine whether the force that he used was reasonable under the circumstances.  Although my review of the record demonstrates that this is a much closer question, I conclude that it would not have been clear to a reasonable officer that the use of pepper spray against McKnight under the circumstances was unlawful.  Accordingly, I find that Nicholls is entitled to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  In determining whether a defendant is entitled to qualified immunity, courts must evaluate (1) whether the facts establish that the defendant violated plaintiff's constitutional right and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (1990)).  The question whether a right is clearly established turns on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. at 202.  In other words, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 136 S. Ct. at 308.  Thus, qualified immunity provides a broad shield for "all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

53

In this case, Dr. Williams opined that Nicholls's use of OC spray was excessive because less invasive alternatives were available, including verbal commands, which would have been effective in obtaining control over McKnight.  (Tr. 572, 626, 629, 635).  Williams further opined that Nicholls's use of the spray was excessive because two physically fit officers should have been able to physically control McKnight, a shorter, overweight female, without the use of pepper spray and that more effective verbal communication could have diffused the situation. (Tr. 626, 629, 635).

Certainly, the ideal encounter between law enforcement officers and civilians is one that involves the least invasive measures possible to obtain compliance from arrestees.  But the Fourth Amendment does not mandate that an officer's actions conform to a standard of perfection or even best possible police practices; rather, it requires nothing more or less than reasonableness.  In the context of force to effect an arrest, the use of more invasive alternatives does necessarily constitute excessive force.  *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) ("the availability of a less aggressive way of accomplishing an arrest [does not] necessarily mean[] that the technique that was used is thereby shown to have been excessive").  Rather, "[p]olice officers must be entitled to make a reasonable selection among alternative techniques for making an arrest."  *Id.*

Unquestionably, "infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects, . . . and, as such, its use constitutes a significant degree of force."  *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010).  Thus, many courts "have made clear that [pepper spray] should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer. *Id.* (collecting cases); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("[c]ourts have

consistently concluded that using pepper spray is excessive force in cases where the crime is a

minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no

threat to the officers or anyone else"). On the other hand, courts have made clear that the use of

pepper spray may be reasonable to subdue an individual who is actively resisting arrest or poses

a threat to public or officer safety. *See Nigro v. Carrasquillo*, 663 F. App'x 894, 897 (11th Cir.

2016) (officer's use of pepper spray was not excessive where plaintiff was resisting arrest and

violently kicking the patrol car"); *Kenney v. Floyd*, 700 F.3d 604, 610 (1st Cir. 2012) (use of

pepper spray was not excessive where plaintiff "was not a peaceful, compliant, and secured

suspect who could pose no threat to the officer seeking to detain him") (quotations omitted);

*Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) ("[i]t was also reasonable to use mace to

attempt to control [plaintiff] under the circumstances, which involved a physical struggle both

before and after placing him in handcuffs") (citing *Brooks v. City of Aurora*, 653 F.3d 478, 486

(7th Cir. 2011) ("[c]ourts often have held that it is reasonable to use pepper spray against a

suspect who is physically resisting arrest")); *Vinyard v. Wilson*, 311 F.3d at 1348 ("[c]ourts have

consistently concluded that using pepper spray is reasonable, however, where the plaintiff was

either resisting arrest or refusing police requests"); *Wagner v. Bay City*, 227 F.3d 316, 324 (5th

Cir. 2000) (officers' use of pepper spray was objectively reasonable given the dangerous

situation and their attempts to restrain a suspect who was physically resisting arrest); *Dawson v.

City of Yonkers Police Dep't*, 2001 WL 969005, *4 (S.D.N.Y. 2001) ("it was reasonable for the

officers to use force and pepper spray to subdue [plaintiff]" where he resisted arrest by kicking

and punching).

       As the caselaw demonstrates, the reasonableness of the use of pepper spray

depends heavily upon the circumstances confronting the officer. As recently as 2015, the Second

Circuit addressed the reasonableness of the use of pepper spray in a case in which an individual refused to submit to handcuffing. *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015). The Court affirmed that questions of whether an arrestee was fleeing, physically assaulting, or posing a threat to officer safety remain central to the determination of the reasonableness of the force used. *Brown v. City of New York*, 798 F.3d at 100-03. As the Court acknowledged:

> The continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts. . . . In this case, the majority and the dissent differ on that legal issue.

*Id.* at 103.

