UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MIRIAM McKNIGHT,

                                 Plaintiff,

          v.

G. VASILE,

                               Defendant.
_____

<u>DECISION & ORDER</u>

11-CV-6328P

By Decision and Order dated March 30, 2017, this Court granted judgment in favor of plaintiff Miriam McKnight ("McKnight") against defendant Gregory Vasile ("Vasile") on her state law claims for false arrest and imprisonment, and battery. (Docket # 87). Judgment was granted in favor of Vasile and Michael Nicholls ("Nicholls") on the remaining claims. (*Id.*). Familiarity with the Court's lengthy decision, which followed a bench trial, is assumed.

The Decision and Order did not determine the issue of damages, noting that the parties had devoted "fairly scant attention" to it in their post-trial memoranda, and ordered them to submit supplemental memoranda on the issues of compensatory and punitive damages. (*Id.* at 65). Both parties have done so (Docket ## 94, 96), and the Court has considered those submissions. The issue of damages is ripe for determination.

## **<u>COMPENSATORY DAMAGES</u>**

The goal of compensatory damages is "to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred."

*McDougald v. Garber*, 73 N.Y.2d 246, 254 (N.Y. 1989). Accordingly, such damages should be awarded in an amount appropriate "to compensate the victim, not to punish the wrongdoer." *Id.* at 253-54; *see also Presler v. Compson Tennis Club Assocs.*, 27 A.D.3d 1096, 1097 (4th Dep't 2006). Moreover, "[a] basic principle of compensatory damages is that an injury can be compensated only once." *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996). Accordingly, where a defendant is found liable on two causes of action providing a legal basis to compensate the same injury, the plaintiff is only entitled to recover once. *Id.*

"Generally, a plaintiff may recover for loss of earnings, medical expenses, and mental and physical pain and suffering attributable to the defendant's [tortious conduct]." *Robinson v. United States*, 330 F. Supp. 2d 261, 290 (W.D.N.Y. 2004). Monetary awards for pain and suffering are "inherently subjective . . . , not subject to precise quantification, and generally present[] a question of fact." *Leto v. Amrex Chem. Co.*, 85 A.D.3d 1509, 1511 (3d Dep't 2011) (internal quotations omitted); *see Saladino v. Stewart & Stevenson Servs., Inc.*, 2011 WL 284476, *3 (E.D.N.Y. 2011) ("[b]oth federal and state courts have long acknowledged that, in contrast to economic damages, awards for pain and suffering 'do not lend themselves as easily to computation,' and a precise measure is simply 'impossible'") (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998) and *Braun v. Ahmed*, 127 A.D.2d 418, 424 (2d Dep't 1987)), *aff'd*, 500 F. App'x 69 (2d Cir. 2012). "'Factors to be considered in evaluating such awards include the nature, extent and permanency of the injuries, the extent of past, present, and future pain and the long-term effects of the injury,' including the effect on the capacity to enjoy life, engage in daily tasks and/or activities that once brought pleasure, as well as any loss of self-esteem." *Cody v. State of New York*, 59 Misc. 3d 302, 314 (N.Y. Ct. Cl. 2017)

(quoting *Nolan v. Union Coll. Trust of Schenectady, N.Y.*, 51 A.D.3d 1253, 1256 (3d Dep't), *lv. denied*, 11 N.Y.3d 705 (N.Y. 2008)).

Compensable damages caused by an unlawful arrest generally include two components: "(1) deprivation of liberty and (2) tangible injury, which includes physical harm, embarrassment, and emotional suffering." *Martinez v. Port Auth. of N.Y. and N.J.*, 2005 WL 2143333, *19 (S.D.N.Y. 2005), *aff'd*, 445 F.3d 158 (2d Cir. 2006); *see McPherson v. City of New York*, 122 A.D.3d 809, 810 (2d Dep't 2014) ("[c]ompensatory damages for false arrest are typically warranted even when the sole or primary injury suffered is loss of liberty"); *Sanabria v. State of New York*, 29 Misc. 3d 988, 993 (N.Y. Ct. Cl. 2010) ("[s]uch damages may include noneconomic damages for mental anguish and economic damages for loss of earnings . . . , as well as noneconomic damages for loss of liberty during a period of unlawful confinement"). Deprivation of liberty damages "redress the denial of free movement and the violation done to [an individual's] dignity, as a result of the unlawful detention, and not the physical and mental injuries arising from the incident." *Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990); *see Sanabria v. State of New York*, 29 Misc. 3d at 994 ("[d]amages attributable to loss of liberty include damages for the loss of the fundamental right to be free, lost opportunities to engage in everyday activities while confined, and for the mental anguish that accompanies the loss of liberty").