The majority in *Brown* reasoned that summary judgment in favor of the defendants on an excessive force claim was inappropriate because the officers had used pepper spray to arrest for a minor crime a smaller female who was refusing to be handcuffed, but was not attempting to flee and posed no the threat to the officers. *Id.* at 102-03. The dissent noted that the plaintiff had "energetically resist[ed] arrest" and reasoned that "the fact that a suspect 'actively resist[s] arrest,' by itself, 'necessitat[es] a forceful response.'" *Id.* at 108, 110 (Jacobs, J., dissenting in part) (quoting *Tracy v. Freshwater*, 623 F.3d at 97). The disagreement between the majority and the dissent highlights the uncertainty facing officers in the field. Indeed, on remand, the district court determined that the officers were entitled to qualified immunity. *Brown v. City of New York*, 2016 WL 1611502, *8 (S.D.N.Y. 2016).

In this case, the questions to be resolved are whether Nicholls's use of pepper spray violated McKnight's constitutional rights and, if so, whether its unlawfulness would have been clear to a reasonable officer faced with the circumstances that Nicholls confronted. I conclude that even if Nicholls's use of the spray amounted to excessive force, the law was not

sufficiently settled to conclude that every reasonable officer in Nicholls's position would have understood that use of the spray under the circumstances was unlawful.

When Nicholls first observed the altercation, he saw McKnight actively attempting to pull away from Vasile to avoid arrest.  By the time he arrived on the porch, he observed that McKnight had hooked her arm to the doorway and was struggling with Vasile to try to get inside the house.  Nicholls attempted unsuccessfully to unhook McKnight's arm from the doorway and get her hands behind her back.  Although Nicholls himself did not warn McKnight before deploying the OC spray, *Whitfield v. City of Newburgh*, 2015 WL 9275695, *16 (S.D.N.Y. 2015) ("[w]e have previously concluded that an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation"), he testified that he deployed the spray after he failed to gain control of her and in the moment that she turned toward him and he felt vulnerable to a physical threat, such as a punch.[12]  *See Bozung v. Rawson*, 439 F. App'x at 520 (in determining that force used was reasonable, court noted "it may have been difficult for the officers to judge [arrestee's] intentions" to harm officers); *cf. Brown*, 798 F.3d at 102 (noting that plaintiff was not "making a move that an officer could reasonably interpret as threatening an attack").

Indeed, on cross-examination, Dr. Williams conceded that McKnight's attempts to flee into the house and her direction to unidentified occupants to "get him" raised genuine officer safety concerns that necessitated McKnight's removal from the scene as quickly as possible.  (Tr. 619, 621-23).  Under circumstances similar to these – where an individual is actively resisting arrest and refusing orders, and the scene presents a risk to officer safety –

---

[12]  I disagree with McKnight to the extent that she contends that Vasile had control of her before Nicholls deployed the spray.  (Docket # 83 at 20-21, ¶ 27, 63).  Specifically, I find that the record demonstrates that McKnight was not physically under the control of the officers and was turning to face Nicholls at the time Nicholls resorted to the spray.

courts have granted judgment to the officers on the grounds that the use of pepper spray was not

excessive or that the officers were entitled to qualified immunity.  *Brooks v. City of Aurora*, 653,

F.3d at 481, 487 (7th Cir. 2011) (officer who deployed pepper spray to subdue arrestee who was

fleeing toward his home and ignoring police commands entitled to qualified immunity;

"controlling law would not have communicated to a reasonable officer the illegality of applying

pepper spray to an arrestee" under the circumstances); *Greene v. Barber*, 310 F.3d 889, 899 (6th

Cir. 2002) (use of pepper spray against individual verbally resisting arrest and refusing to permit

officer to handcuff him not clearly unlawful; "[w]e are satisfied that a reasonable officer in

[defendant's] position would not necessarily have known that it might be unlawful for him to use

pepper spray on a plaintiff who was actively resisting arrest"); *Brown v. City of New York*, 2016

WL 1611502 at *8 (officers who deployed pepper spray entitled to qualified immunity where

plaintiff refused orders to place her hands behind her back for handcuffing and was taken to the

ground by officers); *Schoettle v. Jefferson County*, 2014 WL 1117587, *7 (E.D. Mo. 2014)

("[p]laintiff admits that throughout the encounter, he struggled against the officers and refused to

permit them to handcuff him[;] [i]n light of this resistance, it was reasonable for the officers to

use force to attempt to handcuff him, including pepper spray"), *aff'd*, 788 F.3d 855 (8th Cir.