The record demonstrates that McKnight sustained physical injuries and suffered ongoing emotional injuries as a result of her interaction with Vasile and Nicholls on July 3, 2010, her arrest by them that night, her detention in jail until the following morning, and her subsequent prosecution. McKnight's physical injuries consisted of lacerations and scarring to her left arm and, as a result of Nicholls's use of pepper spray, eye and skin pain and discomfort

and breathing difficulties, the intensity of which was substantial the night of her arrest and dissipated over the course of a week. Those injuries are described in much greater detail in my earlier decision. (*See* Docket # 87 at 19-20).

Testimonial evidence of McKnight's emotional injuries was offered by McKnight herself and by Charles Ewing, PhD, a forensic psychologist who was retained to evaluate her "to determine whether and[,] if so[,] to what extent she was psychologically injured by the actions taken against her by employees of the City of Rochester on July 3rd and 4th, 2010 and *subsequently*." (*Id.* at 22 (emphasis added)). Dr. Ewing opined that McKnight suffered from "reoccurring episodes of major depression" and post-traumatic stress disorder ("PTSD") as a direct result of her treatment by Vasile and Nicholls and the related criminal proceedings. (*Id.*). Dr. Ewing's testimony concerning the symptoms, characteristics, severity, effects, and duration of McKnight's psychological injuries, and her prognosis for improvement, are described in significant detail in my earlier decision. (*See id.* at 22-25).

As an initial matter, I find the expert testimony of Dr. Ewing, a well-credentialed and extremely experienced forensic psychologist, credible and helpful to the Court. Among other findings, Dr. Ewing concluded that McKnight was not a malingerer and did not exaggerate her injuries. (*Id.* at 25). Considering that opinion, and based upon my own observations of McKnight's demeanor and assessment of her testimony, I find that McKnight testified credibly regarding her emotional injuries.

The challenge here is not the determination of how much weight to accord the testimony of the plaintiff and her expert – they persuasively testified concerning the serious and persistent emotional injuries she suffered; the challenge is how to apportion the damages from her injuries to the tortious conduct – false arrest and imprisonment, and battery – for which

Vasile has been found liable. Significantly, he was not found liable for excessive use of force, Nicholls was not found liable for false arrest and imprisonment, battery, or excessive use of force, and neither was held liable for malicious prosecution (a claim dismissed before trial). These determinations are important because it was Nicholls, not Vasile, who deployed pepper spray to effect McKnight's arrest and because, as Dr. Ewing's testimony makes clear,[1] her subsequent prosecution (which lasted several months and culminated in the dismissal of the charges pursuant to an adjournment in contemplation of dismissal agreement (*see id.* at 25)) contributed to her psychological injuries.

McKnight argues in her damages submission that Vasile should be held liable for her physical injuries arising from her arrest because it was reasonably foreseeable that Nicholls would use pepper spray to subdue her. (Docket # 94 at 22-24). Although McKnight is entitled to damages proximately caused by Vasile's tortious conduct, including those that were reasonably foreseeable, I disagree that Vasile reasonably should have foreseen that McKnight would resist his attempt to take her into custody. The record is clear that both McKnight and Vasile understood his direction to her to put her hands behind her back as a statement that she was under arrest. (Docket # 87 at 50). Even though that arrest was unlawful for the reasons explained in my earlier decision, McKnight was not permitted to resist physically, as she did. *See* N.Y. Penal Law § 35.27; *Rinaldi v. City of New York*, 756 F. Supp. 111, 116 (S.D.N.Y. 1990) (citing N.Y. Penal Law § 35.27). In other words, it was reasonable for Vasile to foresee that McKnight would comply with his direction, not resist – conduct that prompted a fellow officer to intervene and deploy pepper spray. A contrary rule would lead to the perverse result of making officers liable for all physical injuries sustained by a person subject to an arrest that was

---

[1] For example, Dr. Ewing testified, "[T]hose July 3rd and 4th incidents plus the following criminal justice proceedings against her made her severely depressed." (Docket # 82 at 134).

subsequently determined to lack probable cause no matter how aggressive or combative that person was in resisting arrest.