2015); *Brown v. Rinehart*, 575 F. Supp. 2d 620, 625 (D. Del. 2008) ("[i]t is undisputed that

plaintiff failed to comply and attempted to run into the house to evade arrest[;] . . . [w]hen

plaintiff continued to resist, it was reasonable for the officers to physically restrain him and to

administer the [pepper spray]), *aff'd*, 325 F. App'x 47 (3d Cir. 2009); *Kaylor v. Rankin*, 356

F. Supp. 2d 839, 851-52 (N.D. Ohio 2005) (officer entitled to qualified immunity for use of

pepper spray during course of an unlawful arrest, even though crime was not severe and plaintiff

was not threatening anyone's safety or attempting to flee, "[o]nce the officers undertook to arrest

him, . . . he actively resisted arrest, did so in an aggressive and physical manner, and continued to do so until finally subdued"); *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 703 (W.D. Ky. 2001) ("[n]o one disputes that [p]laintiff was belligerent, ignored reasonable requests, and at the least, passively resisted arrest" by refusing to permit the officers to handcuff him; "in these circumstances, a reasonable police officer could believe that [defendant's] decision to use O.C. spray was proper and certainly was not excessive force").

Judged under this authority, I find that a reasonable officer in Nicholls's position would not have clearly understood that resort to one burst of pepper spray was unlawful. Accordingly, Nicholls is entitled to qualified immunity on McKnight's Section 1983 claim for excessive use of force.

### C.   **Battery**[13]

Under New York state law, "a battery is the intentional wrongful physical contact with another person without consent." *Sulkowska*, 129 F. Supp. 2d at 294 (internal quotations omitted). Moreover, "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute [a] . . . battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Id.* (collecting New York cases); *see Rucks v. City of New York*, 96 F. Supp. 3d at 153 ("where an arrest is unlawful and without consent, the use of force in an arrest *must* give rise to a claim for . . . battery"). Because Vasile lacked probable cause or arguable probable cause to arrest McKnight, Vasile is liable for battery. *See Sulkowska*, 129 F. Supp. 2d at 294 ("[b]ecause plaintiff's arrest was unlawful in this case, the [c]ourt finds that [defendant] is liable for [a] . . . battery on plaintiff because, without her consent, he placed his hands on her, handcuffed her, and placed her into his police vehicle during the course of the

---

[13]   McKnight's post-trial submission makes clear that she seeks to recover for battery, not assault.  (Docket # 83 at 66).

unlawful arrest"); *see also Rucks*, 96 F. Supp. 3d at 154 ("in the context of an unlawful arrest, any use of force constitute[s] battery"). Nicholls, by contrast, has qualified immunity for false arrest and use of force, and his physical contact with her was thus not "wrongful" and he is not liable for battery.

  **D.** **Abuse of Process**

    Under New York state law, a claim for abuse of process requires a showing that defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)); *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (N.Y. 1984) ("[a]buse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective"). McKnight maintains that defendants[14] are liable for abuse of process because Vasile arrested McKnight and initiated criminal proceedings against her in retaliation for her conduct toward him while he was attempting to secure the crime scene. (Docket # 83 at 65 ("[t]he cumulative effect of these . . . perceived insults surely led Vasile to reach the conclusion that plaintiff was subjecting him to enough of her 'shit' to require (in his mind) the application of violent assaults upon her body, an arrest, and prosecution of crimes")). I find that McKnight has failed to carry her burden with respect to this claim.

    As the Second Circuit has noted, "the gist of abuse of process is the improper use of process after it is regularly issued." *Cook v. Sheldon*, 41 F.3d at 80 (quoting New York

---

[14] McKnight's post-trial submission suggests that she is asserting this claim against Vasile, not Nicholls. (Docket # 83 at 64-66). However, because it is not entirely clear whether McKnight seeks to hold Nicholls liable for abuse of process, I address the claim as against both defendants.