Here, I find that Vasile is properly accountable for damages arising from McKnight's handcuffing and placement into and removal from his police car. Those acts are the physical intrusions onto her body that resulted from her unlawful arrest, and for which Vasile is legally responsible. The injuries to her arm and from the burst of pepper spray resulted from Nicholls's actions in attempting to take her into custody – actions that were not and should not have been reasonably foreseeable to Vasile.[2]

With respect to compensatory damages for emotional injuries, Vasile is plainly responsible for those psychological injuries caused by his unlawful arrest and handcuffing, the removal of McKnight from her residence in handcuffs, detention in a police car, non-consensual transportation to the Public Safety Building, and detention overnight in a holding cell. Because her claim for malicious prosecution was previously dismissed, Vasile is not responsible for any injuries, or aggravation of other injuries, caused by the criminal prosecution. The Court is mindful that both McKnight and Dr. Ewing testified about the nature, severity, and effects of her depression and PTSD caused by both her arrest and prosecution, and that the award of damages may not be based on injuries caused by her prosecution.

The trial record convincingly establishes that McKnight suffered substantial emotional injuries as a result of being arrested without cause in the presence of her two teenaged

---

[2] I have already determined that neither officer is liable for the use of excessive force in the arrest. (Docket # 87 at 48-58). Of course, if that determination had been different, the officer(s) would be liable for her physical injuries, albeit for damages arising from a different violation (a Section 1983 violation).

In addition, with respect to McKnight's left arm injuries, the record strongly suggests they were caused by Nicholls's attempt to unhook it from the door frame. (*See id.* at 13). Even if Vasile's actions had resulted in the injuries, the record demonstrates that McKnight's attempt to physically resist rather than submit to arrest caused the injuries.

sons on the porch of her own home. Despite having nothing to do with the serious crime under investigation, and despite having called 911 to report it, McKnight was arrested thirteen seconds after first speaking to Vasile about her objection to the placement of crime scene tape on her property. She was handcuffed, publicly removed from her property and placed in a police car at approximately 11:25 p.m., which remained on the scene for approximately twenty-five minutes. (*See* Docket # 87 at 14). She was transported to the Public Safety Building, booked, and held in a cell until her release the following morning at approximately 10:00 a.m., nearly eleven hours later. (Docket # 76 at 101). The only testimony offered about the conditions of the cell was that it did not have a bed. (*Id.* at 101-102).

In McKnight's own words, when she was released from jail, she was "devastated[;] . . . I had just spent the night in jail in my opinion for no reason." (Docket # 87 at 20). She was especially "devastated that [her] children had to witness" her arrest. (Docket # 76 at 131). She explained that she became "embarrassed, hurt, scared, [and] depressed." (Docket # 87 at 21). By contrast to the positive and confident person she was before her arrest, she became socially withdrawn, fearful of the police, distrustful of others, had nightmares, and drank more. (*Id.*). McKnight testified:

> When something bad happens to you or something happens to you, usually the first thing you do is you call the police to help you, and to have been violated by them in that manner really affected me because if you can't call the police[,] who can you call.

(Docket # 76 at 132). McKnight's marriage failed. (Docket # 87 at 21). She did not seek mental health treatment and eventually obtained a job. (*Id.*).

Dr. Ewing testified that the events of July 3, 2010, and the subsequent criminal proceedings, caused McKnight significant emotional injuries – specifically, "reoccurring episodes of major depression" and PTSD. (*Id.* at 22). My earlier Decision and Order

7

summarized Dr. Ewing's testimony about the symptoms that she suffered from each disorder and how the disorder affected her life:

> [With respect to major depressive symptoms,] [Dr. Ewing] concluded that she suffered "nearly all" of the following symptoms . . . as a result of defendants' conduct:
>
> > remarkably diminished interest in activities that previously would have brought joy or satisfaction[,] [a]ppetite loss . . . , sleep problems, . . . loss of libido, sexual interest, fatigue[,] [s]ometimes psychomotor retardation or agitation . . . [,] [f]eelings of worthlessness and loss of self-esteem, diminished ability to think and concentrate and in some cases reoccurring thoughts of death or suicide.
>
> (Tr. 647-48).
>
> With respect to the manifestations of depression in McKnight's life after her July 2010 arrest, Dr. Ewing testified that McKnight experienced feelings of embarrassment, shame, worthlessness, and diminished self-esteem. (Tr. 648). She developed difficulty sleeping almost immediately, experienced nightmares, began to lose her appetite, lost interest in sex, lost interest in socializing with friends and family, developed excessive worry over her sons and fear of the police, experienced fatigue, was prone to crying bouts, and generally felt hopeless. (Tr. 648-54). According to Ewing, McKnight denied contemplating suicide. (Tr. 649). She resorted to daily alcohol use to address depression and anxiety, which developed into alcoholism. (Tr. 650). By the time she met with Ewing in 2015, she had ceased using alcohol, but acknowledged that sobriety was a daily struggle. (Tr. 657). She became so fearful of the police, Ewing testified, that she avoided going to places where police were likely to be present. (Tr. 654-55).
>
> According to Ewing, McKnight continued to experience depression at the time of their meeting in July 2015. (Tr. 650). He characterized her depression as "not nearly as bad as it had been in previous years," but explained that she remained depressed and still suffered "periodic bouts of major depressive episodes or disorder." (Tr. 656). Ewing testified that the reoccurrences were "becoming further apart and less serious." (Tr. 669).
>
> As to his diagnosis of PTSD, Dr. Ewing explained:

8

> > [PTSD] involves being subjected to or witnessing a situation that is either life threatening or potentially life threatening and thereafter being subjected to a variety of [specific] symptoms.
>
> (Tr. 658). PTSD symptoms that Ewing indicated McKnight suffered included "intrusive thoughts on a regular basis," nightmares, "efforts to avoid stimuli that remind [her] of the incident," social alienation, and hypervigilance "sometimes bordering on paranoia." (Tr. 658-59).
>
> With respect to the manifestations of PTSD, Ewing testified that McKnight is "constantly alert" to the concern that police may show up or that her sons may be victimized by the police. (Tr. 659). He explained that she has altered the way in which she lives and now leads a "very sheltered" life so as to avoid "anything out of the ordinary." (Tr. 661). Ewing characterized her emotional PTSD symptoms as follows:
>
> > She sticks to her routine. She's afraid to go outside that routine for fear that something like this will happen again. . . . [P]rior to this time she had very positive feelings about her future, but since the events of 2010 she said she feels like her life has been ruined, but toward the end of the evaluation I did with her she acknowledged that she does still have some hope that some day she'll get over this.
>
> (Tr. 661-62).

(*Id.* at 22-24).

With respect to McKnight's mental health prognosis, Dr. Ewing testified that McKnight needs and would benefit from psychotherapy and medication for depression and anxiety. (*Id.* at 24). In his opinion, McKnight likely "would feel subjectively better in terms of the depression," but likely would never completely recover from her PTSD. (*Id.*).

Considered together, McKnight's and Dr. Ewing's testimony credibly establishes that McKnight suffered serious psychological injuries from her confrontation with Vasile, subsequent arrest, overnight detention in jail, and subsequent prosecution. That she had

9

previously been jailed overnight in connection with a dispute with her ex-husband (which apparently did not result in any conviction) does not undermine or vitiate the emotional distress and indignity that she experienced as a result of being wrongfully arrested by the police in front of her children at her own home. McKnight's claims that this injustice caused her to experience profound problems trusting others, especially the police, are not only believable, but make sense. Her decision to call 911 to report a serious criminal incident reflected her belief at the time that the police could be trusted to help and to respond appropriately. Her arrest – without explanation or warning – merely minutes after that call, and thirteen seconds after first speaking to Vasile, for "this shit" understandably humiliated her, angered her, and eviscerated her trust in those she had appropriately called for help. Her shame, anger and indignity were only intensified by her custodial detention, first in the backseat of the squad car on the street in front of her house (*see* Docket # 77 at 280, 330) and then in a jail cell until the following morning. That experience, it seems to me, is far different from her earlier experience of being jailed as a result of a dispute with her ex-husband and does not discredit her claimed emotional injuries.

In sum, I credit McKnight and Dr. Ewing's testimony that her unlawful arrest and prosecution caused serious depressive and PTSD symptoms that interfered substantially with her personal relationships and day-to-day functioning and enjoyment of life. McKnight's depressive symptoms have improved over time. At the time of trial, they occurred less frequently and less intensively, and were likely to continue to improve, especially with treatment. Her PTSD symptoms have altered the way she lives, making her more reliant on routines, and its symptoms are unlikely to abate entirely, according to Dr. Ewing. Certainly, the months-long prosecution perpetuated and intensified McKnight's emotional injuries and, as previously explained,

McKnight may not recover damages arising from the prosecution, only the unlawful arrest and related battery.