Pattern Jury Instructions § 3:51). Under this reasoning, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 261 (N.D.N.Y. 2014) (quoting *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995)); *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 131 (S.D.N.Y. 2012) (same), *aff'd*, 654 F. App'x 16 (2d Cir. 2016).[15]

      McKnight has failed to establish that either defendant was involved in her criminal prosecution after Vasile swore out the criminal complaints. At most, the record establishes that Nicholls assisted with her arrest; he had no involvement with her thereafter. With respect to Vasile, he transported her to the Public Safety Building for booking and signed the criminal complaints against her. I find these actions insufficient to establish abuse of process. *See Marcano v. City of Schenectady*, 38 F. Supp. 3d at 261 (dismissing abuse of process claims against officers where there was no evidence that the officers "had any involvement in the prosecution of the criminal case against [p]laintiff after they issued the criminal complaints"); *Mesa*, 2013 WL 31002 at *27 ("there is simply no indication from the record that [d]efendants were engaged in post-process, collateral abuse of the legal system"); *Gilman*, 868 F. Supp. 2d at 133 ("[d]efendants' alleged wrongdoing occurred before [p]laintiffs' indictment, and the mere

---

[15]  In *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 530 (N.Y. 1991), the New York Court of Appeals suggested in *dicta* that its holdings would not necessarily "preclude an abuse of process claim based on the issuance of the process itself," but ultimately left open the question of whether "abuse of process requires some improper conduct *after* issuance of process." However, in *Cook*, a decision that post-dates *Parkin*, the Second Circuit articulated that abuse of process centers on the question of improper use of process "after it is regularly issued." *Cook*, 41 F.3d at 80. More recently, a New York appellate court affirmed this requirement. *Place v. Ciccotelli*, 121 A.D.3d 1378, 1380 (3d Dep't 2014) ("[i]n general, such a claim will only lie for improperly using process after it is issued").

      I agree with those courts that have concluded that *Cook* is binding. *See Mesa v. City of New York*, 2013 WL 31002 at *26 (collecting cases); *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d at 131 ("the *dicta* quoted by [p]laintiffs from *Parkin* does not alter the established law governing malicious abuse of process claims") (quoting *Richardson*, 2009 WL 804096). *But see Crockett v. City of New York*, 2015 WL 5719737, *10 (E.D.N.Y. 2015) (quoting *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d at 530).

act of issuing process does not give rise to a claim") (internal quotations omitted); *Richardson*, 2009 WL 804096 at *17 ("[b]ecause [p]laintiff has failed to adduce evidence that [d]efendants' improperly sought to pursue a collateral objective after the issuance of the summonses, [d]efendants' motion for summary judgment is granted"); *Taylor v. City of New York*, 2006 WL 1699606, *5 (S.D.N.Y. 2006) ("plaintiff does not allege that the process was improperly used after it was issued but only that defendants acted maliciously when they initialized the action[;] . . . [t]he legal process itself was used for what it was intended for, to adjudicate criminal complaints"); *Perciaccanto v. City of New York*, 47 Misc. 3d 1216(A), *14 (N.Y. Sup. Ct. 2015) ("the evidence proffered by defendants establish that while they arrested plaintiff and initiated his prosecution, they were not involved in the perversion of that process [after it was commenced] so as to obtain a collateral advantage").

Even if there were evidence that defendants participated in furthering the criminal prosecution of McKnight after the complaints were signed, the evidence fails to establish that defendants acted with an improper collateral purpose. "[T]he New York Court of Appeals has made clear that '[a] malicious motive alone … does not give rise to a cause of action for abuse of process[;]' . . . [rather,] [i]n order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper *purpose* for instigating the action." *Savino v. City of New York*, 331 F.3d at 77 (quoting *Curiano v. Suozzi*, 63 N.Y.2d at 117). Thus, pursuant to New York law, "to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against [her] by pursuing [her] arrest and prosecution[,] [but] must claim that they aimed to achieve a collateral purpose beyond or in addition to [her] criminal prosecution." *Id.* Wrongful collateral purposes under New York law include "economic harm, extortion, blackmail, and retribution." *Marcano*, 38 F. Supp. 3d at

261; *see also Richardson*, 2009 WL 804096 at *16 ("the collateral objectives typically associated

with abuse of criminal process are extortion, blackmail or retribution; and those objectives are

usually characterized by personal animus") (internal quotation omitted).

McKnight argues that Vasile arrested her and signed the criminal complaints in

retaliation or punishment for her verbal objections to his placement of the crime scene tape at her

residence.  (Docket # 83 at 65).  Even if true, a retaliatory motive is insufficient to establish a

claim for abuse of process.  *See Coleman v. City of New York*, 585 F. App'x 787, 788 (2d Cir.

2014) (summary order) ("retaliation for some offense will not suffice as a collateral motive for

the purposes of an abuse of process claim"); *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir.