In determining an award of compensatory damages, courts may review awards in other cases involving similar claims and injuries, "bearing in mind that any given judgment depends on a unique set of facts and circumstances." *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993). On this record, I find that an award of damages in the amount of $190,000 for her emotional and deprivation of liberty injuries and $1,000 for her compensable physical injuries (which excludes the arm injuries and pepper spray injuries for the reasons explained *supra*) would fairly compensate McKnight for the damages she suffered as a result of Vasile's tortious conduct (false arrest and battery). *See*, *e.g.*, *Colon v. City of New York*, 2012 WL 691544, *15 (E.D.N.Y.) (recommending award of compensatory damages in amount of $50,000 to plaintiff who was falsely arrested, spent 36 hours in custody, and suffered from major depressive disorder and acute PTSD), *report and recommendation adopted by*, 2012 WL 686878 (E.D.N.Y. 2012); *Martinez v. Port Auth. of N.Y. and N.J.*, 2005 WL 2143333 at *17-22 (remitting jury award of compensatory damages in amount of $1,000,000 to $360,000 where plaintiff was falsely arrested, spent 19 hours in jail, and suffered PTSD as a result; noting "false arrest awards vary widely" and collecting cases); *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 304-309 (S.D.N.Y. 2001) (awarding compensatory damages in amount of $275,000 to plaintiff who was falsely arrested, was detained for approximately 15 hours, suffered minimal physical injuries relating primarily to the application of handcuffs, and suffered "significant," "intense and pervasive" PTSD and depression); *see also Levans v. Delta Airlines, Inc.*, 2016 WL 9447211, *11 (E.D.N.Y. 2016) (collecting cases demonstrating "broad range of awards courts in this circuit and New York States have sustained where damages result from false arrest followed

by limited confinement"), *aff'd*, 691 F. App'x 678 (2d Cir. 2017); *Thomas v. Kelly*, 903 F. Supp. 2d 237, 264-65 (S.D.N.Y. 2012) (finding jury's compensatory damages award of $125,000 to plaintiff who was falsely arrested, detained for seven hours, and suffered physical and emotional injuries was "within the wide range of false arrest awards deemed reasonable by other courts in this Circuit"; collecting cases).

## **PUNITIVE DAMAGES**

Unlike compensatory damages, punitive damages are awarded "to punish and deter behavior involving moral turpitude." *Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 512 (N.Y. 2013); *McDougald v. Garber*, 73 N.Y.2d at 254 ("purely punitive damages – that is, those which have no compensatory purpose – are prohibited unless the harmful conduct is intentional, malicious, outrageous, or otherwise aggravated"). The standard for imposing punitive damages is strict, and such damages are warranted "only in exceptional cases." *Marinaccio v. Town of Clarence*, 20 N.Y.3d at 511; *see also Gruber v. Craig*, 208 A.D.2d 900, 900 (2d Dep't 1994) ("punitive damages are allowable in tort cases . . . so long as the very high threshold of moral culpability is satisfied") (internal quotation omitted). "[The] [m]ere commission of a tort, even an intentional tort requiring proof of common law malice, is insufficient; there must be circumstances of aggravation or outrage, or a fraudulent or evil motive on the part of the defendant." *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 85 A.D.3d 457, 458 (1st Dep't 2011); *Marinaccio*, 20 N.Y.3d at 511 ("[p]unitive damages may be awarded for conduct that represents a high degree of immorality and shows such wanton dishonesty as to imply a criminal indifference to civil obligations") (intentional quotation omitted). Thus, in tort actions, punitive damages are justified where the wrongdoing "is intentional or deliberate, has circumstances of

aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton." *U.S. Trust Corp. v. Newbridge Partners, LLC*, 278 A.D.2d 172, 172 (1st Dep't 2000); *see Dupree v. Giugliano*, 20 N.Y.3d 921, 924 (N.Y. 2012) (punitive damages award requires "aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious disregard of the interests of others that the conduct may be called willful or wanton") (internal quotations omitted).