2007) (summary order) ("the falsity of the allegations and defendant's malicious motive in

making them do not, of themselves, give rise to a cause of action for abuse of process where the

process was both issued and used for its intended purpose") (internal quotations omitted);

*Jean-Laurent v. Bowman*, 2014 WL 4662221, *9 (E.D.N.Y.) (improper motive is insufficient to

establish abuse of process), *report and recommendation adopted*, 2014 WL 4662232 (E.D.N.Y.

2014); *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 392 (E.D.N.Y. 2013) (granting summary

judgment on abuse of process claim where plaintiff failed to raise an issue of fact "regarding the

existence of a collateral purpose other than that of securing his arrest and prosecution"; "[e]ven

assuming that defendants acted with a malicious motive, such as personal animus, in arresting

[plaintiff], plaintiff alleges merely that they employed legal process for the purpose . . . for which

the law created it").

To the extent McKnight's argument may be read more broadly to allege that

Vasile also signed the criminal complaints in order to attempt to justify his use of force against

McKnight, such allegations are likewise insufficient to suggest a collateral objective, as opposed

to an improper motive. *See Gilliard v. City of New York*, 2013 WL 521529, *14 (E.D.N.Y.

2013) ("[a]t most, [d]efendants issued the summons with the improper *motive* of covering up

their abuse of authority in arresting plaintiff . . . [,][b]ut an improper motive does not equate to an

improper purpose; the [d]efendants used the process of the court for the purposes for which the

law created") (internal quotations and brackets omitted); *Dotson v. Farrugia*, 2012 WL 996997,

*8 (S.D.N.Y. 2012) (plaintiff's contention that the summons was issued to plaintiff in retaliation

"for his perceived affront, and to attempt to cover up the wrongdoing of the [c]ourt [o]fficers in

having arrested plaintiff was insufficient to state a claim for abuse of process; "[t]hese

allegations, however, even if taken as true, do not support a claim for abuse of process, because

they allege only an improper motive, which is not actionable, rather than an ulterior collateral

purpose or objective, which may be") (internal quotations omitted); *Crews v. County of Nassau*,

2007 WL 4591325, *12 (E.D.N.Y. 2007) ("[b]ecause plaintiffs have merely alleged that

defendants were motivated by their desire to cover up their misdeeds, but not that defendants had

a purpose other than to prosecute [plaintiff], the abuse of process claim fails").  In any event, I

find no persuasive evidence in the record to support the proposition that Vasile's purpose in

initiating the charges was to cover up his conduct in order to avoid adverse consequences to

himself. *See Brenner v. Heavener*, 492 F. Supp. 2d 399, 404 (S.D.N.Y. 2007) ("[plaintiff]

presents no concrete evidence from the record that . . . provides any basis for a reasonable

inference that [defendants] were motivated by a scheme to cover up their alleged misconduct");

*see Mesa*, 2013 WL 31002 at *27 ("there is no evidence in the record to indicate that

[d]efendants sought to abuse th[e] legal process in order to achieve some other, nefarious end").

   For the reasons discussed above, I conclude that defendants are entitled to

judgment on McKnight's claim for abuse of process.

E.  **Damages**

Before determining the issue of damages, this Court believes that it would be prudent to invite both parties to submit memoranda of law addressing the question of an appropriate award of damages on the claims on which McKnight has prevailed.  On the issue of compensatory damages, McKnight has cited only one case in a letter dated July 17, 2016; defendants have cited none.  While both parties have addressed punitive damages in their post-trial memoranda, they have devoted fairly scant attention to the issue of whether punitive damages are warranted here and, if so, what an appropriate punitive damages award would be.[16] McKnight has cited no caselaw in her three-page discussion; the few cases defendants have cited in their one-paragraph discussion add little to illuminate the question of whether punitive damages are warranted on the circumstances presented by this case.

Accordingly, plaintiff shall file her memorandum of law on the question of damages by no later than **April 24, 2017**; defendant Vasile shall file his by no later than **May 8, 2017**.

**CONCLUSION**

For the reasons stated above, judgment shall be awarded in favor of McKnight on her claims against Vasile for false arrest, false imprisonment, and battery.  Judgment shall be

---

[16] Of course, punitive damages are a remedy, not an independent cause of action.  *See Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 563 (W.D.N.Y. 2013).

awarded in favor of defendants on all other counts.  The Clerk of the Court is hereby directed to

enter judgment accordingly.

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
     March 30, 2017