While the focus of compensatory damages is on the plaintiff and the determination of an amount adequate to compensate her fully and fairly for legally-cognizable damages or injuries caused by the defendant, the focus of punitive damages is on the tortfeasor defendant and the nature of his tortious conduct. The more egregious or conscience-shocking the behavior, the more justified an award of punitive damages will be. This different focus – the former on the injuries to the plaintiff and the need for compensation, the latter on the behavior of the defendant and the need for punishment and deterrence – explains why some cases warrant an award of substantial compensatory damages but no award of punitive damages. *See*, *e.g.*, *Rivera v. City of New York*, 40 A.D.3d 334, 344 (1st Dep't 2007) ("even assuming defendants' liability [on false arrest claim], no reasonable view of the evidence supports a finding that defendants were 'motivated by actual malice or acted in reckless disregard of' plaintiff's rights") (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 503 (N.Y. 1978)), *lv. dismissed*, 16 N.Y.3d 782 (N.Y. 2011)); *Byrd v. N.Y.C. Transit Auth.*, 172 A.D.2d 579, 581 (2d Dep't 1991) (denying punitive damages where "under no reasonable view of the evidence can it be concluded that [defendants] . . . acted maliciously in connection with the plaintiff's arrest and imprisonment"), *lv. denied*, 80 N.Y.2d 751 (N.Y. 1992); *Guion v. Associated Dry Goods Corp.*, 56 A.D.2d 798, 798 (1st Dep't

13

1977) (reversing award of punitive damages; although jury found that "defendants did not proceed in a reasonable manner in detaining the plaintiff and charging her . . . [,] [there was] no support in the record for the requisite proof of malice or wanton and reckless conduct"), *aff'd*, 43 N.Y.2d 876 (N.Y. 1978); *Selden v. City of Albany*, 50 A.D.2d 975, 975 (3d Dep't 1975) (reversing punitive damages award on claim for false arrest where there was "an absence of proof that [the officer] acted in a willful, wanton or malicious manner toward plaintiff"). That is the case here.

First, the trial record permits no doubt, and I have previously found, that Vasile was engaged in authorized law enforcement duties when he first encountered McKnight on her property. (Docket # 87 at 32). He was the first officer to respond to the scene of a stabbing and potential shooting. (*Id.* at 4). When he arrived shortly after 11:15 p.m., the scene was noisy and chaotic; fifteen to twenty people were near or on McKnight's property; some were yelling at each other; and, a victim was lying on the sidewalk in front of the house next door to McKnight's, refusing to cooperate, but in apparent need of medical attention. (*Id.* at 4-5). Vasile's supervisor, Nicholls, arrived a few minutes later and directed Vasile to secure the crime scene. (*Id.* at 5). That direction complied with the written policies and procedures of the Rochester Police Department ("RPD") as reflected in RPD General Order 401, which provided that officers, upon arrival at a crime scene, should "provide aid and comfort to the victim(s), observe all conditions, events, and remarks and secure the scene to maintain and protect physical evidence, utilizing yellow crime scene tape." (*Id.* at 5-6).

Nicholls testified that the use of tape to designate a crime scene serves several important purposes, among them the protection of evidence and the prevention of entry into or away from the scene. (*Id.* at 6). Based upon his experience, Nicholls also explained, "It

generally calms things down and people start to understand that we're there and starting to take control of what's going on." (*Id.*). Significantly, Nicholls also explained that the practice of RPD was to affix crime scene tape to an area larger than the location of the criminal occurrence; in a residential area, the practice was to attach the tape to "one house at a minimum to either side of where we think the scene is." (*Id.*).

McKnight's property at 232 Pierpont Street was adjacent to the property where the stabbing occurred (*id.* at 2), and Vasile was thus acting in accordance with RPD policy and his supervisor's direction by fastening the tape to McKnight's property to designate it as a crime scene boundary. Vasile testified that he perceived an urgent need to secure the crime scene because of the large number of people present. (*Id.* at 7). Indeed, in the moments before she first spoke with Vasile, McKnight herself was concerned with a group of teenagers who had walked onto her property and had to call to them loudly several times to get them to move. (*Id.* at 6).

The trial evidence thus demonstrates that when Vasile first encountered McKnight, he was engaging in a law enforcement function at the direction of his supervisor that was sufficiently important to be embodied in RPD's written policies and orders. Although the use of crime scene tape may not appear important to an average person, Nicholls and Vasile both testified based on their experience that the demarcation of a crime scene serves significant law enforcement purposes, especially where the scene is volatile and involves the presence of many individuals. That was the scene they both encountered when they arrived.

There is no evidence that Vasile targeted or even noticed McKnight before he began to affix the tape to her porch railing. (*See id.* at 8). Rather, the credible evidence suggests that he was focused on his responsibility to mark the crime scene in accordance with RPD

15

practice using the physical structures available to him. That led him to determine to run the tape west from McKnight's porch railing (at 232) to a large tree in the apron near the bottom of the stairs in front of 234 and then north to another spot likely to include 236. (*Id.* at 7). Vasile was beginning to run the tape along the boundaries he had determined by tying the tape to McKnight's porch railing when McKnight spoke to him. (*Id.* at 7-8). She said, "Officer, you cannot put that yellow tape in my yard." (*Id.* at 9). The rest of the thirteen-second interaction culminating in her arrest is described in detail in my earlier decision.

        The law entitles Vasile to perform his governmental functions without obstruction from others. It does not, however, entitle him to do so without being questioned. That a homeowner who had no involvement in a crime, particularly a crime that was not even committed on her property, might not want crime scene tape on her property is understandable. That she might not understand the reasons for the practice of designating boundaries larger than the actual location of the crime is also unsurprising. McKnight's first communication to Vasile simply reflects that reality: police actions, however routine and logical they may be to members of law enforcement, may confound an average citizen. When that happens, the citizen does not commit a crime by questioning the action, or generally by verbally objecting to it, especially where the action involves her own property. When and how to respond to those questions or objections is a matter of judgment for the officer involved, but one that is of course bounded by law.

        In this case, Vasile did not explain to McKnight that tape is customarily affixed to properties adjoining the property where the crime occurred and does not mean a crime occurred there. Rather, he dismissed her statement that the crime "didn't happen here[;] it happen[ed] there," with a disrespectful, "I don't care." (*Id.* at 9-10). Her response – "Well, this is not gonna

16

stay here all night," accompanied by either motioning or pointing in the direction of the tape (*id.* at 7-10) – prompted Vasile's immediate direction to put her hands behind her back and profane utterance, "I've had enough of this shit" (*id.* at 10). Undoubtedly, the exercise of better judgment by Vasile could have averted a precipitous arrest, and one that was subsequently determined to be unlawful.

Of course, punitive damages are not awarded to punish or deter the exercise of bad judgment or disrespectful behavior. They are reserved for those instances in which the defendant's wrongful conduct – here, Vasile's decision to arrest McKnight for obstructing governmental administration without the requisite physical conduct – is characterized by malice, evil intent, or "such a conscious and deliberate disregard of the interests of others that the conduct – may be called willful or wanton." *Marinaccio*, 20 N.Y.3d at 511 (quoting *Dupree v. Giugliano*, 20 N.Y.3d at 924).

Contrary to McKnight's contentions (Docket # 94 at 10, 22), the record does not support the finding that Vasile was motivated by or acted with malice towards McKnight. Her argument that his treatment of her was motivated by racial animus (*id.* at 7-8, 40-41) lacks evidentiary support. So too does her contention that Vasile deliberately left her in his squad car for approximately twenty-five minutes following her arrest to "maliciously tortur[e]" her while he "hung around doing nothing." (*Id.* at 24-25). There is absolutely nothing in the record to suggest that Vasile deliberately sat idle before taking her to the Public Safety Building for the purpose of increasing her suffering from the effects of the pepper spray. Although Vasile acted precipitously and indeed unlawfully in arresting McKnight, and treated her with disrespect during their brief encounter, I cannot find that his behavior was marked by the kind of "moral turpitude" that justifies an award of punitive damages. *See Marinaccio*, 20 N.Y.3d at 512.

## **CONCLUSION**

For the reasons stated above, I find that an award of compensatory damages is warranted, and the Clerk of the Court is directed to enter judgment for plaintiff Miriam McKnight against defendant Gregory Vasile[3] in the total amount of $191,000 ($190,000 for her emotional and deprivation of liberty injuries and $1,000 for her compensable physical injuries) with prejudgment interest to be awarded at the rate of 9% per annum from March 30, 2017, through the entry of this judgment, with any post-judgment interest to be calculated pursuant to 28 U.S.C. § 1961. I further find that punitive damages are not justified.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 27, 2018

---

[3] Despite the fact that the City of Rochester was dismissed from the action (Docket # 58), McKnight surprisingly requests that "any [j]udgment the Court imposes for compensatory damages be imposed on the institutional defendant[] as well as on Vasile." (Docket # 94 at 41). That request is denied.